# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA

|  |  |
|---|---|
| **CROWN EQUIPMENT CORPORATION**,<br><br>        **Plaintiff**,<br><br>   v.<br><br>**DAVID BRADY, WILLIAM TUCKER, JOSEPH BOGGS, BRAWTUS HOLDING COMPANY, INC. (f/k/a Pneu-Mech Systems Manufacturing, Inc.)**, **BRAWTUS, MANAGEMENT COMPANY, LLC, PNEU-MECH SYSTEMS MANUFACTURING, LLC (K.N.A. Pneu-Mech Dissolution, LLC), PNEU-MECH SYSTEMS MANUFACTURING, INC., UNITED FINISHING SYSTEMS LLC**,<br><br>        **Defendants**. | **Civil Action No. 5:23-cv-00059** |

## COMPLAINT
## (JURY TRIAL DEMANDED)

Crown Equipment Corporation, for its complaint against David Brady, William Tucker, Joseph Boggs, Brawtus Holding Company, Inc., Brawtus, Management Company, LLC, Pneu-Mech Systems Manufacturing, Inc., Pneu-Mech Systems Manufacturing, LLC, and United Finishing Systems LLC, alleges as follows:

## INTRODUCTION

1.    This matter involves a finishing systems contractor abandoning a multi-million dollar project to engineer and construct a powder coating system for Plaintiff Crown Equipment Corporation ("Crown"), seemingly shutting down its company operations completely thereafter to avoid its obligations. Crown entered into a contract with a Pneu-Mech branded entity for the engineering and construction of a $15 million powder coating system. The Pneu-Mech branded

entity failed to properly complete the project or fix its errors with the system. Further, the system as constructed damaged the Crown facility surrounding the powder coating system and certain components of the system damaged other system components.

2.      Thereafter, Crown suffered significant damage in repairing the powder coating system and the surrounding structure. Crown further faced demands for payment from subcontractors the Pneu-Mech branded entity used but did not pay for work on the powder coating system project.

3.      Since the Pneu-Mech branded entity abandoned the contract, Crown has learned there were several iterations of the "Pneu-Mech" company, all either owned or controlled by David Brady and William Tucker. As described in more detail below, David Brady and William Tucker developed a pattern of creating new "Pneu-Mech" companies over the years, transferring the assets of the old companies to the new companies and "starting fresh." At different times during the relationship, Crown unknowingly dealt with different iterations of "Pneu-Mech."

4.      Further, Crown has learned that David Brady and William Tucker have once again created a new entity following the demise of the latest Pneu-Mech entity which worked with Crown. "United Finishing Systems LLC" is a new entity which, upon information and belief, holds all of the assets of the prior Pneu-Mech entity. As directors of the prior Pneu-Mech entity, David Brady and William Tucker transferred its assets to United Finishing Systems LLC to defraud the Pneu-Mech entity's creditors and other obligors, such as Crown.

5.      In summary, the convoluted nature of this matter is the result of David Brady's, William Tucker's, and others' efforts to hide the Pneu-Mech entity's assets from collection following a failed business and an attempt to "start fresh." Crown is entitled to collect from these individuals and companies to satisfy liabilities owed to Crown.

**PARTIES**

6.      Crown is an Ohio corporation with its principal place of business at 44 South Washington Street, New Bremen, Ohio 45869. Crown manufactures, services, and sells material handling equipment, such as lift trucks, and related warehouse products.

7.      David Brady is an individual residing at 496 Eufola Rd., Statesville, North Carolina, 28677.

8.      William Tucker is an individual residing at 211 Ashbrook Rd., Statesville, North Carolina, 28677.

9.      Joseph Boggs is an individual residing at 1566 Old Mountain Rd., Statesville, North Carolina, 28677.

10.      Brawtus Holding Company, Inc. is a corporation, organized and existing under the laws of North Carolina, with its principal place of business at 201 United Drive[1] in Statesville, North Carolina, 28625. Brawtus Holding Company, Inc.'s registered agent is David Brady.

11.      Pneu-Mech Systems Manufacturing, LLC (k/n/a Pneu-Mech Dissolution, LLC) is a limited liability company, organized and existing under the laws of North Carolina, with its principal place of business at 201 United Drive in Statesville, North Carolina, 28625. Its statutory agent is David Brady. On information and belief, Pneu-Mech Systems Manufacturing, LLC is a single-member LLC and Brawtus Holding Company, Inc. is its sole member.

12.      Brawtus, Management Company, LLC is a limited liability company, organized and existing under the laws of North Carolina, with its principal place of business at 201 United Drive in Statesville, North Carolina, 28625. Its statutory agent is David Brady. On information

---

[1] Until recently, 201 United Drive was known as 201 Pneu-Mech Drive.

and belief, Brawtus, Management Company, LLC is a single-member LLC and Brawtus Holding Company, Inc. is its sole member.

13.     Pneu-Mech Systems Manufacturing, Inc. is a corporation, organized and existing under the laws of North Carolina, with its principal place of business at 201 United Drive in Statesville, North Carolina, 28625. Pneu-Mech Systems Manufacturing, Inc.'s registered statutory agent is James R. Andrews.

14.     United Finishing Systems LLC is a limited liability company, organized and existing under the laws of North Carolina, with its principal place of business at 201 United Drive in Statesville, North Carolina, 28625. Its statutory agent is Alwyn Moody III. On information and belief, the members of United Finishing Systems LLC are Alwyn Moody III and William Anthony Brady, both citizens of North Carolina.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332. Complete diversity exists because Plaintiff and all Defendants are citizens of a different state and the amount in controversy exceeds $75,000.

16.     Personal jurisdiction is proper over Defendants because all Defendants reside in and are citizens of North Carolina and because all Defendants took actions forming the basis of the claims in North Carolina.

17.     Venue is proper in this Court under 18 U.S.C. § 1391(b)(2) because a substantial part of the acts or omission giving rise to the claims occurred in this judicial district.

## FACTUAL BACKGROUND

**I.     PNEU-MECH 1.0**

18.     Defendant Brawtus Holding Company, Inc. was incorporated in 1991 as Pneu-Mech Systems Manufacturing, Inc. ("Pneu-Mech 1.0"). At all relevant times, Defendant David

Brady ("Brady") was Pneu-Mech 1.0's President, CEO, or both, and Defendant William Tucker ("Tucker") was its Vice-President, General Manager and Secretary. On information and belief, Brady and Tucker are the only Pneu-Mech 1.0 shareholders and are some or all of the Pneu-Mech 1.0 directors.

19.     Pneu-Mech 1.0 designed, fabricated, and installed paint finishing systems for commercial and industrial customers. By 2001, Pneu-Mech 1.0 also owned a commercial building and property out of which it operated at what was then 201 Pneu-Mech Drive, Statesville, North Carolina. Pneu-Mech 1.0's headquarters has been at the same location since at least 2001.

## II.      PNEU-MECH 2.0

20.     In March 2004, Pneu-Mech 1.0 changed its name to Brawtus Holding Company, Inc. Within days of this change, Brady formed Pneu-Mech Systems Manufacturing, LLC as, on information and belief, a single-member LLC, with Pneu-Mech 1.0 as the sole member. Pneu-Mech 1.0 and Brady were the original designated Managers for Pneu-Mech Systems Manufacturing, LLC and have served as Managers continually.[2]

21.     On information and belief, Brady formed Pneu-Mech Systems Manufacturing, LLC to transfer the Pneu-Mech 1.0 business operations into Pneu-Mech Systems Manufacturing, LLC. Thus, starting in 2004, Pneu-Mech 1.0 operated as Pneu-Mech Systems Manufacturing, LLC ("Pneu-Mech 2.0").

22.     Since its formation, Pneu-Mech 2.0 has maintained its headquarters at what was 201 Pneu-Mech Drive.

23.     At the same time Brady and Tucker transferred the Pneu-Mech 1.0 business operations to Pneu-Mech 2.0, Brady formed Brawtus Management Company, LLC ("Brawtus

---

[2]     Pneu-Mech Systems, LLC eventually changed its name to Pneu-Mech Systems Manufacturing, LLC and then Pneu-Mech Dissolution, LLC.

Management") as, on information and belief, a single-member LLC, with Pneu-Mech 1.0 as the sole member. Pneu-Mech 1.0 and Brady were the original designated Managers for Brawtus Management and have served as the Managers continually. Since its formation, Brawtus Management has also maintained its headquarters at what was 201 Pneu-Mech Drive.

24. On information and belief, Brady formed Brawtus Management to transfer all real estate Pneu-Mech 1.0 owned into Brawtus Management. Thus, as of 2004, Brawtus Holding had transferred the commercial property Pneu-Mech 1.0 owned into Brawtus Management, thereby completing the move of all Pneu-Mech 1.0 assets into either Pneu-Mech 2.0 or Brawtus Management.

## III. PNEU-MECH 3.0

25. James Andrews ("Andrews") worked for Pneu-Mech 1.0 and 2.0, joining Pneu-Mech 1.0 in 2004 in a marketing role and eventually serving as Pneu-Mech 2.0 President when Brady and Tucker reduced their roles in the day-to-day operations of Pneu-Mech 2.0.

