# EXHIBIT 2



**Equipment Corporation**

New Bremen, Ohio 45869 USA
Tel +1 () 629 2311  Fax +1 () 629 2000

To:       All Prospective Suppliers

From:     Paul Knapke, Purchasing Manager

Subject:  Crown Terms and Conditions Revision (OF12672, 03/14)

In our continuing effort to remain compliant with Federal law, Crown Equipment Corporation is providing a copy of our Standard Order Terms and Conditions. Please see the attached document, OF12672 - Revision 03/14

If awarded business by Crown, it is deemed reasonable and customary to provide suppliers with a purchase order through various technologies. Crown purchase orders will reference our Terms and Conditions, but may not provide the full text document due to the chosen method of transmission. Therefore, this communication will serve as a notice to the suppliers that all purchase orders shall be governed by these terms and conditions

Please review the enclosed Terms and Conditions document and provide Crown with a formal acceptance. Completed form should be scanned and emailed to your Purchasing contact.

If any future purchase orders are awarded by Crown, they will serve as acceptance of these terms and conditions should this form not be returned.

If you have any questions or concerns, please do not hesitate to contact us.

Sincerely,

*Paul Knapke*
Paul Knapke
Purchasing Manager

We __Pneu-Mech Systems Mfg. LLC__ have received, and acknowledgement agreement to, the
         (Company Name)
attached Terms and Conditions, OF12672 revision 3/14.

__Joseph B Boggs__ (Authorized Signature)                    __CFO__ Title
Joseph B Boggs                                               2/16/2015
Print Name                                                   Date

PUR-CORP-123                 Revision 10                     3-10-14
                            Printed copies of this document are uncontrolled

Case 5:23-cv-00059-KDB-DCK   Document 1-3   Filed 05/10/23   Page 2 of 9

# Crown Equipment Corporation
## STANDARD TERMS AND CONDITIONS OF PURCHASE

**DEFINITIONS:**
**Agreement:** shall mean these Terms and Conditions together with the Order pursuant to which goods or services are being provided and all documents specifically referenced herein or in such Order.
**Buyer:** shall mean Crown Equipment Corporation.
**Deliverables:** shall mean Goods and/or Services depending on the context.
**Goods:** shall mean materials or products described in Orders, the purchase of which is governed by the terms of this Agreement.
**Order:** shall mean a document, electronic or hard copy, issued by Buyer to Seller, in the form of a purchase order or release or similar document, referring to these Terms and Conditions and ordering Deliverables.
**Seller:** shall mean the individual, partnership, corporation or other entity contracting to furnish the Deliverables described in the Order, to whom the Order is issued by Buyer.
**Services:** shall mean services (whether or not ancillary to a sale of Goods) described in Orders, the purchase of which is governed by the terms of this Agreement.
**Terms and Conditions:** shall mean these Standard Terms and Conditions of Purchase.

**1.0 SCOPE OF THE AGREEMENT:**
1.1 This Agreement must be accepted as indicated in Orders or, if Orders do not provide, in writing by Seller within the time specified on the face of the Order or, if not so specified, within a reasonable time of Seller's receipt hereof.
1.2 If for any reason Seller fails to accept this Agreement in writing or as specified in the Order, the furnishing or commencement of any Services called for hereunder, (including preparation for manufacture), the shipment by Seller of any Goods (or lots thereof) ordered hereby, the acceptance of any payment by Seller hereunder, or any other conduct by Seller that recognizes the existence of a contract pertaining to the subject matter hereof, may, at Buyer's election, be treated as an unqualified acceptance by Seller of this Agreement and all the terms and conditions hereof.
1.3 Any terms or conditions proposed in Seller's acceptance or in any acknowledgment, invoice, or other form of Seller that add to, vary from, or conflict with the terms herein are hereby rejected. Any such proposed terms shall be void and the terms and conditions of this Agreement shall constitute the complete and exclusive statement of the terms and conditions of the contract between the parties and shall apply to each Deliverable received by Buyer from Seller hereunder, and such terms and conditions may hereafter be modified only by written instrument executed by an authorized representative of Buyer's Purchasing Department and an authorized representative of Seller.
1.4 If the Order is issued by Buyer in response to an offer by Seller and if any of the terms herein are additional to or different from any terms of such offer, then the issuance of the Order by Buyer shall constitute an acceptance of such offer subject to the express condition that Seller assents to all such additional and different terms herein and acknowledge that this Agreement constitutes the entire agreement between Buyer and Seller with respect to the subject matter hereof. Seller shall be deemed to have so assented and acknowledged unless Seller notifies Buyer to the contrary in writing within ten (10) days of receipt of the relevant Order.

**2.0 PRICE AND PAYMENT:**
2.1 Payment terms: Unless otherwise agreed to and indicated in writing on Buyer's Purchase Order, Crown Standard Payment terms will be net sixty (60) days following (i) receipt of conforming Deliverables delivered pursuant to Buyer's delivery requirements, and (ii) satisfaction of the invoicing requirements (electronic or otherwise) set forth in this Agreement.
2.2 Seller warrants that the agreed price for the Deliverables is not less favorable than that currently extended to any other buyer for the same or like Deliverables in similar quantities.
2.3 Cash Discount: The cash discount period, if any, shall be computed as commencing with receipt by Buyer of invoice or of Deliverables, whichever is later.
2.4 Invoices: All invoices must contain the following information: Purchase order number, item number, description of items, quantities, unit prices, and taxes. Payments of invoices shall not constitute acceptance of Deliverables and shall be subject to adjustment for shortages, defects and other failure of Seller to meet the requirements of this Agreement. Buyer or any of its affiliated companies may set off any amount owed by Seller or any of its affiliated companies to Buyer or any of its affiliated companies against any amount owed by Buyer hereunder. In accordance with U.S. Bureau of Customs and Border Protection ("CBP") Regulations – 19 CFR 141.81, a commercial invoice will be presented with each merchandise shipment entering the U.S. Such invoice shall be prepared in the English language (or an English translation attached thereto), in accordance with 19 CFR 141.86-141.89.

2.5 Buyer shall not be obligated to pay for any Deliverable if the invoice for such Deliverable is received more than twelve (12) months after the receipt of the Deliverable.

