IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| CROWN EQUIPMENT CORPORATION, | ) |
| PLAINTIFF, | ) |
| | ) Civil Action No. 5:23-cv-00059 |
| v. | ) |
| DAVID BRADY, WILLIAM TUCKER, JOSEPH BOGGS, BRAWTUS HOLDING COMPANY, INC. (f/k/a Pneu-Mech Systems Manufacturing, Inc.), BRAWTUS, MANAGEMENT COMPANY, LLC, PNEUMECH SYSTEMS MANUFACTURING, LLC (K.N.A. Pneu-Mech Dissolution, LLC), PNEU-MECH SYSTEMS MANUFACTURING, INC., UNITED FINISHING SYSTEMS LLC | ) |
| DEFENDANTS. | |

## FIRST AMENDED CROSSCLAIM

Cross-claimants, David Brady, William Tucker, Brawtus Holding Company, LLC, and Brawtus Management Company, LLC, hereby bring this First Amended Crossclaim against Pneu-mech Systems Manufacturing, Inc. for indemnity, having the right to file this Amended Cross-claim as a matter of course pursuant to Federal Rule of Civil Procedure Rule 15(a)(1)(B).

### FACTS

1. David Brady ("Brady") and William Tucker ("Tucker") successfully ran Pneu-Mech Systems Manufacturing, LLC (the "Original Company") for nearly 20 years. During this period, they took on numerous employees, some of which ultimately expressed interest, in 2017, in taking over control of the Company and wishing to purchase the Company's

assets, as Brady and Tucker were nearly retirement age and no longer wished to run the Company as a going concern.

2. The employees that ultimately noted interest in the Company were James Andrews ("Andrews") and Jerry Trostle ("Trostle"). At the time that they expressed interest in purchasing the Company's assets, Andrews and Trostle were both in positions of trust within the Company and were assisting with running day-to-day operations, as well as undertaking new client acquisition and contract acquisition for Pneu-Mech Systems Manufacturing, LLC.

3. The parties, after discussing a sale price, ultimately utilized the law firm of Pope McMillan in Statesville, North Carolina to draw up an Asset Purchase Agreement ("Agreement") in late December 2017, with an effective date of 12:01am, January 1, 2018. The parties, along with the Company's parent company, Brawtus Holding Company, Inc., executed this Agreement. Brawtus Holding Company, Inc., was wholly owned by Brady and Tucker.

4. The Agreement included a sales price of $8,500,000.00, payable in monthly installments of $65,024.43, for 180 total months.

5. The terms of the Agreement included the transfer of the physical assets, intangible property, and going concerns of the Company, including accounts receivable after a certain date. The physical assets also included extensive equipment, vehicles, office supplies, and works-in-process.

6. Brady and Tucker, when the sale ultimately closed, were paid $1,865,380.00 in cash from the Company's bank account. On deposit left with the Buyer was a remainder of $500,000.00 of operating capital.

7. A Promissory Note, detailing the amortization and total balance of the finance agreement was entered into by Andrews and Trostle, with a first repayment date of February 1, 2018.

8. Pneu-Mech Holdings, Inc. (the "New Company"), a company created by Andrews and Trostle to purchase the business assets from the Company, also entered into a lease agreement for 201 Pneu-Mech Drive (now United Drive). The owner of this real estate was Brawtus Management Company, LLC, whose members are Brady and Brawtus Holding, Inc., of which Brady and Tucker are shareholders.

9. The sale price of the Original Company's assets were split between intangible assets, valued at $6,932,000.00, and the physical assets, valued for the remainder, $1,568,000.00.

10. After the sale was executed, the Original Company was renamed to Pneu-Mech Dissolution, LLC, and administratively dissolved thereafter.

11. The New Company created by Andrews and Trostle to purchase the assets of the Original Company subsequently changed its name to Pneu-Mech Systems Manufacturing, Inc.

12. Trostle and Andrews were the sole shareholders of the New Company at the time of the sale, and on information and belief, they remained the sole shareholders of the New Company until it became insolvent and dissolved.

13. As a result of their collective 100% ownership of the New Company, Trostle and Andrews controlled the New Company, served as its officers, and ran the day-to-day affairs of the business.

14. As part of the organization of the New Company, Trostle and Andrews formed a "Board" under the New Company's written Bylaws and promised indemnity to all members of the Board expressly in writing.