26. Jerry Trostle ("Trostle") joined Pneu-Mech 2.0 in 2012 and served as Vice-President of Sales.

27. In 2017, Brady proposed to sell Pneu-Mech 2.0's assets to Andrews and Trostle. On information and belief, the terms of the proposed sale included Andrews and Trostle buying the assets under a 100% "owner-financed" transaction. The proposed sale also included a multi-year lease for what was then 201 Pneu-Mech Drive. The proposed sale would result in Brady and Tucker functioning as the lender and landlord either directly or through one of their companies.

28. To facilitate the sale, Andrews incorporated Pneu-Mech Holdings, Inc. in December 2017, which later changed its name to Pneu-Mech Systems Manufacturing, Inc. ("Pneu-Mech 3.0"), the same name used when Pneu-Mech 1.0 formed in 1991.

29.     Brady and Tucker completed the transfer of Pneu-Mech 2.0's assets to Pneu-Mech 3.0 in early 2018. On information and belief, the sale price, which was about $9 million, exceeded the actual value of Pneu-Mech 2.0's assets and was 100% owner-financed by Brady and Tucker, which arrangement gave Brady and Tucker control over Pneu-Mech 3.0. On information and belief, Pneu-Mech 3.0 provided Brady and Tucker, or one of their companies, a promissory note purportedly secured by the assets sold ("Note").

30.     Pneu-Mech 3.0 also signed a 5-year lease on 201 Pneu-Mech Drive with Brady and Tucker or one of their companies ("Lease").

31.     Since Pneu-Mech 3.0's formation, Andrews has been President and Trostle Vice-President and Secretary. The Pneu-Mech 3.0 Board of Directors has always been Brady, Tucker, Andrews, Trostle and Joseph Boggs ("Boggs"), who served as Pneu-Mech 3.0's Chief Financial Officer. Boggs also serves as the accountant for Brady and Tucker's other companies. As their employee, Brady and Tucker control Boggs' actions in relation to Pneu-Mech 3.0.

32.     Pneu-Mech 3.0 engineered and constructed commercial and industrial finishing systems, the same business as Pneu-Mech 2.0 and Pneu-Mech 1.0.

33.     Once Pneu-Mech 2.0 transferred its assets to Pneu-Mech 3.0, it was without sufficient assets to operate; Pneu-Mech 3.0 operated the same equipment as Pneu-Mech 2.0; Pneu-Mech 3.0 assumed the ordinary business obligations of Pneu-Mech 2.0; Pneu-Mech 2.0's records and documents have, on information and belief, been stored with Pneu-Mech 3.0; Pneu-Mech 3.0 operated with most of the same employees, managers, supervisors and officers as Pneu-Mech 2.0, doing essentially the same jobs they did with Pneu-Mech 2.0; and Pneu-Mech 2.0 and Pneu-Mech 3.0 shared at least some of the same owners, directors and officers as a result of the asset transfer.

34.     On information and belief, the transfer of Pneu-Mech 2.0 assets to Pneu-Mech 3.0 was to defraud Pneu-Mech 2.0's creditors.

35.     On information and belief, from 2018 to 2022, Andrews, Trostle and/or Pneu-Mech 3.0 made payments under the Note and/or Lease. The payments under the Note alone exceeded $3 million.

36.     Brady, Tucker and Boggs were aware at all times of the financial status of Pneu-Mech 3.0. Boggs, as CFO, provided Brady and Tucker weekly financial reports. Brady and Tucker also attended nearly weekly Pneu-Mech 3.0 management meetings where they directed decisions on the day-to-day operations of the company and received updates on the status of various projects, including the Crown project at issue here (detailed below).

37.     Andrews' and Trostle's roles following the sale were no different than before when they were Pneu-Mech 2.0 employees. That is, the day following the sale, the business operated the same as it had the day before the sale, with one exception. The location of the business operations, the employees, the management, the company assets and the business goodwill and purpose all continued unchanged following the sale but, on information and belief, Brady and Tucker stripped Pneu-Mech 2.0 of around $2 million in cash before the sale closed.

38.     On information and belief, by serving as Pneu-Mech 3.0 directors and being or completely controlling Pneu-Mech 3.0's lender and landlord, Brady and Tucker controlled all Pneu-Mech 3.0's important decisions and completely dominated Pneu-Mech 3.0. In fact, Pneu-Mech 3.0 could not spend more than $10,000 at any one time without Brady and Tucker authorizing the expenditure. Although Andrews and Trostle were identified on paper as Pneu-Mech 3.0 owners, Brady and Tucker were the de facto owners of the company.

39.     Brady and Tucker's sheer dominance over Pneu-Mech 3.0 is evident by the fact that in July 2022, when Pneu-Mech 3.0 owed millions to creditors, including Crown, and was struggling to make payments under the Note and Lease and to satisfy its other financial obligations, Brady and Tucker rejected the sale of Pneu-Mech 3.0 to Wenker Inc. ("Wenker"), a subsidiary of a German company providing finishing systems like Pneu-Mech 3.0.

40.     Trostle, and to a lesser extent Andrews, worked with Wenker to explore the potential acquisition of Pneu-Mech 3.0. This included Wenker representatives visiting the Crown Project before it was completed and the President of Wenker's parent company twice travelling from Germany to participate in due diligence.

41.     As the Pneu-Mech 3.0 controlling Directors and Pneu-Mech 3.0's lender and landlord, and de facto owners, Brady and Tucker, required Wenker to present any offer to them.

42.     In July 2022, Wenker met with Brady and Tucker in North Carolina to offer to acquire Pneu-Mech 3.0's stock or assets and either lease or buy what was then the 201 Pneu-Mech Drive property. Trostle and Andrews were excluded from the meeting, even though they purportedly owned Pneu-Mech 3.0 and were members of the Pneu-Mech 3.0 Board of Directors.

43.     On around Wednesday, July 27, 2022, within days of the Wenker meeting, Brady and Trostle declared the Note in default and gave Trostle and Andrews notice to vacate 201 Pneu-Mech Drive or be deemed trespassers. Brady and Tucker instructed Andrews and Trostle to turn in their keys, leave behind all Pneu-Mech 3.0 property including their computers, and leave the building immediately or they would call the police.

44.     With help from Boggs, Brady and Tucker changed the locks at 201 Pneu-Mech Drive and took control over all Pneu-Mech 3.0 assets, including cash in its bank account, equipment, accounts receivables and work in progress. With help from Boggs, Brady and Tucker

also terminated Andrews' and Trostle's access to any company information, including its email system and banking information.

45.     On information and belief, Brady and Tucker took control of and transferred Pneu-Mech 3.0 assets to Pneu-Mech 4.0 after Pneu-Mech 3.0 became insolvent.

46.     On information and belief, the value of the assets Tucker and Brady took control over far exceeded any amount due under the Note and Lease, and the purpose of Brady and Tucker seizing control of Pneu-Mech 3.0's assets was to hide these assets from Crown.

## IV.     PNEU-MECH 4.0

47.     On Monday, August 1, 2022, only days after Brady and Tucker rejected the sale to Wenker and instead took control of Pneu-Mech 3.0's assets, United Finishing Systems LLC ("UFS or "Pneu-Mech 4.0") was registered as a North Carolina Limited Liability Company. Alwyn Moody is UFS' President, and William Brady is its Vice President.

48.     Beginning on August 1, 2022, UFS started operating at 201 Pneu-Mech Drive, providing the same services as Pneu-Mech 3.0. The UFS website is nearly identical to the Pneu-Mech 3.0 website, including some of the same text and many of the same pictures. In addition, from the first day it operated, UFS claimed to be working with companies like Caterpillar, Ashley, Volvo, BF Goodrich, Bosch and Daimler. These are all companies Pneu-Mech 3.0 worked with and, on information and belief, any work UFS has done with any of these companies is as a mere continuation of Pneu-Mech 3.0's business.

49.     Further, on the first day UFS started operating, all of its employees were former Pneu-Mech 3.0 employees, including:

   a.  William A. Brady ("A. Brady"), Brady's son and UFS Vice President of Manufacturing, was Pneu-Mech 3.0's Manager of Manufacturing and Safety;
   b.  Alwyn Moody ("Moody"), UFS President, was Pneu-Mech 3.0's Manager of Engineering;

c. Mike Richmond, UFS Director of Installation, was Pneu-Mech 3.0's Director of Installation;

d. Brian Christopher Gregory, UFS Vice-President of Sales, was responsible for Pneu-Mech 3.0's Inside Sales and Service Department;

e. Jason Hahn, UFS Senior Project Estimator, was Pneu-Mech 3.0's Senior Project Manager and Sales Estimator;

f. Bill Brawley, UFS Director of Sales, was responsible for Pneu-Mech 3.0's Sales and Marketing;

g. Joe Boggs, UFS CFO, was Pneu-Mech 3.0's CFO; and

h. All the non-managerial employees for UFS were Pneu-Mech 3.0 employees.

50. Pneu-Mech 4.0 is continuing Pneu-Mech 3.0's business. Moody included Crown in an email blast in August 2022 announcing Pneu-Mech 4.0's opening and detailing the services provided, which are identical to those Pneu-Mech 3.0 provided. (*See* Exhibit 1, attached).

51. On information and belief, the Pneu-Mech 4.0 Board of Directors is Brady, Tucker, Boggs, Moody, and A. Brady. Further, on information and belief, Brady and Tucker dominate Pneu-Mech 4.0 operations in the same way they dominated Pneu-Mech 3.0 operations.

52. Shortly after Brady and Tucker took control of Pneu-Mech 3.0's assets, evicted the purported owners of the company, and transferred the assets to Pneu-Mech 4.0, they changed the name of the physical address where the company operated from 201 Pneu-Mech Drive to 201 United Drive.