**3.0 TAXES:**
3.1 Tax Liability: Seller shall properly impose upon, collect and remit from Buyer any and all sales, use, excise, transaction and value added taxes, customs, duties, contributions, or similar levies by taxing jurisdictions as required by law ("Taxes") that are imposed by any government Tax authority ("Tax Authority") upon Buyer's payments pursuant to this Agreement, and are the legal obligation of the Buyer. Each of the Taxes shall be separately stated on all applicable Seller invoices.
3.2 Tax Exceptions: No Taxes, interest, penalties, or other additions to Taxes, shall be collected by Seller if, pursuant to this Agreement or the laws of the applicable Tax Authority, (a) the transaction is not subject to Taxes; (b) Buyer has been authorized to pay Taxes directly to the appropriate Tax Authority; or (c) Seller is obligated to pay the Taxes. Seller shall also pay any Taxes arising out of its willful misconduct or negligence for which Buyer becomes liable.
3.3 Tax Assessment Notification: Seller shall, upon receipt from any Tax Authority of any levy, notice, assessment, or withholding of any Taxes for which Buyer may be obligated, notify Buyer in writing directed to: Manager, Tax Compliance, Crown Equipment Corporation, 44 South Washington Street, New Bremen, Ohio 45869.
3.4 Tax Disputes: Seller shall cooperate in the equitable resolution of disputes pertaining to any Taxes arising from this Agreement. If Buyer may directly contest any Taxes in its own name, then it may do so and, to the extent permitted by law, withhold payment during contest pendency. If Buyer is not so permitted, Seller shall in good faith, as requested by Buyer, contest the Taxes. Seller shall supply Buyer with information and documents as Buyer may reasonably request to control or participate in any proceeding to the extent permitted herein.
3.5 Tax Refund and Indemnification: If Seller receives a refund of any Taxes attributable to Buyer; Seller shall pay such amount to Buyer within thirty (30) days of receipt. Seller shall indemnify Buyer against any and all losses, costs, and expenses (including reasonable attorneys' fees) which result from Seller's violation of its obligations under this section.
3.6 Delivery of Software: Seller shall deliver electronically via the Internet or CD as indicated on Buyer's Purchase Order, all software Deliverables of any type (including manuals) that are the subject of, rather than are ancillary to, this Agreement. Seller shall separately itemize the costs of electronically delivered software, licenses, fees and all Services on all invoices. Invoices shall clearly indicate the manner of software delivery by inclusion of the phrase, "software delivered electronically to the customer via the internet." License locations should clearly be stipulated in the Agreement to allow for proper allocation of any Taxes owed.
3.7 Property Taxes: Buyer shall report and remit any property-related Taxes relating to property for which Buyer retains title pursuant to this Agreement, accruing prior to and after the commencement of this Agreement. Where Seller possesses Buyer-owned property, Seller shall notify Buyer of any disposal or movement of such property. Seller shall report and remit any property-related Taxes relating to property for which Seller retains title pursuant to this Agreement, accruing prior to and after the commencement of this Agreement.

**4.0 DELIVERY:**
4.1 Seller shall furnish the items called for by this Agreement in accordance with the delivery terms stated on the Order and if delivery dates are not stated, Seller shall offer Buyer its best delivery dates, subject to written acceptance by Buyer ("Delivery Dates"). Time is of the essence in Seller's performance of the Order, and Seller shall deliver Goods and perform Services by the Delivery Dates. Buyer may from time-to-time adjust its delivery schedules, and unless otherwise agreed in writing, such changes in schedule shall not affect the prices of the Deliverables ordered. Buyer may defer payment or return at Seller's expense, any Deliverables delivered in advance of the scheduled Delivery Date or in excess of the quantity specified for such items.
4.2 Unless otherwise expressly set forth in the purchase order, the delivery terms for Goods shall be: DDP Buyer's facility Incoterms 2000 provided that Seller shall be responsible for unloading of the Goods in accordance with Buyer's instructions and the risk of unloading will be that of Seller. See paragraphs 28 and 29 below. As consistent with this delivery term, standard delivery instructions of the relevant procurement department apply and may be obtained through the relevant Buyer procurement representative. Title shall pass to Buyer on delivery of Goods as provided in this section. If delivery is required to be made to a third party (drop shipment), title and risk of loss shall pass to Buyer when delivered at the consignee's facility.
4.3 Notice Of Delay: Whenever an actual or potential reason for delay

Case 5:23-cv-00059-KDB-DCK   Document 1-3   Filed 05/10/23   Page 3 of 9

(including but not limited to labor disputes), delays or threatens to delay the timely performance of the Order, Seller agrees to immediately notify Buyer in writing of all relevant information and, subject to the force majeure provision set forth herein, to make and pay for all necessary changes to fulfill its obligations under the Order and mitigate the potential impact of any such delay. Buyer has the right without incurring any liability to cancel any Deliverables affected by the delay in performance.

**4.4 Cessation of Production:** Seller shall give Buyer at least one hundred eighty (180) days prior written notice of the permanent discontinuance of production of items covered by Orders, provided however that compliance with this provision shall in no way relieve the Seller from its obligations under the Order.

**4.5 Packing:** Seller shall not charge separately for packaging, packing or boxing, unless Buyer has agreed to such charges in writing. Seller shall not combine in the same container, material that is to be delivered to different receiving locations. All wood products used in packaging shall be ISPM 15 compliant.

**4.6 Marking:** Unless otherwise agreed in writing, exterior containers shall be marked with the following: (1) Address of Buyer site and Seller; (2) Order number; (3) Part number; (4) Special markings called for on the Order; (5) Quantity; and (6) (where applicable) Vendor Code or other vendor identification number. In accordance with CBP Regulations 19 CFR 134, unless excepted, every article of foreign origin (or its container) imported into the U.S. shall be marked in a conspicuous place as legibly, indelibly and permanently as the nature of the article or its container will permit, in such a manner as to indicate to the ultimate purchaser in the U.S. the English name of the country of origin of the article. This requirement is in addition to any individual part marking required by Buyer's engineering drawings.

**4.7 Bills of Lading:** Bills of Lading shall reference the Order and Buyer's receiving address and purchase point of contact. When Buyer will be the importer of record, Seller will follow the instructions of Buyer's designated representative regarding completion of documentation used in the importation process and proper declaration of value. The original copy of the bill of lading with Seller's invoice shall be mailed to the location specified by Buyer's procurement contact, or if no location is specified by Buyer, to Buyer's applicable Accounts Payable Department or Accounts Payable service provider.

**4.8 Packing Slip:** Seller shall include an itemized packing slip with all shipments that will adequately identify the Goods shipped, including Buyer part number.

**4.9 Shipping and Approved Carriers:** On Orders where Buyer either pays for or reimburses Seller directly for shipping costs, Goods shall be shipped in accordance with routing instructions furnished by Buyer. If such instructions are not received, Goods shall be shipped via least expensive method sufficient to meet delivery requirements, but always through Buyer approved carriers. In the event additional information or clarification is required, contact the Crown Import Support Center at (419)-629-2311 x3447 or (import.support@crown.com).

**6.0 PRIME OR CUSTOMER CONTRACT REQUIREMENTS:**
When Seller's work hereunder will form a part of the work, whether Goods or Services, under a contract that Buyer has with another or others, Seller agrees, by its acceptance hereof, to be bound to Buyer in the same manner and to the same extent that Buyer is bound to its customer. Seller further agrees that Buyer's contract with its customer is incorporated herein and forms an integral part of this Agreement and that it has examined the drawings, specifications, terms and conditions of such contract and that it will be bound by such drawings, specifications, terms and conditions. Access to all such documentation will be provided to Seller upon request.

**6.0 INSPECTION/ACCEPTANCE/REJECTION:**
6.1 All Deliverables being provided to Buyer's specifications covered by the Order will be inspected and tested by Buyer and/or its designee, at all reasonable times and places, including during manufacture. Seller shall provide, without additional charge, all reasonable facilities and assistance for such inspections and tests.

6.2 All inspection records relating to Deliverables covered by the Order and being manufactured to Buyer's specifications and/or drawings shall be available to Buyer during the performance of the Order and for such longer periods as specified by Buyer.

6.3 Deliverables furnished hereunder shall have zero defects, and Seller has the obligation to properly inspect such items prior to delivery to Buyer. If any Deliverables covered by the Order are defective or otherwise not in conformity with the requirements of the Order, Buyer may, (i) rescind the Order as to such Deliverables, and rescind the entire Agreement if such defect or non-conformity materially affects Buyer; (ii) accept such Deliverables at an equitable reduction in price; or (iii) reject such Deliverables and require the delivery of replacements. Deliveries of replacements shall be accompanied by a written notice specifying that such Deliverables are replacements. If Seller fails to deliver required replacements promptly, Buyer may (i) replace, obtain or correct such Deliverables and charge Seller the cost occasioned Buyer thereby, and/or (ii) terminate the Order for cause.