15. The Bylaws listed Brady and Tucker as members of the Board, although Brady and Tucker do not agree, and never acted as if or otherwise believed that they had any authority to control the New Company.

16. Brady and Tucker had very little interaction with the New Company, and merely advised Trostle and Andrews on business operations every once in a while, both to help Trostle and Andrews and to ensure profitable operations so that Trostle and Andrews could pay off the Promissory Note.

17. While Brady and Tucker served as advisors, they did not involve themselves in the day-to-day operations of the business, and they had no authority to direct any of the New Company's operations, including by deciding which customer jobs to accept or contracts to enter.

18. Throughout 2018 and until the New Company ultimately failed in 2022, Brady and Tucker routinely warned Andrews and Trostle that they needed to substantially cut spending and take smaller jobs, given the state of the market, as well as the inability of a smaller operation like Pneu-Mech to take on much larger jobs. Andrews and Trostle ignored these warnings, and Andrews and Trostle, who had the sole authority to make business decisions and take on jobs, decided to take on jobs well beyond their capacity and skill level. This included jobs like the project the Plaintiff has filed suit upon in the Complaint, which vastly exceeded the annual revenue of the New Company.

19. For these reasons, Brady and Tucker specifically warned Trostle and Andrews not to take the project Crown alleges in the Complaint caused significant damages to Crown.

20. Trostle and Andrews took the Crown job anyway, despite the repeated warnings of Brady and Tucker.

21. Not long after Trostle and Andrews agreed to purchase the Company's assets, Andrews and Trostle immediately gave themselves significant salary raises of $25,000.00, each, and incorporated those raises into the Asset Purchase Agreement.

22. Andrews and Trostle also took out significant "shareholder loans" from the business after the sale. These loans totaled, depending on whether interest was calculated, between $89,127.92 in 2019, and $93,196.84, being owed as of December 2021.

23. Even though the Original Company, Pneu-Mech Systems Manufacturing, LLC had changed its name to Pneu-Mech Dissolution, LLC in February 2018, Andrews and Trostle continued to use the name Pneu-Mech Systems Manufacturing, LLC on its letterhead and in other communications, even though the name had changed substantially (to a name that would suggest to any reader that the entity was not an ongoing concern), and even though Trostle and Andrews knew that business actually operated under the New Company, which was namedPneu-Mech Systems Manufacturing, Inc.

24. Andrews and Trostle are sophisticated businessmen, with several company ownership interests each. They knew of this clear difference in corporate persons, and yet they continued to use this false letterhead, and other false communications with false signature blocks suggesting that Pneu-Mech Systems Manufacturing, LLC (the now dead Original Company) was an ongoing concern that Trostle and Andrews represented, and which customers were engaging to do work.

25. Nevertheless, Trostle and Andrews used this false letterhead, and other false communications claiming to represent or implying that they represented the dead Original Company in dealing with Crown Equipment Corporation, despite their sophistication and

5

knowledge that such communications were false and knowing that in fact the entity was named Pneu-Mech Dissolution LLC and that it was not an ongoing concern.

26. Only when Crown had to issue payment under the job that is the subject of the Complaint did Andrews inform Crown that it would be writing checks to the "Inc.," or the New Company, as they did not have and did not control a bank account for the dissolved "LLC," or Old Company, nor did they have a Tax ID for the Old Company which Crown would need to properly account for the payments and to issue tax forms, including a required 1099.

27. Brady and Tucker were not included in any communications between Andrews, Trostle, and any Crown representatives.

28. The Crown job which is the subject of the Complaint did not come to fruition until nearly a year after Brady and Tucker had sold the Original Company's assets to the New Company, which was wholly owned by Trostle and Andrews.

29. Brady and Tucker do not remember speaking even a single time with anyone from Crown for the job described in the Complaint that Crown alleges gives rise to liability.

30. Brady and Tucker had such limited involvement that they were only at annual meetings to discuss the finances of the Company. They were completely left out of any operating business discussions, after having sold the Original Company.

31. In the limited number of meetings with Andrews and Trostle that they had, Brady and Tucker gave progressively dire warnings to Andrews and Trostle about their excessive overhead and the fact that they would likely soon be unable to cover ordinary operating expenses, especially if they took on additional high operating expense work.