53. Moody and A. Brady formed Pneu-Mech 4.0 for the purpose of Brady and Tucker transferring some or all of Pneu-Mech 3.0 assets to Pneu-Mech 4.0 and so that Pneu-Mech 4.0 could continue the Pneu-Mech 3.0 business. Further, on information and belief, Brady and Tucker have an arrangement with Moody and A. Brady like the arrangement with Andrews and Trostle - Pneu-Mech 4.0 gave Brady and Tucker or one of their companies a promissory note for 100% of the purchase price of the Pneu-Mech 3.0 assets and signed a multi-year lease for 201 United Drive.

54. On information and belief, Brady and Tucker transferred all of the Pneu-Mech 3.0 assets to either themselves, Pneu-Mech 1.0, Brawtus Management, or Pneu-Mech 4.0.

55. Once Brady and Tucker completed the transfer of Pneu-Mech 3.0 assets, Pneu-Mech 3.0 was without sufficient assets to operate; Pneu-Mech 4.0 is operating the same equipment as Pneu-Mech 3.0; Pneu-Mech 4.0 assumed the ordinary business obligations of Pneu-Mech 3.0; Pneu-Mech 3.0's records and documents have, on information and belief, been stored with Pneu-Mech 4.0; Pneu-Mech 4.0 is operating with most of the same employees, managers, supervisors and officers as Pneu-Mech 3.0, doing essentially the same jobs they did with Pneu-Mech 3.0; and, on information and belief, Pneu-Mech 3.0 and Pneu-Mech 4.0 share at least some of the same owners, directors and officers.

## V.    CROWN AND PNEU-MECH

56. Crown first did business with a Pneu-Mech branded entity in February 2015 when, as a new potential vendor, Pneu-Mech 2.0's CFO, Joseph Boggs, signed a notice acknowledging Crown's standard Terms and Conditions controlled all of Crown's purchases. (*See* Exhibit 2, attached). Pneu-Mech 2.0, through Boggs, also signed Crown's standard Non-Disclosure Agreement. (*See* Exhibit 3, attached).

57. Crown's Terms and Conditions include, in part:

8.0 WARRANTIES:
8.1 Seller expressly covenants and warrants that all Deliverables shall…be suitable for the purpose intended, merchantable, free from defects in material and workmanship, and free from liens, or encumbrances of title, and that Deliverables of Seller's design will be free from defect in design, inspection, test, acceptance or use of Deliverables furnished hereunder shall not affect Seller's obligation under this warranty, and such warranties shall survive inspection, test, acceptance and use…Seller agrees to replace or correct defects of any Deliverables not conforming to the foregoing warranty promptly, without expense to Buyer, when notified of such nonconformity by Buyer. In the event of failure by Seller to correct defects in or replace nonconforming Deliverables promptly, Buyer, after reasonable notice to Seller, may make such correction or replace such Deliverables and charge Seller for the cost incurred by Buyer thereby, Seller further warrants that all work will be performed in a professional manner In accordance with the highest Industry standards.
***

16.0 GENERAL INDEMNIFICATION:

Seller shall indemnify, protect, defend and save the Buyer, its officers, directors and Buyer's affiliates and their officers and directors harmless from all suits, claims, losses, damages, injuries, costs or expenses (including attorneys' fees) arising out of, or caused by, Seller's performance hereof or any defects in the Deliverables…
***

30.0 WAIVER OF MECHANIC'S LIENS:
…Seller shall obtain from any subcontractor or materialman prior to the performance of any work on the items, or to the furnishing of any materials for the items, a written waiver satisfactory to Buyer of such subcontractor's or materialman's right to any such lien and shall deliver such waiver to Buyer promptly upon receipt thereof. Upon Buyer's request, Seller shall obtain, without additional cost to Buyer, a bond satisfactory to Buyer to Indemnify Buyer against such liens and charges. Seller shall reimburse Buyer for all costs and damages including attorneys' fees and any special, indirect, incidental, or consequential damages incurred by Buyer in connection with or as a result of the existence or discharge of any such lien or charge, which are not satisfied by such a bond. Amounts due to Seller under this order may be credited by Buyer against amounts owed to Buyer in respect of such costs or damages.

58.     At the same time, Boggs gave Crown a W-9 showing Pneu-Mech 1.0 owned Pneu-Mech 2.0 as a single-member LLC. (*See* Exhibit 4, attached).

59.     Crown bought around $45,000 in services/goods from Pneu-Mech 2.0 in 2015.

60.     The next work Pneu-Mech 2.0 completed for Crown was replacement of a burner tube. Pneu-Mech 2.0 submitted a proposal in June 2017 for this project and issued invoices in July and October 2017. Pneu-Mech 2.0 completed this project, and Crown paid its invoices.

61.     In September 2018, Pneu-Mech 2.0, through its employees David Trundall (Inside Sales\Service) and Trostle (Vice President of Sales), submitted a proposal to Crown to replace another burner tube. When Crown personnel responsible for awarding contract awarded this project to Pneu-Mech 2.0, they did not know that months earlier Brady and Tucker had transferred Pneu-Mech 2.0's assets to Pneu-Mech 3.0.

62.     Between September and December 2018, Crown paid invoices for this project:

   a.   October 11, 2018, invoice from Pneu-Mech 3.0 for $12,654;
   b.   November 14, 2018, invoice from Pneu-Mech 3.0 for $25,308; and
   c.   December 6, 2018, invoice from Pneu-Mech 3.0 for $4,218.

13

63. Although Crown was unaware at the time, the "Pneu-Mech" employees drew no distinction between Pneu-Mech 2.0 and Pneu-Mech 3.0 because Pneu-Mech 3.0 was a mere continuation of Pneu-Mech 2.0.

64. In January 2018, because Pneu-Mech 2.0 performed well on earlier projects, Crown included Pneu-Mech 2.0 as a potential bidder on a large project involving the design and construction of an automated powder coating system in one of Crown's plants in New Bremen, Ohio ("Crown Facility").

65. In February 2018, Pneu-Mech 2.0, through its Regional Sales Manager, JB Graves and its Special Projects Manager, Jason Gatton, submitted a proposal to engineer and construct the powder coating system: "*Pneu-Mech Systems Mfg. LLC* is very pleased to provide the attached complete proposal for the detailed equipment and services." (*See* Exhibit 5, attached, Pneu-Mech Systems Mfg. LLC Proposal No. 18038).

66. Following this proposal, Crown continued discussions with Pneu-Mech 2.0. These discussions resulted in Pneu-Mech 2.0, through Graves, Gatton and Trostle, submitting Proposal No. 18038E.1 in August 2018 to engineer the powder coating system at a cost of $1,500,000 ("Engineering Proposal" for the "Engineering Project"). (*See* Exhibit 6, attached).

67. Crown awarded Pneu-Mech 2.0 the Engineering Project on September 19, 2018, and issued Purchase Order #A408898 ("Engineering Contract"). (*See* Exhibit 7, attached). Crown personnel responsible for awarding the Engineering Contract did not know that Brady and Trostle had months earlier orchestrated the transfer of Pneu-Mech 2.0 assets to Pneu-Mech 3.0.

68. Despite Crown awarding the Engineering Project to *Pneu-Mech 2.0* and entering the Engineering Contract, beginning in October 2018, and continuing to January 2019, *Pneu-Mech 3.0* issued, and Crown paid, the following invoices under the Engineering Contract:

14

a. October 11, 2018, Pneu-Mech 3.0 invoice for $375,000 (*see* Exhibit 8, attached);
b. November 14, 2018, Pneu-Mech 3.0 invoice for $375,000 (*see* Exhibit 9, attached);
c. December 28, 2018, Pneu-Mech 3.0 invoice for $375,000 (*see* Exhibit 10, attached);
d. February 13,2019 Pneu-Mech 3.0 final invoice for $375,000 (*see* Exhibit 11, attached).

69.     On January 14, 2019, Pneu-Mech 2.0, through its employees Graves, Gatton and Trostle, submitted Proposal No. 18038H to construct the powder coating system at a cost of $15,125,000 ("Construction Proposal" for the "Construction Project"), less the $1.5 million paid under the Engineering Contract.[3] (*See* Exhibit 12, attached).

70.     Crown awarded Pneu-Mech 2.0 the Construction Project in February 2019 and issued Purchase Order #A412353 ("Construction Contract"). (*See* Exhibit 13, attached).

71.     Between April 2019 and February 2021, Crown paid twenty-four Pneu-Mech 3.0 invoices under the Construction Contract, even though Crown awarded the Construction Contract to Pneu-Mech 2.0.

72.     When Crown awarded Pneu-Mech 2.0 the Construction Contract and paid invoices for work done under that contract, the Crown personnel responsible for awarding the Construction Contract did not know Brady and Tucker had earlier completed the transfer of Pneu-Mech 2.0's assets to Pneu-Mech 3.0 or that Pneu-Mech 3.0 was the successor to Pneu-Mech 2.0.

73.     Because Pneu-Mech 3.0 was a mere continuation of Pneu-Mech 2.0 and assumed the Engineering and Construction Contracts by performing work on the Project, Pneu-Mech 3.0 is bound to the Contracts. Alternatively, Pneu-Mech 3.0 assumed the Engineering and Construction Contracts with Crown, had them assigned, or had them otherwise transferred to Pneu-Mech 3.0. Further references to "Pneu-Mech" are to Pneu-Mech 2.0 and Pneu-Mech 3.0, collectively.