6.4 Rejected Deliverables may be returned to Seller at Seller's cost.

**7.0 CHANGE ORDERS:**
Buyer shall have the right at any time prior to the Delivery Date of Deliverables to make changes in drawings, designs, specifications, packaging, place of delivery, nature and duration of Services, and method of transportation, or require additional or diminished work. If any such changes cause an increase or decrease in the cost or the time required for the performance or otherwise affect any other provision of the Order, an equitable adjustment shall be made and the Order shall be modified in writing accordingly. Seller's claims for adjustment under this section shall be deemed waived unless asserted in writing (including the amount of the claim) and delivered to Buyer within thirty (30) days from the date Seller receives the change order.

**8.0 WARRANTIES:**
8.1 Seller expressly covenants and warrants that all Deliverables shall conform to the specifications, drawings, samples or other description upon which the Order is based, shall be suitable for the purpose intended, merchantable, free from defects in material and workmanship, and free from liens, or encumbrances of title, and that Deliverables of Seller's design will be free from defect in design. Inspection, test, acceptance or use of Deliverables furnished hereunder shall not affect Seller's obligation under this warranty, and such warranties shall survive inspection, test, acceptance and use. This warranty shall run to Buyer, its successors, assigns, customers, and the users of the Deliverables. Seller agrees to replace or correct defects of any Deliverables not conforming to the foregoing warranty promptly, without expense to Buyer, when notified of such nonconformity by Buyer. In the event of failure by Seller to correct defects in or replace nonconforming Deliverables promptly, Buyer, after reasonable notice to Seller, may make such correction or replace such Deliverables and charge Seller for the cost incurred by Buyer thereby. Seller further warrants that all work will be performed in a professional manner in accordance with the highest industry standards.

8.2 Permits and Licenses: Except for permits and/or licenses required by statute or regulation to be obtained by Buyer, Seller agrees to obtain and maintain -at its own expense -all permits, licenses and other forms of documentation required by Seller in order to comply with all existing national, state, provincial or local laws, ordinances, and regulations, or of other governmental agency, which may be applicable to Seller's performance of work hereunder. Buyer reserves the right to review and approve all applications, permits, and licenses prior to the commencement of any work hereunder.

8.3 Product Support Obligation: Seller shall maintain, at its expense, the ability to, and shall, provide product support for the Deliverables for ten (10) years after the last Order is placed by Buyer under this Agreement.

**9.0 ENVIRONMENTAL, HEALTH & SAFETY:**
9.1 Test Reports: Any Seller test reports or other test results related to the Deliverables shall be provided to Buyer as set forth in the terms of the Order, or if not specified in the Order terms, upon Buyer's request.

9.2 Environmental and Safety: Seller agrees to comply with Buyer's environmental, health and safety standards during Seller's performance hereunder and when at Buyer's jobsites/facilities/customer sites, including without limitation, Buyer's jobsite/facility/customer site safety rules; and if Seller is unable or unwilling to comply with such requirements, the Order can be withdrawn without further recourse by Seller. Specifically, and without limitation, Seller agrees to: (1) Comply with the applicable national, state, provincial or local environmental, occupational health and/or safety legislation or regulations. (2) Supply to employees and require that all employees wear specified safety equipment, including but not limited to eye protection and foot protection. (3) Adhere to all Buyer's safety requirements and instructions as indicated by Buyer or Buyer's representatives including without limitation, if Seller will be performing Services within Buyer's facilities, the compliance requirements and restrictions applicable to Services performed within Buyer's facilities. (4) Immediately prior to commencement of any work or service, contact a responsible Buyer representative. (5) Submit the Workers' Compensation Board Firm Number to Buyer's safety office. (6) Require its suppliers to agree to the requirements of this section and the section of this Agreement entitled "Compliance with Laws". (7) Utilize industry standard safety practices for Confined Spaces, Hot Operations, and Energy Control such as Lockout/Tagout etc...

9.3 Use Of Hazardous Substances: Seller agrees to provide, upon and as requested by Buyer to satisfy any applicable regulatory or customer requirements restricting the use of any hazardous substances, all reasonably necessary documentation to verify the material composition, on a substance by substance basis including quantity used of each substance, of any Goods ordered by Buyer and/or of any process used to make,

assemble, use, maintain or repair any Goods ordered by Buyer. Separately and/or alternatively, Seller agrees to provide, upon and as requested by Buyer to satisfy any applicable regulatory or customer requirements restricting the use of any hazardous substances, all reasonably necessary documentation to verify that any Goods ordered by Buyer and/or any process used to make, assemble, use, maintain or repair any Goods ordered by Buyer, do not contain particular hazardous substances specified by Buyer.

**10.0 SECURITY:**
10.1 Each person requiring unescorted access to Buyer's facilities or systems shall meet the following minimum requirements:

(a) Be a citizen, permanent resident alien, or otherwise authorized to work in the country in which the person will be providing services; and

(b) Not be convicted of any criminal offence resulting in a sentence of more than one year of prison (even if such sentence is deferred or suspended).

10.2 Seller shall provide to Buyer in advance of Buyer's granting access to a person (i) a certification that the person meets the requirements of section 10.1.a) and (ii) the criminal record of the person to the extent permissible by law or if the access is required in the United States, the results of a background check provided by a recognized/licensed provider regarding felony issues.

**11.0 C-TPAT SUPPLY CHAIN SECURITY:**
(Applicable to Orders in which Goods will be shipped into the United States)
11.1 The U.S. Bureau of Customs and Border Protection has created the Customs Trade Partnership Against Terrorism ("C-TPAT") program in which the Government and business will work to protect the supply chain from the introduction of terrorist contraband (weapons, explosives, biological, nuclear or chemical agents, etc.) in shipments originating from off-shore for delivery into the United States. Buyer is committed to be in full compliance with the C-TPAT program and requires its suppliers to comply.

11.2 Seller agrees that during the period in which it ships goods to Buyer, it and its subcontractors who either ship directly or package goods for shipment will either (i) be certified under the C-TPAT program by the U.S. Bureau of Customs and Border Protection or (ii) demonstrate to Buyer's satisfaction that it meets the security requirements of C-TPAT. Accordingly, Supplier must either provide Buyer with documentation that it and such subcontractors are certified (e.g. – C-TPAT certification or Status Verification Interface (SVI) number) or provide documentation and evidence satisfactory to Buyer to demonstrate compliance with C-TPAT security requirements. C-TPAT requirements can be found at www.cbp.gov.

11.3 Upon five days prior written notice, Buyer, or its designee, may audit all pertinent books and records of Seller and its subcontractors, and make reasonable inspection of Seller's and its subcontractor's premises, in order to verify compliance with the requirements of this provision.

11.4 Any delay in delivery due to Seller's failure to comply with this provision shall not relieve Seller of its obligations and shall not constitute a force majeure or give rise to an excusable delay.

**12.0 INTELLECTUAL PROPERTY:**
12.1 "Intellectual Property" means all proposals, prototypes, designs, methods, processes, inventions, ornamental designs, works of authorship, requirements, specifications, graphical displays, interfaces, marks, know-how, algorithms, codes, computer programs, software, strategies, invention disclosures, patents, copyrights, mask works, industrial property rights, trademarks, trade secrets, and other information or rights of a similar nature worldwide to the extent that such information or rights are created or made possible by Seller (alone or acting with Buyer or others) and result from the Seller's performance under this Agreement or are included in any Deliverables provided to Buyer.