32. Trostle is also an executive level board member of a company called "AFI Carolinas." AFI conducts liquid and powder sign coating. Trostle was a member of this Company at the same time that he was a shareholder of the New Company.

33. Brand Performance Fabrication, LLC ("BPF") is another wholly owned subsidiary of AFI that conducts welding and fabrication services and creating made-to-order custom parts. Andrews is the member-manager of BPF. Andrews was a shareholder, officer, and board member of the New Company at the same time he was a member-manager of BPF.

34. By mid-2022, the New Company was severely deficient in its obligation to pay Brady and Tucker pursuant to the financing agreement they had reached. On information and belief, this had exceeded $600,000 in arrearage principal, being roughly 10 months in arrears.

35. In the final annual meeting that Andrews and Trostle held, to which they invited Brady and Tucker, Andrews and Trostle informed Brady and Tucker that the 15-year note was likely not going to be repaid without significant hardship. When Brady and Tucker asked them how they would need to restructure the note, the accountant working on the matter informed them that it was likely too late and that the New Company didn't have cash sufficient to pay the interest or even begin making progress against the arrearage payments.

36. By the time that Brady and Tucker, as creditors of the New Company, called the note in default and repossessed the various assets of the business, they discovered several outstanding invoices and accounts receivable to both AFI and BPF.

37. AFI owed $26,500.00 on one invoice.

38. AFI also owed several other invoices totaling $20,124.34.

39. AFI also owed accruing interest on those invoices, which were, as of 2022, unpaid. The total balance, with interest, was $58,112.24, when the Company ceased operations.

7

40. BPF, on the other hand, had an accounts payable balance to the New Company of $179,072.37, by the end of 2021.

41. On information and belief, Andrews and Trostle were siphoning away work that could have been completed by the New Company, because they were seeking to have the money earned by their subsidiaries, and carrying an open balance with the New Company, an enterprise they fully intended to bankrupt, being well underwater by the period of 2021-2022.

42. On information and belief, Trostle and Andrews never intended to pay the invoices to AFI or BPF, because they were aware of the financial insolvency of the New Company and knew the money was going to disappear into interest arrearage payments.

43. On information and belief, the New Company supplied materials and labor to both AFI and BPF, and the New Company was rarely, if ever, paid.

44. Andrews and Trostle have routinely sought to palm off liability for their failure to intelligently conduct the business of the New Company onto Brady and Tucker, despite failing to heed any of their financial advice.

45. Andrews and Trostle have directly spoken to the Plaintiff in this case, and are actively aiding the Plaintiff in this case, including by misdirecting blame for the Plaintiff's alleged wrongdoing at Brady and Tucker, even though Brady and Tucker have nothing to do with the wrongdoing alleged in the Complaint.

46. Andrews and Trostle have also pointed the finger at Brady and Tucker regarding contracts that were entered into in 2022 with another business, Queen's Logistics, LLC, nearly 4 years after the sale, and have told opposing parties to sue Brady and Tucker directly, claiming insufficient assets to make various prior customers whole.

47. At the time the Queen's Logistics contracts were negotiated by Andrews and Trostle, the New Company was functionally bankrupt, with assets outweighed by liabilities 3 to 1 or more, and were likely not going to maintain operations much longer. Despite this knowledge, Andrews and Trostle continued taking on new work and entering new contracts with no intention of ever paying the various creditors they had.

48. By engaging in this conduct, Andrews and Trostle knew, or reasonably should have known, that they would have inadequate resources to support jobs like the one that Crown alleges gives rise to liability in its Complaint. Trostle and Andrews seemed fully satisfied with simply blaming Brady and Tucker for actions Brady and Tucker had no say in, knowledge of, or control over, and all of which were undertaken through the New Company by Trostle and Andrews and entirely for their benefit and that of the New Company, which they owned entirely.

49. Considering the above, Brady and Tucker have engaged in no wrongdoing in this case, and they and the companies they own have absolutely no fault for the wrongdoing which Crown alleges in its Complaint, which are entirely the fault of the New Company and its owners, Trostle and Andrews.