---

[3] The Engineering Project and the Construction Project are collectively the "Project."

74. Pneu-Mech employees and sub-contractors started work on the Construction Project in April 2019.

75. In 2022, when Pneu-Mech and its subcontractors had substantially completed work under the Construction Contract except for work needing service, maintenance, correction, repair or replacement, Crown discovered problems with the completed work including:

   a. A critical component of the system is the use of an industrial oven to cure painted parts. Pneu-Mech installed the cure oven so the heat from the oven did not dissipate properly and instead escaped into the Crown Facility causing excessive heat. This caused physical damage to the Crown Facility;

   b. The installed cure oven caused other physical damage to the Crown Facility, including:
      i. bursting of sprinkler heads;
      ii. sagging and leaking in water lines;
      iii. charring of duct mastic; and
      iv. deformation and separation of metal strapping across the oven;

   c. Further, the installed cure oven threatened to cause:
      i. melting of insulated metal panels installed throughout;
      ii. deterioration of and damage to the roof insulation and membrane and compromise of the roof system;
      iii. loosening of bolted connections of building steel and compromise of the building infrastructure;
      iv. deterioration of PVC piping;
      v. loosening of bolted connections of sprinkler lines damaging the sprinkler system;
      vi. overheating of equipment and system motors used throughout;
      vii. failure of exhaust fans used throughout;
      viii. degradation of electrical wires causing arcing, faults and explosions;
      ix. shortened life span of lights;
      x. shortened life span of breakers and fuses;
      xi. weakening of conduits and supports; and
      xii. failure of fire alarms and IT devices.

76. At the same time, Pneu-Mech was struggling financially. Even though Pneu-Mech had invoiced, and Crown had paid all amounts due then under the Engineering and Construction Contracts, Pneu-Mech asked Crown for a $330,000 payment in March 2022.

16

77. Pneu-Mech's payment request led to Crown and Pneu-Mech entering into an Addendum to Agreement to Design and Manufacture Powder Coating Paint System on June 7, 2022 ("Addendum"). (*See* Exhibit 14, attached). The Addendum did not cover the correction of the cure oven because Pneu-Mech acknowledged it could not correct the oven. The Addendum covered Pneu-Mech servicing, maintaining, correcting, repairing, replacing or otherwise fixing issues unrelated to the cure oven.

78. Pneu-Mech represented in the Addendum that it "[was] actively engaged in discussion with a third-party to sell either the assets or equity interest in the company." The third party was Wenker.

79. Besides servicing, maintaining, correcting, repairing, replacing, or otherwise fixing the identified issues, Pneu-Mech agreed in the Addendum that certain Pneu-Mech employees would work on the Project full time. In return, Crown agreed to pay for the hourly services of the Pneu-Mech employees and provide living accommodations.

80. Pneu-Mech also agreed in the Addendum to "[r]equire in any sale of its assets or equity interests that the purchaser assume Pneu-Mech's full obligations under the Agreement."

81. Crown and Pneu-Mech also agreed that "[e]xcept as specifically modified by this Addendum, all provisions of the Agreement expressly including Crown's Purchase Order #A412353 and the incorporated Terms & Conditions…shall remain in full force and effect and shall govern the rights and responsibilities of the parties."

82. In July 2022, Pneu-Mech stopped working on the Project entirely. Since that time, Pneu-Mech has admitted it was ill-equipped to handle the Project. Pneu-Mech never had the engineering capacity to complete the Project, and officers within Pneu-Mech were aware all along

that Pneu-Mech was not providing the resources needed to properly complete the Project. In fact, Pneu-Mech had never completed a project on such a large scale.

83. Because Pneu-Mech was unable to correct the cure oven, Crown hired a third-party contractor. To prevent more damage to the Crown Facility and to correct and repair the cure oven so it would operate properly, the contractor had to, among other things, reroute the conveyor element of the powder coating system, install a 90-degree entrance vestibule to the infrared oven, change the heat distribution throughout the cure oven, install a 180-degree exit vestibule to the cure oven, and relocate 30 feet of cooling tunnel panels.

84. Since Pneu-Mech stopped work at the Crown Facility, Crown has incurred significant damages related to the correction of the cure oven and completion and repair of work covered by the Engineering Contract, Construction Contract and Addendum.

85. In addition, in June 2022, American Fab & Maintenance, LLC ("Am Fab"), a Pneu-Mech subcontractor, filed a lien on the Crown Facility. In August 2022, Am Fab sued Crown, seeking more than $300,000 it claims Pneu-Mech owes for work as a subcontractor on the Project. Crown and Am Fab ultimately entered into a settlement agreement which required Crown to pay a significant portion of the amount Am Fab demanded.  As a result of the settlement, Am Fab assigned to Crown all claims it has against Pneu-Mech.  Further, under Crown's Terms and Conditions and the Addendum, Pneu-Mech was to ensure subcontractors filed no mechanics' liens. Crown is therefore entitled to indemnification by Pneu-Mech for the settlement payment to Am Fab.

## VI.    DISREGARD OF CORPORATE FORMS

86. Pneu-Mech 1.0, Brawtus Management, Pneu-Mech 2.0, Pneu-Mech 3.0, and Pneu-Mech 4.0 are collectively the "Brady-Tucker Entities."

87.    On information and belief, during the pertinent time, Brady and Tucker have operated the Brady-Tucker Entities as their alter egos.

88.    On information and belief, during the pertinent time, Brady and Tucker engaged in control, not mere majority or complete actual or de facto stock or unit control, but complete domination, not only of finances, but of policy and business practices so that the Brady-Tucker Entities had no separate mind, will or existence of their own.

89.    On information and belief, during the pertinent time, the domination of the Brady-Tucker Entities by Brady and Tucker was so complete that Brady and Tucker usurped corporate control over the Brady-Tucker Entities and the Brady-Tucker Entities had no independent identity and no separate mind, will or existence.

90.    On information and belief, Brady and Tucker devised and have implemented a scheme for fragmentation of their business enterprises to defraud Crown and others.

91.    On information and belief, Brady and Tucker inadequately capitalized the Brady-Tucker Entities.

92.    These facts show Brady and Tucker disregarded and ignored the separate existences of the Brady-Tucker Entities because Brady and Tucker are using these entities as their instrumentalities or tools of their corporate existence.

93.    Brady and Tucker have improperly used the Brady-Tucker Entities in their fraudulent activity related to Crown.

94.    The actions of Pneu-Mech 2.0 and Pneu-Mech 3.0 to present themselves as operating entities able to perform under the Engineering Contract, Construction Contract and Addendum were intentionally misleading, false and made to induce Crown to continue to look to

the Pneu-Mech 2.0 and Pneu-Mech 3.0 shell entities instead of the actual dominant and controlling individuals Brady and Tucker.

95. Brady and Tucker's complete dominance, control and manipulation of the Brady-Tucker Entities is evident in part by their refusal to permit Wenker to acquire the assets or equity of Pneu-Mech 3.0, eviction of Pneu-Mech 3.0, seizure of all of Pneu-Mech 3.0 assets, and transfer of Pneu-Mech 3.0 assets to Pneu-Mech 4.0.

96. Brady and Tucker's continuing domination and control over the assets, business and bank accounts of Pneu-Mech 3.0 are evident by, among other things, transferring funds for Brady and Tucker's ultimate benefit.

97. Brady and Tucker abused the corporate form of the Brady-Tucker Entities to defraud and deceive Crown and continuing adherence to the fiction of separate corporate entities would constitute the sanctioning of fraud and injustice done to Crown.

98. During the pertinent times, Brady and Tucker used their control to commit a fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or to cause a dishonest and unjust act in contravention of Crown's legal rights.

99. Brady and Tucker operate the Brady-Tucker Entities as a shield for their activities in violation of the declared public policy, laws, and regulations of the United States and North Carolina.

100. Brady and Tucker's exercise of their control and breaches of duty proximately caused the injury or unjust loss to Crown here.

101. Brady and Tucker's complete dominance, control and manipulation of the Brady-Tucker Entities had a direct effect on the Brady-Tucker Entities and Crown.

102. The Court should find that indicia of Brady and Tucker's control is evident by: (1) inadequate capitalization of the Brady-Tucker Entities; (2) non-compliance with corporate formalities; (3) complete domination and control so that the Brady-Tucker Entities have no independent identity, and (4) excessive fragmentation of a single enterprise into separate entities.

103. This Court must pierce the corporate veils here and declare that the Brady-Tucker Entities were and are the alter-egos of Brady and Tucker to avoid the fraudulent and unjust conduct Brady and Tucker committed.

104. Brady and Tucker cannot hide behind the curtain of corporate protection to shield assets from being used to satisfy a Crown judgment.

105. As a direct and proximate result of Brady and Tucker's misuse of their positions in the Brady-Tucker Entities, Crown was harmed and has a right to recover damages in an amount more than $75,000 from each of the Defendants jointly and severally.

### COUNT ONE
### Negligence Causing Damage to Crown's Property other than the Powder Coating System
### (Against Pneu-Mech 2.0 and Pneu-Mech 3.0)

106. Crown realleges and incorporates by reference the paragraphs alleged above.

107. Pneu-Mech had a legal duty to act with reasonable and ordinary care when working in the Crown Facility and to not damage Crown's property.