12.2 **Grant of Rights:** Seller shall promptly disclose in writing to Buyer all Intellectual Property conceived or first reduced to practice or created in the performance of this Agreement. Seller (i) agrees that any works of authorship created in the course of this Agreement by Seller that come under any one of the categories of "Works Made for Hire" in 17 U.S.C. §101 shall be considered a "Work Made for Hire", and (ii) agrees that for any works of authorship that do not come under such categories, Seller hereby assigns to Buyer all right, title, and interest it has to any copyright in such works. Seller hereby irrevocably waives all "moral rights", all rights of privacy and publicity, and the like, in all materials provided to Buyer. In addition to the foregoing, and to the extent permissible by law, Seller, hereby irrevocably assigns and hereby agrees to assign to Buyer all right, title and interest to all Intellectual Property conceived or first reduced to practice or created by Seller, any employees or any others used by Seller, in the performance of this Agreement.

12.3 **Grant of License Rights:** To the extent Buyer does not otherwise have the right(s) under this Agreement, Seller hereby grants to Buyer worldwide, non-exclusive, perpetual, fully-paid, irrevocable, transferable licenses (with rights to grant sublicenses) to (i) make, have made, use, offer for sale, sell, import, (ii) copy, distribute, publicly display, publicly perform, make derivative works, embed, operate, install, maintain, repair, and otherwise freely exploit in connection with the Deliverables and similar, related or integrated goods or services, all Intellectual Property which Seller provides or has provided to Buyer either during the term of or prior to the effective date of this Agreement, in any and all media now known or later developed.

12.4 **Work Product:** The tangible and intangible work product developed under this Agreement, whether or not delivered under this Agreement, including, but not limited to, all analyses, recommendations, reports, and memoranda, shall become the property of Buyer.

12.5 **Cooperation:** Seller will cooperate fully and will execute or cause to be executed any documents required to establish, defend and enforce Buyer's Intellectual Property rights under this Agreement.

12.6 **Warranty of Title to Intellectual Property:** Seller agrees, warrants, and represents to Buyer that, to its knowledge (i) Buyer shall acquire good and clear title to the Intellectual Property, that (ii) Seller has all rights and authority to perform its obligations under this section regarding Intellectual Property, or that the Intellectual Property is in the public domain, and the use thereof by Buyer, its representatives, distributors, dealers, end users, and other direct and indirect customers does not and shall not infringe any proprietary rights of any third party. As of the date of this Agreement, Seller represents that it has not received any notice or claim alleging that the Intellectual Property or Deliverables or any portion thereof, infringes any proprietary rights of a third party.

**13.0 BUYER'S PROPERTY:**
All tools, equipment dies, gauges, models, drawings or other materials furnished by Buyer to Seller or made by Seller for the purpose of this Agreement or paid for by Buyer and all replacements thereof and materials attached thereto, shall be and remain the property of Buyer. All Buyer's property and, whenever applicable, each individual item thereof, will be plainly marked and otherwise adequately identified by Seller as being Buyer's property, will at Seller's expense be safely stored (separate and apart from Seller's property whenever practicable) and maintained and will be kept free of all liens, claims, encumbrances and interests of third parties. Seller shall be responsible for loss of and damage to Buyer's property. Seller will not substitute any property for Buyer's property, will not deliver or make available to any third party any of Buyer's property or any property or goods developed, manufactured or created with the aid of any of Buyer's property and will not use any of Buyer's property or any property or goods manufactured, developed or created with the aid of Buyer's property, except in fulfilling the Orders of Buyer. Upon completion by Seller of the Order, or upon the written request of Buyer at any time, Seller will prepare all Buyer's property for shipment and deliver such property to Buyer in the same condition as originally received by Seller, reasonable wear and tear excepted. Buyer shall have the right, at all reasonable times, upon prior notice to enter Seller's premises to inspect any and all Buyer's property and any property or goods manufactured, developed or created with the aid of any Buyer's property. Should Seller be unable to deliver Goods pursuant to this Agreement, Buyer, by written notice, may vest in itself title to finished parts, raw materials or work in process associated with this Agreement, and Seller shall deliver all such material and other Buyer property to such location or locations outside its facility as may be designated by Buyer.

**14.0 PROPRIETARY INFORMATION:**
14.1 "Proprietary Information" shall for the purpose of this Agreement, mean all Intellectual Property and Information, knowledge or data disclosed by Buyer or its affiliated companies to Seller (including without limitation financial, business, and product strategy; product specifications; product designs; internal procedures, studies; tests; and reports) regardless of whether disclosed in written, tangible, oral, visual or other form, and related to work performed or contemplated under this Agreement. If Buyer furnishes sample products, equipment, or other objects or material to Seller, the items so received shall be used and the information obtained from said items shall be treated as if they were Proprietary Information disclosed pursuant to this Agreement.

14.2 Proprietary Information, including Proprietary Information received prior to the execution or approval of an Order, shall be used by Seller solely for the purposes of the current business relationship with Buyer or evaluating the feasibility of a future business relationship with Buyer and shall not be used for any other purpose including without limitation to design, manufacture, repair or service equipment, to provide or sell services or to seek any government or third party approval to do such. Seller shall not disclose Proprietary Information to any third party without Buyer's express written consent. Seller may disclose the Proprietary Information to contract workers, consultants and agents of Seller who have a need to know and who have executed agreements with Seller obligating them to treat such Proprietary Information in a manner consistent with the terms of this Agreement.

14.3 Seller shall maintain all Proprietary Information received in strict

confidence and shall safeguard the Proprietary Information by using all reasonable efforts to prevent its disclosure to or use by third parties other than as this Agreement permits. Seller shall not reverse engineer, reverse assemble, or decompile Proprietary Information.

14.4 Notwithstanding the foregoing provisions, this Agreement shall not restrict or affect Seller's rights to use or disclose Information:

    (a) which is or may hereafter be in the public domain through no fault of Seller and through no improper act or omission of a third party ; or

    (b) which is received by Seller without restriction as to disclosure by Seller from a third party having a right to disclose it; or

    (c) which Seller can show, as reflected by its contemporaneous documents, was known to it prior to the disclosure by Buyer; or

    (d) which Seller independently develops without the use of the Proprietary Information as evidenced by its contemporaneous writings kept in the ordinary course of business.

14.5 If Seller is required to disclose Proprietary Information pursuant to governmental or judicial process, notice of such process shall be promptly provided to Buyer to allow Buyer to intercede in such process to contest such disclosure, and Seller will cooperate with Buyer to protect the Proprietary Information from further disclosure.

14.6 Upon expiration or termination of this Agreement for any reason whatsoever, Seller shall promptly return to Buyer or otherwise dispose of at Buyer's direction, all Proprietary Information.

14.7 Obligations in this section regarding Proprietary Information shall, with respect to each disclosure of Proprietary Information hereunder, continue for ten (10) years from the date of such disclosure or ten (10) years after termination of this Agreement whichever is later.

**15.0 GENERAL INDEMNIFICATION:**
Seller shall indemnify, protect, defend and save the Buyer, its officers, directors and Buyer's affiliates and their officers and directors harmless from all suits, claims, losses, damages, injuries, costs or expenses (including attorneys' fees) arising out of, or caused by, Seller's performance hereof or any defects in the Deliverables. Under no circumstances shall Buyer be liable for special, indirect or consequential damages of any type, whether in contract, tort, warranty or otherwise.