**COUNT I**
**INDEMNITY**

50. The preceding paragraphs 1-49 are herein incorporated by reference.

51. Under North Carolina law, a party is entitled to indemnity when the party "is exposed to liability by the action of another who, in law or equity, should make good the loss of another." *Carl v. State*, 192 N.C.App. 544, 557, 665 S.E.2d 787, 797 (2008) (internal quotations omitted). The most common form of indemnity is indemnity expressly provide for in a written contract, although "[a] contract of indemnity need not be express;

indemnity may be recovered if the evidence establishes an implied contract. In addition, a right to indemnity exists whenever one party is exposed to liability by the action of another who, in law or equity, should make good the loss of the other." *McDonald v. Scarboro*, 91 N.C. App. 13, 22, 370 S.E.2d 680, 686 (1988) (internal quotations omitted). The first category of indemnity is self-explanatory. The second category "of indemnity implied-in-fact stems from the existence of a binding contract between two parties that necessarily implies the right," which "is derived from the relationship between the parties, circumstances of the parties' conduct, and that the creation of the indemnitor/indemnitee relationship is derivative of the contracting parties' intended agreement." *Crescent Univ. City Venture*, LLC v. AP Atl., Inc., 2019 NCBC LEXIS 46, *116, 2019 NCBC 46, 2019 WL 3765313 (internal quotations omitted). The third category, indemnity implied in law, "arises from an underlying tort, where a passive tort-feasor pays the judgment owed by an active tort-feasor to the injured third party." *Woody v. FlightGest, Inc.*, 265 N.C. App. 602, 827 S.E.2d 346 (2019).

52. If the cross-claimants are found liable under the Complaint, then the Cross-claimants are entitled to indemnity from Pneu-mech Systems Manufacturing, Inc. based upon the express promise of indemnity to Brady and Tucker found in the company's bylaws, as previously explained in this pleading.

53. If the cross-claimants are found liable under the Complaint, they are further entitled to indemnity based on a theory of implied-in-fact contract, since the complete circumstances described in this pleading and those alleged in the Complaint demonstrate that any passive advisor like Brady and Tucker would have indemnity by implication.

54. Finally, if the cross-claimants are found liable under the Complaint, they are entitled to indemnity based on a theory of indemnity implied-by-law because the active tortfeasor as alleged in the Complaint, and as further factually alleged in this cross claim, is Trostle and Andrews and their wholly-owned and wholly-controlled corporation, Pneu-Mech Systems Manufacturing, Inc.

55. The cross-claimants are further entitled to recover attorney's fees and costs for the same reason.

56. Because Pneu-Mech Systems Manufacturing, Inc. is a defunct company which has been dissolved by the State of North Carolina, the cross-claimants are entitled to recover from the only shareholders of this corporation, Trostle and Andrews.

WHEREFORE, Cross-claimants respectfully request that this Court order the relief requested above, and any other relief it deems just and proper.

Dated: May 22, 2024                    BY COUNSEL

/Andrew P. Connors/
Andrew P. Connors, Esq. (Va. Bar. No. 80248)
(Admitted *Pro Hac Vice*)
DARKHORSE LAW PLLC
119 Tradewynd Dr., Suite B.
Lynchburg, VA 24502
Phone: 540-553-8149 ext. 2
Fax: 540-301-6460
andrew@darkhorse.law

John Riordan (NC. Bar No. 54973)
FIDELITY LAW GROUP
8511 Davis Lake Pkwy, C6-138,
Charlotte, NC, 28269
Phone: 704-285-8111
j.riordan@theflg.com

Abbi White Harris, Esq. (NC Bar No. 59883)
Naman, Howell, Smith, and Lee
400 Austin Ave., Suite 800
Waco, TX 76701
Phone: 254-755-4112
Fax: 254-754-6331

*Counsel for Defendants David Brady, William Tucker, Brawtus Holding Co., Inc., Brawtus Management Co., LLC, and Pneu-Mech Dissolution LLC*

12

Case 5:23-cv-00059-KDB-DCK   Document 77   Filed 05/22/24   Page 12 of 13

**CERTIFICATE OF SERVICE**

      I hereby certify that on May 22, 2024, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which served all counsel of record via CM/ECF.

/Andrew P. Connors/
Andrew P. Connors, Esq. (Va. Bar. No. 80248)
DARKHORSE LAW PLLC
Phone: 540-553-8149 ext. 701
Fax: 540-301-6460
andrew@darkhorse.law

*Counsel for Defendants Brady, Tucker, Brawtus Holding, Inc., Brawtus Management LLC, and Pneu-Mech Dissolution LLC*