108. The way Pneu-Mech designed and constructed the powder coating system damaged the Crown Facility, in breach of Pneu-Mech's duty of care.

109. Pneu-Mech did not use reasonable care in designing and constructing the cure oven component of the powder coating system, and the cure oven did not dissipate heat properly, thereby actually and proximately damaging the Crown Facility.

110. When the powder coating system was substantially completed and tested, it caused property damage to the Crown Facility, including damage to the ceiling as well as triggering the sprinkler system.

111. Without remediation, the powder coating system will continue to damage the Crown Facility by causing:

   a. bursting of sprinkler heads installed throughout;
   b. deterioration of PVC piping and sagging and leaking in the water lines in the ceiling;
   c. melting of insulated metal panels installed throughout;
   d. deterioration of and damage to the roof insulation and membrane and compromise of the rood system;
   e. loosening of bolted connections of building steel and compromise of the building infrastructure;
   f. loosening of bolted connections of sprinkler lines damaging the sprinkler system;
   g. overheating of equipment and system motors used throughout;
   h. failure of exhaust fans used throughout;
   i. degradation of electrical wires causing arcing, faults and explosions;
   j. shortened life span of lights, breakers and fuses;
   k. weakening of conduits and supports; and
   l. failure of fire alarm and IT devices.

112. Pneu-Mech's negligence is a direct and proximate cause of Crown's damages, which are in an amount to be determined at trial, but reasonably believed to exceed $75,000.

**COUNT TWO**
**Negligence Causing Damage to the Powder Coating System**
**(Against Pneu-Mech 2.0 and Pneu-Mech 3.0)**

113. Crown realleges and incorporates by reference the paragraphs alleged above.

114. Pneu-Mech had a legal duty to act with reasonable and ordinary care when working in the Crown Facility and to not damage Crown's property.

115. The way Pneu-Mech designed and constructed certain components of the powder coating system damaged other components of the powder coating system, in breach of Pneu-Mech's duty of care.

116. Pneu-Mech did not use reasonable care in designing and constructing the cure oven component of the powder coating system, and the cure oven did not dissipate heat properly, thereby actually and proximately damaging other components of the powder coating system.

117. When the cure oven component of the powder coating system was substantially completed and tested, it damaged other components of the system, including charring of duct mastic and deformation and separation of metal strapping across the oven.

118. Without remediation, the cure oven will cause more damage to the powder coating system, including:

    a. further charring of duct mastic;
    b. further deformation and separation of metal strapping;
    c. loosening of bolted connections;
    d. overheating of equipment and motors; and
    e. failure of exhaust fans.

119. Pneu-Mech's negligence is a direct and proximate cause of Crown's damages, which are in an amount to be determined at trial, but reasonably believed to exceed $75,000.

### COUNT THREE
### Breach of Engineering Contract, Construction Contract and Addendum
### (Against Pneu-Mech)

120. Crown realleges and incorporates by reference the paragraphs alleged above.

121. Crown and Pneu-Mech entered the Engineering Contract, Construction Contract and Addendum (collectively, the "Contracts"), each incorporating Crown's Terms and Conditions.

122. Crown has fully performed its obligations under the Contracts.

123. Pneu-Mech breached the Contracts by, among other things, failing to:

    a. design and construct a powder coating system suitable for its intended purpose and free from defects in design, material and workmanship (Section 8.1 of Terms & Conditions);
    b. promptly replace or correct defects in the powder coating system not conforming to the warranty, without expense to Crown (Section 8.1 of Terms & Conditions);

c.  perform all work in a professional manner in accordance with the highest industry standards (Section 8.1 of Terms & Conditions);

d.  provide product support for 10 years after constructing the powder coating system (Section 8.2 of Terms & Conditions);

e.  indemnify Crown for all suits, claims, losses, damages, injuries, costs or expenses, arising out of its performance (Section 15 of Terms & Conditions);

f.  ensure that no subcontractor used in the design or construction of the powder coating paint system place mechanic's liens on any Crown property and immediately take all steps necessary to obtain removal of any such lien that may be place (Section 1.3 of Addendum);

g.  obtain from its subcontractors written waivers of the subcontractors' rights to mechanics' liens or any other liens (Section 30 of Terms & Conditions);

h.  reimburse Crown for all costs and damages including attorneys' fees and any special, indirect, incidental, or consequential damages incurred by Crown in connection with or as a result of the existence or discharge of any such lien or charge (Section 30 of Terms & Conditions);

i.  ensure employees use their best efforts and best commercially available expertise to fully and effectively remedy issues covered by the Addendum (Section 1.b of Addendum); and

j.  require in any purchaser in any sale of its assets or equity interests to assume obligations under the Addendum (Section 1.d of Addendum).

124.  Pneu-Mech's breaches are a direct and proximate cause of Crown's damages, which are in an amount to be determined at trial, but reasonably believed to exceed $75,000, with ongoing annual contractual interest of 18%. Crown is also entitled to recover its attorney fees, filing costs and expenses incurred in bringing this action.

## COUNT FOUR
## Breach of Fiduciary Duty
## (Against Brady and Tucker)

125.  Crown realleges and incorporates by reference the paragraphs alleged above.

126.  Brady and Tucker were members of the Pneu-Mech 3.0 Board of Directors when, in July 2022, on their own behalf or behalf of one or more of their alter egos, they declared the Note in default, evicted Pneu-Mech 3.0, seized control of Pneu-Mech 3.0's assets, and caused Pneu-Mech 3.0 to stop operating.

127.     When Brady and Tucker declared the Note in default, evicted Pneu-Mech 3.0, seized control of Pneu-Mech 3.0's assets, and caused Pneu-Mech 3.0 to stop operating, they knew Pneu-Mech 3.0 owed Crown substantial money for the damages caused to Crown's property and because of its breach of the Contracts.

128.     When Brady and Tucker declared the Note in default, evicted Pneu-Mech 3.0, seized control of Pneu-Mech 3.0's assets, and caused Pneu-Mech 3.0 to stop operating, they also knew that by at least March 2022, Pneu-Mech 3.0 was insolvent and unable to pay Crown.

129.     When Brady and Tucker declared the Note in default, evicted Pneu-Mech 3.0, seized control of Pneu-Mech 3.0's assets, and caused Pneu-Mech 3.0 to stop operating, they stood to personally benefit to Crown's detriment, a Pneu-Mech 3.0 creditor.

130.     When Brady and Tucker declared the Note in default, evicted Pneu-Mech 3.0, seized control of Pneu-Mech 3.0's assets, and caused Pneu-Mech 3.0 to stop operating, they owed Crown a fiduciary duty because they were Pneu-Mech 3.0 Directors and because Pneu-Mech 3.0 was insolvent, planning to cease doing business, and was no longer prosecuting its business in good faith with a reasonable prospect and expectation of continuing to do so.

131.     When Brady and Tucker declared the Note in default, evicted Pneu-Mech 3.0, seized control of Pneu-Mech 3.0's assets, and caused Pneu-Mech 3.0 to stop operating, Pneu-Mech 3.0 was in circumstances amounting to winding up, and Brady and Tucker were prohibited from using their intimate knowledge of Pneu-Mech 3.0's corporate affairs and from using their position of trust for their own benefit, to the detriment of Crown, a Pneu-Mech 3.0 creditor.

132.     As fiduciaries of Crown, Brady and Tucker had to refrain from taking action that would harm Crown. And Crown fiduciaries, Brady and Tucker had to ensure payment to Crown from Pneu-Mech 3.0 operations and assets.

133. On information and belief, the value of the Pneu-Mech 3.0 assets Brady and Tucker seized exceeded the amount of any debt Pneu-Mech 3.0 owed Brady and Tucker or one of their alter egos.

134. For their own financial gain, Brady and Tucker breached their fiduciary duty owed to Crown as a Pneu-Mech 3.0 creditor when they declared the Note in default, evicted Pneu-Mech 3.0, seized control of Pneu-Mech 3.0's assets, caused Pneu-Mech 3.0 to stop operating, and caused Pneu-Mech 3.0's assets to be transferred to Brady and Tucker or one or more of their alter egos, including UFS.

135. Brady and Tucker's breach of fiduciary duty was malicious, willful, and wanton.

136. Brady and Tucker's breach of their fiduciary duty is a direct and proximate cause of Crown's damages, which are in an amount to be determined at trial, but reasonably believed to exceed $75,000. Crown is also entitled to recover punitive damages, its attorney fees, filing costs and expenses incurred in bringing this action.

**COUNT FIVE**
**Breach of Fiduciary Duty**
**(Against Boggs)**

137. Crown realleges and incorporates by reference the paragraphs alleged above.

138. Boggs was Pneu-Mech 3.0's CFO and member of its Board of Directors, financial advisor to Brady and Tucker and the other Brady-Tucker Entities, and, on information and belief, Director for one or more of the other Brady-Tucker Entities, when, in July 2022, on their own behalf or behalf of one or more of their alter egos, Boggs aided Brady and Tucker to declare the Note in default, evict Pneu-Mech 3.0, seize control of Pneu-Mech 3.0's assets, and cause Pneu-Mech 3.0 to stop operating.

139.     When Boggs aided Brady and Tucker, he knew Pneu-Mech 3.0 owed Crown substantial money for the damages caused to Crown's property and because of its breach of the Contracts.

140.     When Boggs aided Brady and Tucker, he also knew that by at least March 2022, Pneu-Mech 3.0 was insolvent and unable to pay Crown.