**16.0 INFRINGEMENT INDEMNIFICATION:**
16.1 Seller shall indemnify and hold harmless Buyer, its officers, directors and Buyer's affiliates and their officers and directors and any third party indemnified by Buyer for any losses, costs, damages and liabilities, arising from any threatened, pending, completed or future claim, suit, action, proceeding, or investigation alleging that any manufacture, use, sale or offer for sale of the Deliverables under this Agreement infringe any patent, trademark, copyright, or alleging any other violation of an Intellectual Property right; except and to the extent that such alleged infringement arises directly from Seller's compliance with designs furnished by Buyer. In the event and to the extent Seller's compliance as set forth in this paragraph shall form the basis of any claim, suit or action for infringement against Seller, Buyer shall indemnify Seller as set forth below.

16.2 The party required to indemnify under the provisions hereof shall promptly assume and diligently conduct the entire defense of such alleged infringement at its own expense, provided that such party receives prompt written notice of such claim, suit, or action as such is commenced against the other party. Insofar as its interests are affected, the other party shall have the right, at its own expense and without releasing any obligation, liability, or undertaking of the party required to indemnify, to: (i) cooperate in the defense of such claim, and (ii) with permission of the court, to intervene in any such suit or action. Buyer shall have the right to reasonably reject counsel selected by Seller and the right to reject any settlement that would negatively impact Buyer as determined solely by Buyer. Buyer shall have the right to participate with Seller in determining the strategy to defend any such suit or action.

16.3 Notwithstanding any of the above provisions, Buyer shall have the further right, at its own election, to supersede Seller in the defense of any such alleged infringement and thereafter to assume and conduct the same according to Buyer's sole discretion, in which event Seller shall be released from its obligation to pay for attorneys' fees and court costs. Further, Seller, if requested in writing by Buyer, shall cooperate with Buyer in Buyer's defense of any alleged infringement claim.

**17.0 TERMINATION FOR CONVENIENCE:**
Buyer may terminate, for its convenience, all or any part of this Agreement at any time by written notice to Seller. In such case Buyer's sole obligation will be to pay for completed Deliverables that are delivered to Buyer. Notwithstanding anything to the contrary in the previous sentence, Buyer will not be obliged to pay for any Deliverables in excess of that which would be delivered to Buyer in the "Lead Time Period" of the Order. The "Lead Time Period" for each terminated Deliverable will commence on receipt of Buyer's notice of termination and end upon the expiration of the lead-time specified for a Deliverable. If no lead-time is specified for a Deliverable, the lead-time will be a reasonable average actual lead-time under normal delivery circumstances for that Deliverable. In no event shall costs associated with, or anticipated profit or overhead, on unperformed work be payable to Seller.

If (i) Seller fails to make any delivery or perform Services in accordance with Delivery Dates or otherwise fails to comply with the Order and does not remedy such failure within a reasonable time after receipt of written notice thereof, (ii) Seller fails to make progress to such an extent that performance of the Order is endangered, (iii) any proceeding is filed by or against Seller in bankruptcy or insolvency, or for appointment for the benefit of creditors, or (iv) Seller commits any other breach of this Agreement, Buyer may (in addition to any other right or remedy provided by this Agreement or by law) terminate all or any part of this Agreement by written notice to Seller without any liability and may purchase substitute goods and services elsewhere. Seller shall be liable to Buyer for any cost occasioned Buyer thereby. Buyer also may require Seller to transfer title and deliver to Buyer any completed supplies, and such partially completed supplies and materials, parts, tools, dies, jigs, fixtures, plans, drawings, information, and contract rights as Seller has specifically produced or specifically acquired for the performance of such part of this Agreement and any technology or information necessary for production of Deliverables. If a court of competent jurisdiction finds that any termination for cause was wrongful, then such termination shall be automatically converted to a termination for convenience and the rights and obligations of the parties will be as set forth in the section hereof titled "Termination for Convenience". The parties agree that the provisions of this Default section shall not apply to failures or delays in making deliveries of Deliverables when such failure or delay is due to any cause beyond the control and without the fault or negligence of Seller as provided in the force majeure provision set forth herein; provided, however, that Buyer may cancel without liability to Seller its purchase of any such items.

**19.0 ASSIGNMENT:**
19.1 Neither this Agreement nor any interest hereunder shall be assignable by either party unless such assignment is mutually agreed to in writing by the parties hereto; provided, however, that Buyer may assign this Agreement to any corporation with which Buyer may merge or consolidate or to which Buyer may assign substantially all of its assets or that portion of its business to which this Agreement pertains or to any third party provider of "integrated services" that will purchase the Deliverables for Buyer's benefit without obtaining the agreement of Seller. Seller shall not subcontract any work called for by this Agreement without Buyer's prior written approval.

19.2 Claims for money due or to become due to Seller from Buyer arising out of this Agreement may not be assigned, unless such assignment is made to one assignee only and covers all amounts payable under this Agreement and not already paid. Buyer shall be under no obligation to pay such assignee unless and until Buyer has received written notice of the assignment from Seller, a certified copy of the instrument of assignment, and suitable documentary evidence of Seller's authority to so assign. However, any payments made to a third party subsequent to Buyer's receipt of notice that any claims for money due or to become due hereunder have been assigned or should be paid thereto shall fulfill Buyer's requirements to make any such payments hereunder.

**20.0 OFFSET:**
20.1 Buyer and its affiliated companies may be required by their customers to fulfill offset and other industrial cooperation obligations in specific countries. These obligations may take the form of technology transfer, purchase of components or services, technical and export assistance or other business transactions.

20.2 Seller acknowledges Buyer's exclusive rights in and to any offset credit that is generated as a result of this Agreement and any subsequent subcontracting by Seller to fulfill this Agreement. Buyer may use all or any part of the value of this Agreement, including the value of subcontracts placed by Seller for this Agreement, for satisfying offset obligations of Buyer, Buyer's affiliates or any entity that Buyer transfers such value to. Seller may use the offset credit generated by this Agreement or the subcontracting of this Agreement only upon the receipt of written approval from Buyer.

20.3 Seller shall also support Buyer, in any manner reasonably requested by Buyer, and at no additional cost to Buyer, in meeting Buyer's offset requirements in the amounts and in the countries specified by Buyer. Seller shall furnish upon request any certificates or other documents reasonably required by Buyer in fulfillment of Buyer's offset obligations, including, any documents transferring title to the offset credits to Buyer, any documents perfecting any rights granted to Buyer in this section, and take other action as Buyer deems appropriate in order to protect Buyer's interests in offset credits.

**21.0 COMPLIANCE WITH LAWS:**
21.1 Seller shall comply with all applicable national, state, provincial, and local laws, ordinances, rules, and regulations, including but not limited to

Case 5:23-cv-00059-KDB-DCK    Document 1-3    Filed 05/10/23    Page 6 of 9

those relating to:

(a) pollution control such as the Clean Air Act, (42 U.S.C. 7401, et seq. and the Clean Water Act 44 U.S.C. 1251 et seq.); waste disposal, such as the Resource Conservation and Recover Act, 42 U.S.C. 6901, et seq.; hazardous substances such as the Toxic Substances Control Act, 15 U.S.C. 2601, et seq., and the European Union law and regulations on the Directive on Restrictions on Use of Hazardous Substances in Electrical Electronic Equipment (Directive 2002/95/EC); occupational health and safety, such as the Occupational Safety and Health Act, 29 U.S.C. 651 et. seq., and any other national, state, provincial, and local laws, ordinances, rules, and regulations dealing with protection of the environment, health and safety;