141.     When Boggs aided Brady and Tucker, he knew Brady and Tucker stood to benefit to the detriment of Crown, a Pneu-Mech 3.0 creditor.

142.     When Boggs aided Brady and Tucker, he owed Crown a fiduciary duty because he was a Pneu-Mech 3.0 Director and because Pneu-Mech 3.0 was insolvent, planning to cease doing business, and was no longer prosecuting its business in good faith with a reasonable prospect and expectation of continuing to do so.

143.     When Boggs aided Brady and Tucker, Pneu-Mech 3.0 was in circumstances amounting to winding up, and Boggs was prohibited from exploiting his intimate knowledge of Pneu-Mech 3.0's corporate affairs and from using his position of trust for his or Brady and Tucker's benefit, to the detriment of Crown, a Pneu-Mech 3.0 creditor.

144.     As a fiduciary of Crown, Boggs had to refrain from taking action that would harm Crown. And as a fiduciary of Crown, Boggs had to ensure payment to Crown from Pneu-Mech 3.0 operations and assets.

145.     On information and belief, the value of the Pneu-Mech 3.0 assets Boggs helped Brady and Tucker seize exceeded the amount of any debt Pneu-Mech 3.0 owed Brady and Tucker or one of their alter egos.

146.     Boggs breached his fiduciary duty when he took actions contrary to Crown's best interests, including helping Brady and Tucker declare the Note in default, evict Pneu-Mech 3.0,

take control of Pneu-Mech 3.0's assets, cause Pneu-Mech 3.0 to stop operating, and cause Pneu-Mech 3.0's assets to be transferred to Brady and Tucker and one or more of their alter egos.

147.    Boggs' breach of his fiduciary duty was malicious, willful, and wanton.

148.    Boggs' breach of his fiduciary duty is a direct and proximate cause of Crown's damages, which are in an amount to be determined at trial, but reasonably believed to exceed $75,000. Crown is also entitled to recover punitive damages, its attorney fees, filing costs and expenses incurred in bringing this action.

**COUNT SIX**
**Aiding and Abetting Breach of Fiduciary Duty**
**(Against Boggs)**

149.    Crown realleges and incorporates by reference the paragraphs alleged above.

150.    Boggs was Pneu-Mech 3.0's CFO and member of its Board of Directors, financial advisor to Brady and Tucker and the other Brady-Tucker Entities, and, on information and belief, Director for one or more of the other Brady-Tucker Entities, when, in July 2022, on their own behalf or behalf of one or more of their alter egos, Boggs aided and abetted Brady and Tucker to declare the Note in default, evict Pneu-Mech 3.0, take control of Pneu-Mech 3.0's assets, and cause Pneu-Mech 3.0 to stop operating.

151.    When Boggs aided Brady and Tucker, he knew Pneu-Mech 3.0 owed Crown substantial money for the damages caused to Crown's property and its breach of the Contracts.

152.    When Boggs aided Brady and Tucker, he also knew that by at least March 2022, Pneu-Mech 3.0 was insolvent and unable to pay Crown.

153.    When Boggs aided Brady and Tucker, he knew Brady and Tucker stood to benefit personally to Crown's detriment, a Pneu-Mech 3.0 creditor.

154.    When Boggs aided Brady and Tucker, they owed Crown a fiduciary duty because they were Pneu-Mech 3.0 Directors and because Pneu-Mech 3.0 was insolvent, planning to cease doing business, and was no longer prosecuting its business in good faith with a reasonable prospect and expectation of continuing to do so.

155.    When Boggs aided Brady and Tucker, Pneu-Mech 3.0 was in circumstances amounting to winding up, and Boggs was prohibited from exploiting his intimate knowledge of Pneu-Mech 3.0's corporate affairs and from using his position of trust for his or Brady and Tucker's benefit, to the detriment of Crown, a Pneu-Mech 3.0 creditor.

156.    As fiduciaries of Crown, Brady and Tucker had to refrain from taking action that would harm Crown. And as Crown fiduciaries, Brady and Tucker had to ensure payment to Crown from Pneu-Mech 3.0 operations and assets.

157.    On information and belief, the value of the Pneu-Mech 3.0 assets Boggs helped Brady and Tucker seize exceeded the amount of any debt Pneu-Mech 3.0 owed Brady and Tucker or one of their alter egos.

158.    Boggs aided and abetted breaches of fiduciary duty to Crown when he took actions contrary to Crown's best interests, including helping Brady and Tucker declare the Note in default, evict Pneu-Mech 3.0, take control of Pneu-Mech 3.0's assets, cause Pneu-Mech 3.0 to stop operating, and cause Pneu-3.0's assets to be transferred to Brady and Tucker and one or more of their alter egos.

159.    Boggs' conduct in aiding and abetting Brady and Tucker's breaches of fiduciary duty was malicious, willful, and wanton.

160.    Boggs' conduct in aiding and abetting Brady's and Taylor's breaches of their fiduciary duties is a direct and proximate cause of Crown's damages, which are in an amount to

be determined at trial, but reasonably believed to exceed $75,000. Crown is also entitled to recover punitive damages, its attorney fees, filing costs and expenses incurred in bringing this action.

## COUNT SEVEN
### Fraud
### (Against Pneu-Mech 3.0)

161.    Crown realleges and incorporates by reference the paragraphs alleged above.

162.    In August 2018, months after Brady and Tucker orchestrated the transfer of Pneu-Mech 2.0 assets to Pneu-Mech 3.0, Graves and Gatton, as Pneu-Mech 3.0 employees, and Trostle, as a Pneu-Mech 3.0 employee, owner, officer, and director, submitted the Engineering Proposal to Crown on behalf of Pneu-Mech 2.0. (*See* Ex. 6). More specifically, the Engineering Proposal stated, "***Pneu-Mech Systems Mfg. LLC*** [Pneu-Mech 2.0] is very pleased to provide the attached complete proposal for the detailed equipment and services."

163.    Graves, Gatton and Trostle submitted the Engineering Proposal in the course and scope of their Pneu-Mech 3.0 employment. When they submitted the Engineering Proposal, they were not Pneu-Mech 2.0 employees. Graves, Gatton and Trostle knew they were Pneu-Mech 3.0 employees when they submitted the Engineering Proposal, and they knew Pneu-Mech 2.0's assets had been transferred to Pneu-Mech 3.0 months earlier.

164.    When Graves, Gatton and Trostle submitted the Engineering Proposal on Pneu-Mech 2.0's behalf, they knew the representations about Pneu-Mech 2.0 were false, and they knew Crown was relying on those representations to award the project and enter a contract.

165.    Pneu-Mech 3.0, through its employees, intended to deceive Crown with these false representations.

166.    Crown reasonably relied on the representations from Pneu-Mech 3.0's employees in the Engineering Proposal, awarded Pneu-Mech 2.0 the Engineering Project, and entered into the Engineering Contract. (*See* Exhibit 7, attached).

167.    If Crown had known when it awarded the Engineering Project and entered into the Engineering Contract that Brady and Tucker had long ago transferred Pneu-Mech 2.0 assets to Pneu-Mech 3.0, it would not have awarded the Engineering Project to or entered into the Engineering Contract with Pneu-Mech 2.0.

168.    On January 14, 2019, Graves, and Gatton, as Pneu-Mech 3.0 employees, and Trostle, as a Pneu-Mech 3.0 employee, owner, officer, and director, submitted the Construction Proposal to Crown on behalf of Pneu-Mech 2.0. (*See* Exhibit 12, attached). More specifically, the Construction Proposal stated, "***Pneu-Mech Systems Mfg. LLC*** [Pneu-Mech 2.0] is very pleased to provide the attached complete proposal for the detailed equipment and services."

169.    Graves, Gatton and Trostle submitted the Construction Proposal in the course and scope of their Pneu-Mech 3.0 employment. When they submitted the Construction Proposal, Graves, Gatton and Trostle were not Pneu-Mech 2.0 employees. Graves, Gatton and Trostle knew they were Pneu-Mech 3.0 employees when they submitted the Construction Proposal, and they knew Pneu-Mech 2.0's assets had been transferred to Pneu-Mech 3.0 a year earlier.

170.    When Graves, Gatton and Trostle submitted the Construction Proposal on Pneu-Mech 2.0's behalf, they knew the representations about Pneu-Mech 2.0 were false, and they knew Crown was relying on those representations to award the project and enter the contract.

171.    Pneu-Mech 3.0, through its employees, intended to deceive Crown with these false representations.

172.     Crown reasonably relied on the representations from Pneu-Mech 3.0's employees in the Construction Proposal, awarded Pneu-Mech 2.0 the Construction Project, and entered into the Construction Contract. (*See* Exhibit 13, attached).

173.     If Crown had known when it awarded the Construction Project and entered into the Construction Contract that Brady and Tucker had long ago transferred Pneu-Mech 2.0 assets to Pneu-Mech 3.0, it would have at least conducted additional due diligence before awarding the Construction Project to or entering into the Construction Contract with Pneu-Mech 2.0.