(b) employment practices and child labor such as Sections 6, 7 and 12 of the Fair Labor Standards Act of 1938 ("FLSA"), as amended (29 U.S.C. §§ 201-219) and of regulations and orders of the United States Department of Labor issued under Section 14 thereof. Section 12(a) and Section 15(a) (1) of the FLSA and the Walsh-Healy Public Contracts Act (41 U.S.C. §§ 35-45) and the Contract Work Hours and Safety Standards Act (40 U.S.C. §§ 327-332), and any amendments thereto, as well as with the provisions of any other laws with respect to labor relations, minimum wages and hours of employment, now in effect or hereafter enacted. Seller also agrees to comply with the provisions of 29 CFR part 470;

(c) customs import or export, including country of origin marking requirements, including, without limitation, U.S. Customs Importing laws;

(d) Equal Employment Opportunity including, without limitation: the Equal Employment Opportunity provisions set forth in section 21.3 of this Agreement, 48 CFR Section 52.222-35 (Equal Opportunity for Veterans), and 48 CFR Section 52.222-36 (Affirmative Action for Workers with Disabilities), as amended, which prohibit discrimination on the basis of race, color, religion, sex, national origin, disability or protected veteran status; 29 CFR Part 470 (E.O. 13201 (Payment of Union Dues or Fees)); 41 CFR 1-1.1303 and 41 CFR 1-1.1310 (E.O. 12432 (Minority Business Enterprises)); 29 CFR Part 471, Appendix A to Subpart A (E.O. 13496 (Notification of Employee Rights Under Federal Labor Laws)); and other similar federal or state laws or regulations;

(e) Data Privacy meaning laws relating to data privacy, trans-border data flow or data protection, including, without limitation, the Health Insurance portability ad Accountability Act of 1996 ("HIPAA") and the implementing legislation and regulations of the European Union member states under the European Union Directive 95/46/EC;

(f) Providing, attempting to provide, or offering to provide any kickback (as defined in the Anti-Kickback Act of 1986, the Foreign Corrupt Practices Act of 1977, 15 U.S.C. other statutes, 18 U.S.C. § 1341, 1343, the travel act, 18 U.S.C. § 1952 or any other applicable national, state or local laws which provides for federal prosecution of violations regarding kickbacks or commercial bribery); and

0(g) export controls and sanctions, including, without limitation, the i) United States Export Administration Regulations ("EAR"), ii) International Traffic in Arms Regulations ("ITAR"), iii) regulations and orders administered by the Treasury Department's Office of Foreign Assets Control and iv) laws and regulations of other countries.

21.2 Seller warrants that:

(a) the Deliverables meet or exceed the applicable standards imposed by the Consumer Products Safety Act;

(b) the Deliverables meet or exceed the safety and health standards established and promulgated under the Federal Occupational Safety and Health Act (Public Law 91-596);

(c) Seller has fully complied with the Equal Pay Act and applicable provisions of the FLSA as amended;

(d) Seller has complied with all laws, ordinances, rules, and regulations designating certain parties as "denied", "restricted" or similarly ineligible to do business with U.S. entities. Seller shall notify Buyer promptly if Seller is: (i) suspended, debarred, or proposed for suspension or debarment from doing business with the U.S. Government, or (ii) listed or is proposed to be listed by the U.S. Government in any "denial orders," as a "blocked person," as a "specially designated national," or as a "specially designated terrorist" for U.S. export administration purposes (collectively, "Debarment"). Seller shall indemnify and hold Buyer harmless against any loss or damage suffered by Buyer as a result of Seller's Debarment, and

(e) this Agreement does not violate any laws or regulations of the territories where Seller conducts business or will perform this Agreement.

21.3 Equal Employment Opportunity: Buyer is a federal contractor that complies fully with Executive Order 11246, as amended, and the applicable regulations contained in 41 CFR Parts 60-1 through 60-50; 29 U.S.C. Section 793 (Section 503 of the Rehabilitation Act) and the applicable regulations contained in 41 CFR Part 60-741; and 38 U.S.C. Section 4212 (Vietnam Era Veterans Readjustment Assistance Act (VEVRAA)) and the applicable regulations contained in 41 CFR Part 60-300. The following provisions are incorporated into this Agreement by reference:

(a) Executive Order 11246 and the Equal Employment Opportunity clause, section 60-1.4(a) of 41 CFR, concerning equal opportunity obligations of federal contractors and subcontractors;

(b) Executive Orders 11701 and 11758, and the Affirmative Action clauses, sections 60-300.5(a) and 60-741.5(a) of 41 CFR, concerning affirmative action obligations for protected veterans and workers with disabilities of federal contractors and subcontractors. This contractor [Buyer] and subcontractor [Seller] shall abide by the requirements of 41 CFR 60-300.6(a) and 60-741.5(a). These regulations prohibit discrimination against qualified individuals on the basis of protected veteran status or disability, and require affirmative action by covered prime contractors and subcontractors to employ and advance in employment qualified protected veterans and individuals with disabilities;

(c) U.S. immigration laws; and

(d) Executive Order 13496 and the Employee Notice clause, section 471.2(b) and Appendix A to Subpart A of Part 471 of 29 CFR, regarding notification of employee rights under federal labor law.

21.4 MBE/WBE: If Seller is a Minority Owned Business Enterprise or a Women Owned Business Enterprise, Seller shall provide a current certificate on an annual basis and promptly notify Buyer if such status is lost.

21.5 Gratuities: Seller has not and will not offer or give to any employee, agent or representative of Buyer any gratuity and/or gift other than items of nominal value with a view toward securing any business from Buyer by influencing such person with respect to the terms, conditions, or performance of any contract with or order from Buyer. Any breach of this warranty shall be a material breach of each and every contract between Buyer and Seller.

21.6 Drawback: Upon request, Seller agrees to furnish completed drawback certificates and retain substantiating documentation pursuant to 19 U.S.C. Section 1313.

21.7 NAFTA: If applicable, Seller will furnish annual certificates in accordance with the North American Free Trade Act ("NAFTA") per 19CFR, Part 181 only on Deliverables which have met NAFTA rules of eligibility; and maintain record keeping to support qualification. Related costs will be the responsibility of Seller.

21.8 REACH:

(a) Seller expressly warrants that all the products and/or materials supplied in the European Union ("EU") under this Agreement will be supplied in full compliance with the provisions of the European Regulation (EC) n° 1907/2006 of 18 December 2006 concerning the Registration, Evaluation, Authorization and Restriction of Chemicals (the "REACH Regulation").

(b) Seller expressly warrants that all the substances in the products and materials supplied in the EU that require registration are or will be pre-registered (for phase-in substances) and registered within the applicable REACH statutory deadlines.

(c) To the extent that the products and/or materials supplied under this Agreement are imported by Buyer or one of its affiliates or customers in the EU and such fact is communicated to Seller, Seller expressly undertakes to appoint an Only Representative to pre-register and register the substances in these products and/or materials that require registration or, if so agreed on a case by case basis by Buyer, to supply Buyer at Seller's own cost with all necessary data and information needed for Buyer to pre-register and register the substances in these products that require registration, and to reimburse Buyer for the registration fees paid for these substances. Furthermore, Seller expressly undertakes to notify the European Chemicals Agency of any substances of very high concern as defined either in article 57 of the REACH Regulation (prior to publishing of the "candidate list") or as identified on the "candidate list" (as published in accordance with Article 59.1 of the REACH Regulation) that are contained in these products and/or materials and that require notification or, if so

agreed on a case by case basis by Buyer, to supply Buyer at Seller's own cost with all necessary data and information needed for Buyer to notify the European Chemicals Agency of substances in these products that require notification and to reimburse Buyer for any associated fees.