174.     In June 2022, Trostle, in his capacity as a Pneu-Mech 3.0 employee, negotiated and executed the Addendum between Pneu-Mech 2.0 and Crown. (*See* Exhibit 14, attached). The Addendum stated in relevant part:

> This document is an addendum to a previously existing and legally binding agreement…between Crown Equipment Corporation ("Crown") and Pneu-Mech Systems Manufacturing LLC…[Pneu-Mech 2.0] that provides for the design and building of an automated powder coating paint system.
>
> \*\*\*
>
> In January 2019, Crown and Pneu-Mech [2.0] executed documents through which Crown contracted for Pneu-Mech [2.0] to design and build an automated powder coating paint system…That Agreement remains valid and executory.  In general, Crown agreed to pay Pneu-Mech [2.0] $13,625,000.00 for the delivery of a properly and fully functioning automated powder coating paint system (the "Project").
>
> \*\*\*
>
> Pneu-Mech [2.0] has expressed an interest in continuing work to completion on the non-cure oven issues. However, Pneu-Mech [2.0]'s current financial condition prevents it from funding its employees who are necessary to complete the work on the Non-Cure Oven Issues.
>
> Pneu-Mech [2.0] is actively engaged in discussions with a third-party to sell either the assets or the equity interests in the company.
> \*\*\*

175. Many representations in the Addendum were false, including references to "Pneu-Mech [2.0]" showing interest in continuing work, its dire financial condition and inability to pay employees, and its participation in sales discussions.

176. Although Crown did not know it at the time, by June 2022, the truth was Pneu-Mech 2.0 had not operated for more than a year, did not have any employees, and was not participating in any sale discussions.

177. When Trostle signed the Addendum on Pneu-Mech 2.0's behalf, he knew the representations about Pneu-Mech 2.0 were false and he knew Crown was relying on those representations to agree to pay more money.

178. Pneu-Mech 3.0, through its employees, intended to deceive Crown with these false representations.

179. Crown reasonably relied on the representations about Pneu-Mech 2.0 and, as a result, agreed to and did pay more than $300,000.

180. If Crown knew when it negotiated the Addendum that Brady and Tucker had long ago transferred Pneu-Mech 2.0 assets to Pneu-Mech 3.0 it would have at least conducted additional due diligence before entering into the Addendum.

181. Pneu-Mech 3.0's wrongful conduct through its false representations was malicious, willful, and wanton.

182. As a direct and proximate result of Pneu-Mech 3.0's wrongful conduct, Crown has been damaged in an amount to be determined at trial, but reasonably believed to exceed $75,000. Crown is also entitled to recover punitive damages, its attorney fees, filing costs and expenses incurred in bringing this action.

# COUNT EIGHT
## Successor Liability Under North Carolina and Federal Common Law
### (Against Pneu-Mech 3.0)

183.    Crown realleges and incorporates by reference the paragraphs alleged above.

184.    Pneu-Mech 3.0, as the successor to Pneu-Mech 2.0, is liable to Crown for all claims against Pneu-Mech 2.0.

185.    There was actual continuity between Pneu-Mech 2.0 and Pneu-Mech 3.0 of management, personnel/employees, physical location, assets, and general business operations.

186.    Pneu-Mech 3.0 assumed the liabilities and obligations of Pneu-Mech 2.0 ordinarily necessary for the uninterrupted continuation of normal business operations of Pneu-Mech 2.0.

187.    There was continuity between Pneu-Mech 2.0 and Pneu-Mech 3.0 of ownership in that Brady and Tucker directly or through Pneu-Mech 1.0 owned Pneu-Mech 2.0, and Brady and Tucker either directly or through Pneu-Mech 1.0 were the de facto owners of Pneu-Mech 3.0.

188.    Once Brady and Tucker moved Pneu-Mech 2.0 assets to Pneu-Mech 3.0, Pneu-Mech 2.0 could not operate and ceased its ordinary business operations.

189.    Further, on information and belief, Brady and Tucker transferred Pneu-Mech 2.0's assets to Pneu-Mech 3.0 to defeat or defraud Pneu-Mech 2.0's creditors, including Crown.

190.    On information and belief, the transfer of Pneu-Mech 2.0's assets to Pneu-Mech 3.0 was for inadequate consideration and the transaction was illusory.

191.    On information and belief, Brady and Tucker's transfer of Pneu-Mech 2.0's assets lacked elements of a good faith purchase for value because the creation of Pneu-Mech 3.0 was intended to separate and insulate the Pneu-Mech 2.0 assets from any of Pneu-Mech 2.0's liabilities.

192.     As a direct and proximate result of Pneu-Mech 2.0 and Pneu-Mech 3.0's wrongful conduct, Crown has been damaged in an amount to be determined at trial, but reasonably believed to exceed $75,000.

## COUNT NINE
### Successor Liability Under North Carolina and Federal Common Law
### (Against Pneu-Mech 4.0)

193.     Crown realleges and incorporates by reference the paragraphs alleged above.

194.     Pneu-Mech 4.0, as the successor to Pneu-Mech 3.0, is liable to Crown for all claims against Pneu-Mech 3.0.

195.     Pneu-Mech 4.0 assumed the liabilities and obligations of Pneu-Mech 3.0 ordinarily necessary for the uninterrupted continuation of normal business operations of Pneu-Mech 3.0.

196.     There is actual continuity between Pneu-Mech 3.0 and Pneu-Mech 4.0 of management, personnel/employees, physical location, assets, and general business operations.

197.     There is continuity of ownership between Pneu-Mech 3.0 and Pneu-Mech 4.0 in that Brady and Tucker were, on information and belief, the de facto owners of Pneu-Mech 3.0 and, on information and belief, Brady and Tucker are the de facto owners of Pneu-Mech 4.0.

198.     Once Brady and Tucker moved Pneu-Mech 3.0 assets to Pneu-Mech 4.0, Pneu-Mech 3.0 could not operate and ceased its ordinary business operations.

199.     Further, on information and belief, Brady and Tucker transferred Pneu-Mech 3.0's assets to Pneu-Mech 4.0 to defeat or defraud Pneu-Mech 3.0's creditors, including Crown.

200.     On information and belief, the transfer of Pneu-Mech 3.0's assets to Pneu-Mech 4.0 was for inadequate consideration, and the transaction was illusory.

201.    On information and belief, Brady and Tucker's transfer of Pneu-Mech 3.0's assets lacked elements of a good faith purchase for value because the creation of Pneu-Mech 4.0 was intended to separate and insulate the Pneu-Mech 3.0 assets from any of Pneu-Mech 3.0's liabilities.

202.    As a direct and proximate result of Pneu-Mech 3.0 and Pneu-Mech 4.0's wrongful conduct, Crown has been damaged in an amount to be determined at trial, but reasonably believed to exceed $75,000.

## COUNT TEN
## Fraudulent Transfer in Violation of the North Carolina Fraudulent Transfer Act (NCFTA) N.C. Gen. Stat. § 39-23.4 and § 39-23.5
## (Against Brady, Tucker, Pneu-Mech 2.0, and Pneu-Mech 3.0)

203.    Crown realleges and incorporates by reference the paragraphs alleged above.

204.    Crown is a creditor of Pneu-Mech 2.0 and Pneu-Mech 3.0 under the NCFTA, and Pneu-Mech 2.0 and Pneu-Mech 3.0 are debtors under the NCFTA.

205.    While dominating and controlling the Brady-Tucker Entities, Brady and Tucker, on information and belief, caused Pneu-Mech 2.0 and Pneu-Mech 3.0 to transfer certain assets to Brady and Tucker.

206.    The transfers are transfers under the NCFTA, and Brady and Tucker are transferees under the NCFTA.

207.    The transfers were fraudulent because they were made: (1) with the actual intent to hinder, delay and defraud Crown; and (2) without receiving reasonably equivalent value in exchange for the transferred assets, leaving behind an entity or entities engaged in a business or transaction for which the remaining assets, if any, were unreasonably small in relation to the business or transaction.

208.    On information and belief, the unlawful transfers include, but are not limited to, the transfer of cash to Brady and Tucker.

209.     These transfers were, among other things, to insiders, not disclosed, made after Pneu-Mech 2.0 and Pneu-Mech 3.0 were threatened with suit, made to a lienor who transferred the assets to an insider of the debtors, and made when Pneu-Mech 2.0 and Pneu-Mech 3.0 were insolvent.

210.     These transfers constitute fraudulent transfers under N.C. Gen. Stat. § 39-23.4 and § 39-23.5.

211.     As a direct and proximate result of Pneu-Mech 2.0, Pneu-Mech 3.0, Brady and Tucker's wrongful conduct, Crown has been damaged in an amount to be determined at trial, but reasonably believed to exceed $75,000. Crown is also entitled to recover its attorney fees, filing costs and expenses incurred in bringing this action.

**COUNT ELEVEN**
**Fraudulent Transfer in Violation of the North Carolina Fraudulent Transfer Act (NCFTA)**
**N.C. Gen. Stat. § 39-23.4 and § 39-23.5**
**(Against Brady, Tucker, Brawtus Management, Pneu-Mech 1.0, Pneu-Mech 2.0, Pneu-Mech 3.0, and Pneu-Mech 4.0)**

212.     Crown realleges and incorporates by reference the paragraphs alleged above.

213.     Crown is a creditor under the NCFTA of Pneu-Mech 2.0 directly, Pneu-Mech 3.0 directly and as successor to Pneu-Mech 2.0, and Pneu-Mech 4.0 as successor to Pneu-Mech 3.0. Pneu-Mech 2.0, Pneu-Mech 3.0 and Pneu-Mech 4.0 are debtors under the NCFTA.

214.     While dominating and controlling the Brady-Tucker Entities, Brady and Tucker, on information and belief, caused Pneu-Mech 2.0 and Pneu-Mech 3.0 to transfer certain assets to Brawtus Management, Pneu-Mech 1.0, and Pneu-Mech 4.0.