(d) To the extent that the products supplied by Seller qualify as "articles" under REACH, Seller hereby expressly undertakes to investigate and communicate to Buyer if there are any substances intended to be released from these articles that require registration under REACH and if there are any substances of very high concern as defined either in article 57 of the REACH Regulation (prior to publishing of the "candidate list") or as identified on the "candidate list" (published in accordance with Article 59.1 of the REACH Regulation) and present in these articles or parts thereof above 0,1%, in which case Seller shall inform Buyer of the identity of this/these substance(s) and its/their concentration in these articles. This obligation also applies to articles already supplied under this Agreement at the time of the inclusion of the substances concerned on the candidate list.

(e) Seller expressly warrants that all the substances, products and/or materials supplied under this Agreement in the EU are in compliance with the restrictions of Annex XVII of REACH, which will replace Directive 76/769/EEC on June 1, 2009. In addition, Seller undertakes to properly and timely inform Buyer of any additional restrictions set forth by the REACH Regulation or otherwise undertaken by the relevant authorities in the implementation of the REACH Regulation, including but not limited to, any restriction on use or listing in Annex XIV of the REACH Regulation for Authorization, impacting or likely to impact the use, sale or disposal of any substance contained in the products and/or materials supplied under this Agreement.

(f) Seller also undertakes to timely provide the Buyer with all relevant information on the products and/or materials supplied under this Agreement that Seller and/or its suppliers are required to communicate down the supply chain (that is, any subsequent purchaser or user) under the REACH Regulation, and in any case, to provide all the information necessary for the Buyer and/or the actors down its supply chain to timely and accurately fulfill their obligations under the REACH Regulation.

(g) For the avoidance of doubt, Seller shall bear all costs, charges and expenses related to pre-registration and registration under the REACH Regulation of the chemical substances that are the subject of this Agreement.

21.9 Import Security Filing: Seller shall comply with 19 CFR 149.1-6. For ALL ocean shipments destined for the United States, an Import Security Filing (ISF) Notification must be sent by fax or e-mail to the Crown Import Support Center, (import.support@crown.com) or as otherwise instructed. The Pre-Notification shall be sent a minimum of 72 hours before loading. Additional instructions and information may be obtained from the Crown Import Support Center 419-629-2311 x3447.

22.0 PUBLICITY:
Seller shall not make or authorize any news release, advertisement, or other disclosure which shall deny or confirm the existence of this Agreement or which shall make use of Buyer's name or logo without the prior written consent of Buyer, except as may be reasonably required to perform this Agreement.

23.0 INSURANCE:
23.1 Without limiting Seller's duty to defend, hold harmless and indemnify hereunder, Seller agrees to secure and carry as a minimum during the entire term of this Agreement and any Order, the following insurance:

(a) Workers' Compensation Insurance, inclusive of an alternate employer endorsement, in an amount sufficient by virtue of the laws of the U.S., foreign country, state, or other governmental subdivision in which the work or any portion of the work is performed and Employer's Liability Insurance in the amount of $1,000,000 for any one occurrence;

(b) General Liability Insurance including Premises and Contractual Liability, in which the limit of liability for property damage and bodily injuries, including accidental death, shall be at a minimum, a combined single limit of $5,000,000 for any one occurrence, unless some other amount is agreed to in writing;

(c) If Seller vehicles are used on Buyer's premises and/or used to accomplish work under this Agreement or an Order or otherwise on behalf of Buyer, Automobile Liability Insurance in which the limit of liability for property damage and bodily injuries, including accidental death, shall be a combined single limit of $2,000,000 for any one occurrence;

(d) If Seller or its subcontractors have Buyer's materials or equipment in its care, custody or control, Seller shall maintain All Risk Property Insurance in an amount sufficient to meet or exceed the replacement value of such material; and

(e) If Seller is performing professional services on behalf of Buyer, Seller shall maintain Professional Liability Insurance with a limit of not less than $5,000,000, unless some other amount is agreed to in writing.

23.2 All such insurance shall be issued by companies authorized to do business under the laws of the jurisdiction in which all or part of the Services are to be performed and must have an AM Best financial rating of A-or better or an equivalent rating by another rating agency acceptable to Buyer.

23.3 The insurance coverage's described above shall be in a form satisfactory to Buyer, and shall contain a provision prohibiting cancellation except upon at least ten (10) days' prior notice to Buyer. All such insurance policies will be primary in the event of a loss arising out of Seller's performance of work and shall provide that where there is more than one insured the policy will operate, except for the limits of liability, as if there were a separate policy covering each insured and shall operate without right of contribution from any other insurance carrier by Buyer. Certified copies of said policies or certificates evidencing such insurance and endorsements naming Buyer as an additional insured or, in the case of All Risk Property Insurance, naming Seller and Buyer as loss payees, shall be filed with Buyer upon execution of this Agreement and before commencement of any work hereunder, and within a reasonable time after any renewals or changes to such policies are issued. To the extent permitted by law, Seller and its insurer(s) agree that subrogation rights against Buyer are hereby waived. Seller shall reflect such waiver in any policy(ies) required under this Agreement and shall advise the amount of available policy limits as of execution of this Agreement and shall identify the amounts of any self-insured retention.

23.4 The certificate of insurance shall identify the contract number or work to be performed and shall acknowledge that such coverage applies to liabilities incurred by Seller, its employees, invitees or agents under the Agreement and that such insurance shall not be invalidated by any act or neglect of Seller whether or not such act or neglect is a breach or violation of any warranty, declarations or conditions of the policies.

23.5 Seller agrees to insert the applicable substance of this provision in all major subcontracts entered into by Seller to support work performed under the Order.

24.0 AUDIT RIGHTS:
In addition to any other inspection or audit rights granted to Buyer hereunder, Buyer may inspect and audit, on reasonable notice, Seller's books, records and its facilities, or such parts of its facilities as may be engaged in the performance of this Agreement, if the Order: (a) is a time and material order, (b) is a cost based order, or (c) provides for advance or progress payments based on costs incurred by Seller.

25.0 FORCE MAJEURE / DISASTER RECOVERY:
25.1 Neither Seller nor any Buyer shall be liable for damages for any failure or delay in the performance of this Agreement or any Order resulting from causes beyond its reasonable control including, but not limited to, unforeseeable events such as acts of God, acts of Government, war, court order, riots, natural disasters, and labor strikes. Buyer may cancel without liability to Seller its purchase of any Deliverables affected by Seller's failure or delay in performance. The party incurring the delay shall give timely notice to the others of any such event and shall use all reasonable efforts to avoid or remove the cause and resume performance with minimum delay. If requested by Buyer, the parties shall jointly prepare a contingency plan to address the potential impact of any such event.

25.2 Disaster Recovery: Seller that is: (i) a sole source of supply; or (ii) providing Deliverables whose lead-time exceeds one hundred twenty (120) days, shall develop and maintain a Disaster Recovery Plan. The said plan must include strategy and actions for recovery and continuation of business, related to production of Seller's Deliverables furnished under this Agreement, in the event of a disaster or emergency in order to prevent or limit interruption of supply of Deliverables. Seller shall furnish a copy of Disaster Recovery Plan to Buyer upon request.

26.0 DISPUTE RESOLUTION / GOVERNING LAW:
26.1 Both parties agree that they will endeavor to resolve any disputes arising from or related to this Agreement amicably through discussions with each other; and that prior to either party filing legal action against the other (except for equitable actions that may be necessary to protect a party's rights), they will enter into informal settlement discussions between management personnel of each party. The settlement discussions will commence following receipt of written notice by one party to the other and will conclude within a 60-day period, unless the parties agree to a different time period. Such settlement discussions will include attempts that are at least two tiered; meaning that if one level of management from each side cannot resolve the dispute, then each party will appoint a higher level of management to review the dispute and endeavor to reach resolution. The purpose of this section is to prevent costly litigation where early frank and

Case 5:23-cv-00059-KDB-DCK   Document 1-3   Filed 05/10/23   Page 8 of 9

pragmatic discussions between the parties could avert such litigation.