215.     The transfers are transfers under the NCFTA, and Brawtus Management, Pneu-Mech 1.0, and Pneu-Mech 4.0 are transferees under the NCFTA.

216.    The fraudulent transfers were fraudulent because they were made: (1) with the actual intent to hinder, delay and defraud Crown; and (2) without receiving reasonably equivalent value in exchange for the transferred assets, leaving behind an entity or entities engaged in a business or transaction for which the remaining assets, if any, were unreasonably small in relation to the business or transaction.

217.    On information and belief, the unlawful transfers included the transfer of:

    a.   cash;
    b.   accounts receivable;
    c.   inventory, including work in progress;
    d.   contracts and leases;
    e.   equipment and other fixed assets;
    f.   intellectual property;
    g.   a website;
    h.   employee relationships;
    i.   customer relationships;
    j.   vendor relationships; and
    k.   goodwill.

218.    These transfers were, among other things, to insiders, not disclosed, made after Pneu-Mech was threatened with suit, involved substantially all of Pneu-Mech 3.0's assets, made to a lienor who transferred the assets to an insider of the debtors, and made when Pneu-Mech 2.0 and Pneu-Mech 3.0 were insolvent.

219.    These transfers constitute fraudulent transfers under N.C. Gen. Stat. § 39-23.4 and § 39-23.5.

220.    Brawtus Management, Pneu-Mech 1.0, and Pneu-Mech 4.0 received the fraudulent transfers in bad faith.

221.    As a direct and proximate result of Pneu-Mech 2.0, Pneu-Mech 3.0, Brady and Tucker, Brawtus Management, Pneu-Mech 1.0, and Pneu-Mech 4.0's wrongful conduct, Crown has been damaged in an amount to be determined at trial, but reasonably believed to exceed

$75,000. Crown is also entitled to recover its attorney fees, filing costs and expenses incurred in bringing this action.

## COUNT TWELVE
### Common Law Piercing of the Corporate Veil / Alter Ego
### (Against Brady and Tucker)

222.    Crown realleges and incorporates by reference the paragraphs alleged above.

223.    Disregard or piercing of a corporate form is not an independent cause of action, but an equitable remedy used to impose liability on those individuals who abuse the corporate form.

224.    Brady and Tucker oversaw a convoluted network of business entities to avoid liability. On information and belief, Brady and Tucker exercised complete dominion and control over the Brady-Tucker Entities.

225.    On information and belief, Brady and Tucker are in complete control of not only the finances of the Brady-Tucker Entities, but of the policies and business practices of the Brady-Tucker Entities, especially as it pertains to the Brady-Tucker Entities' unlawful actions against Crown, so that when the Brady-Tucker Entities committed their unlawful actions against Crown, they had no separate mind, will or existence of their own.

226.    During the pertinent times, Brady and Tucker used their control of the Brady-Tucker Entities to commit a fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or to cause a dishonest and unjust act in contravention of Crown's legal rights.

227.    On information and belief, Brady and Tucker have completely disregarded the corporate forms of the Brady-Tucker Entities and operated the Brady-Tucker Entities as alter egos.

228.    Brady and Tucker's control of the Brady-Tucker Entities has been and is still being used to commit unlawful acts against and defraud Crown, in contravention of Crown's rights.

229.     During the pertinent times, Brady and Tucker's exercise of their control over the Brady-Tucker Entities proximately caused injury or unjust loss to Crown.

230.     The Court should find that indicia of Brady and Tucker's control over the Brady-Tucker Entities is, on information and belief, shown by: (1) inadequate capitalization; (2) non-compliance with corporate formalities; (3) complete domination and control of the entities so they have no independent identity; and (4) excessive fragmentation of a single enterprise into separate corporations.

231.     Brady and Tucker abused the corporate forms of the Brady-Tucker Entities to defraud and deceive Crown and continuing adherence to the fiction of separate corporate entities would constitute the sanctioning of fraud and injustice done to Crown.

232.     Crown is entitled to a finding that the corporate veil for the Brady-Tucker Entities should be pierced. This Court must pierce the corporate veils here and declare that the Brady-Tucker Entities were and are the alter-egos of Brady and Tucker to avoid the fraudulent and unjust conduct committed by Brady and Tucker.

233.     As a result of Brady and Tucker's control of the Brady-Tucker Entities, and their use of the Brady-Tucker Entities to perpetrate unlawful acts against Crown, Crown has been damaged in an amount to be determined at trial, but reasonably believed to exceed $75,000. Crown is also entitled to recover its attorney fees, filing costs and expenses incurred in bringing this action.

## COUNT THIRTEEN
### Alter Ego Doctrine / Single Business Enterprise / Instrumentality Rule
### (Against all Corporate Entity Defendants)

234.     Crown realleges and incorporates by reference the paragraphs alleged above.

235.    Disregard or piercing of a corporate form based on the alter ego / single business enterprise doctrine / instrumentality rule is not an independent cause of action, but an equitable remedy used to impose liability on one or more other corporate forms.

236.    The alter ego doctrine, also known as the instrumentality rule or single business enterprise doctrine, applies when a corporate entity exercises actual control over another, operating the latter as a mere instrumentality or tool. When the businesses function as a single business enterprise in substance, even though they are not a single business in form, the alter ego doctrine applies.

237.    The Brady-Tucker Entities all operate from the same location. The entities have the same chief financial officer (Boggs) and, on information and belief, the same actual or de facto owners (Brady and Tucker). The board of managers or board of directors for the entities are, on information and belief, dominated by the same mangers or directors (Brady and Tucker).

238.    Pneu-Mech 4.0, Pneu-Mech 3.0, Pneu-Mech 2.0, and Brawtus Management are not separate and distinct entities from Pneu-Mech 1.0, which is itself controlled and dominated by Brady and Tucker. The Brady-Tucker Entities are, in substance, a single business enterprise so that the alter ego doctrine applies.

239.    Crown is entitled to a finding that some or all of the Brady-Tucker Entities function as a single business enterprise in substance, their corporate veils should be disregarded, and the Court should declare that the Brady-Tucker Entities were and are the alter-egos of one another, Pneu-Mech 1.0 and Brady and Tucker.

WHEREFORE, Plaintiff Crown Equipment Corporation asks the Court to award judgment in its favor and against Defendants jointly and severally as follows:

A. For all Counts, compensatory damages in an amount to be determined at trial but reasonably believed to exceed $75,000;

B. For Counts Four, Five, Six, Seven, and all other Counts warranted by law, an award of punitive damages in an amount to be determined at trial;

C. For Count Eight, a declaration that Pneu-Mech 3.0 is the successor entity to Pneu-Mech 2.0 and therefore liable for Pneu-Mech 2.0's liabilities;

D. For Count Nine, a declaration that Pneu-Mech 4.0 is the successor entity to Pneu-Mech 3.0 and therefore liable for Pneu-Mech 3.0's liabilities;

E. For Counts Ten and Eleven, an Order for avoidance of any transfer of assets made from Pneu-Mech 2.0 and Pneu-Mech 3.0 to Brady, Tucker, Brawtus Management, Pneu-Mech 1.0 and Pneu-Mech 4.0;

F. For Counts Ten and Eleven, an Order enabling Crown to levy execution on all of the assets transferred from Pneu-Mech 2.0 and Pneu-Mech 3.0 to Brady, Tucker, Brawtus Management, Pneu-Mech 1.0 and Pneu-Mech 4.0, and their proceeds;

G. For Count Twelve, an Order holding Brady and Tucker personally liable for any liability of the Brady-Tucker Entities to Crown;

H. Four Count Thirteen, a declaration that all Brady-Tucker Entities were the mere instrumentalities and alter egos of all other Brady-Tucker Entities, and at least Pneu-Mech 1.0, and of Brady and Tucker, and that the corporate veils of the Brady-Tucker Entities must be pierced to reach Brady and Tucker and each Brady-Tucker Entity in order to remedy the fraud and inequitable conduct committed with respect to Crown;

I. An award of attorneys' fees, expenses, and costs incurred in this action pursuant to North Carolina law and in an amount to be determined at trial;

J.   For prejudgment and post-judgment interest;

K.   That there by a trial by jury; and

L.   And for all other legal and equitable relief that this Court deems just and appropriate.

Respectfully submitted, this 10th day of May, 2023.

*/s/Fred M. Wood, Jr.*
Fred M. Wood, Jr., NC Bar No. 18437
Evan M. Sauda, NC Bar No. 32915
David Blue, NC Bar No. 57829
Nelson Mullins Riley & Scarborough, LLP
301 South College St., 23rd Floor
Charlotte, North Carolina 28202
T: (704) 417-3000
F: (704) 377-4814
Email: fred.wood@nelsonmullins.com
Email: evan.sauda@nelsonmullins.com
Email: david.blue@nelsonmullins.com

and

Toby K. Henderson (0071378)
(*pro hac vice forthcoming*)
Joanna W. Gisel (0100701)
(*pro hac vice forthcoming*)
SEBALY SHILLITO + DYER
40 North Main Street
1900 Stratacache Tower
Dayton, Ohio 45423
T: (937) 222-2500
F: (937) 222-6554
Email: thenderson@ssdlaw.com
Email: jgisel@ssdlaw.com

*Attorneys for Plaintiff*
*Crown Equipment Corporation*