26.2 This Agreement shall be interpreted in accordance with the plain English meaning of its terms and the construction thereof shall be governed by the laws of the State of Ohio, USA without regard to conflicts of law principles. Buyer may, but is not obligated to, bring any action or claim relating to or arising out of this Agreement in the appropriate court in the jurisdiction described above, and Seller hereby irrevocably consents to personal jurisdiction and venue in any such court, hereby appointing the pertinent Secretary of State or other applicable government authority as agent for receiving service of process. Notwithstanding the foregoing, if Buyer in good faith determines that enforcement of a judgment granted by a Ohio court would not be given full faith and credit by a court in a jurisdiction where enforcement may be sought, Buyer may bring the action in that jurisdiction under Ohio law.

26.3 Any action or claim by Seller with respect hereto shall also be brought in the appropriate court in the jurisdiction described above, if Buyer so elects. Accordingly, Seller shall give written notice to Buyer of any such intended action or claim, including the intended venue thereof, and shall not commence such action or claim outside of such jurisdiction if Buyer, within thirty (30) days from receipt thereof, makes its election as aforesaid. If Buyer and Seller mutually agree to participate in alternative dispute resolution, Seller agrees that all alternative dispute resolution proceedings shall take place in Ohio.

26.4 The parties specifically disclaim application to this Agreement of the United Nations Convention on Contracts for the International Sale of Goods.

**27.0 MISCELLANEOUS:**

27.1 **Duty To Proceed:** Seller shall proceed diligently with the performance of this Agreement. Except as expressly authorized in writing by Buyer, no failure of Seller and Buyer to reach any agreement regarding a dispute related to this Agreement shall excuse Seller from proceeding. During the pendency of any dispute, Buyer shall continue to pay in accordance with this Agreement for Seller's performance related to matters not in dispute. Notwithstanding the generality of the foregoing, Buyer shall retain its rights with respect to setoff and withholding.

27.2 **Independent Contractor:** Seller shall perform the services required under this Agreement as an independent contractor and shall have exclusive control and direction of the persons engaged by Seller to perform such services, including, but not limited to, employees of Seller working at Buyer facilities. Seller assumes full responsibility for the acts and omissions of such persons. Seller shall have exclusive liability for the payment of and compliance with regulations pertaining to local, state, and federal or other governmental entity payroll taxes or contributions, and taxes for unemployment insurance, workers' compensation, social security and/or similar or related protection for such persons, as required by applicable law. Seller shall have no power to legally bind, or act on behalf of, Buyer and shall not hold itself out as an agent of Buyer.

27.3 **Survival:** All obligations and duties under any provisions, which by their nature extend beyond the expiration or termination of this Agreement, including but not limited to warranties, indemnifications, intellectual property (including protection of proprietary information) shall survive the expiration or other termination of this Agreement of which these provisions are made a part.

27.4 **Waiver:** Buyer's failure to seek a remedy for any breach by Seller or Buyer's failure to insist on performance of any of the terms or conditions herein or to exercise any right or privilege hereunder shall not thereafter be deemed a waiver for any such terms, conditions, rights or privileges or any other terms, conditions, or privileges whether of the same or similar type. Acceptance of any Deliverables or payment therefore shall not waive any breach.

27.5 **Remedies:** Seller shall be liable for any damages incurred by Buyer as a result of Seller's acts or omissions under this Agreement. The rights and remedies herein reserved to Buyer shall be cumulative and additional to any other or further rights and remedies provided in law or equity.

27.6 **Partial Invalidity:** If in any instance any provision of this Agreement shall be determined to be invalid or unenforceable under any applicable law, such provision shall not apply in such instance, but the remaining provisions shall be given effect in accordance with their terms unless the purposes of the Agreement can no longer be preserved by doing so.

27.7 **Interpretation:** This Agreement shall be construed as if drafted jointly by the parties and no provision in this Agreement shall be interpreted for or against any party because that party or that party's legal representative drafted the provision.

27.8 **Captions:** The captions, headings, section numbers, and table of contents appearing in this Agreement have been inserted as a matter of convenience and for reference only and in no way define, limit or enlarge the scope or meaning of this Agreement or any provision hereof.

27.9 **Seller Code of Conduct:** Crown Equipment Corporation expects Seller to adopt and conform its conduct to a statement or code of ethical business conduct suitable to its business. At a minimum, it shall establish the minimum standard that Seller shall comply with all pertinent laws and regulations, and may address Seller's policies regarding workplace health and safety; labor standards as required by local law or regulation, including avoiding the use of child or forced labor; protection of the environment and resources, including efficiency of Seller's products and reduction of wastes, emissions, energy consumption, and materials of concern; product safety and quality; and anti-corruption.

**28.0 TITLE AND RISK OF LOSS:**

In accordance with the terms of sale stated on the face of the purchase order, Seller warrants it shall pass clear, unrestricted, and unencumbered title to, and risk of loss for the goods to Buyer upon Buyer's receipt and acceptance of the goods. All terms of sale are to be in conformity with INCOTERMS 2000. If no INCOTERMS category of international commercial terms of sale is stated on the face of the purchase order, the applicable category is assumed to be Cost, Insurance, and Freight ("CIF"). Notwithstanding the forgoing, if Seller is an affiliate of Buyer, the INCOTERMS category selected by Seller shall govern.

**29.0 CISG/INCOTERMS:**

The parties agree that the purchase order will not be governed by the United Nations Convention on Contracts for the International Sale of Goods. THIS CONTRACT SHALL BE GOVERNED BY INCOTERMS 2010.

**30.0 WAIVER OF MECHANIC'S LIENS:**

Seller hereby waives its rights to any mechanic's lien or other lien under any applicable statutes or otherwise for work done or materials furnished in connection with the Items. Seller shall obtain from any subcontractor or materialman prior to the performance of any work on the Items, or to the furnishing of any materials for the Items, a written waiver satisfactory to Buyer of such subcontractor's or materialman's right to any such lien and shall deliver such waiver to Buyer promptly upon receipt thereof. Upon Buyer's request, Seller shall obtain, without additional cost to Buyer, a bond satisfactory to Buyer to indemnify Buyer against such liens and charges. Seller shall reimburse Buyer for all costs and damages including attorneys' fees and any special, indirect, incidental, or consequential damages incurred by Buyer in connection with or as a result of the existence or discharge of any such lien or charge, which are not satisfied by such a bond. Amounts due to Seller under this order may be credited by Buyer against amounts owed to Buyer in respect of such costs or damages.

**31.0 ENTIRE AGREEMENT:**

This document shall be deemed to contain the entire agreement between Buyer and Seller and to constitute the complete and exclusive expression of the terms of the agreement, all prior or contemporaneous written or oral agreements or negotiations with respect to such terms as are included herein or are the subject matter hereof being merged herein. By way of illustration and not limitation, Seller's acceptance shall be deemed to incorporate, without exception, all the terms and conditions hereof notwithstanding any acknowledgment or other form of Seller containing additional or contrary terms or conditions, unless Seller shall have expressly advised Buyer to the contrary in a writing apart from the printed provisions of such form. In the event of a written request by Seller for additional or contrary terms or conditions, such modification may only be made in these terms and conditions by a written instrument signed by one of the Seller officers.

Pneu-Mech Systems Mfg. LLC

*[signature]* 2-16-2015

CFO