2020 WL 6216836
Only the Westlaw citation is currently available.
United States District Court, W.D. North Carolina,
Statesville Division.

PEKIN INSURANCE COMPANY, Plaintiff,

v.

INNOVATIVE COATINGS AND
MATERIALS, L.L.C.; ABT, Inc.;
and C.R. Onsrud, Inc., Defendants.

Civil Action No. 5:19-CV-128-KDB-DSC
|
Signed 10/22/2020

**Attorneys and Law Firms**

Stephen Kyle Pytlik, Jeffrey D. Keister, McAngus Goudelock & Courie, PLLC, Raleigh, NC, for Plaintiff.

James M. Dedman, IV, Gallivan, White, & Boyd, P.A., Charlotte, NC, for Defendant ABT, Inc.

Amiel J. Rossabi, Rossabi Law Parters, Greensboro, NC, for Defendant C.R. Onsrud, Inc.

**ORDER ON PLAINTIFF PEKIN INSURANCE COMPANY AND DEFENDANT ABT, INC.'S MOTIONS FOR DEFAULT JUDGMENT**

Kenneth D. Bell, United States District Judge

**\*1 THIS MATTER** is before the Court on Plaintiff Pekin Insurance Company's ("Pekin") Motion for Default Judgment (Doc. No. 40) and Renewed Motion for Default Judgment (Doc. No. 57) and Defendant ABT, Inc.'s ("ABT") Motion for Default Judgment (Doc. No. 43). The Court has carefully considered these motions, the parties' briefs and exhibits in support of their respective positions, and the Stipulation (Doc. No. 56) filed by the parties. For the reasons discussed below, the Court will **GRANT** both motions.

**I. LEGAL STANDARD**

Pekin and ABT move for default judgment under Rule 55(b) of the Federal Rules of Civil Procedure, because their

claims do not seek a sum certain. In order to be granted default judgment, Pekin's Complaint (Doc. No. 1) and ABT's Amended Crossclaim (Doc. No. 19) must include "[f]actual allegations ... enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 167 L.Ed.2d 929, 940 (2007). The claims must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 173 L.E.2d 868, 884 (2009) (quotations omitted).

When considering a motion for default judgment, the Court accepts all well-plead factual allegations. *See Erickson v. Pardus* 551 U.S. 89, 94 (2007). "[T]he general rule is that 'facts alleged by the plaintiff are deemed admitted' while 'plaintiff's conclusions of law are not deemed established.' " *Synergy Fin. LLC v. Zarro*, 2005 U.S. Dist. LEXIS 55646 at \*17, 2005 WL 8173808 (W.D.N.C., Oct. 18, 2005) (citing 10 Moore's Federal Practice § 55.12(1) (3d ed. 1999)).

Pekin's claims arise out of a policy of insurance issued to ICM, an Iowa corporation, and this court currently sits with diversity jurisdiction. "A federal court exercising diversity jurisdiction is obligated to apply the substantive law of the state in which it sits, including the state's choice of law rules." *Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co.*, 386 F.3d 581 (4th Cir. 2004) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 79 (1938)).

North Carolina follows the general rule of *lex loci contractus*, *i.e.*, "the substantive law of the state where the last act to making a binding contract occurred, usually delivery of the policy, controls the interpretation of an insurance policy." *Cont'l Cas. Co. v. Physicians Weight Loss Ctrs. Of Am.*, 61 Fed. App. 841, 844 (4th Cir. 2003) (unreported). Here, Pekin issued its policy to ICM, an Iowa corporation; as such, Iowa law controls interpretation of the policy of insurance.

Under Iowa law, "fraudulent misrepresentations leading to the creation of a contract give rise to a right of rescission." *Robinson v. Perpetual Servs. Corp.*, 412 N.W.2d 562, 568 (Iowa 1987). To avoid a contract through the doctrine of equitable rescission, five elements must be proven: "(1) a representation, (2) falsity, (3) materiality, (4) an intent to induce the other to act or refrain from acting, and (5) justifiable reliance." *Hyler v. Garner*, 548 N.W.2d 864 (Iowa 1996). Under Iowa law, "it is not the knowledge of falsity that is at issue, but 'whether misrepresentations induced the complaining party to contract.' " *Rubes v. Mega Life & Health Ins. Co.*, 642 N.W.2d 263, 269 (Iowa 2002) (citing *Utica Mut.*

Case 5:23-cv-00059-KDB-DCK Document 109-1 Filed 09/16/24 Page 1 of 81

*Ins. Co. v. Stockdale Agency*, 892 F. Supp. 1179, 1193 (N.D. Iowa 1995)).

## II. FACTS AND PROCEDURAL HISTORY

**\*2** On or around January 30, 2019, Defendant Innovative Coatings & Materials, L.L.C. ("ICM") submitted a bid to ABT for spray painting services to four (4) commercial silos at the ABT plant in Troutman, North Carolina, to occur in May 2019. The spray painting services included sand and/ or water blasting, cleaning and prepping the silos, two (2) coatings of paint to the silos, and supplies (hereinafter, this scope of work is referred to as, the "Bid"). The commercial silos are over three stories tall.

After ICM submitted the Bid to ABT, on or around March 15, 2019, ICM applied for a Commercial General Liability policy with Pekin by completing an insurance application and contractors supplemental application (collectively, the "Application"). In the Application, ICM answered "no" to the question of whether it's work included any work over three stories. In reliance on ICM's representations, PEKIN issued a Commercial General Liability policy to ICM bearing number CLO240465-0, with effective dates of March 29, 2019 to March 15, 2020 (the "Policy"). ICM paid the premiums required. The Policy includes the following relevant provisions:

> ### SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS
>
> ...
>
> **6. Representations**
>
> By accepting this policy, you agree:
>
> **a.** The statements made in the Declarations are accurate and complete;
>
> **b.** Those statements are based upon representations you made to us; and
>
> **c.** We have issued this policy in reliance upon your representations.

Based upon the Bid, ICM provided spray painting services to ABT's four (4) commercial silos in May 2019, which included work over three stories. During the work, approximately 117 vehicles owned by employees of C.R. Onsrud, Inc.

("Onsrud"), a neighboring business, were damaged with overspray painting as a result of ICM's work. As a result of the overspray damage, Onsrud engaged the services of The Auto Salon, LLC to clean the affected vehicles, and paid damages to mitigate the damage to its employees' vehicles.

Based upon the foregoing, Pekin filed its Complaint and seeks a declaratory judgment that it is entitled to rescission of Policy due to material misrepresentations made in ICM's application for the insurance and seeks a declaration that it may refuse to defend and indemnify ICM under the Policy and not be required to pay damages for any losses covered by the insurance, specifically including claims for damages by Onsrud and ABT. (Doc. No. 1) ABT served an Amended Crossclaim on ICM, seeking indemnity, contribution and recovery of costs, interest, and attorneys' fees. (Doc. No. 19)

ICM failed to answer either Pekin's Complaint or ABT's Amended Crossclaim, and both parties moved for, and were granted default as to ICM. Both Pekin and ABT now move for default judgment under Fed. R. Civ. P. 55(b), and Onsrud, the remaining appearing defendant, does not oppose either Motion. (Doc. No. 56) Therefore, these motions are ripe for the Court's determination.

## III. DISCUSSION

### A. PEKIN'S CLAIM FOR RESCISSION OF THE POLICY.

Pekin seeks to rescind the Policy, based upon the alleged material misrepresentations of ICM in its application of insurance. To rescind the Policy, Pekin must prove five elements under Iowa law. *Hyler, surpa.* For the reasons set forth herein, the Court finds Pekin has proven these five elements and may rescind the Policy.

As an initial matter, because ICM failed to answer Pekin's Complaint, the facts alleged by Pekin are deemed admitted as to ICM, including *inter alia*, (1) ICM contracted with ABT to provide spray painting services to four commercial silos (Doc. No. 1, ¶ 11); (2) the four commercial silos are over three stories tall (*Id.*, ¶ 13); (3) ICM submitted the Bid to ABT on or around January 30, 2019 for spray painting of the commercial silos (*Id.*, ¶ 11); (4) on or around March 15, 2019, ICM applied for a policy of insurance with Pekin by completing the Application (*Id.*, ¶ 14); (5) in the Application, ICM answered "NO" to the question, "Does the applicants' work include ... Work Over 3 Stories" (*Id.*, ¶ 17); and (6) Pekin

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2

bound the Policy in reliance on ICM's representations (*Id.*, ¶ 19).[1]

**\*3** Based upon the factual allegations which are deemed admitted as to ICM based upon its default, prior to completing the Application, ICM had contracted with ABT to provide spray painting serves for commercial silos over three stories tall. Therefore, ICM knew, or should have known, at the time of making the Application it would perform work over three stories. Accordingly, ICM's representation that it did not perform work over three stories was false. Pekin has therefore proven elements one (representation) and two (falsity) as required under Iowa law.

Next, the Court must determine whether ICM's false representation was material, the third element required under Iowa law. A representation is material when it induces another to act and "the transaction would not have occurred without it." *Rubes*, 642 N.W.2d 270 (citing *Utica Mut. Ins. Co.*, 892 F. Supp. at 1194). Based upon the factual allegations which are deemed admitted as to ICM based upon its default, ICM admitted Pekin would not have issued the Policy, accepted the risk, or set the premium as it did if ICM had truthfully answered the Application. (*See id.* ¶¶ 46-49) Pekin, therefore, has proven the third element (materiality) required under Iowa law.

Turning to the fourth and fifth elements, the Court must determine whether ICM's material misrepresentation induced Pekin to act (or refrain from acting), because Pekin justifiably relied on the representations made in the Application to issue the Policy. Based upon the factual allegations which are deemed admitted as to ICM based upon its default, ICM's material misrepresentations induced Pekin to act, as Pekin issued the Policy in reliance upon ICM's representations. (*See id.* ¶¶ 20; 46-48) Furthermore, based upon the factual allegations which are deemed admitted as to ICM based upon its default, Pekin justifiably relied on the representations in the Application when determining whether to issue the Policy. (*Id.* ¶ 47) Pekin, therefore, has proven the fourth element (inducement) and fifth element (justifiable reliance) required under Iowa law. Accordingly, having satisfied all elements under Iowa law, the Court finds that Pekin is entitled to rescind the Policy and default judgment in Pekin's favor on this basis is proper.

Having determined that Pekin is entitled to rescind the Policy, the Court next considers whether Pekin may refuse to defend and indemnify ICM and not be required to pay damages for any losses covered by the now-rescinded Policy, specifically including claims for damages by Onsrud and ABT. As the Policy has been rescinded, no valid contract of insurance exists between Pekin and ICM such that Pekin has a duty to defend ICM or a duty to indemnify ICM. Therefore, to the extent further claims are presented under the Policy, Pekin is entitled to refuse to defend or indemnify ICM as to any claims that could have been made under the now-rescinded Policy.

## B. ABT'S CLAIMS FOR INDEMNITY AND CONTRIBUTION.

Next, the Court considers ABT's claims for indemnity and contribution from ICM. ABT's claims arise out of claims made against it by Onsrud for property damage as a result of the overspray damage, including claims for negligence and negligent hiring. (Doc. No. 6) ABT served its Amended Crossclaim on ICM, asserting its claims, and ICM failed to answer. For the reasons set forth herein, the Court finds ABT is entitled to indemnity and contribution.

ABT contracted with ICM to perform the spray painting work described herein and alleges that ICM owed ABT a duty to avoid foreseeable harm in the performance of its work. (Doc. No. 43, p. 3) ABT asserts ICM breached this duty by causing the overspray which damaged vehicles on the Onsrud property, and that ICM's tortious conduct reflects active negligence.

**\*4** North Carolina recognizes a right to "implied-in-law" indemnity "when a passive party is made liable for an active party's tortious conduct flowing to and injuring a third party." *Kaleel Builders, Inc. v. Ashby*, 161 N.C. 34, 47, 587 S.E.2d 470, 478 (2003). "Indemnity implied-in-law arises from an underlying tort, where a passive tortfeasor pays the judgment owed by an active tortfeasor to the injured third party." *Id.* at 38-39, 587 S.E.2d at 474. Implied-in-law indemnity exists "where the actively negligent tortfeasor may be found to have made an implied promise to indemnify the passively negligent tortfeasor." *Charlotte Motor Speedway v. Tindall Corp.*, 195 N.C. App. 296, 303, 672 S.E.2d 691, 695 (2009).

Here, ICM, as a contractor to ABT, owed ABT a duty of reasonable care to avoid foreseeable harm during the performance of its work. *Taylor v. Lutz-Yelton Heating & Air Conditioning Corp.*, 43 N.C. App. 194, 198-199, 258 S.E.2d 399, 402-403 (1979). ICM breached this duty when it caused the overspray damage to Onsrud's employee's vehicles and other damage, which was a foreseeable consequence of its negligent performance of its work. As such, any negligence of

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

ABT was passive to the active negligence of ICM, and ABT is entitled to indemnity.

ABT also seeks contribution from ICM pursuant to N.C. Gen. Stat. § 1B-1(a). Pursuant to this statute, a party is entitled to contribution where it and another are jointly and severally liable to another in tort. *Holland v. Edgerton*, 85 N.C. App. 567, 571, 355 S.E.2d 514, 517 (1987).

Here, as a result of ICM's negligence, Onsrud alleges it suffered damages to its employees' vehicles, for which it paid to mitigate damages, and otherwise. Therefore, were the Court to conclude that ABT and ICM were joint tortfeasors (which the Court does not decide herein), ABT would be entitled to contribution pursuant to N.C. Gen. Stat. § 1B-1(a). As such, the Court finds that default judgment in ABT's favor on its claims for indemnity and contribution is proper.

## IV. ORDER

**NOW THEREFORE IT IS ORDERED THAT:**

1. Pekin's Motion for Default Judgment (Doc. No. 40) and Renewed Motion for Default Judgment (Doc. No. 57) are **GRANTED**;

2. **Default Judgment** is entered in favor of Pekin against Defendant Innovative Coatings & Materials, L.L.C.;

3. PEKIN is entitled to rescind the Commercial General Liability policy bearing policy number CLO240465-0 and PEKIN has neither a duty to defend nor liability to furnish or pay defense fees or costs for ICM in connection with its May 2019 spray painting services as described above;

4. ABT's Motion for Default Judgment (Doc. No. 43) is **GRANTED**; and

5. **Default Judgment** is entered in favor of ABT against Defendant Innovative Coatings & Materials, L.L.C.

**SO ORDERED ADJUDGED AND DECREED.**

**All Citations**

Not Reported in Fed. Supp., 2020 WL 6216836

Footnotes

1    The Court notes that Pekin has moved to rescind the Policy on three separate bases: (1) that ICM misrepresented the nature and scope of the work it performed (Doc. No. 1 ¶ 40); (2) that ICM misrepresented that it performed work outside the state of Iowa (*Id.* ¶ 35); and (3) that ICM misrepresented that did not perform work over three (3) stories (*Id.* ¶ 45). Because the Court finds that ICM's representation regarding work performed over three (3) stories is evidenced from the admissions and materials before the Court, and this basis alone supports default judgment, the Court does not specifically consider the other bases in entering this Order. (*See e.g.* Doc. No. 40-2)

**End of Document**    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 934829
United States District Court, W.D. North Carolina,
Charlotte Division.

Victoria SQUITIERI, Plaintiff,

v.

PIEDMONT AIRLINES, INC., Anthony
Barden, Darryle Williams, Donielle Prophete,
Larry Baldwin, and Darrel Butler, Defendants.

3:17CV441
|
Signed 02/16/2018

**Attorneys and Law Firms**

Michael Harman, Harman Law, PLLC, Huntersville, NC, for Plaintiff.

Julie K. Adams, Ford & Harrison LLP, Charlotte, NC, Patricia G. Griffith, Ford & Harrison LLP, Atlanta, GA, Narendra Kumar Ghosh, Patterson Harkavy LLP, Chapel Hill, NC, Robert Moore Weaver, Quinn, Connor, Weaver, Davies & Rouco LLP, Decatur, GA, for Defendants.

ORDER

Graham C. Mullen, United States District Judge

 **\*1** This matter is before the Court upon Defendants Piedmont Airlines, Inc. ("Piedmont"), Larry Baldwin, and Darrel Butler's (collectively the "Piedmont Defendants") Motion to Dismiss Parts of Plaintiff's Amended Complaint (Doc. No. 24), as well as Defendants Anthony Barden, Darryle Williams and Donielle Prophete's (collectively "Individual Defendants") Motion to Dismiss (Doc. No. 27). Both motions have been fully briefed and are ripe for disposition.

**FACTUAL BACKGROUND**

Defendant Piedmont is a regional airline and a wholly-owned subsidiary of American Airlines Group, Inc. (Am. Compl. ¶ 3). From February 2013 until October 2016 Plaintiff Victoria Squitieri was employed by Piedmont at its Charlotte operations hub. *Id.* at ¶¶ 12, 50. Squitieri was employed by Piedmont as a Customer Service Ramp Agent and as a Ramp

Unit Manager. *Id.* at ¶¶ 11, 13. From August 19, 2013 until July 13, 2016 she held the Ramp Unit Manager position. *Id.* at ¶¶ 13, 36.

Defendants Barden, Williams and Prophete are officials of Communications Workers of America Local 3645. Mr. Barden is Area Vice President of Local 3645. *Id.* at ¶ 4. Mr. Williams is Local 3645 Executive Vice President. *Id.* at ¶ 5. Ms. Prophete is Local 3645 System Board Coordinator. *Id.* at. 6. Defendant Larry Baldwin is a ramp duty manager for Piedmont and Darrel Butler is a ramp manager. *Id.* at ¶¶ 7-8.

In July 2016 Squitieri maintained a personal Facebook page. On July 8, 2016 she posted comments on her Facebook page regarding the Black Lives Matter movement and her respect for law enforcement. *Id.* at ¶¶ 16-18. Squitieri posted:

> I have 2 brothers and 2 sisters-in-law that are law enforcement. I don't want to see any more of your bullshit posts about cops! There's good an [sic] there's bad—when you need them they come and you're damn glad! I don't care what color you are—stop jumping the bandwagon! Very simply—don't put yourself at the end of a cops [sic] gun! You're black so what, I don't give a shit—don't mean ya [sic] can run your mouth and get on your soap box just because you share skin color! Shut up already!

*Id.* at ¶ 19. Following comments of other persons about Squitieri's initial posting she posted:

> All lives matter. Period. I will not be preached to. I never said Black lives dont [sic] matter. I believe Black lives matter is stoking the fire of racial tension and hate by exploiting deaths and encouraging division. Period. Look again at my words and do not put words in my mouth.

*Id.* at ¶¶ 20-21.

Squitieri claims to have suffered harassment by co-workers on the job and online following her Black Lives Matter Facebook posts. *Id.* at ¶ 26. She alleges that the Individual Defendants[1] maliciously posted false, misleading statements regarding Squitieri's Facebook posts on the CWA Local 3645 Facebook page, the "CLT Eagle Swap" Facebook page, and in a locked glass case in the workplace. *Id.* at ¶ 27. She alleges that the Individual Defendants falsely called her a racist and derided her character. *Id.* at ¶¶ 31, 45. Squitieri complained to Piedmont management about the Individual Defendants' Facebook posts, workplace memorandum and other allegedly slanderous statements. *Id.* at ¶ 48.

Squitieri v. Piedmont Airlines, Inc., Not Reported in Fed. Supp. (2018)

2018 Fair Empl.Prac.Cas. (BNA) 52,931, 2018 IER Cases 52,931

**\*2** In her Amended Complaint, Plaintiff asserts six causes of action: (1) discriminatory disparate treatment due to race in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C § 2000 *et seq.* (Count One); (2) harassment due to race in violation of Title VII (Count Two); (3) discrimination on the basis of race in violation of 42 U.S.C. § 1981 ("Section 1981") (Count Three); (4) harassment on the basis of race in violation of Section 1981 (Count Four); (5) defamation/libel *per se* (Count Five); and (6) defamation/libel *per se* (Count Six). The Piedmont Defendants have moved to dismiss Counts Two, Four, Five and Six of Plaintiff's Amended Complaint for failure to state a claim upon which relief can be granted. The Individual Defendants have likewise moved to dismiss the Fifth and Sixth Claims for Relief.

**DISCUSSION**

A Rule 12(b)(6) motion tests the sufficiency of the complaint. *Smith v. Frye*, 488 F.3d 263, 274 (4th Cir. 2007). In reviewing a Rule 12(b)(6) motion to dismiss, the court must accept as true the well-pleaded allegations of the complaint and view them in the light most favorable to the plaintiff. *Mylan Laboratories, Inc. v. Maktari*, 7 F.3d 1130, 1134 (4th Cir. 1993). "Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law." *McClean v. U.S.*, 566 F.3d 391, 399 (4th Cir. 2009), quoting *Neitzke v. Williams*, 490 U.S. 319, 326 (1989). To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient allegations of fact that, if accepted as true, "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although a complaint need not contain "detailed factual allegations," it must include more than "a formulaic recitation of the elements of the cause of action." *Id.* at 555. The court "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008). "[A]n unadorned, the defendant-unlawfully-harmed-me accusation" is insufficient; rather, legal conclusions "must be supported by factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 668-69 (2009), citing *Twombly*, 550 U.S. at 555.

In Counts Two and Four of her Amended Complaint, Plaintiff alleges that Defendant Piedmont subjected her to harassment because of her race, in violation of Title VII and Section 1981, respectively. To state a claim for hostile work environment, Plaintiff must allege that: (1) she was subjected to unwelcome harassment; (2) the harassment was because of her race; (3) the harassment was sufficiently severe or pervasive to alter the terms and conditions of Plaintiff's employment and create an abusive atmosphere; and (4) there is a basis to impose liability on the employer. *Mosby-Grant v. City of Hagerstown*, 630 F.3d 326, 334 (4th Cir. 2010) (Title VII); *Jordan v. Alternative Res. Corp.*, 458 F.3d 332, 344 (4th Cir. 2006) (Section 1981 principles are same as those for Title VII) (overruled on unrelated grounds by *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 269 (4th Cir. 2015)). A hostile work environment exists only where the work environment is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal citations omitted). In determining whether a work environment is hostile, courts look at the totality of the circumstances; to wit, the frequency and severity of the harassing conduct, whether the conduct is physically threatening or humiliating (as opposed to a mere offensive utterance), and whether it unreasonably interferes with the plaintiff's work performance. *McNeal v. Montgomery County*, 307 Fed. Appx. 766, 776 (4th Cir. 2009). The environment must be both subjectively and objectively offensive. *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008).

**\*3** "Simple teasing, offhand comments and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id.* (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). Likewise, rude or insensitive treatment cannot sustain a hostile work environment claim. *See, e.g., Baqir v. Principi*, 434 F.3d 733, 747 (4th Cir. 2006). Noting that a plaintiff must clear a "high bar" to satisfy the severe and pervasive test, the Fourth Circuit has stated:

> Workplaces are not always harmonious locales, and even incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard. Some rolling with the punches is a fact of workplace life. Thus, complaints premised on nothing more than "rude treatment by [coworkers]," ... "callous behavior by [one's] superiors," ... or "a routine difference of opinion and personality conflict with [one's] supervisor," ... are not actionable under Title VII.

*Sunbelt Rentals*, 521 F.3d at 315-16 (internal citations omitted).

Plaintiff's allegations of harassment against Defendant Piedmont do not rise to the level of severe and pervasive conduct based on her race. Plaintiff's Amended Complaint

Case 5:23-cv-00059-KDB-DCK   Document 109-1   Filed 09/16/24   Page 6 of 81

**Squitieri v. Piedmont Airlines, Inc., Not Reported in Fed. Supp. (2018)**

2018 Fair Empl.Prac.Cas. (BNA) 52,931, 2018 IER Cases 52,931

fails to sufficiently allege that the workplace was permeated with discriminatory intimidation, ridicule, and insult needed to demonstrate a hostile work environment claim. Instead, Plaintiff makes only conclusory and bare legal allegations to the effect that employees ridiculed her by calling her racist following her controversial Facebook post.

First, stating that Plaintiff is "racist" is not racial on its face and is not related to Plaintiff's race. Although such comments may have been unwelcome, there is simply no basis to conclude that they were racially-motivated. *See Trinh Huynh v. O'Neill*, No. Civ. A. 3:01CV445, 2002 WL 32507837, *5 (E.D. Va. May 29, 2002) ("Although the comments and actions the Plaintiff alleges were unwelcome, there is simply no basis to conclude that they were racially-motivated or even motivated by anything more than intra-office conflict among individuals who did not like each other."). Plaintiff's Amended Complaint clearly states that the alleged harassment to which she was subjected involved Facebook postings and rumors indicating that she is racist and should be disciplined. (Am. Compl. ¶¶ 26-27.) Under that theory, any alleged harassment was based on her co-workers' perceptions that she was racist, not because of her race. Further, the timing of the alleged harassment confirms that the harassment was based on Plaintiff's Facebook posts rather than her race. *See* Am. Compl. ¶ 26 ("Shortly after publication of the First Facebook Post, Squitieri suffered coworker-led racial harassment at work and online...."). In support of her claims, Plaintiff asserts that similarly situated African-American employees engaged in comparable conduct but were not subjected to the same ridicule and unwelcome comments. In making this argument, Plaintiff erroneously attempts to conflate her disparate treatment claims with her harassment claims.

Second, even if the work environment was subjectively offensive to Plaintiff, it was not objectively offensive as a matter of law. Plaintiff fails to sufficiently allege that any of Defendant Piedmont's actions interfered with her ability to perform her duties. Nor were any alleged comments that she was racist severe or pervasive within the meaning of the law. *Sunbelt Rentals*, 521 F.3d at 315. "Courts have found the existence of a racially hostile workplace based on verbal harassment only in instances where unambiguous *racial epithets, slurs, or extremely abusive language* were uttered with recurring frequency." *Montano v. INOVA Health Care Servs.*, No. 1:08CV565(GBL), 2008 WL 4905982, *3 (E.D. Va. Nov. 12, 2008) (emphasis added) (citing *Spriggs v Diamond Auto Glass*, 242 F.3d 179, 185-186 (4th Cir. 2001) and *White v. BFI Waste Svcs, LLC*, 375 F.3d 288

(4th Cir. 2004)). While allegedly calling Plaintiff racist may be offensive, it does not constitute unambiguous epithets or extremely abusive language and does not compare to the racial epithets, slurs, and extremely abusive language courts have found to be sufficiently severe within the meaning of the law. *See Montano*, 2008 WL 4905982 at *3 (dismissing plaintiff's racial harassment claim, holding that incidents of defendant's employees stating they assumed Hispanic patients lacked social security numbers do not rise to the requisite level of harassment, stating "[e]ven if the comments that these employees made are offensive, they do not constitute unambiguous epithets or extremely abusive language."); *Spriggs*, 242 F.3d at 185-186 (holding that a workplace where a supervisor constantly referred to African Americans as "monkeys" was a hostile work environment, noting that calling someone a "monkey" "goes far beyond the merely unflattering; it is degrading and humiliating in the extreme.").

**\*4** Further, Plaintiff's allegations that Piedmont coworkers ridiculed Plaintiff "on an almost daily basis, subjecting her to contempt by falsely calling her racist, among other false statements" are merely conclusory allegations that lack any factual support. (Am. Compl. ¶ 31.) Such conclusory allegations are insufficient to give rise to a plausible claim that she was subjected to harassment severe and pervasive enough to effect a term, condition, or privilege of employment. *See Babayan v. Delfin Group USA, LLC*, C.A. No. 2:13-2667-PMD, 2014 WL 5488405, *6 (D.S.C. Oct. 8, 2014) (dismissing plaintiff's harassment claim where plaintiff alleged "in a general and conclusory manner that the defendant subjected him to racial comments, that he was 'constantly' subjected to poor treatment which created a 'hostile work environment', and that Gordon's conduct was 'severe, pervasive and happened almost daily,' " noting that "[t]hese are all quintessential conclusory allegations lacking any factual support."). Plaintiff only identifies three specific occasions where a Piedmont employee told another employee that Plaintiff was racist. (Am. Compl. ¶¶ 41-43.) Such isolated incidents are neither severe nor pervasive. *Mosby-Grant*, 630 F.3d at 337; *see Faragher*, 524 U.S. at 788 ("[I]solated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment"). As Plaintiff cannot establish that she suffered severe or pervasive harassment because of her race, her harassment claims set forth in Counts Two and Four must be dismissed.

Both the Piedmont Defendants and the Individual Defendants move to dismiss Plaintiff's Fifth and Sixth Causes of Action

Squitieri v. Piedmont Airlines, Inc., Not Reported in Fed. Supp. (2018)

2018 Fair Empl.Prac.Cas. (BNA) 52,931, 2018 IER Cases 52,931

alleging defamation/libel *per se*. "To state a North Carolina claim for defamation, a plaintiff must allege that the defendant caused injury to the plaintiff's reputation by making 'false, defamatory statements of or concerning the plaintiff, which were published to a third person.' " *Diagnostic Devices, Inc. v. Pharma Supply, Inc.*, 2009 WL 2998004, *3 (W.D.N.C. Sept. 15, 2009), quoting *Smith-Price v. Charter Behavioral Health Sys.*, 595 S.E.2d 778, 783 (N.C. Ct. App. 2004). "Defamation is divided into two distinct torts: libel and slander." *Id.*, citing *Boyce & Isley, PLLC v. Cooper*, 568 S.E.2d 893, 898 (N.C. Ct. App. 2002. "Libel encompasses any false, written publication, while slander encompasses a false oral communication." *Id.*, citing *Iadanza v. Harper*, 611 S.E.2d 217, 222 (N.C. Ct. App. 2005). " 'Slander *per se* is an oral communication to a third person which amounts ... to an allegation that impeaches the plaintiff in his trade, business or profession.' " *Id.*, quoting *Phillips v. Winston-Salem/Forsyth County Bd. of Educ.*, 450 S.E.2d 753, 757 (N.C. Ct. App. 1994).

Plaintiff relies on alleged statements made by Defendant Butler and Defendant Baldwin that Plaintiff is racist and "other false statements," to assert two defamation claims. (Am. Compl. ¶¶ 79-94.) Under North Carolina law, "expressions of opinion not asserting provable facts are protected speech." *Daniels v. Metro Magazine Holding Co., L.L.C.*, 634 S.E.2d 586, 590 (N.C. Ct. App. 2006). "[I]f a defendant's words cannot be described as either true or false, they are not actionable." *Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 183 (4th Cir. 1998). At a minimum, statements that cannot be proven as verifiably true or false are non-actionable opinion, and cannot support defamation liability. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990). "Whether a statement is of actionable fact is a question of law to be decided by th(e) court." *Nobles v. Boyd*, No. 7:14-CV-214-FL, 2015 WL 2165962, *10 (E.D.N.C. May 8, 2015) citing *Biospherics*, 151 F.3d at 184-186.

Statements indicating that Plaintiff is racist are clearly expressions of opinion that cannot be proven as verifiably true or false. While there appears to be no North Carolina court expressly addressing this issue, many courts in other jurisdictions that have faced the issue of defamation claims based on accusations of bigotry or racism have held the statements to be nonactionable statements of opinion. *See, e.g., Stevens v. Tillman*, 855 F.2d 394, 403 (7th Cir. 1988) (holding that neither general statements charging a person with being racist, unfair, unjust, nor references to general discriminatory treatment, without more, constitute provably

false assertions of fact); *Standing Comm. on Discipline v. Yagman*, 55 F.3d 1430, 1440 (9th Cir. 1995) (holding that calling a judge "anti-Semitic" was a non-actionable opinion); *Ward v. Zelikovsky*, 643 A.2d 972, 980 (N.J. 1994) (accusation that plaintiffs "hated Jews" nonactionable); *Covino v. Hagemann*, 627 N.Y.S.2d 894, 895 (N.Y. Sup. Ct. 1995) (dismissing defamation claim based on statement that plaintiff was "racially insensitive," observing "an expression of opinion is not actionable as a defamation, no matter how offensive, vituperative, or unreasonable it may be" and "[a]ccusations of racism and prejudice" have routinely been found to constitute non-actionable expressions of opinion); *Williams v. Kanemaru*, 309 P.2d 972 (Haw. Ct. App. 2013) (accusation of racism based on disclosed facts not actionable for defamation); *Lennon v. Cuyahoga County Juvenile Court*, No. 86651, 2006 WL 1428920, * 6 (Ohio Ct. App. May 25, 2006) ("[W]e find that appellant's being called a racist was a matter of one employee's opinion and thus is constitutionally protected speech, not subject to a defamation claim."). Furthermore, the North Carolina Court of Appeals has held that calling an individual a fascist was an opinion and not actionable defamation. *See Daniels*, 634 S.E.2d at 591. Accordingly, any statements that Plaintiff is a racist are statements of opinion and are not actionable for defamation.

**\*5** To the extent Plaintiff's defamation/libel *per se* claims rely on other statements, Plaintiff fails to specifically identify them. In order for the Court to determine whether a statement is defamatory, it is essential for the Plaintiff to describe the actual statements or conduct that give rise to the claims. *Dupree v. City of Lexington Police Dep't*, No. 1:12CV345, 2012 WL 1799193, *9 (M.D.N.C. May 17, 2012) (citing *Smith v. McGraw*, No. 10CV2310AW, 2011 WL 1599579, *8 (D. Md. Apr. 27, 2011)). It is well-settled that conclusory statements of legal conclusions are insufficient to state a claim for defamation or libel *per se*. *See Mayfield v. NASCAR*, 674 F.3d 369, 377-78 (4th Cir. 2012) (ruling that defamation claim could not survive motion to dismiss where complaint contained only "conclusory allegation—a mere recitation of the legal standard"); *Smith*, 2011 WL 1599579 at *8 ("Thus, a defamation complaint must contain more than the plaintiff's personal conclusion that she was the victim of defamatory statements."). Accordingly, Plaintiff's defamation/libel claims must fail.

IT IS THEREFORE ORDERED that Defendants' motions to dismiss are hereby GRANTED, and Plaintiff's Second, Fourth, Fifth, and Sixth Claims for Relief are hereby dismissed.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 934829, 2018 Fair Empl.Prac.Cas. (BNA) 52,931, 2018 IER Cases 52,931

Footnotes

1       The Amended Complaint does not specify which of the five defendants uttered or published which of the alleged defamatory statements described therein, and none of the statements are attached or quoted verbatim.

---

                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 3440637
Only the Westlaw citation is currently available.
United States District Court, W.D. North Carolina,
Asheville Division.

The VILLAGE TAVERN, INC., Plaintiff,

v.

CATBIRD HOSPITALITY, LLC, and
Jason Samuel Cancilla, Defendants.

CIVIL CASE NO. 1:21-cv-00228-MR
|
Signed August 16, 2022

**Attorneys and Law Firms**

Chad Alan Archer, Blanco Tackabery & Matamoros, P.A.,
Winston-Salem, NC, for Plaintiff.

**MEMORANDUM OF DECISION AND ORDER**

Martin Reidinger, Chief United States District Judge

**\*1 THIS MATTER** is before the Court on the Plaintiff's
Motion for Default Judgment [Doc. 9].

**I. PROCEDURAL BACKGROUND**
The Plaintiff, The Village Tavern, Inc., commenced this
action against the Defendants, Catbird Hospitality, LLC and
Jason Cancilla, asserting claims for trademark infringement
and false designation of origin under the Lanham Act, 15
U.S.C. §§ 1114 and 1125(a); a claim for unfair competition
under North Carolina law; and a claim for unfair and
deceptive trade practices under North Carolina General
Statute section 75-1.1 ("Chapter 75"). [Doc. 1].

Each Defendant was properly served with the Summons
and Complaint but failed to answer or otherwise defend.
Accordingly, the Court entered default against both
Defendants on October 15, 2021. [Doc. 7]. The Plaintiff now
moves for entry of a default judgment pursuant to Rule 55 of
the Federal Rules of Civil Procedure. [Doc. 9]. Having been
fully briefed, this matter is ripe for disposition.

**II. STANDARD OF REVIEW**

Rule 55 of the Federal Rules of Civil Procedure provides for
the entry of a default when "a party against whom a judgment
for affirmative relief is sought has failed to plead or otherwise
defend." Fed. R. Civ. P. 55(a). Once a defendant has been
defaulted, the plaintiff may then seek a default judgment. If
the plaintiff's claim is for a sum certain or can be made certain
by computation, the Clerk of Court may enter the default
judgment. Fed. R. Civ. P. 55(b)(1). "In all other cases, the
[plaintiff] must apply to the court for a default judgment."
Fed. R. Civ. P. 55(b)(2).

"The defendant, by his default, admits the plaintiff's well-
pleaded allegations of fact...." Ryan v. Homecomings Fin.
Network, 253 F.3d 778, 780 (4th Cir. 2001) (quoting
Nishimatsu Constr. Co. v. Houston Nat'l Bank, 515 F.2d 1200,
1206 (5th Cir. 1975)). A defendant, however, "is not held ... to
admit conclusions of law." Id. (alteration in original) (quoting
Nishimatsu, 515 F.2d at 1206). The Court therefore must
determine whether the alleged facts state a claim for relief.
GlobalSantaFe Corp. v. Globalsantafe.com, 250 F. Supp. 2d
610, 612 n.3 (E.D. Va. 2003).

**III. PLAINTIFF'S FACTUAL ALLEGATIONS**
The well-pleaded factual allegations of the Plaintiff's
Complaint having been deemed admitted by virtue of the
Defendants' default, the following is a summary of the
relevant facts.

The Plaintiff, The Village Tavern, Inc. ("Village"), is a
corporation organized and existing under the laws of the
State of North Carolina, with its principal office located in
Winston-Salem, North Carolina. [Doc. 1 at ¶ 1]. Defendant
Catbird Hospitality, LLC ("Catbird") is a limited liability
company organized and existing under the laws of the State
of North Carolina, with its principal office in Cashiers, North
Carolina. [Id. at ¶ 2]. Defendant Jason Cancilla ("Cancilla") is
a citizen and resident of the State of North Carolina, residing
in Sapphire, North Carolina. [Id. at ¶ 3].

Since 1984, Village has been operating its restaurant
in Winston-Salem, North Carolina under the trademark
"VILLAGE TAVERN." [Id. at ¶ 6]. Over the past thirty-eight
years, Village has extensively advertised such mark, and it is
now "highly recognizable" to the public as a "unique venue
for high quality food and service." [Id. at ¶¶ 28-29]. During
that same period Village has expanded its business, opening a
second location in Winston-Salem, two additional locations in
North Carolina, and four locations in other states. [Id. at ¶ 8].

**\*2** Since 1990, Village has owned the federally registered trademark VILLAGE TAVERN®, U.S. Reg. No. 1,599,993. [Id. at ¶ 9; see also Doc. 1-2 (official United States Patent and Trademark Office ("USPTO") registration)]. Village's now incontestable ownership of the VILLAGE TAVERN mark guarantees Village the exclusive right to use such mark in connection with restaurant services nationwide. [Doc. 1 at ¶ 10].

Catbird and Cancilla operate a restaurant in Cashiers, North Carolina. [Id. at ¶ 12]. The Defendants' restaurant operates under the names "The VILLAGE TAVERN" and "Cashiers VILLAGE TAVERN." [Id.]. The exterior of such restaurant features at least two prominent signs displaying the words "VILLAGE TAVERN" in black capital letters, as in the Plaintiff's registered trademark. [Id. at ¶ 14]. The Defendants also employ the same mark on their website, as part of the restaurant's online menu. [Id. at ¶ 15].

Sometime after the Defendants' restaurant opened, Village received a written complaint from "at least one" person who was dissatisfied with the food and service at the Defendants' restaurant. [Id. at ¶ 16]. Having received such complaint and knowing that it had not granted the Defendants permission to use the VILLAGE TAVERN mark, Village sent the Defendants a cease and desist letter on June 16, 2021. [Id. at ¶¶ 17, 30]. Such letter informed the Defendants that Village is the federally registered owner of the VILLAGE TAVERN mark and demanded that the Defendants cease their use of such mark in connection with the operation of their restaurant. [Doc. 1-1 (cease and desist letter)].

The Defendants did not respond to Village's letter. [Doc. 1 at ¶ 19]. In light of the Defendants' lack of responsiveness, Village contacted Cancilla via email on July 20, 2021. [Id.]. Cancilla replied to Village's email that same day. [Id.]. In his reply, Cancilla thanked Village for its "patience" and explained that "[n]ew signage ha[d] been ordered with a name change." [Id.]. Expressing a desire to eliminate any confusion, Cancilla claimed to have already taken down the restaurant's website and noted that he would take down the Google listing, if he could gain ownership of such listing. [Id.]. Cancilla disclaimed any intent to confuse consumers, positing that he used the words "VILLAGE TAVERN" in reference to the local expression that Cashiers, North Carolina is a "village." [Id.]. Recognizing, however, that confusion was occurring, Cancilla promised to remove all existing signage "[i]f new signage [was] not in place by the end of [July 2021]." [Id.].

Despite Cancilla's promises, the Defendants' signage remained in place, with the words "VILLAGE TAVERN" prominently displayed, through at least August 12, 2021. [Id. at ¶¶ 14, 20-21]. Moreover, despite Cancilla's assertion that the restaurant website had been taken down prior to July 20, 2021, such website remained accessible in August 2021. [Id. at ¶ 22]. Thereafter, Village made repeated attempts to contact the Defendants, without success. [Id. at ¶ 23]. On August 19, 2021, Village filed the instant action.

## IV. DISCUSSION

### A. Trademark Infringement and False Designation of Origin[1]

**\*3** Section 32 of the Lanham Act provides that the registrant of a trademark may bring a civil action against:

> [a]ny person who shall, without the consent of the registrant ... use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive[.]

15 U.S.C. § 1114(1)(a). Section 43(a) of the Act provides that a registrant may bring a civil action against:

> [a]ny person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person.

15 U.S.C. § 1125(a)(1)(A).

"Both infringement and false designation of origin have five elements." Lamparello v. Falwell, 420 F.3d 309, 313 (4th Cir. 2005). To prevail on such causes of action, a plaintiff must establish:

> (1) that it owns a valid mark; (2) that the defendant used the mark "in commerce" and without plaintiff's authorization; (3) that the defendant used the mark (or an imitation of it)

"in connection with the sale, offering for sale, distribution, or advertising" of goods or services; and (4) that the defendant's use of the mark is likely to confuse consumers. Rosetta Stone Ltd. v. Google, Inc., 676 F.3d 144, 152 (4th Cir. 2012) (quoting 15 U.S.C. § 1114(a)) (citing Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC, 507 F.3d 252, 259 (4th Cir. 2007); People for the Ethical Treatment of Animals v. Doughney, 263 F.3d 359, 364 (4th Cir. 2001)).

Here, the Plaintiff's factual allegations, which are deemed admitted by virtue of default, establish that the Plaintiff is the registered owner of the VILLAGE TAVERN mark for use in connection with restaurant services. Despite the Plaintiff's registered ownership of the VILLAGE TAVERN mark, the Defendants used the mark, displaying it on a website and various restaurant signs. Such use occurred "in commerce" because the Defendants displayed the mark on the internet, a channel of interstate commerce. See Int'l Bancorp, LLC v. Societe des Bains de Mer et du Cercle des Estrangers a Monaco, 329 F.3d 359, 363-64 (4th Cir. 2003) (holding that "commerce" for purposes of the Lanham Act "is coterminous with that commerce that Congress may regulate under the Commerce Clause of the United States Constitution"); United States v. Roof, 10 F.4th 314, 385-87 (4th Cir. 2021) (holding that the defendant's use of the internet, "a channel of interstate commerce," in planning and carrying out his crimes placed his conduct "within the reach of Congress's Commerce Clause authority"). Moreover, such use occurred without the Plaintiff's permission.

 **\*4** As to whether the Defendants' use of the Plaintiff's mark occurred " 'in connection with the sale, offering for sale, distribution, or advertising' of goods or services," the Defendants displayed the mark on the front entrance of their restaurant, on a street sign for their restaurant, and on the website for their restaurant. Moreover, the mark formed the primary part of the Defendants' business names: "Cashiers VILLAGE TAVERN" and "the VILLAGE TAVERN." As such, the Defendants used the Plaintiff's mark in connection with the operation of their restaurant business.

With respect to the final element—likelihood of consumer confusion—the Fourth Circuit has identified a number of factors to determine whether such confusion is likely to occur. Those factors include:

(1) the strength or distinctiveness of the plaintiff's mark as actually used in the marketplace; (2) the similarity of the two marks to consumers; (3) the similarity of the goods or services that the marks identify; (4) the

similarity of the facilities used by the markholders; (5) the similarity of advertising used by the markholders; (6) the defendant's intent; (7) actual confusion; (8) the quality of the defendant's product; and (9) the sophistication of the consuming public.

Rosetta Stone, 676 F.3d at 153 (citation omitted). These factors, however, "are not always weighted equally, and not all factors are relevant in every case." Louis Vuitton, 507 F.3d at 259-60 (citation omitted). At bottom, "the likelihood of consumer confusion is an 'inherently factual' issue that depends on the unique facts and circumstances of each case." Variety Stores, Inc. v. Wal-Mart Stores, Inc., 888 F.3d 651, 666 (4th Cir. 2018) (quoting Anheuser-Busch, Inc. v. L & L Wings, Inc., 962 F.2d 316, 318 (4th Cir. 1992)).

Here, the admitted facts establish that the Plaintiff has used the VILLAGE TAVERN mark since 1984 and has been the mark's registered owner since 1990. To determine the strength of such mark, the Court must assess both its "conceptual strength and commercial strength." George & Co. v. Imagination Ent. Ltd., 575 F.3d 383, 393 (4th Cir. 2009) (quoting CareFirst of Md., Inc. v. First Care, P.C., 434 F.3d 263, 269 (4th Cir. 2006)).

"A mark's conceptual strength is determined in part by its placement into one of four categories of distinctiveness: (1) generic; (2) descriptive; (3) suggestive; or (4) arbitrary or fanciful." Id. at 393-94 (citing Pizzeria Uno Corp. v. Temple, 747 F.2d 1522, 1527 (4th Cir. 1984)). " 'Fanciful,' 'arbitrary,' and 'suggestive' marks are inherently distinctive, and thus receive the greatest protection against infringement." Sara Lee Corp. v. Kayser-Roth Corp., 81 F.3d 455, 464 (4th Cir. 1996) (citation omitted). A mark is presumably suggestive, and therefore inherently strong or distinctive, if the USPTO permitted its registration without requiring proof of a secondary meaning.[2] George & Co., 575 F.3d at 395 (citing Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc., 43 F.3d 922, 934 (4th Cir. 1995)). Because the record before the Court indicates that the VILLAGE TAVERN mark was registered without the Plaintiff being required to provide proof of a secondary meaning, the Court must presume the mark is at least suggestive. Id. The Defendants, moreover, have failed to offer any evidence "to rebut the presumption raised by the USPTO's determination." Id. As such, the Court concludes that the Plaintiff's mark is conceptually strong.

 **\*5** To evaluate a mark's commercial strength, a court looks to six factors: "(1) the plaintiff's advertising expenditures;

(2) consumer studies linking the mark to a source; (3) the plaintiff's record of sales success; (4) unsolicited media coverage of the plaintiff's business; (5) attempts to plagiarize the mark; and (6) the length and exclusivity of the plaintiff's use of the mark." Id. (citing Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 125 (4th Cir. 1990)). The admitted facts establish that the Plaintiff has "extensively advertised" its mark in connection with the operation of its restaurant and that the Plaintiff's mark is "highly recognizable" to the public as a "unique venue for high quality food and service." [Doc. 1 at ¶¶ 28-29]; see Petro Stopping Centers, L.P. v. James River Petroleum, Inc., 130 F.3d 88, 93 (4th Cir. 1997) (emphasizing that "[t]he strength of a mark ultimately depends on the degree to which the designation is associated by prospective purchasers with a particular source." (internal quotation marks and citation omitted)). Moreover, recognition has occurred for nearly forty years, thirty-two of which occurring while the Plaintiff was the registered owner of the mark. See Perini, 915 F.2d at 126 (noting that the plaintiff's use of its tradename spanned several decades). Thus, the Court concludes that the Plaintiff's mark possesses commercial strength. Considering such commercial strength in combination with the conceptual strength discussed above, the Court concludes that the Plaintiff's mark is strong enough to make consumer confusion more likely. See George & Co., 575 F.3d at 393 ("Generally, the stronger the mark, the greater the likelihood that consumers will be confused by competing uses of the mark."). Therefore, the first factor weighs in favor of concluding that consumers are likely to be confused by the Defendants' use of the mark.

In assessing the second likelihood of confusion factor, the similarity between the two marks, the Court must "focus on the dominant portions of the parties' marks." Id. at 396 (citations omitted). Based upon such dominant portions of the marks, the Court must assess "whether there exists a similarity in sight, sound, and meaning which would result in confusion." Id. (citations omitted). Here, the dominant portions of both marks are the words "VILLAGE TAVERN" in black all capital letters. While the Defendants' signs and menu include descriptive words in small type adjacent to the VILLAGE TAVERN mark, such words do not take away from the identical nature of the dominant portions of the marks. Both the Plaintiff's and the Defendants' mark look the same, sound the same, and refer to restaurants. Therefore, this second factor weighs in favor of concluding that consumers are likely to be confused by the Defendants' use of the mark.

The third, fourth, and fifth factors turn on whether the parties provide similar goods and services, in similar markets, and with similar advertising. Id. at 397. Here, the admitted facts establish that both parties operate restaurants. Moreover, both restaurants compete for customers in North Carolina, and both advertise their businesses in an effort to garner public recognition. Thus, all three factors weigh in favor of concluding that consumers are likely to be confused by the Defendants' use of the mark.

The sixth factor requires the Court to assess the Defendants' "intent in adopting" the mark at issue. Id. Here, the admitted facts include a statement from Cancilla in which he disavows any intent to "take advantage of an existing brand." [Doc. 1 at ¶ 19]. He contends that he intended only to draw on the local description of Cashiers, North Carolina as a "village." [Id.]. Moreover, he expresses a desire to "eliminate any confusion as quickly as possible" through removing the Google listing, changing his restaurant name, and putting up new signage. [Id.]. Despite promising to put up new signage by the end of July 2021, however, the admitted facts also establish that Cancilla failed to do as he promised. The signs to which the Plaintiff objected were still in place on August 12, 2021, as was the Defendants' website and online menu. Therefore, while the Court cannot conclude that the Defendants intended to cause consumer confusion when they initially adopted the VILLAGE TAVERN mark, the Defendants' failure to change course (or at least substantial tardiness) after being made aware of Village's registered ownership of such mark undermines any potential assertion of good-faith mistake or coincidence. On balance, the sixth factor is therefore neutral.

"The seventh and most important factor is actual confusion." George & Co., 575 F.3d at 398. In assessing such factor, the Court must balance "the number of instances of actual confusion" against "the background of the number of opportunities for confusion." Id. (citations omitted). Generally, "[e]vidence of only a small number of instances of actual confusion may be dismissed as *de minimis*." Id. (citations omitted). Moreover, where the record reveals a significant number of opportunities for confusion, but the plaintiff produces only a few instances of actual confusion, the court draws "a strong inference that there is no likelihood of confusion." CareFirst, 434 F.3d at 269.

 **\*6** Here, the admitted facts establish that "at least one disappointed customer" sent the Plaintiff a written complaint "regarding the quality of service and food at [the] *Defendants'* restaurant location." [Doc. 1 at ¶ 16 (emphasis added)];

see Sara Lee, 81 F.3d at 466 (emphasizing that consumers purchased the defendant's products under the mistaken belief that such products were produced by the plaintiff). While this admitted fact demonstrates one incident of actual confusion, the record contains neither facts establishing additional instances of actual confusion nor facts clarifying the number of opportunities for such confusion. Without such facts, the Court has no standard against which to measure the one instance of actual confusion and therefore cannot draw any negative inference from it. See CareFirst, 434 F.3d at 269 (holding that no evidence of actual confusion over the course of nine years "creates a strong inference that there is no likelihood of confusion" (citation omitted)); George & Co., 575 F.3d at 399 (holding that the *de minimis* actual confusion evidence "weigh[ed] heavily against a likelihood of confusion" where the plaintiff sold 500,000 games per year but produced evidence of only four instances of actual confusion (footnote omitted)). Therefore, the Court concludes that the Plaintiff's evidence of actual confusion shows such to be *de minimis*. Nonetheless, the Court draws no negative inference based upon this conclusion, as there is some evidence of actual confusion. As such, this seventh factor is neutral.

The eighth factor, "the quality of the defendant's product," only applies in "situations involving the production of cheap copies or knockoffs of a competitor's trademark-protected goods." George & Co., 575 F.3d at 399 (quoting Sara Lee, 81 F.3d at 467). Here, the trademark at issue applies to the sale of prepared food and beverages at a restaurant, not the sale of a particular type of trademarked good. As such, this eighth factor is irrelevant.

Finally, the ninth factor, "the sophistication of the consuming public," only applies "when the relevant market is not the public at-large." Id. at 400 (quoting Sara Lee, 81 F.3d at 467). Here, the relevant market is the general public. Therefore, this ninth factor is also irrelevant.

Examining all of the applicable factors, the Court concludes that five factors preponderate toward a likelihood of consumer confusion, and four factors are either neutral or irrelevant. As such, consumer confusion is likely, and the Plaintiff's well-pleaded factual allegations establish its claims for trademark infringement and false designation of origin against the Defendants.

**B. North Carolina Unfair Competition[3]**

Under North Carolina law, a business may use a trademark or tradename to "designate and identify [its] wares or business," and where the business "has acquired and established a patronage and good will of substantial value, the same will be protected from unfair competition on the part of a rival." Yellow Cab Co. v. Creasman, 185 N.C. 551, 117 S.E. 787, 788 (1923). It is "unfair competition when such rival adopts for his own business, etc., a sign or symbol in such apparent imitation of the former as will likely mislead his customers and the public as to the identity of the goods sold or service rendered." Id. (citations omitted); see also Charcoal Steak House of Charlotte, Inc. v. Staley, 263 N.C. 199, 203, 139 S.E.2d 185, 188 (1964) ("Unfair competition is 'the child of confusion.' " (citation omitted)); Polo Fashions, Inc. v. Craftex, Inc., 816 F.2d 145, 148 (4th Cir. 1987) ("The North Carolina common law of unfair competition in the context of trademarks ... is similar to the federal law of trademark infringement.").

Here, the admitted facts establish that the Plaintiff is the registered owner of the VILLAGE TAVERN mark and has used such mark for nearly forty years. The admitted facts also establish that, during the course of such use, the Plaintiff developed substantial consumer recognition and goodwill. As such, the Defendants engaged in unfair competition to the extent they used the VILLAGE TAVERN mark in a way likely to cause consumer confusion. Because the Court has concluded that the Defendants' use of the Plaintiff's mark created a likelihood of consumer confusion, the Plaintiff's well-pleaded factual allegations establish its claim for unfair competition against the Defendants.

**C. North Carolina Unfair and Deceptive Trade Practices**

*7 To establish a claim under Chapter 75, a plaintiff must demonstrate that "(1) the defendant engaged in conduct that was in or affecting commerce, (2) the conduct was unfair or had the capacity or tendency to deceive, and (3) the plaintiff suffered actual injury as a proximate result of defendant's deceptive statement or misrepresentation." Belk, Inc. v. Meyer Corp., 679 F.3d 146, 164 (4th Cir. 2012), as amended (May 9, 2012) (internal quotation marks and citation omitted).

Here, the Defendants' conduct occurred in commerce because they operated a restaurant for profit under the VILLAGE TAVERN mark and displayed such mark on their website. Such conduct was deceptive because, as the Court previously concluded, it was likely to cause

consumer confusion regarding the source of the food and services provided at the Defendants' restaurant. Finally, the Plaintiff suffered actual injury as a proximate result of the Defendants' deceptive misrepresentation because at least one consumer was deceived by the Defendants' use of the VILLAGE TAVERN mark. Such deception led the consumer to falsely believe that Village was responsible for the low-quality food and service she received at the Defendants' restaurant. Therefore, the Court concludes that the admitted allegations establish the Plaintiff's Chapter 75 claim against the Defendants.

### D. Remedies Sought

Having determined that the Plaintiff has established its claims by alleging sufficient facts that the Defendants have admitted, the Court now turns to the issue of whether the Plaintiff has demonstrated entitlement to the relief requested. In its motion, the Plaintiff seeks the following remedies:

(1) A permanent injunction enjoining the Defendants and all those acting in concert with the Defendants from making any use of the VILLAGE TAVERN mark and any other marks confusingly similar thereto;

(2) An Order requiring the Defendants to remove from public view any references to the VILLAGE TAVERN mark and any other references to Village or its registered mark;

(3) An award of statutory damages in an amount not less than $15,000, plus treble damages as allowed by law; and

(4) An award of costs of this action taxed to the Defendants. The Court will address each of these requests for relief in turn.

### 1. Injunctive Relief

Under the Lanham Act, the Court is authorized to issue an injunction "according to principles of equity and upon such terms as the court may deem reasonable" to prevent further violations of trademark law. 15 U.S.C. § 1116(a). To establish entitlement to injunctive relief, a plaintiff must demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would

not be disserved by a permanent injunction." eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006) (citations omitted).

Here, the admitted facts establish that the Defendants have infringed upon the Plaintiff's federally registered trademark and remain readily able to continue such infringement.[4] "[I]rreparable injury regularly follows from trademark infringement." Lone Star Steakhouse & Saloon, 43 F.3d at 939 (citation omitted). Specifically, trademark infringement causes a plaintiff to lose control of its business identity and suffer any reputational harm which the infringing party imposes on such identity. See id. Such reputational harm occurred in this case when at least one consumer mistook the Defendants' restaurant for the Plaintiff's. That person not only confused the two businesses, but also lowered her esteem for the Plaintiff's business based upon the low-quality food and service she received at the *Defendants'* restaurant. Therefore, the Court concludes that the first factor of irreparable injury has been met.

**\*8** As for the inadequacy of legal remedies, the loss of reputation and goodwill accompanying trademark infringement results in largely incalculable harm for which damages alone are insufficient. See U.S. Polo Ass'n v. PRL USA Holdings, Inc., 800 F. Supp. 2d 515, 541 (S.D.N.Y. 2011). Moreover, in the absence of an injunction, the Plaintiff would be compelled to bring successive actions for monetary damages in order to recover for such continually accruing, incalculable harm. See Mon Cheri Bridals, LLC v. Partnerships, No. 3:15-cv-00021-FDW-DCK, 2015 WL 3509259, at *6 (W.D.N.C. June 4, 2015). Accordingly, the Court concludes that the second factor of inadequate legal remedies has also been satisfied.

As for the balance of hardships, "the hardship to be sustained by the [P]laintiff if the [permanent] injunction is not granted" is substantial. Direx Israel, Ltd. v. Breakthrough Med. Corp., 952 F.2d 802, 816 (4th Cir. 1991). Absent an injunction prohibiting the Defendants' use of the VILLAGE TAVERN mark, the Plaintiff will continue to be deprived of its right to exclusive use of the mark in connection with restaurant services, and it will lose consumer goodwill and suffer reputational harm. On the other hand, the hardship to be suffered by the Defendants if an injunction is issued is minimal. See Legend Night Club v. Miller, 637 F.3d 291, 302 (4th Cir. 2011) (emphasizing that the harm to the plaintiffs in the absence of an injunction "easily outweigh[ed] whatever burden the injunction may impose"). The Defendants may

continue to operate a restaurant, serving the same food and beverages in the same geographic area. They will only be enjoined from operating such restaurant under the VILLAGE TAVERN mark or a confusingly similar mark. Accordingly, the Plaintiff has shown that the balance of hardships weighs in its favor.

Finally, "preventing future consumers from being misled" is in the public interest. Lone Star Steakhouse, 43 F.3d at 939 (citations omitted). Enjoining the Defendants' use of the VILLAGE TAVERN mark will further such public interest by requiring the Defendants to operate any future restaurant under a readily distinguishable tradename. Therefore, the Plaintiff has demonstrated that an injunction is in the public interest.

For these reasons, the Court concludes that the entry of a permanent injunction is appropriate. The Court therefore will enter a permanent injunction enjoining the Defendants and all those acting in concert with the Defendants from making any use of the VILLAGE TAVERN mark and any marks confusingly similar thereto; requiring the Defendants to remove all signage featuring the VILLAGE TAVERN mark; and requiring the Defendants to delete and/or remove all internet references through which the Defendants have made improper use of the VILLAGE TAVERN mark, including but not limited to the Defendants' online menu and its website or webpage.

**2. Statutory Damages**

In certain circumstances, the Lanham Act permits a Plaintiff to elect to recover statutory damages "*instead* of actual damages and profits." 15 U.S.C. § 1117(c) (emphasis added). To recover statutory damages, the Plaintiff must prove that the infringement involved the use of a "counterfeit mark ... in connection with the sale, offering for sale, or distribution of goods or services." Id. The Act defines "counterfeit mark" as "a counterfeit *of a mark* that is registered on the principal register in the [USPTO] for such goods or services sold, offered, or distributed and that is in use, whether or not the person against whom relief is sought knew such mark was so registered." Id. § 1116(d)(1)(B)(i). It further defines the word "counterfeit" as "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." Id. § 1127. "A 'spurious' mark, in turn, is one that is 'fake' and '[d]eceptively suggest[s] an erroneous origin.'" Tiffany & Co. v. Costco Wholesale Corp., 971 F.3d

74, 95 n.18 (2d Cir. 2020) (alterations in original) (quoting Spurious, Black's Law Dictionary (11th ed. 2019)). As such, to qualify as a counterfeit trademark, a non-genuine mark must (1) be substantially indistinguishable from the registered mark and (2) be used to designate the same type of goods or services as the registered mark. See Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC, 507 F.3d 252, 269 (4th Cir. 2007); Sturgis Motorcycle Rally, Inc. v. Rushmore Photo & Gifts, Inc., 908 F.3d 313, 340 (8th Cir. 2018); Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc., 658 F.3d 936, 946 (9th Cir. 2011).

**\*9** Here, the Plaintiff has elected to pursue statutory damages in lieu of actual damages or lost profits. [Doc. 9]. The admitted facts establish that the Defendants' rendition of the VILLAGE TAVERN mark is "substantially indistinguishable" from the Plaintiff's registered mark, as both feature the words VILLAGE TAVERN in black capital letters. Louis Vuitton, 507 F.3d at 269 (citation omitted). Moreover, the Defendants used the identical VILLAGE TAVERN mark in connection with the provision of restaurant services, the same type of services for which the Plaintiff is entitled to exclusive use of the VILLAGE TAVERN mark. Therefore, the Defendants' use of the VILLAGE TAVERN mark constitutes use of a counterfeit mark, and the Plaintiff is entitled to statutory damages on both its trademark infringement claim and its false designation of origin claim.

Where a plaintiff establishes entitlement to statutory damages, such plaintiff may recover "not less than $1,000 or more than $200,000 per counterfeit mark *per type of goods or services* sold, offered for sale, or distributed, as the court considers just."[5] 15 U.S.C. § 1117(c)(1) (emphasis added); see also Gabbanelli Accordions & Imports, L.L.C. v. Gabbanelli, 575 F. 3d 693, 698 (7th Cir. 2009) (emphasizing that statutory damages are awarded per type of goods or services sold under the mark, "not per individual item bearing the counterfeit mark" (citation omitted)). The district court has discretion to award statutory damages within such prescribed range. See Lyons P'ship, L.P. v. Morris Costumes, Inc., 243 F.3d 789, 799 (4th Cir. 2001) (applying an analogous provision in the Copyright Act, 17 U.S.C. § 504(c)(1)). A district court may "weigh the seriousness of the [infringing] conduct in determining the amount of the award."[6] Newport News Holdings Corp. v. Virtual City Vision, Inc., 650 F.3d 423, 442 (4th Cir. 2011).

Here, the Plaintiff is entitled to statutory damages for both of its Lanham Act claims. See 15 U.S.C. § 1117(a), (c). To

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works. 7

that end, the Plaintiff seeks $7,500 for the infringement claim and $7,500 for the false designation of origin claim, for a combined award of $15,000.[7] [Doc. 9 at 2].

In determining the appropriateness of the statutory damages award, the Court considers the following admitted facts. The Defendants displayed *one* counterfeit mark in connection with *one* type of services sold. See 15 U.S.C. § 1117(c)(1); Gabbanelli Accordions, 575 F.3d at 698. The admitted facts do not establish the exact duration of the Defendants' use of such counterfeit mark, but the facts do establish that at least one month of use occurred *after* the Defendants indisputably became aware of the Plaintiff's registered ownership of the VILLAGE TAVERN mark. However, that month of use occurred after Cancilla disingenuously asserted that the website had already been removed and promised that the infringing signage would soon be removed. On the other hand, the Defendants did cease using the mark sometime before the Plaintiff moved for a default judgment, and nothing before the Court indicates that such use has resumed.

**\*10** Since the Plaintiff asserts different theories of recovery regarding the Defendants' singular act of using the VILLAGE TAVERN mark for the provision of restaurant services, the Court will award a single statutory damages award for all of the Plaintiff's Lanham Act violations. Considering the relatively short duration of the infringement; the fact that it has voluntarily ceased prior to the Plaintiff's filing of the present motion; the substantial distance between the Plaintiff's establishment and the Defendants' establishment, which limits the harmful confusion; and the fact that the Plaintiff concedes that it is seeking to recover its attorneys fees as part of this award, apart from what statutory damages are supposed to represent, the Court in its discretion awards a total of statutory damages in the amount of $4,000.

### 3. Treble Damages

"Under N.C. Gen. Stat. § 75-16, courts must treble damages if a defendant violates [Chapter 75]." DENC, LLC v. Philadelphia Indem. Ins. Co., 32 F.4th 38, 52 (4th Cir. 2022). Such award of treble damages, however, "is limited to 'damages *proximately caused* by' " the defendant's Chapter 75 violation. Id. (emphasis in original) (quoting Gray v. N.C. Ins. Underwriting Ass'n, 352 N.C. 61, 74, 529 S.E.2d 676, 684 (2000)). As such, "[p]roof of actual damages" sustained as the proximate result of the defendant's Chapter 75 violation "is an essential element for an award of treble damages." Shell

Oil Co. v. Com. Petroleum, Inc., 928 F.2d 104, 109 n.7 (4th Cir. 1991) (citation omitted).

Here, the Plaintiff requests that the Court treble, pursuant to N.C. Gen. Stat. § 75-16, the statutory damages awarded to the Plaintiff for the Defendants' Lanham Act violations. [Doc. 9 at 2]. North Carolina law, however, does not permit the Court to automatically treble "damages on every claim that happens to arise in a case involving a [Chapter 75] violation." DENC, 32 F.4th at 52 (quoting Gray, 352 N.C. at 74, 529 S.E.2d at 685). Because the Plaintiff has submitted no evidence of actual damages sustained by way of the Defendants' Chapter 75 violation, the Court denies its request for treble damages. See Shell Oil, 928 F.2d at 109 n.7.

### ORDER

**IT IS, THEREFORE, ORDERED** that the Plaintiff's Motion for Default Judgment [Doc. 9] is **GRANTED**, and **IT IS HEREBY ORDERED, ADJUDGED, AND DECREED as follows:**

1. The Defendants, including all officers, members, directors, agents, employees, representatives, and all persons acting in concert or participation with them who receive actual notice of the Default Judgment and Permanent Injunction Order are permanently enjoined and restrained from:

   A. Using the VILLAGE TAVERN mark or any confusingly similar mark, in connection with the operation of a restaurant or similar business;

   B. Using any false designation of origin or representing or suggesting directly or by implication that the Defendants are affiliated with, associated with, authorized by, or otherwise connected to the Plaintiff;

   C. Engaging in any other activity constituting infringement of the VILLAGE TAVERN mark or unfair competition with the Plaintiff through false association, false advertising, or cybersquatting;

   D. Assisting, aiding, or abetting any other person or business entity in engaging or performing any of the activities referred to in paragraphs A through C above, or effecting any assignments or transfers, forming new entities or associations, or utilizing any other device for the purpose of circumventing or otherwise avoiding the prohibitions set forth in paragraphs A through C above.

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2. The Defendants shall remove all signage featuring the VILLAGE TAVERN mark and delete and/or remove all internet references through which the Defendants have made improper use of the VILLAGE TAVERN mark, including but not limited to the Defendants' online menu and its website or webpage;

**\*11** 3. The Defendants are jointly and severally liable to the Plaintiff for the payment of statutory damages in the amount of $4,000 pursuant 15 U.S.C. § 1117(c).

**IT IS FURTHER ORDERED** that the costs of this action are taxed against the Defendants. The Plaintiff shall submit a bill of costs within fourteen (14) days of the entry of this Order.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2022 WL 3440637

---

Footnotes

1   The Plaintiff alleges two claims under 15 U.S.C. § 1125(a), one for "false designation of origin" (Count One) and one for "unfair competition" (Count Three). [Doc. 1 at ¶¶ 24-26, 37-45]. Section 1125(a) creates "two distinct bases of liability": false association (also known as false designation of origin) and false advertising. Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 122 (2014). The Fourth Circuit describes both theories of liability as "unfair competition causes of action." Belmora LLC v. Bayer Consumer Care AG, 819 F.3d 697, 706 (4th Cir. 2016). Because "unfair competition" is not a separate theory of liability, and because the Plaintiff does not make any specific allegations of false advertising, the Court will address the Plaintiff's counts one and three as *a single* § 1125(a) false designation of origin claim.

2   "Secondary meaning is defined as 'the consuming public's understanding that the mark, when used in context, refers not to what the descriptive word ordinarily describes, but to the particular business that the mark is meant to identify." U.S. Search, LLC v. U.S. Search.com Inc., 300 F.3d 517, 525 (4th Cir. 2002) (citation omitted).

3   The Plaintiff labels this claim: "Misappropriation of Good Will." [Doc. 1 at ¶ 46-49]. Upon review of the substance of the claim, however, the Court concludes that such claim is for unfair competition under North Carolina common law. See Yellow Cab Co. v. Creasman, 185 N.C. 551, 117 S.E. 787, 788 (1923).

4   According to the Plaintiff, the Defendants ceased their infringing use of the VILLAGE TAVERN mark sometime after the Plaintiff filed this action but before it filed the Motion for Default Judgment. [Doc. 10 at 10 n.3]. Generally, a request for injunctive relief is moot once the Plaintiff has received the relief sought in such injunction. See Long v. Pekoske, 38 F.4th 417, 423 (4th Cir. 2022). A well-recognized exception to this rule exists, however, "when a defendant voluntarily ceases its allegedly improper behavior, [and] there is a reasonable chance that the behavior will resume." Lighthouse Fellowship Church v. Northam, 20 F.4th 157, 162 (4th Cir. 2021). Pursuant to such exception, a request for injunctive relief remains justiciable unless the *defendant* demonstrates "that 'it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur.' " Porter v. Clarke, 852 F.3d 358, 360 (4th Cir. 2017) (quoting Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 190 (2000)). Here, the Defendants have presented no evidence from which the Court could determine that such "heavy burden" has been satisfied. Id. at 364 (citation omitted). Because the record before the Court indicates that the Defendants "retain[ ] the authority and capacity to repeat" the infringement, the action is not moot. Id. (quotation marks and citations omitted).

5   The $200,000 maximum is increased to $2,000,000 where the Court "finds that the use of the counterfeit mark was willful." 15 U.S.C. § 1117(c)(2); see Romag Fasteners, Inc. v. Fossil, Inc., 140 S. Ct. 1492, 1495 (2020).

6   In Newport News Holdings, the Fourth Circuit analyzed the statutory damages provision in 15 U.S.C. § 1117(d). See 650 F.3d at 441-42. Because of the similarity between § 1117(c)(1) and § 1117(d), the Court concludes that the Court of Appeals' analysis also applies to statutory damages awarded under § 1117(c)(1).

7   The Plaintiff argues that this is "on the lower end of the permissible spectrum" of statutory damages. [Doc. 10 at 10 n.3]. The lower end, however, would be $2,000, not $15,000. 15 U.S.C. § 1117(a). The Plaintiff also argues that such an award

would stand for its attorneys fees. Though attorneys fees may be recoverable in this matter, statutory damages are not intended to be a means for recovering such fees, and the Plaintiff has not proven any entitlement to the award of fees.

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.   10

Blue Ridge Pediatric & Adolescent Medicine, Inc. v. First..., Not Reported in...

2012 NCBC 51

2012 WL 4714497
Superior Court of North Carolina,
Watauga County,
Business Court.

BLUE RIDGE PEDIATRIC & ADOLESCENT
MEDICINE, INC., a North Carolina
professional corporation; A to Z Enterprises,
LLC, a North Carolina limited liability
company; Gregory L. Adams, an individual;
Clinton B. Zimmerman, Jr., an individual; and
Wesley Scott St. Clair, an individual, Plaintiffs,
v.
FIRST COLONY HEALTHCARE, LLC,
a North Carolina limited liability company;
FCHC—Greenway Commons Land, LLC,
a North Carolina limited liability company;
FCHC—Greenway Commons Investors, LLC,
a North Carolina limited liability company;
FCHC—Greenway Commons, LLC, a North
Carolina limited liability company; FC
Healthcare, Inc., a North Carolina corporation;
First Colony Healthcare Holdings II, LLC,
a North Carolina limited liability company;
Randy T. Russell, an individual; Dennis R.
Norvet, an individual; Bobby D. Hinson, an
individual; First Colony Healthcare II, LLC,
a North Carolina limited liability company;
FC Healthcare II, Inc., a North Carolina
corporation; Colony Development Partners,
LLC, a North Carolina limited liability
company; and Colony Management, Inc.,
a North Carolina corporation, Defendants.

No. 11 CVS 127.
|
Oct. 3, 2012.

**Attorneys and Law Firms**

Harris, Creech, Ward and Blackerby, P.A., by W. Gregory
Merritt, Thomas M. Ward, Jay C. Salsman, and Luke A.
Dalton, for Plaintiffs.

Brown Law, LLP, by Gregory W. Brown and Justin M.
Osborn, for Defendants.

**ORDER & OPINION**

MURPHY, District Judge.

**\*1** {1} **THIS MATTER** is before the Court on
Defendants' (First Colony Healthcare, LLC and several
affiliated companies (collectively "First Colony"), Randy
T. Russell ("Russell"), Dennis R. Norvet ("Norvet"), and
Bobby D. Hinson ("Hinson") (collectively "Individual
Defendants")) Motion to Dismiss (the "Motion") pursuant to
Rules 9(b) and 12(b)(6) of the North Carolina Rules of Civil
Procedure.

{2} Having considered Plaintiffs' Amended Complaint, the
parties' briefs and submissions, and the contentions of counsel
made at the October 31, 2011, hearing on Movants' Motion
to Dismiss, the Court **GRANTS** in part and **DENIES** in part
Defendants' Motion to Dismiss.

I.

PROCEDURAL HISTORY

{3} On March 8, 2011, Plaintiffs Blue Ridge Pediatric
and Adolescent Medicine, Inc. ("Blue Ridge"); A to Z
Enterprises, LLC ("A to Z"); Gregory L. Adams, Clinton
B. Zimmerman, Jr., John R. Lonas, and Wesley Scott St.
Clair (collectively the "Doctors") brought this action against
Defendants. (Compl.39.)

{4} Plaintiffs filed a Verified Amended Complaint on May
27, 2011. (V.Am.Compl.41.)

{5} Defendants filed this Motion on July 8, 2011. (Defs.' Mot.
Dismiss 4.)

{6} The Motion was fully briefed on August 29, 2011, and the Court held a hearing on October 31, 2011. (Pls.' Mem. Law Opp. Defs .' Mot. Dismiss 50.)

{7} By order dated May 14, 2012, the Court stayed all case management deadlines, including discovery until August 13, 2012, and directed the parties to engage in mediation before August 13, 2012. *Blue Ridge Pediatric & Adolescent Medicine, Inc. v. First Colony Healthcare, LLC,* No. 11 CVS 127 (N.C.Super.Ct. May 14, 2012) (order staying discovery).

II.

FACTUAL BACKGROUND

{8} Defendants move the Court to dismiss Plaintiffs' complaint pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure. While Rule 12(b)(6) motions ordinarily do not require findings of fact because they do "not present the merits, but only [determine] whether the merits may be reached," for purposes of the Court's Rule 12(b)(6) analysis, this Order and Opinion recites those facts from the Complaint that are relevant to the Court's legal determinations. *Concrete Serv. Corp. v. Investors Group, Inc.,* 79 N.C.App. 678, 681, 340 S.E.2d 755, 758 (1986).

{9} Plaintiff Blue Ridge, a North Carolina professional corporation, provides pediatric and adolescent medical services. The Blue Ridge doctors are all shareholders and directors of Blue Ridge, as well as members and managers of A to Z. (V.Am.Compl.¶¶ 2–3.)

{10} Defendants are in the business of real estate development and property management. Plaintiffs brought this action against Defendants seeking to recover damages arising out of a real estate development and lease agreement between the parties. (*See generally* V. Am. Compl.)

{11} Initially, Defendants First Colony Healthcare, LLC; First Colony Healthcare II, LLC; First Colony Healthcare Holdings II, LLC; FC Healthcare, Inc.; FC Healthcare II, Inc.; FCHC—Greenway Commons, LLC ("GC"); FCHC—Greenway Commons Investors, LLC ("GCI"); and FCHC—Greenway Commons Land, LLC ("GCL") (collectively "First Colony Subsidiaries") were affiliates of First Colony Corporation. (V.Am.Compl.¶ 10.) However, First Colony Corporation filed for bankruptcy, is currently under the

protection of the Bankruptcy Court, and is not named in this lawsuit. (V.Am.Compl.¶ 61.)

**\*2** {12} Defendants Colony Development Partners, LLC ("CDP") and Colony Management, Inc. ("CM") are affiliated companies formed after the execution of the agreements at issue in this litigation. (V.Am.Compl.¶¶ 11, 55.) In the summer of 2008, CDP took over for First Colony Corporation, assuming the assets and duties of a number of its affiliates. (V.Am.Compl.¶¶ 55, 191.)

{13} In early 2006, Plaintiffs decided to relocate their business. (V.Am.Compl.¶ 14.) Unable to locate an existing building to fit their needs, Plaintiffs began the search for 1.5 to 2 acres of land located close to the hospital upon which to construct a new building. (V.Am.Compl.¶ 15.)

{14} One parcel (the "Templeton Property," owned by Templeton Properties ("Templeton")) appeared to be particularly suitable, but was larger than Plaintiffs needed. (V.Am.Compl.¶ 16 .) When Templeton declined to sell less than the whole parcel to Plaintiffs, Joe Joseph, a representative of one of the construction companies considered for the project, referred Plaintiffs to First Colony to discuss the potential development of the property. (V.Am.Compl.¶¶ 16–17.)[1] First Colony "held itself out as a very financially strong and very fiscally responsible expert in medical park development." (V.Am.Compl.¶ 110.) Plaintiffs were then introduced to Norvet, a principal of First Colony. Norvet made a sales presentation to Plaintiffs and provided promotional materials detailing First Colony's construction and development expertise. (V.Am.Compl.¶¶ 18–20.) After the presentation, "Russell was introduced to Plaintiffs as another principal of First Colony who would be Plaintiffs' primary contact for the proposed project." (V.Am.Compl.¶ 22.)

{15} First Colony proposed a partnership arrangement with Plaintiffs whereby First Colony would provide the capital and assume all risks incident to developing the Templeton Property into a medical office park and Blue Ridge would lease office space from First Colony for a period of ten years. (V.Am.Compl.¶ 20.) As part of the agreement, Blue Ridge would, through ownership in A to Z, become members in the companies owning the office park, allowing Blue Ridge to share in the profits from the office building and from any subsequent sale of the property. (V.Am.Compl.¶ 21.)

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

{16} Induced by First Colony's assurances that Plaintiffs would be equity participants in the deal and that Plaintiffs would have access to all of First Colony's pertinent financial records for the deal, Plaintiffs indicated a tentative decision to move forward with the proposed partnership. (V.Am.Compl.¶¶ 24, 27.) On October 26, 2006, anticipating the deal with First Colony, Plaintiffs signed a contract to purchase the Templeton Property for less than fair market value. (V.Am.Compl.¶ 25.)

{17} In response, Defendant Hinson prepared the documents needed to memorialize the agreement of the parties, including a lease and an operating agreement. (V.Am.Compl.¶ 28.) In early January 2007, Plaintiffs forwarded the documents to their counsel, Thomas M. Ward, for his review. (V.Am.Compl.¶ 29.)

**\*3** {18} Ward raised concerns about the proposed deal that caused Plaintiffs to reconsider their involvement. At Plaintiffs' request, Ward wrote a letter to Hinson detailing those aspects of the proposal he viewed as unfavorable to Plaintiffs. (V.Am.Compl.¶¶ 33–34.) Thereafter, Russell personally visited Plaintiffs in Boone, North Carolina. Insisting that Ward did not understand the transaction, Russell assured Plaintiffs that the parties' relationship was a "special relationship of trust and confidence," and that First Colony would always have Plaintiffs' "best interest at heart." (V.Am.Compl.¶ 35.) Russell also pointed out that Plaintiffs would be recouping a substantial part of the lease payments in profits from the deal. (V.Am.Compl.¶ 35.) In February 2007, Plaintiffs decided to go forward with the deal as proposed. (V.Am.Compl.¶ 36.)

{19} On February 22, 2007, Russell emailed the transaction documents prepared by Hinson to Plaintiffs and stated that no material changes had been made to them. (V.Am.Compl.¶¶ 41–42.) Russell reiterated that Hinson would act as the lawyer for the partnership and had prepared the documents with Plaintiffs' interests in mind. (V.Am.Compl.¶ 42.)

{20} In March 2007, the parties completed the agreement. As part of the deal, on March 29, 2007, Plaintiffs conveyed the Templeton Property to GCL. (V.Am.Compl.¶ 47.) Shortly before, on March 7, 2007, Blue Ridge entered into a ten-year lease agreement (the "Lease") on the yet-to-be-constructed office building at a rate in excess of fair market value that the Doctors individually guaranteed. (V.Am.Compl.¶¶ 21, 46.) On the same day, A to Z and GCL executed an operating agreement (the "Operating Agreement"). (V.Am.Compl.Ex.Q.) Plaintiffs allege that, as

an inducement to enter the Lease, First Colony promised that profits arising out of the Operating Agreement would be distributed quarterly to A to Z. (V .Am.Compl.¶ 57.)

{21} Plaintiffs moved into the completed office on or around March 21, 2008. (V.Am.Compl.¶ 56.) To date, Blue Ridge has paid rents in excess of $971,000, but A to Z has received no distributions of profits pursuant to the Operating Agreement. (V.Am .Compl.¶¶ 56–57.)

{22} In October 2008, and March 2009, Plaintiffs asked Defendants about the payments required under the profit-sharing provisions of the Operating Agreement. (V.Am.Compl.¶¶ 58–60.) Plaintiffs allege that Russell's long-delayed responses failed to fully explain the financial status of the project. (V.Am.Compl.¶¶ 58–60.) Also in October 2008, Plaintiffs sought financial information about the project, as promised by First Colony. In response, Plaintiffs received some financial records from Russell. (V.Am.Compl.¶¶ 24, 59.) When they compared the records from Russell to copies of the Lease and Operating Agreements provided by First Colony at the signing of the Lease, Plaintiffs noticed what they allege were material changes to certain contractual terms of the Operating Agreement. (V.Am.Compl.¶ 71.) Plaintiffs also discovered that they were never provided with fully executed copies of the agreements. (V.Am.Compl.¶ 68.) Plaintiffs later learned that all of the Templeton Property had been sold without Plaintiffs' knowledge, and Plaintiffs had received nothing from the sale. (V.Am.Compl.¶ 66.)

**\*4** {23} Plaintiffs' allegations of wrongdoing by the Defendants can be generally summarized as follows: (1) Defendants concealed or misrepresented facts surrounding the financial stability of First Colony; (2) Defendants altered the Operating Agreement and other documents without Plaintiffs' knowledge or consent; (3) Defendants sold the property without A to Z's consent and without sharing any of the profits of the sale; and (4) Defendants misrepresented material facts and made unauthorized changes to the agreements which resulted in additional costs and fees for Plaintiffs. (*See generally* V. Am. Compl. ¶¶ 12–110.)

III.

LEGAL STANDARD

{24} On a motion to dismiss pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure, the question for the

WESTLAW  © 2024 Thomson Reuters. No claim to original U.S. Government Works.

court is " 'whether, as a matter of law, the allegations of the complaint, treated as true, are sufficient to state a claim upon which relief may be granted under some legal theory.' " *Block v. County of Person,* 141 N.C.App. 273, 277, 540 S.E.2d 415, 419 (2000) (quoting *Harris v. NCNB Nat'l Bank,* 85 N.C.App. 669, 670, 355 S.E.2d 838, 840 (1987)).

{25} "The complaint must be liberally construed, and the court should not dismiss the complaint unless it appears beyond a doubt that the plaintiff could not prove any set of facts to support his claim which would entitle him to relief." *Id.* at 277–78, 540 S.E.2d at 419. When the complaint fails to allege the substantive elements of some legally cognizable claim, or where it alleges facts that defeat any claim, the complaint should be dismissed under Rule 12(b)(6). *See Hudson–Cole Dev. Corp. v. Beemer,* 132 N.C.App. 341, 345–46, 511 S.E.2d 309, 312 (1999).

{26} However, unlike factual allegations, bare legal conclusions are "not entitled to a presumption of truth" on a motion to dismiss. *Miller v. Rose,* 138 N.C.App. 582, 592, 532 S .E.2d 228, 235 (2000).

{27} In applying the standard applicable to Rule 12(b)(6) motions, the Court is mindful that averments of fraud, denial of performance or condition precedent of a contract, and demands for punitive damages must be pled specifically and with particularity. N.C. R. Civ. P. 9(b), (c), (k).

IV.

ANALYSIS

A.

INTRODUCTION

{28} Defendants' arguments are generally twofold. First, Defendants argue that certain Plaintiffs lack standing to bring claims against Defendants. Second, Defendants argue that each of Plaintiffs' claims in the Verified Amended Complaint, except for claim thirteen (wrongful conversion), should be dismissed pursuant to Rules 12(b)(6) and 9(b) of the North Carolina Rules of Civil Procedure.

B.

CLAIMS

1.

DOCTORS' STANDING

{29} To properly assert a claim against another party, a plaintiff must have standing. Therefore, "[a] lack of standing may be challenged by a 12(b)(6) motion to dismiss." *See, e.g., Energy Investors Fund v. Metric Constructors, Inc.,* 351 N.C. 331, 337, 525 S.E.2d 441, 445 (2000).

**\*5** {30} "[G]uarantors of a corporation's debts ordinarily may not pursue individual actions to recover damages for injuries to the corporation." *Barger v. McCoy Hillard & Parks,* 346 N.C. 650, 661, 488 S.E.2d 215, 221 (1997). However, a guarantor may establish standing by alleging "either (1) that the wrongdoer owed him a *special duty,* or (2) that the injury suffered by the guarantor is personal to him and distinct from the injury sustained by the corporation itself." *Id.* (emphasis added). "[T]he existence of a special duty may be established by facts showing that defendants owed a duty to plaintiffs that was personal to plaintiffs as guarantors and was separate and distinct from the duty defendants owed the corporation." *Id.*

{31} In *Barger,* the court found a special duty arose between the parties because (1) the plaintiffs "specifically informed" defendants that the loan would be personally guaranteed, and (2) defendants assured the plaintiffs of the corporation's financial status to induce the guarantees. *Id.* at 661, 488 S.E.2d at 221.

{32} Here, the Doctors agreed to personally guarantee the Lease after Defendants allegedly misrepresented themselves as "very financially strong and very fiscally responsible." (V.Am.Compl.¶¶ 21, 110.) As in *Barger,* the facts alleged in Plaintiff's complaint sufficiently indicate that (1) Defendants were aware the Doctors were personally guaranteeing the Lease, and (2) the representations made by Defendants about their financial status "induced" the Doctors' guarantees. These allegations, taken as true, would create a special duty personal to the Doctors, adequate to confer standing upon them.

{¶33} Accordingly, the Court concludes that Plaintiffs Adams, Zimmerman, and St. Clair have standing to bring their individual claims as personal guarantors of the Lease and may pursue all claims associated with those personal guarantees.

2.

PLAINTIFFS' CLAIMS APPLICABLE TO THE FIRST COLONY SUBSIDIARIES AND THE INDIVIDUAL DEFENDANTS

a.

PIERCING THE CORPORATE VEIL—INSTRUMENTALITY

{¶34} "It is well recognized that courts will disregard the corporate form or 'pierce the corporate veil,' and extend liability for corporate obligations beyond the confines of a corporation's separate entity, whenever necessary to prevent fraud or to achieve equity." *Glenn v. Wagner,* 313 N.C. 450, 454, 329 S.E.2d 326, 330 (1985); *see also White v. Collins Bldg., Inc.,* 704 S.E.2d 307, 310 (N.C.Ct.App.2011) (applying the veil-piercing theory against a LLC). However, a court will only "disregard the corporate form and pierce the corporate veil where an individual exercises actual control over a corporation, operating it as a mere instrumentality or tool." *Becker v. Graber Builders, Inc.,* 149 N.C.App. 787, 790, 561 S.E.2d 905, 908 (2002) (internal quotations and citation omitted).

{¶35} In determining whether to enforce a claim under this theory, North Carolina courts apply the "instrumentality rule," which considers the following:

  **\*6** (1) Control, not mere majority or complete stock control, but complete domination, ... so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and

  (2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights; and

  (3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*Glenn,* 313 N.C. at 454–55, 329 S.E.2d at 330 (quoting *B–W Acceptance Corp. v. Spencer,* 268 N.C. 1, 9, 149 S.E.2d 570, 576 (1966)).

{¶36} Factors that have been considered by the courts in piercing the corporate veil include (1) inadequate capitalization, (2) non-compliance with corporate formalities, (3) complete domination and control of the corporation so that it has no independent identity, or (4) excessive fragmentation of a single enterprise into separate corporations. *Id.* at 636, 329 S.E.2d at 198.

{¶37} Plaintiffs assert that the structure of the First Colony Subsidiaries gives rise to such a claim with regard to the Individual Defendants as principals and officers of the First Colony Subsidiaries. Specifically, Plaintiffs allege (1) that the principals "exercised complete dominion and control over [First Colony Subsidiaries]," (2) that such control was used to "perpetrate a wrong and/or fraud against Plaintiffs," and (3) that the aforesaid control proximately caused "monetary losses and interest thereon, inconvenience as well as other incidental and consequential damages." (V.Am.Compl.¶¶ 98–99.) However, these bare legal conclusions are not entitled to the presumption of truth afforded factual allegations on a motion to dismiss.

{¶38} While Plaintiffs allege that numerous affiliates occupy the same office, share the same employees, and are insolvent (V.Am.Compl.¶ 96), they fail to point to specific acts of control or domination by the Individual Defendants over First Colony Subsidiaries that would allow them to take advantage of this arrangement. Plaintiffs allege that Russell, a principal of First Colony, acted as their point of contact, and that Hinson served as the lawyer for the partnership and prepared the documents for the deal. (V.Am.Compl.¶¶ 22, 28, 42.) However, these allegations merely establish a working relationship, rather than outlining the requisite control and domination to substantiate this claim. As to Norvet, Plaintiffs only allege legal conclusions, unsupported by actual facts, regarding Norvet's degree of control over the First Colony Subsidiaries. (V.Am.Compl.¶¶ 97–98.) As such, the Court concludes that Plaintiffs have failed to adequately allege that the First Colony Subsidiaries are "a mere instrumentality" of the Individual Defendants sufficient to pierce the corporate veil and hold Russell, Hinson, and Norvet liable for the companies' wrongs.

**\*7** {¶39} For these reasons, the Court **GRANTS** Defendants' Motion to Dismiss as to Plaintiffs' claim of piercing the corporate veil.

b.

BREACH OF CONTRACT

{¶40} To sufficiently state a claim for breach of contract, a plaintiff must show "(1) existence of a valid contract and (2) breach of the terms of [the] contract." *Woolard v. Davenport,* 166 N.C.App. 129, 134, 601 S.E.2d 319, 322 (2004) (quoting *Poor v. Hill,* 138 N.C.App. 19, 26, 530 S.E.2d 838, 843 (2000)).

{¶41} Plaintiffs' Amended Complaint alleges that (1) "[i]n return for and in consideration of a ten year Lease by Blue Ridge, ... the Defendants agreed ... to provide all capital, assume all risk, and ... [share] 50% of the profits from the sale of any part of the Templeton Property" (V.Am.Compl.¶ 21), and (2) Defendants failed to deliver Plaintiffs' share of the proceeds from the sale of the Templeton property (V.Am.Compl.¶ 107). The Court concludes that the facts as pled are sufficient to survive Defendants' motion to dismiss Plaintiffs' claim for breach of contract.

{¶42} Accordingly, the Court DENIES Defendants' Motion to Dismiss as to Plaintiffs' claim for breach of contract.

c.

FRAUD IN THE INDUCEMENT, INTENTIONAL OR NEGLIGENT MISREPRESENTATION, AND NEGLIGENCE

{¶43} First, in moving to dismiss the fraud claim, Defendants argue that Plaintiffs have failed to meet the Rule 9 pleading standard requiring "all averments of fraud ... [to] be stated with particularity." N.C. R. Civ. P. 9(b).

{¶44} "The essential elements of fraud are: '(1) False representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party.' " *Rowan County Bd. of Educ. v. U.S. Gypsum Co.,* 332 N.C. 1, 17, 418 S.E.2d 648, 658 (1992)

(quoting *Terry v. Terry,* 302 N.C. 77, 83, 273 S.E.2d 674, 677 (1981)).

{¶45} While Rule 9 allows intent and knowledge to be averred generally, the plaintiff must particularly allege the "time, place and contents of the fraudulent representation, the identity of the person making the representation and what was obtained." *Terry,* 302 N.C. at 85, 273 S.E.2d at 678. In addition, the plaintiff must allege that he justifiably relied on the misrepresentation in that "he was denied the opportunity to investigate or that he could not have learned the true facts by exercise of reasonable diligence." *Hudson–Cole Dev. Corp. v. Beemer,* 132 N.C.App. 341, 346, 511 S.E.2d 309, 313 (1999).

{¶46} Here, Plaintiffs allege that each of the Individual Defendants made certain misrepresentations on specific dates and at specific locations regarding the details of the transactions at issue, and about the company's financial status. (V.Am.Compl.¶¶ 21, 24, 32, 34, 35, 39, 42, 110.)

{¶47} However, Plaintiffs' allegations are devoid of any facts supporting justifiable reliance. Although Plaintiffs argue that Defendants falsely held themselves out as being financially stable (V.Am.Compl.¶ 110), they make no allegations regarding efforts timely taken to investigate this assertion or to learn the true facts through reasonable diligence. While Plaintiffs allege that Defendants promised access to Defendants' financial records concerning the proposed transaction, Plaintiffs neglected to request such information for nearly two years. (V.Am.Compl.¶¶ 24, 59.) When Plaintiffs expressed concerns about the deal before finalizing it, Defendants reassured them they had their "best interests at heart" (V.Am.Compl.¶ 35) and Plaintiffs ultimately moved forward with the deal. (V.Am.Compl.¶ 36.) It was only after the transaction failed to fully materialize that Plaintiffs sought access to the financial information.

**\*8** {¶48} Plaintiffs also argue that the changes made to the contract after Plaintiffs signed the document support fraud. Again, Plaintiffs fail to allege justifiable reliance on the representations made with respect to the contents of the contract. Even though Plaintiffs allege that in an email exchange Russell lied about the changes to the contract, they admit the same email contained a copy of the contract with certain changes. (V.Am.Compl.¶¶ 42–43.) By failing to allege facts in support of their own investigation and due diligence, Plaintiffs have not demonstrated reasonable reliance. As such, Plaintiffs' claim for fraud is fatally deficient.

{49} As with fraud, claims for intentional or negligent misrepresentation and negligence require allegations of justifiable reliance. *Oberlin Capital, L.P. v. Slavin,* 147 N.C.App. 52, 61, 554 S.E.2d 840, 847 (2001) (dismissing claims for fraud, negligent misrepresentation, and negligence for failing to allege justifiable reliance in spite of the fact that the stricter Rule 9(b) pleading standard does not apply to negligence); *see also Helms v. Holland,* 124 N.C.App. 629, 635, 478 S.E.2d 513, 517 (1996). Because the complaint fails to set out such reliance, Plaintiffs have failed to state a claim for intentional or negligent misrepresentation and for negligence.

{50} Given the above conclusions, the Court need not address Defendants' arguments regarding the personal tort liability of Russell, Norvet, and Hinson, or the applicability of the economic loss rule to these claims.

{51} For the reasons given, the Court GRANTS Defendants' Motion to Dismiss Plaintiffs' third, fifth and sixteenth claims for relief, fraud in the inducement, intentional or negligent misrepresentation, and negligence, respectively.

d.

CONSTRUCTIVE FRAUD

{52} Pleading constructive fraud requires less particularity than active fraud. *Sidden v. Mailman,* 137 N.C.App. 669, 677, 529 S.E.2d 266, 272 (2000) (citing *Terry v. Terry,* 302 N.C. 77, 85, 273 S.E.2d 674, 678–79 (1981)). Constructive fraud can be based on a breach of a "confidential relationship rather than a specific misrepresentation." *Terry,* 302 N.C. at 85, 273 S.E.2d at 678–79.

{53} To support a claim of constructive fraud, a plaintiff must sufficiently allege "(1) the existence of a fiduciary duty, and (2) a breach of that duty." *Governor's Club, Inc. v. Governors Club Ltd. P'ship,* 152 N.C.App. 240, 249–50, 577 S.E.2d 781, 788 (2002) (citing *Keener Lumber Co. v. Perry* 149 N.C.App. 19, 28, 560 S.E.2d 817, 824 (2002)). A fiduciary relationship exists where "there has been a special confidence reposed in one who in equity and good conscious is bound to act in good faith and with due regard to the interests of the one reposing confidence...." *Kaplan v. O.K. Techs., LLC,* 196 N.C.App. 469, 472, 675 S.E.2d 133, 136 (2009). However, "it is not sufficient for plaintiff to allege merely that defendant had won

his trust and confidence and occupied a position of dominant influence." *Rhodes v. Jones,* 232 N.C. 547, 548–49, 61 S.E.2d 725, 726 (1950).

**\*9** {54} Here, Plaintiffs simply allege a fiduciary relationship arising out of contractual duties owed by Defendants. (V.Am.Compl.¶ 131.) Such a conclusory allegation, unsupported by facts, cannot sustain this claim. Plaintiffs did not point to any language in either the Lease or Operating Agreement which would support a fiduciary duty. In addition, Plaintiffs cannot establish the existence of a blanket duty based on the relationship between the LLC managers and members under the Operating Agreement. *See Kaplan,* 196 N.C.App. at 474, 675 S.E.2d at 137 ("[M]anagers of a limited liability company ... owe a fiduciary duty to the company, and not to individual members.").

{55} Plaintiffs' allegations describe a land development deal between businessmen with no specific facts to support a special confidence reposed in the Defendants. In support of their claim, Plaintiffs allege that Russell expressly told them they had a relationship of trust and confidence. (V.Am.Compl.¶ 35.) However, Plaintiffs neglect to allege any facts which establish that this type of relationship actually existed beyond a single statement made during the course of negotiations. In fact, Plaintiffs retained their own counsel to review the documents prepared by Defendants (V.Am.Compl.¶ 29) and negotiated back and forth via a series of emails before finalizing the deal. (V.Am.Compl.¶¶ 33–42.) The Court concludes, therefore, that Plaintiffs have not adequately alleged the existence of a fiduciary relationship with Defendants. As such, Plaintiffs' claim for constructive fraud fails as a matter of law.

{56} In light of its conclusions, the Court does not address Defendants' arguments regarding the personal tort liability of Russell, Norvet, and Hinson or the applicability of the economic loss rule to these claims.

{57} For these reasons, the Court **GRANTS** Defendants' Motion to Dismiss Plaintiffs' fourth claim for relief, constructive fraud.

e.

SECURITIES FRAUD

{58} As to Plaintiffs sixth claim, securities fraud, Defendants argue the Amended Complaint again fails to meet the Rule 9(b) requirement of particularity. (Mem. Law Supp. Defs.' Mot. Dismiss 21–23, 25.)

{59} The North Carolina Securities Act imposes liability upon any person who:

(1) Offers or sells a security in violation of G.S. 78A–8(1), 78A–8(3) ..., or

(2) Offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading (the purchaser not knowing of the untruth or omission), and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known of the untruth or omission.

N.C. Gen.Stat. § 78A–56 (2011).

{60} A violation of sections 78A–8(1) and (3), pursuant to subsection (1) above, requires that the defendant, in connection with the offer, sale, or purchase of any security, either (1) employ a "device, scheme, or artifice to defraud" or (2) engage in an "act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." N.C. Gen.Stat. §§ 78A–8(1), (3) (2011).

**\*10** {61} According to the North Carolina Securities Act, the definition of "security" includes a "certificate of interest or participation in any profit-sharing agreement, ... [and an] investment contract...." N.C. Gen.Stat. § 78A–2(11) (2011).

{62} Plaintiffs allege Defendants induced Plaintiffs to enter into the Operating Agreement that gave Blue Ridge a membership interest in GCL, GCI, and GC and purported to allocate the profits of the companies. (V.Am.Compl.¶¶ 21, 111, Ex. Q.) And, Defendants "sold" the security in exchange for Plaintiffs' obligations under the Lease. (V.Am.Compl.¶ 21.) The Court concludes that Plaintiffs have properly alleged the sale of a security.

{63} Plaintiffs allege specific material misrepresentations by Defendants regarding the financial health of First Colony, and regarding the terms of the contract (V.Am.Compl.¶¶ 18–20, 28, 35, 42, 50–92, 110, 146.), that support Plaintiffs' assertion of a "scheme" or "course of business" that operated to deceive the Plaintiffs in connection with the offer of

the security. (V.Am.Compl.¶¶ 50–92.) These allegations satisfy the requisite particularity requirements of time, place, and individual actions taken, in accordance with Rule 9(b), as discussed above. *See supra* ¶ 45–46. Specifically, Plaintiffs allege statements made by Russell (V.Am.Compl.¶¶ 35, 42), Hinson's preparation of the altered documents (V.Am.Compl.¶¶ 28, 85), and Norvet's participation at the initial sales presentation proclaiming First Colony's financial stability and expertise in developing medical parks. (V.Am.Compl.¶¶ 18–20, 110.) The Court concludes that Plaintiffs have sufficiently pled facts to support its claim under N .C. Gen Stat. section 78A–56.[2]

{64} Defendants also argue that Russell, Norvet, and Hinson should not be included in the tort claims since they acted as agents for First Colony. However, Defendants misapprehend the well-settled rule that "one is personally liable for all torts committed by him, including negligence, notwithstanding that he may have acted as agent for another or as an officer for a corporation." *Strang v. Hollowell,* 97 N.C.App. 316, 318, 387 S.E.2d 664, 666 (1990) (citing *Palomino Mills, Inc. v. Davidson Mills Corp.,* 230 N.C. 286, 52 S.E.2d 915 (1949)).

{65} The Amended Complaint contains several allegations supporting the personal liability of the Individual Defendants, as discussed above. In light of these individual acts, the Court concludes that Plaintiffs have stated a claim for securities fraud against the Individual Defendants.

{66} The Court also concludes that Defendants' reliance on the economic loss rule is inapplicable as North Carolina appellate courts have yet to extend the doctrine to bar claims based on fraud. *See Coker v. Daimler Chrysler Corp.,* 172 N.C.App. 386, 405, 617 S.E.2d 306, 318 (2005), *aff'd per curiam,* 360 N.C. 398, 627 S.E.2d 461 (2006) (Hudson, J., dissenting).

**\*11** {67} Accordingly, the Court **DENIES** Defendants' Motion to Dismiss Plaintiffs' sixth claim for relief, securities fraud.

f.

RESCISSION OF LEASE FOR FAILURE OF CONDITION PRECEDENT

{68} "A condition precedent is a fact or event, occurring subsequently to the making of a valid contract, that must exist or occur before there is a right to immediate performance, before there is a breach of contract duty, before the usual judicial remedies are available." *Chem. Realty Corp. v. Home Fed. Sav. & Loan Ass'n of Hollywood,* 84 N.C.App. 27, 37, 351 S.E.2d 786, 792 (1987) (internal quotations and citations omitted). "Conditions precedent are not favored by the law and a provision will not be construed as such in the absence of language clearly requiring such construction." *Id.* (quoting *Cox v. Funk,* 42 N.C.App. 32, 255 S.E.2d 600 (1979)). Allegations regarding the failure of a condition precedent "shall be made specifically and with particularity." N.C. R. Civ. P. 9(c).

{69} Plaintiffs Amended Complaint merely alleges "[t]hat the failure of Defendants to fulfill their agreements with Plaintiffs constitutes a failure of a condition precedent material to the agreements to the parties." (V.Am.Compl.¶ 152.) Specifically, Plaintiffs take the position that the Lease should be declared void because they have not received the equity ownership interest and profits from the operation of the Templeton Property or the sharing of profits from the sale of the property, as provided for in the Operating Agreement. (V.Am.Compl.¶ 150.) Applying this logic would require Plaintiffs to receive their equity interest and Defendants to pay out profits from the sale of the property to trigger Plaintiffs' obligations under the Lease. Plaintiff's equity interest was driven in part by Plaintiffs' lease payments. It would be counter-intuitive for Plaintiffs' equity interest or profits from the sale of the Templeton Property to be a condition precedent to the Plaintiffs' obligations under the Lease absent an express provision in the Lease or Operating Agreement upon which Plaintiffs rely. Plaintiffs have not asserted the existence of any such provision(s) in either the Lease or Operating Agreement. Accordingly, the Court concludes Plaintiffs have not stated a claim for failure of a condition precedent.

{70} Therefore, the Court GRANTS Defendants' Motion to Dismiss Plaintiffs' seventh claim for relief, rescission of lease for failure of condition precedent.

g.

ACTION TO CANCEL LEASE AND FOR RESCISSION FOR FAILURE OF CONSIDERATION

{71} " 'In order to defeat a contract for failure of consideration, the failure of consideration must be complete and total.' " *Fairfield Harbour Prop. Owners Ass'n v. Midsouth Golf, LLC,* 715 S.E.2d 273, 282 (N.C.Ct.App.2011) (quoting *Harllee v. Harllee,* 151 N.C.App. 40, 49, 565 S.E.2d 678, 683 (2002)). However, "where a person has been induced to part with something of value for little or no consideration, equity will seize upon the slightest circumstance of fraud, duress, or mistake for the purpose of administering justice in a particular case." *Hinson v. Jefferson,* 24 N.C.App. 231, 237, 210 S.E.2d 498, 502 (1974), *j. modified on other grounds,* 287 N.C. 422, 215 S.E.2d 102 (1975).

**\*12** {72} Here, Plaintiffs allege no facts demonstrating there was a "complete and total" failure of consideration, *Fairfield,* 715 S.E.2d at 282, or that they received "little or no consideration" under the Lease. *Hinson,* 24 N.C.App. at 237, 210 S.E.2d at 502. Essentially, Plaintiffs allege the deal with Defendants was that,

> in consideration of the execution of a ten year Lease by Blue Ridge and the guarantee of the Lease by the individual Doctors, the Defendants agreed and contracted ... to provide all capital, assume all risk, and as "partners," First Colony and Plaintiffs through A to Z would each receive 50% of the profits from the sale of any part of the Templeton Property [and that] Blue Ridge would also share in a portion of the ownership and profits from the office building....

(V.Am.Compl.¶ 21.) In fact, Defendants provided the capital and completed the build-out of the Blue Ridge building as agreed, and Plaintiffs moved in on March 21, 2008. (V.Am.Compl.¶¶ 49, 50, 53.) Furthermore, at the time they filed their Amended Complaint, Plaintiffs were still tenants under the Lease making lease payments. (V.Am.Compl.Ex. N.) As stated by Plaintiffs, they merely did not receive as great a benefit from the business arrangement with Defendants as expected, (Pls.' Mem. Law Opp. Defs.' Mot. Dismiss 19–20), not that there was a "complete and total" failure of consideration. (V. Am. Compl ¶ 57.)

{73} For the foregoing reasons, the Court **GRANTS** Defendants' Motion to Dismiss Plaintiffs' eighth claim for relief, rescission of lease for failure of consideration.

h.

WESTLAW  © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Blue Ridge Pediatric & Adolescent Medicine, Inc. v. First..., Not Reported in...

2012 NCBC 51

## WAIVER

{74} Plaintiffs' claim that Defendants waived their right to enforce the Lease through their alleged bad conduct. (*See* Pls.' Mem. Law Opp. Defs.' Mot. Dismiss 41 (citing *Bell v. Brown,* 227 N.C. 319, 322, 42 S.E.2d 92, 94 (1947)).) In *Bell,* the plaintiff lessee told the defendant lessor that he was no longer interested in purchasing the property under an option contract that had been executed by the parties. *Bell,* 227 N.C. at 323, 42 S.E .2d at 94. Defendant relied on plaintiff's rejection of his right to purchase the property and incurred additional costs by making changes to his construction plan. *Id.* When plaintiff then sought to enforce the option, the court found his previous statement amounted to a waiver of his right to purchase under the option agreement. *Id.*

{75} In *Bell,* the Court wrote: "a written contract, involving an interest in land, may be waived or rescinded by parol, but in the absence of a mutual agreement, an abandonment, or waiver of such a contract is to be inferred only from such positive and unequivocal acts and conduct as are clearly inconsistent with the contract." *Id.* at 322.

{76} Here, Plaintiffs do not allege a mutual agreement with Defendants, or any parol representations made by Defendants, constituting a waiver of Defendants' right to enforce the Lease with Plaintiffs.

**\*13** {77} The Court next considers whether Defendants committed "such positive and unequivocal acts and conduct as are clearly inconsistent with the [lease]." Again, Plaintiffs do not point to any specific terms of the lease agreement that Defendants repudiated or abandoned by acts or conduct that were clearly inconsistent with the Lease.

{78} Accordingly, the Court **GRANTS** Defendants' Motion to Dismiss Plaintiffs' ninth claim for relief, waiver.

i.

## CONFLICT OF INTEREST

{79} Plaintiffs seek relief on the grounds of conflict of interest. The Court is unaware of any a factual or legal circumstance that would form the basis of a separate and independent claim for conflict of interest in North Carolina,

and the Court declines to recognize such a claim herein. The Court notes in passing that, ordinarily, conflicts of interest might be relevant evidence in circumstances where a party owed a fiduciary duty to another. In their Amended Complaint, however, Plaintiffs fail to allege a fiduciary relationship existed between the parties, as discussed above.

{80} The Court, therefore, **GRANTS** Defendants' Motion to Dismiss Plaintiffs' tenth claim for relief, conflict of interest.

j.

## UNJUST ENRICHMENT

{81} "In order to state a claim for unjust enrichment, the plaintiffs allegations must set forth that a benefit was conferred on the defendant, that the defendant accepted the benefit, and that the benefit was not gratuitous." *Jackson v. Carolina Hardwood Co.,* 120 N.C.App. 870, 872, 463 S.E.2d 571, 573 (1995) (citing *Booe v. Shadrick,* 322 N.C. 567, 570, 369 S.E.2d 554, 556 (1988)).

{82} Plaintiffs allege they assigned to Defendants a right to purchase property at a price far below fair market value, executed a long-term lease at a rate in excess of fair market value, and that Plaintiffs granted these non-gratuitous benefits to get a share of the profits from the property. (V.Am.Compl.¶¶ 25, 46, 47, 56, 126.) These allegations satisfy the elements of a claim for unjust enrichment.

{83} Defendants argue, however, that "if there is a contract between the parties, the contract governs the claim and the moving party may not maintain a claim for unjust enrichment." (Mem. Law Supp. Defs.' Mot. Dismiss 21 (citing *Se. Shelter Corp. v. BTU, Inc .,* 154 N.C.App. 321, 331, 572 S.E.2d 200, 206 (2002)).)

{84} While the Court notes that several contracts are alleged to be at issue in this case, this fact does not, at this phase of the litigation, bar the allegation of alternative theories of recovery in the Amended Complaint. *See* N. C. R. Civ. P. 8(e)(2). Accordingly, the Court concludes that Plaintiffs have sufficiently pled this claim.

{85} Therefore, the Court hereby DENIES Defendants' Motion to Dismiss Plaintiffs' eleventh claim for relief, unjust enrichment.

Blue Ridge Pediatric & Adolescent Medicine, Inc. v. First..., Not Reported in...

2012 NCBC 51

k.

## UNFAIR AND DECEPTIVE TRADE PRACTICES

{86} "To establish a claim for unfair or deceptive trade practices[,] ... a plaintiff must show (1) defendant engaged in an unfair or deceptive practice or act, (2) 'in or affecting commerce,' and (3) such act proximately caused actual injury to the plaintiff." *Governor's Club Inc.,* 152 N.C.App. at 250, 567 S.E.2d at 788 (quoting N.C. Gen Stat. § 75–1.1 (2011)). Activities affecting commerce include "buying, developing and selling real estate," *id.,* as well as "the rental of commercial property." *Mosley & Mosley Builders v. Landin Ltd.,* 97 N.C.App. 511, 518, 389 S.E.2d 576, 580, *disc. rev. denied,* 326 N.C. 801, 393 S.E.2d 898 (1990). Furthermore, to properly allege an unfair or deceptive act, "it is sufficient if a plaintiff shows that a defendant's acts possessed the tendency or capacity to mislead or created the likelihood of deception." *RD & J Props. v. Lauralea–Dilton Enters.,* 165 N.C.App. 737, 748, 600 S.E.2d 492, 501 (2004).

 **\*14** {87} Here, the facts supporting Plaintiffs' claim for securities fraud can similarly be relied upon to support the unfair and deceptive practices claim. (V.Am.Compl.¶¶ 18–20, 28, 35, 42, 50–92, 110.) Further, by developing and renting the Templeton Property in connection with the alleged actions, the practice is "in or affecting commerce." Lastly, Plaintiffs allege Defendants' fraudulent acts deprived Plaintiffs of profits promised under the Operating Agreement. (V.Am.Compl.¶ 56.) The Court concludes, therefore, that Plaintiffs have sufficiently pled facts alleging unfair and deceptive trade practices.

{88} In light of its conclusions, the Court **DENIES** Defendants' Motion to Dismiss Plaintiffs' twelfth claim for relief, unfair and deceptive trade practices.

1.

## PUNITIVE DAMAGES

{89} In their fourteenth claim, Plaintiffs seek to place Defendants on notice that punitive damages are sought in this matter.

{90} "Ordinarily punitive damages are not recoverable. In the proper case, however, punitive damages are permitted on public policy grounds." *Terry,* 302 N.C. at 88, 273 S.E.2d at 680 (internal citations omitted). " 'In North Carolina actionable fraud ... is well within North Carolina's policy underlying this concept of punitive damages.' " *Id.* (alteration original) (citation omitted).

{91} Having found sufficient facts alleging securities fraud and unfair and deceptive trade practices, the Court concludes that Plaintiffs have also adequately stated a claim for punitive damages.

{92} The Court, therefore, **DENIES** Defendants' Motion to Dismiss Plaintiffs' fourteenth claim for relief, punitive damages.

m.

## CIVIL CONSPIRACY

{93} It is well recognized that "there is not a separate civil action for civil conspiracy in North Carolina." *Dove v. Harvey,* 168 N.C.App. 687, 690, 608 S.E.2d 798, 800 (2005), *disc. rev. denied,* 360 N.C. 289, 628 S.E.2d 249 (2006) (citing *Shope v. Boyer,* 268 N.C. 401, 150 S.E.2d 771 (1966)). However, a plaintiff may assert the claim of civil conspiracy to "associate the defendants together [such that] the acts and conduct of one might be admissible against all." *Id.* (quoting *Fox v. Wilson,* 85 N.C.App. 292, 300, 354 S.E.2d 737, 742–43 (1987)).

{94} "In order to state a claim for civil conspiracy, a complaint must allege 'a conspiracy, wrongful acts done by certain of the alleged conspirators, and injury.' " *Norman v. Nash Johnson & Sons' Farms, Inc.,* 140 N.C.App. 390, 537 S.E.2d 248, 265 (2000) (quoting *Henry v. Been,* 310 N.C. 75, 87, 310 S.E.2d 334 (1984)).

{95} As to wrongful acts, the Court previously concluded that Plaintiffs alleged sufficient facts demonstrating unfair and deceptive trade practices and securities fraud. Plaintiffs further allege an agreement encompassing those unlawful acts existed between the Defendants (V.Am.Compl.¶ 177), which deprived Plaintiffs of profits arising out of the Operating Agreement. (V.Am.Compl.¶ 56.) Accordingly, the Court concludes Plaintiffs have sufficiently stated a claim for civil conspiracy.

**\*15** {96} Therefore, the Court **DENIES** Defendants' Motion to Dismiss Plaintiffs' fifteenth claim for relief, civil conspiracy.

n.

EQUITABLE ESTOPPEL

{97} Plaintiffs seek to rely on equitable estoppel to rescind and enjoin enforcement of the Lease. However, in its Motion, Defendants do not assert any claim or affirmative defense under the Lease.

{98} This Court is not aware of any North Carolina case in which equitable estoppel has been asserted as the basis of an independent affirmative claim for relief. Rather, like the case cited by Plaintiffs in support of its claim, equitable estoppel provides a defense to bar enforcement of opposing claims or affirmative defenses. *See Friedland v. Gales,* 131 N.C.App. 802, 806, 509 S.E.2d 793, 796 (1998) (allowing equitable estoppel claim to bar statute of limitations defense). This Court declines to recognize equitable estoppel as an affirmative claim for relief at this stage.

{99} However, given that Defendants have yet to file an answer in this case, the Court's ruling here does not bar Plaintiffs' from later asserting this claim in response to any affirmative defenses or counterclaims raised by Defendants.

{100} For this reason, the Court **GRANTS** Defendants' Motion to Dismiss Plaintiffs' seventeenth claim for relief, equitable estoppel, without prejudice.

3.

PLAINTIFFS' CLAIMS APPLICABLE TO COLONY DEVELOPMENT PARTNERS, LLC ("CDP"), AND COLONY MANAGEMENT, INC. ("CM")

{101} Plaintiffs allege that First Colony assigned its contractual rights and duties to CDP and CM in the summer of 2008. (V.Am.Compl.¶ 55.) Taken as true, Plaintiffs' allegation would allow Plaintiffs to assert claims arising out of the duties enumerated in those assignments.

{102} Defendants contend that Plaintiffs fail to allege any connection giving rise to a duty owed by CDP and CM to Plaintiffs. However, where an assignment exists, "the other party to the original contract may sue the assignee as a third-party beneficiary of his promise of performance." *Rose v. Vulcan Materials,* Co., 282 N.C. 643, 663, 194 S.E.2d 521, 534 (1973).

{103} This Court concludes that the assignment is properly alleged such that Plaintiffs should have the opportunity during discovery to uncover exactly what, if any, liability CDP and CM may have to Plaintiffs.

{104} The Court, therefore, **DENIES** Defendants' Motion to Dismiss Plaintiffs' claim incorporating certain claims from Section I of the Amended Complaint against CDP and CM.

4.

CLAIMS APPLICABLE TO ALL DEFENDANTS

a.

CONSTRUCTIVE TRUST

{105} "[A] constructive trust is a fiction of equity, brought into operation to prevent unjust enrichment through the breach of some duty or other wrongdoing." *Roper v. Edwards,* 323 N.C. 461, 464, 373 S.E.2d 423, 424–25 (1988). Although this Court concluded no fiduciary duty has been alleged, Plaintiffs did properly plead an unjust enrichment claim to support this request for relief.

**\*16** {106} Defendants contend the election of remedies doctrine bars pleading this form of relief. (Mem. Law Supp. Defs.' Mot. Dismiss 29–30.)

{107} "The 'whole doctrine of election [of remedies] is based on the theory that there are inconsistent rights or remedies of which a party may avail himself, and a choice of one is held to be an election not to pursue the other.' " *Richardson v. Richardson,* 261 N.C. 521, 530, 135 S.E.2d 532, 539 (1964) (quoting *Machine Co. v. Owings,* 140 N.C. 503, 53 S.E. 345 (1906)).

{108} However, this doctrine does not apply to pleadings, as the Rules of Civil Procedure allow parties to plead in the

alternative. N.C. R. Civ. P. 8(e)(2) ("A party may also state as many separate claims or defenses as he has regardless of consistency and whether based on legal or on equitable grounds or on both.").

{¶109} Accordingly, the Court **DENIES** Defendants' Motion to Dismiss Plaintiffs' claim for imposition of a constructive trust.

b.

INDEPENDENT RECEIVER

{¶110} Plaintiffs seek appointment of an independent receiver to receive and distribute rents and to preserve GCL, GCI, and GC. (V .Am.Compl.¶ 208.)

{¶111} "[A] receiver may be appointed ... when plaintiff establishes an apparent right to specific property ... where specific property, or its rents and profits, are in danger of being lost or materially injured or impaired." *Murphy v. Murphy,* 261 N.C. 95, 101, 134 S.E.2d 148, 153 (1964). More specifically, receiverships are allowed by statute for unfair and deceptive trade practices where "restitution is sought for violations of G.S. 75–1.1." N.C. Gen.Stat. § 1–502(5) (2011).

{¶112} As previously discussed, Plaintiffs have alleged both a right to receive a share of rents and a claim for unfair and deceptive trade practices. Accordingly, the Court concludes this claim is proper.

{¶113} The Court, therefore, **DENIES** Defendants' Motion to Dismiss Plaintiffs' claim for appointment of an independent receiver.

c.

REQUEST FOR ACCOUNTINGS

{¶114} In this claim, Plaintiffs seek access to records and an audit of the Greenway Companies (GCL, GCI, and GC) by an independent third party pursuant to Section 11.2 of the Operating Agreement. (V. Am. Compl. Ex. Q at 27.) By statute, all members of a limited liability company "shall be bound by any operating agreement." N.C. Gen.Stat. § 57C–3–05 (2011). Here, the Operating Agreement expressly allows

for any member of the limited liability company to request either or both of the actions sought by Plaintiffs here. (V. Am. Compl. Ex. Q at 27.)

{¶115} In their Amended Complaint, Plaintiffs reference and include a letter dated February 23, 2011, which called for the inspection of records. (V.Am.Compl.Ex.S.) Since the Operating Agreement does not specify any requirements for a proper demand under Section 11.2, Defendants' failure to submit to Plaintiffs' request may constitute a further breach of contract under the Operating Agreement. As such, the Court concludes that Plaintiffs' properly assert this claim for relief pursuant to their rights under the Operating Agreement.

**\*17** {¶116} For the reasons given, the Court **DENIES** Defendants' Motion to Dismiss Plaintiffs' claim for a request for accountings.

d.

DECLARATORY JUDGMENT

{¶117} Defendants make no specific argument as to why this claim should be dismissed, and the Court sees no reason to find that it fails to state a claim pursuant to Rule 12(b)(6). (Mem. Law Supp. Defs.' Mot. Dismiss 30.)

{¶118} "Where a complaint requesting declaratory relief alleges the existence of a real controversy arising out of the parties' opposing contentions and respective legal rights, it is normally sufficient." *Fuller v. Easley,* 145 N.C.App. 391, 398, 553 S.E.2d 43, 48 (2001) (internal quotations and citations omitted).

{¶119} This Court, having found sufficient facts to allege a real controversy as to the Lease, concludes dismissal of this claim would be improper.

{¶120} For the reasons given, the Court hereby **DENIES** Defendants' Motion to Dismiss Plaintiffs' claim for declaratory judgment.

e.

PRELIMINARY INJUNCTION

Case 5:23-cv-00059-KDB-DCK   Document 109-1   Filed 09/16/24   Page 32 of 81

{121} Plaintiffs seek the issuance of a preliminary injunction to protect their possessory interests in the medical office that is the subject of this litigation. They allege that Defendants have threatened ejection for non-payment of certain fees under the terms of the Lease. (V.Am.Compl.¶ 215.)

{122} "[A] prayer for relief in [a] complaint may constitute a sufficient motion for a preliminary injunction, and ... a separate or additional motion is not necessarily required." *Collins v. Freeland,* 12 N.C.App. 560, 562, 183 S.E.2d 831, 832 (1971). However, Business Court Rule 15.2 requires that "[a]ll motions, unless made orally during a hearing or trial, ... be in paper writing or electronic form and ... be accompanied by a brief ... set out in a *separate* paper." BCR 15.2 (2006) (emphasis added).

{123} Plaintiffs stated a prayer for relief in their Amended Complaint, but have not filed a supporting brief pursuant to the Business Court Rules. Therefore, a motion for injunctive relief is not properly before the Court at this time.

{124} Accordingly, the Court GRANTS Defendants' Motion to Dismiss Plaintiffs fifth claim in this section, Motion for Preliminary Injunction, without prejudice.

5.

DERIVATIVE CLAIMS

{125} Plaintiffs alternatively raise derivative claims on behalf of GCL, GCI, and GC. (V.Am.Compl.¶¶ 225–245.) Defendants argue, and this Court agrees, that Plaintiffs have not satisfied the statutory requirements for bringing such an action. (Mem. Law Supp. Defs.' Mot. Dismiss 30.)

{126} By statute, a member of a limited liability company may bring a derivative action in accordance with the following conditions:

> (1) The plaintiff does not have the authority to cause the limited liability company to sue in its own right; and
>
> (2) The plaintiff (i) is a member of the limited liability company at the time of bringing the action, and (ii) was a member of the limited liability company at the time of the transaction of which the plaintiff complains....

*18 (b) The complaint shall allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the managers, directors, or other applicable authority and the reasons for the plaintiff's failure to obtain the action, or for not making the effort. N.C. Gen.Stat. §§ 57C–8–01(a)–(b) (2011).

{127} Plaintiffs' Amended Complaint fails to sufficiently allege derivative claims because it does not state with particularity the actions sought from the Defendants or the efforts made in seeking those actions. Rather, Plaintiffs allege their counsel sent a letter, dated February 23, 2011, to Defendants "advis[ing] of the filing of the Complaint and the relief sought." (V.Am.Compl. ¶ 232, Ex. S.) The Court concludes that the letter dated February 23, 2011, and allegedly delivered contemporaneously with the filing of this action, is insufficient to meet the requirements of section 57C–8–01. Furthermore, because the Amended Complaint also fails to allege with particularity Plaintiffs' reasons for not making an effort to obtain the desired action from the Defendants, Plaintiffs are not entitled to relief by way of a derivative action.

{128} Therefore, the Court **GRANTS** Defendants' Motion to Dismiss Plaintiffs' derivative claims contained in section IV of the Amended Complaint, without prejudice.

V.

CONCLUSION

{129} For the reasons stated herein, the Court **GRANTS** in part and **DENIES** in part Defendants' Motion to Dismiss pursuant to Rule 12(b)(6). Accordingly, the Court **DISMISSES** with prejudice Plaintiffs' claims for piercing the corporate veil, fraud in the inducement, intentional or negligent misrepresentation, negligence, constructive fraud, rescission of the lease for failure of condition precedent, rescission of the lease for failure of consideration, waiver, and conflict of interest as to all Defendants; **DISMISSES** without prejudice Plaintiffs' claims for equitable estoppel, preliminary injunction and all derivative claims as to all Defendants.

**SO ORDERED.**

**All Citations**

Not Reported in S.E.2d, 2012 WL 4714497, 2012 NCBC 51

Footnotes

1   In the Amended Complaint, Plaintiffs assign the term "First Colony" to "First Colony Corporation" (V.Am.Compl.¶ 5), but later state, "collectively, for administrative ease First Colony Corporation and/or its Affiliates may be referred to herein as 'First Colony.' " (V.Am.Compl.¶ 10.) This ambiguity has no bearing on the Court's resolution of these Motions.

2   The Court is unaware of any case law asserting that the common law fraud requirement for alleging justifiable reliance extends to statutory claims for securities fraud. And, the Court declines to extend such a requirement to this claim at this stage.

**End of Document**                                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.          15

2015 WL 5431466
Only the Westlaw citation is currently available.
United States District Court, W.D. North Carolina,
Charlotte Division.

CHARLOTTE CHIROPRACTIC
CLINIC, P.A., Plaintiff,

v.

CHIRO–CAROLINA FAMILY

AND SPORTS CARE, PLLC, and

Richard Williams, Defendants.

Civil Action No. 3:14–CV–585–RJC–DCK.
|
Signed June 24, 2015.
|
Filed June 25, 2015.

**Attorneys and Law Firms**

Sarah Chih–Jen Hsia, Jason Matthew Sneed, Sneed, PLLC,
Davidson, NC, for Plaintiff.

Susan Freya Olive, Olive & Olive, Durham, NC, for
Defendants.


**MEMORANDUM AND RECOMMENDATION**

DAVID C. KEESLER, United States Magistrate Judge.

  *1  **THIS MATTER IS BEFORE THE COURT** on
"Defendants' Motion To Dismiss Complaint" (Document
No. 14). This motion has been referred to the undersigned
Magistrate Judge pursuant to 28 U.S.C. § 636(b), and
is now ripe for disposition. Having carefully considered
the arguments, the record, and applicable authority, the
undersigned will respectfully recommend that the motion be
*granted* in part and *denied* in part.


**I. BACKGROUND**

Charlotte Chiropractic Clinic, P.A. d/b/a
"ChiroCarolina" ("Plaintiff") initiated this action with
the filing of its "Complaint" (Document No. 1) on
October 10, 2014. Plaintiff's Complaint asserts causes of

action against Chiro–Carolina Family And Sports Care,
PLLC ("CCFSC") and Dr. Richard Williams ("Williams")
(together, "Defendants") for: (1) unfair competition; (2) false
designation of origin; (3) unfair and deceptive trade practices;
(4) trademark infringement; and (5) tortious interference with
actual and prospective business relations. (Document No. 1).

On January 20, 2015, Plaintiff filed a "Motion For
Preliminary Injunction" (Document No. 13). The next day,
"Defendants' Motion To Dismiss Complaint" (Document No.
14) was filed with the Court. Defendants seek dismissal
pursuant to Fed.R.Civ.P. 12(b)(6) contending that the
Complaint fails to satisfy the requirements of Fed.R.Civ.P. 8.
(Document No. 14).

In addition, Defendants have filed a "... Motion To Strike
Declarations And Hearsay ..." (Document No 24) and
an "... Amended Motion To Strike Declarations And
Hearsay ..." (Document No. 28).

The pending motions have been fully briefed and are ripe for
disposition. The motions for injunctive relief and to strike are
before the presiding district judge. The motion to dismiss has
been referred to the undersigned for a "Memorandum And
Recommendation," and immediate review is appropriate.


**II. STANDARD OF REVIEW**

A motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) tests
the "legal sufficiency of the complaint" but "does not resolve
contests surrounding the facts, the merits of a claim, or
the applicability of defenses." *Republican Party of N.C. v.
Martin,* 980 F.2d 943, 952 (4th Cir.1992); *Eastern Shore
Markets, Inc. v. J.D. Assoc. Ltd. Partnership,* 213 F.3d 175,
180 (4th Cir.2000). A complaint attacked by a Rule 12(b)
(6) motion to dismiss will survive if it contains "enough
facts to state a claim to relief that is plausible on its face."
*Ashcroft v. Iqbal,* 556 U.S. 662, 697 (2009) (quoting *Bell
Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007)); *see
also, Robinson v. American Honda Motor Co., Inc.,* 551 F.3d
218, 222 (4th Cir.2009). "A claim has facial plausibility when
the plaintiff pleads factual content that allows the court to
draw the reasonable inference that the defendant is liable for
the misconduct alleged." *Iqbal,* 556 U.S. at 678. "Threadbare
recitals of the elements of a cause of action, supported by mere
conclusory statements, do not suffice." *Id.*

  *2  The Supreme Court has also opined that

Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Specific facts are not necessary; the statement need only " 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " In addition, when ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint. *Erickson v. Pardus,* 551 U.S. 89, 93–94 (2007) (quoting *Twombly,* 550 U.S. at 555–56).

"Although for the purposes of this motion to dismiss we must take all the factual allegations in the complaint as true, we are not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain,* 478 U.S. 265, 286 (1986). The court "should view the complaint in the light most favorable to the plaintiff." *Mylan Labs, Inc. v. Matkar,* 7 F.3d 1130, 1134 (4th Cir.1993).

## III. DISCUSSION

Defendants contend that even under the liberal standard of review set forth above, Plaintiff has failed to comply with the requirements of Fed.R.Civ.P. 8 or to show a plausible claim for relief. (Document No. 15, pp. 4–5). The undersigned will address Defendants' specific arguments below.

### A. Lanham Act, 15 U.S.C. § 1125(a)(1)(A) and (B)

Plaintiff's first two (2) causes of action assert claims of "unfair competition" and "false designation of origin" under 15 U.S.C. § 1125(a). (Document No. 1, pp. 10–11). Defendants argue that Plaintiff's first claims must be dismissed because "Plaintiff has not alleged that its mark acquired distinctiveness" and because Plaintiff has not "alleged that its own use of its mark was lawful." (Document No. 15, p. 7).

In order to prevail in an action for service mark infringement and **unfair competition** under § 43(a) of the Lanham Act, a plaintiff must "first and most fundamentally prove that it has a valid and protectable mark." *MicroStrategy,* 245 F.3d at 341. If the plaintiff's mark is deemed to be protectable, it still cannot prevail unless it can show that the defendant's use of an identical or similar mark is likely to cause confusion among consumers. *U.S. Search, LLC v. U.S. Search.com Inc.,* 300 F.3d 517, 523 (4th Cir.2002) (emphasis added).

"Section 43(a) creates a federal remedy against **unfair competition** in the form of a **false designation of origin.**" *Superior Performers, Inc. v. Family First Life, LLC,* 2014 WL 7338923, at *4 (M.D.N.C. Dec. 22, 2014) (emphasis added) (quoting *Devan Designs, Inc. v. Palliser Furniture Corp.,* 1992 WL 511694, at *4 (M.D.N.C. Sept. 15, 1992)).

To state a **false designation of origin claim,** a plaintiff must sufficiently allege that:

(1) a defendant uses a designation; (2) in interstate commerce; (3) in connection with goods and services; (4) which designation is likely to cause confusion, mistake or deception as to origin, sponsorship, or approval of defendant's goods or services; and (5) plaintiff has been or is likely to be damaged by these acts.

**\*3** *Id.* (quoting *America Online, Inc. v. LCGM, Inc.,* 46 F.Supp .2d 444, 449 (E.D.Va.1998)) (emphasis added).

As noted by Defendants, the Lanham Act's protection includes unregistered marks. (Document No. 15, p. 5) (citing *Ale House Mgmt., Inc. v. Raleigh Ale House, Inc.,* 205 F.3d 137, 140 (4th Cir .2000) (citing 15 U.S.C. § 1125(a)). "To ascertain whether a mark is protected, we must determine whether it is 1) generic, 2) descriptive, 3) suggestive or 4) arbitrary or fanciful." *U.S. Search, LLC,* 300 F.3d at 523 (citing *Perini Corp. v. Perini Construction, Inc.,* 915 F.2d 121, 124 (4th Cir.1990); *see also, Ale House Mgmt., Inc. v. Raleigh Ale House, Inc.,* 205 F.3d at 140.

In response to the motion to dismiss, Plaintiff contends that it has adequately "alleged that it possess[es] a trademark that was used by Defendants in commerce in connection with the sale, offering for sale and advertising of services in a manner likely to cause confusion." (Document No. 23, pp. 4–5) (internal citations omitted). The undersigned agrees that Plaintiff has stated sufficiently plausible claims pursuant to 15 U.S.C. § 1125(a) to survive a motion to dismiss at this early stage and proceed to discovery.

Of course, the undersigned expresses no opinion at this time as to the ultimate merits of Plaintiff's claims. Notably, the Court's own research suggests that while Plaintiff appears to assert sufficient factual content to support plausible claims pursuant to § 1125(a)(1)(A) & (B), these claims may be mislabeled. *See Int'l Foundation of Employee Ben. Plans, Inc. v. Cottrell,* 2015 WL 127839, at *2 (D.Md. Jan. 7, 2015) ("Section 1125(a) provides two grounds for asserting **unfair competition** claims: 15 U.S.C. § 1125(a)(1)(**A**) protects

against **false designation;** 15 U.S.C. § 1125(a)(1)(**B**) protects against **false advertising.**") (emphasis added); *MDM Group Associates, Inc. v. Emerald Isle Realty, Inc.,* 2008 WL 2641271, at *5, n. 2 (E.D.N.C. July 1, 2008)* ("Lanham Act contains two prongs. Section 1125(a)(1)(**A**) governs "**false designation of origin**" claims, and section 1125(a)(1)(**B**) governs "**false advertising**" claims.") (emphasis added); *see also, Belmora Inc. v. Bayer Consumer Care AG,* 2015 WL 518571, at *6, 12–13 (E.D.Va. Feb. 6, 2015). If indeed these claims are mislabeled, the undersigned assumes that these are scrivener's errors and not cause for dismissal at this stage. Plaintiff should consider whether to seek leave to amend, if appropriate.

## B. Unfair and Deceptive Trade Practices, N.C.Gen.Stat. § 75–1.1

Next, Defendants contend that the allegations in the Complaint do not support a claim for unfair and deceptive trade practices under N .C.Gen.Stat. § 75–1.1 ("UDTPA"). (Document No. 15, pp. 8–9).

Under the North Carolina General Statutes section 75–1.1, a plaintiff must show that the defendant committed an unfair or deceptive act, that affected commerce, and proximately injured the plaintiff. *Pleasant Valley Promenade v. Lechmere, Inc.,* 120 N.C .App. 650, 464 S.E.2d 47, 58 (N.C.Ct.App.1995). North Carolina courts indicated that the words "unfair methods of competition," as used by the statute, encompass any conduct a court of equity would consider unjust. *Harrington Mfg. Co. v. Powell Mfg. Co.,* 38 N.C.App. 393, 248 S.E.2d 739, 744, 746 (N.C.Ct.App.1978). "A practice is unfair if it is unethical or unscrupulous, and it is deceptive if it has a tendency to deceive." *Polo Fashions, Inc. v.. Craftex, Inc.,* 816 F.2d 145, 148 (4th Cir.1987).
**\*4** *Shell Trademark Mgmt. BV & Motiva Enterprises, LLC v. Ray Thomas Petroleum Co., Inc.,* 3:07–CV–163–RJC, 642 F.Supp.2d 493, 505 (W.D.N.C.2009).

Here, Defendants specifically argue that the Complaint is directed at "professional services" rendered by them, and that "all professional services rendered by a member of a learned profession" are expressly excluded under North Carolina's UDTPA. (Document No. 15, p. 8) (citing N.C.Gen.Stat. § 75–1.1(b)). Defendants further argue that Plaintiff's UDTPA claim is deficient because it fails to adequately allege reliance on purported misrepresentations, or damages. (Document No. 15, pp. 8–9).

In response, Plaintiff argues that the Complaint is not directed at Defendants' provision of chiropractic services, but at "their advertising, marketing and promotion thereof." (Document No. 23, p. 13). According to Plaintiff, its allegations of UDTPA violations are not excluded because the claims do not relate to a "necessary part" of the professional services provided. (Document No. 23, p. 13) (citing *Reid v. Ayers,* 138 N.C.App. 261, 267–68 (2000)).

Defendants contend that Plaintiff's reliance on *Reid* is based on dicta, and that more recent decisions uphold the "learned profession" exemption, even in circumstances involving advertising. (Document No. 26, pp. 7–8) (citing *Phillips v. Triangle Women's Health Clinic, Inc.,* 155 N.C.App. 372 (2002), *aff'd per curiam,* 357 N.C. 576 (2003); *Wheeless v. Maria Parham Med. Ctr., Inc.,* 768 S.E.2d 119 (N.C.App. Dec. 2, 2014)). Defendants further contend that even if they were subject to such claims, Plaintiff has failed to set out sufficient factual support for a UDTPA claim. (Document No. 26, p. 8).

The undersigned observes that the *Wheeless* decision cited by Defendants relies on *Reid* to set forth the proper analysis:

To determine whether the "learned profession" exclusion applies, a two-part inquiry must be conducted: "[f]irst, the person or entity performing the alleged act must be a member of a learned profession. Second, the conduct in question must be a rendering of professional services." *Wheeless,* 768 S.E.2d at 123 (quoting *Reid,* 138 N.C.App. at 266).

In this case, like *Wheeless,* there does not appear to be any dispute that Defendants are members of a learned profession. *See* (Document No. 23, p. 13–14); *see also,* N.C.Gen.Stat. § 55B–2 (5)-(6). Therefore, the remaining question is whether the conduct alleged by Plaintiff was a "rendering of professional services."

A decision in which this Court considered the applicability of *Reid* and whether certain conduct qualified as "rendering of professional services" is instructive here. *See RCDI Construction, Inc. v. Spaceplan/Architecture, Planning & Interiors, P.A.,* 148 F.Supp.2d 607 (W.D.N.C.2001). In *RCDI,* this Court determined that architects and architectural firms qualified as members of a learned profession. *RCDI,* 148 F.Supp.2d at 619. The *RCDI* Court then observed that the North Carolina General Statutes define the scope of the practice of architecture as including "offering to perform ... professional services"—which the Court found to be the

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

3

conduct plaintiffs complained of in that case. *Id.* (citing N.C.Gen.Stat. § 83A–1(7). This Court concluded that the architect defendants' alleged conduct qualified as "rendering of professional services," and therefore, could *not* serve as the basis for a UDTPA claim. *Id* .

**\*5** The parties in this case do not directly address the scope and/or definition of chiropractic services, or whether such services include the conduct alleged by Plaintiff to support its UDTPA claim. According to Plaintiff, the relevant conduct involves "Defendants' use of 'reproductions, counterfeits, copies, and colorable imitations of Plaintiff's CHIROCAROLINA Mark' in connection with the advertising and marketing of chiropractic services." (Document No. 23, p. 14) (citing Document No. 1, ¶¶ 14–15, 17). So far, neither the parties nor the undersigned has identified a statute or case law that clearly indicates whether advertising or marketing fall within the scope of chiropractic professional services.

As noted above, the North Carolina General Statutes define the "practice of architecture" as including "offering to perform ... professional services." N.C.Gen.Stat. § 83A–1 (7). Similarly, the statutes define the "practice of medicine" as including the act of "advertising." N.C.Gen.Stat. § 90–1.1. The statutes provide a definition of "chiropractic," but do not appear to further elaborate on the chiropractic practice or whether it includes offers to perform, advertising, or marketing. N.C.Gen.Stat. § 90–143.

The undersigned finds that this issue presents a close call. Under the circumstances of this case, the undersigned will recommend that dismissal of this claim be denied at this stage to allow for discovery, and if appropriate, further development of the arguments through summary judgment motions. In short, the undersigned concludes that Plaintiff's UDTPA allegations are sufficient to survive a motion to dismiss.

### C. Trademark Infringement

Defendants also seek dismissal of Plaintiff's claim for trademark infringement. (Document No. 15, pp. 9–10). Defendants primarily argue that Plaintiff has not adequately alleged that it owns a valid mark and/or that its mark has acquired distinctiveness. *Id.*

> To establish trademark infringement under federal law, [plaintiff] must prove that (1) it owns a valid mark; (2) defendants used the mark in commerce and without [plaintiff's] authorization; (3) defendants used the mark, or

an imitation of it, in connection with the sale of goods and services; and (4) defendants' use of the mark is likely to confuse customers. *Rosetta Stone Ltd. v. Google, Inc., 676 F.3d 144, 152 (4th Cir.2012)* (quotation omitted); *see* 15 U.S.C. § 1114(1)(a); *George & Co. LLC v. Imagination Entm't Ltd., 575 F.3d 383, 393 (4th Cir.2009); Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC, 507 F.3d 252, 259 (4th Cir.2007); People for Ethical Treatment of Animals v. Doughney, 263 F.3d 359, 364 (4th Cir.2001).* "**The North Carolina common law of unfair competition in the context of trademarks ... is similar to the federal law of trademark infringement.**" *Polo Fashions, Inc. v. Craftex, Inc., 816 F.2d 145, 148 (4th Cir.1987)*

*Re/Max LLC v. M.L. Jones & Associates, Ltd., 2014 WL 7405461, at \*4 (E.D.N.C. Dec. 30, 2014)* (emphasis added). *See also, Superior Performers, Inc. v. Family First Life, LLC, 2014 WL 7338923, at \*4 (M.D.N.C. Dec. 22, 2014)* (citing *Resorts of Pinehurst, Inc. v. Pinehurst Nat. Corp., 148 F.3d 417, 422 (4th Cir.1998)* (" 'Likelihood of confusion' is the basic test of both common-law trademark infringement and federal statutory trademark infringement."). "The inquiry concerning the likelihood of confusion is a fact-intensive inquiry." *Superior Performers, Inc . 2014 WL 7338923, at \*5* (citing *U.S. Hosiery Corp. v. The Gap, Inc., 707 F.Supp. 800, 810 (W.D.N.C.1989)*). It is not appropriate to weigh the various factors to be considered in such inquiry at the motion to dismiss stage. *Id.*

**\*6** The parties appear to agree that review of trademark infringement follows the same principles that apply to Section 43(a) of the Lanham Act. *See* (Document No. 15, pp. 9–10: Document No. 23, pp. 4–12; Document No. 26, p. 9). As such, and considering the undersigned's previous determination regarding Plaintiff's Lanham Act claims and the authority cited above, the undersigned will recommend that dismissal of the trademark infringement claim be denied at this stage. Again, the undersigned finds that Plaintiff's claim should be subjected to discovery, and then most likely, further argument at a later stage of this litigation.

### D. Tortious Interference

Plaintiff's final claim is for tortious interference with actual and prospective advantage. (Document No. 1, p. 12). Defendants move to dismiss Plaintiff's tortious interference claim arguing that it has failed to allege facts to support such a claim. (Document No. 15, pp. 10–13). Specifically, Defendants argue that Plaintiff has not sufficiently alleged that: (1) Plaintiff had a valid contract with a third party; (2) Defendant knowingly interfered with contract rights by

persuading a third party not to do business with Plaintiff; (3) Defendants acted without justification; (4) a third party refrained from entering a contract with Plaintiff; (5) Plaintiff lost a contract due to Defendants' interference; (6) Defendants acted without justification; and/or that (7) Plaintiff suffered particular damages. (Document No. 15, pp. 11–12).

In response, Plaintiff contends that it has adequately alleged that Defendants "maliciously" interfered with patients with whom Plaintiff had an actual or prospective business relationship. (Document No. 23, pp. 14–15). Moreover, Plaintiff asserts that it "sets out **damages** it has suffered due to Defendant's bad acts **in detail** in Paragraphs 40, 42, 46, and 51." (Document No. 23, p. 15) (emphasis added).

Both parties appear to recognize that *Walker v. Sloan,* a decision by the North Carolina Court of Appeals, is instructive here. *See* (Document No. 15, pp. 12–13; Document No. 23, p. 15). *Walker v. Sloan* provides in pertinent part that:

> An action for tortious interference with prospective economic advantage is based on conduct by the defendants which prevents the plaintiffs from entering into a contract with a third party. *Owens v. Pepsi Cola Bottling Co.,* 330 N.C. 666, 680, 412 S.E.2d 636, 644 (1992). In *Coleman v. Whisnant,* 225 N.C. 494, 35 S.E.2d 647 (1945), our Supreme Court stated the following:
>
>> We think the general rule prevails that unlawful interference with the freedom of contract is actionable, whether it consists in maliciously procuring breach of a contract, or in preventing the making of a contract when this is done, not in the legitimate exercise of the defendant[s'] own rights, but with design to injure the plaintiff[s], or gaining some advantage at [their] expense.... In *Kamm v. Flink,* 113 N.J.L., 582 [175 A. 62] 99 A.L.R., 1, it was said: "Maliciously inducing a person not to enter into a contract with another, which he would otherwise have entered into, is actionable if damage results." The word "malicious" used in referring to malicious interference with formation of a contract does not import ill will, but refers to an interference with design of injury to plaintiff[s] or gaining some advantage at [their] expense.
>
> **\*7** 225 N.C. at 506, 35 S.E.2d at 656. Thus, to state a claim for wrongful interference with prospective advantage, the plaintiffs must allege facts to show that the defendants acted without justification in "inducing a third party to

refrain from entering into a contract with them which contract would have ensued but for the interference." *Cameron v. New Hanover Memorial Hospital,* 58 N.C.App. 414, 440, 293 S.E.2d 901, 917, *disc. review denied and appeal dismissed,* 307 N.C. 127, 297 S.E.2d 399 (1982). *Walker v. Sloan,* 137 N.C.App. 387, 392–93 (2000).

The *Walker* decision further provides that plaintiffs are "required to assert some **measurable damages** resulting from defendants' allegedly tortious activities, i.e., what 'economic advantage' was lost to plaintiffs as a consequence of defendants' conduct." *Walker,* 137 N.C.App. at 394 (emphasis added). The *Walker* court concluded that a complaint that "states only that 'Defendants actions resulted in actual damage to the plaintiffs' " is insufficient. *Id.*

Based on the foregoing authority, and the parties' briefs, the undersigned is persuaded that the Complaint fails to sufficiently allege factual content to support a plausible claim for tortious interference. In particular, the undersigned observes that although Plaintiff argues that it has set out its damages "in detail," such a conclusion is not supported. *See* (Document No. 23, p. 15). Contrary to Plaintiff's assertion, paragraphs 40, 42, 46, 51 and 56 make no mention of "damages," and paragraph 58 merely states that "Plaintiff has been damaged by the acts of Defendants complained of herein." (Document No. 1, pp. 10–12). Plaintiff's conclusory statement regarding damages is very similar to the language the *Walker v. Sloan* decision determined was inadequate. *Compare Walker,* 137 N.C.App. at 394 and (Document No. 1, p. 12, ¶ 58).

In short, the undersigned finds that Plaintiff's allegations, including its failure to adequately allege some "measurable damages," are insufficient to support its final claim. *Id.* As such, the undersigned will recommend that the motion to dismiss be granted as to Count V.

## IV. RECOMMENDATION

**FOR THE FOREGOING REASONS,** the undersigned respectfully recommends that "Defendants' Motion To Dismiss Complaint" (Document No. 14) be **GRANTED in part,** and **DENIED in part.** Specifically, the pending motion to dismiss should be denied at this stage of the litigation as to Counts I–IV, and granted as to Count V.

## V. TIME FOR OBJECTIONS

The parties are hereby advised that pursuant to 28 U.S.C. § 636(b)(1)(C), and Rule 72 of the Federal Rules of Civil Procedure, written objections to the proposed findings of fact, conclusions of law, and recommendation contained herein may be filed within **fourteen (14) days** of service of same. Responses to objections may be filed within fourteen (14) days after service of the objections. Fed.R.Civ.P. 72(b) (2). Failure to file objections to this Memorandum and Recommendation with the District Court constitutes a waiver of the right to *de novo* review by the District Court. *Diamond*

*v. Colonial Life,* 416 F.3d 310, 315–16 (4th Cir.2005). Moreover, failure to file timely objections will preclude the parties from raising such objections on appeal. *Diamond,* 416 F.3d at 316; *Page v. Lee,* 337 F.3d 411, 416 n. 3 (4th Cir.2003); *Snyder v. Ridenhour,* 889 F.2d 1363, 1365 (4th Cir.1989); *Thomas v. Arn,* 474 U.S. 140, 147–48 (1985), *reh'g denied,* 474 U.S. 1111 (1986).

**\*8  IT IS SO RECOMMENDED.**

## All Citations

Not Reported in F.Supp.3d, 2015 WL 5431466

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 143094

Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court, W.D. North Carolina, Charlotte Division.

DIAGNOSTIC DEVICES, INC., Plaintiff,

v.

DOCTOR DIABETIC
SUPPLY, INC., Defendant.

Civil No. 3:09CV135-GCM.
|
Jan. 11, 2010.

**Attorneys and Law Firms**

Ashley Long Ellis, Morgan Hunter Rogers, Parker Poe, Parker Poe Adams & Bernstein, Charlotte, NC, for Plaintiff.

Keith Thomas Grumer, Grumer & Macaluso, P.A., Fort Lauderdale, FL, Kenneth R. Raynor, Templeton & Raynor, P.A., Charlotte, NC, for Defendant.

*ORDER*

GRAHAM C. MULLEN, District Judge.

**\*1 THIS MATTER** is before the Court upon the Defendant's Motion to dismiss Plaintiff's Second Amended Complaint, filed July 13, 2009; Plaintiff's Brief in opposition to Defendant's Motion to Dismiss, filed July 29, 2009; and Defendant's Reply in support of Defendant's Motion to Dismiss, filed August 10, 2009. For the reasons set forth below, Defendant's motion is GRANTED as to Plaintiff's claim for relief for libel per se, but DENIED as to all of Plaintiff's other claims.

*I. BACKGROUND*

Plaintiff is in the business of selling diabetic supplies, including diabetic testing meters and strips, under the brand name "Prodigy" to distributors, who then sell the products

to end users. Defendant is a distributor of diabetic supplies, to whom the Plaintiff claims to have sold over a million dollars worth of supplies between 2007 and 2009. This case stems from a shipment of diabetic supplies from the Plaintiff to the Defendant on January 8, 2009, which Plaintiff claims Defendant accepted and then refused to pay for pursuant to the terms of a contract between the parties. The Plaintiff alleges damages in the amount of $100,603.25 resulting from Defendant's refusal to pay. In the alternative to its claim for breach of contract, the Plaintiff asserts a claim in quantum meruit, for those supplies delivered and accepted by the Defendant.

In addition, Plaintiff asserts causes of action for defamation, libel per se, unfair and deceptive trade practices under North Carolina statues, and unfair competition under North Carolina common law, based on allegations by the Plaintiff that the Defendant made misrepresentations to its customers regarding the availability of Plaintiff's product. Specifically, Plaintiff claims that Defendant made misrepresentations to its customers in letters dated March 26, 2009 and March 28, 2009, and through website content and telephone contact with customers, in which Defendant informed them that it would no longer carry Plaintiff's "Prodigy" diabetic supplies because the "manufacturer is discontinuing this model within the U.S. markets." (Exhibits D & E to Second Amended Complaint) Plaintiff alleges Defendant knew this to be incorrect because Plaintiff had previously sent the Defendant a letter on February 5, 2009, informing the Defendant that the Plaintiff's product was not in short supply and that "it will continue to be manufactured by DDI." (Exhibit G to Second Amended Complaint)

*II. DISCUSSION*

**A. Standard of Review**

"A motion to dismiss under [Fed.R.Civ.P. 12(b)(6) ] tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of North Carolina v. Martin,* 980 F.2d 943, 952 (4th Cir.1993) *citing* 5A C. Wright & A. Miller, Fed. Practice and Procedure § 1356 (1990). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U .S. 544, 550 (2007)) The facial

plausibility standard requires "the plaintiff to articulate facts, when accepted as true, that 'show' that the plaintiff has stated a claim entitling him to relief." *Francis v. Giacomelli,* No. 08-1908 (4th Cir. Dec. 2, 2009) (quoting *Iqbal,* 129 S.Ct. at 1950). "The Supreme Court has held that a complaint must contain 'more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.' " *Id.* at 9 (*quoting* Iqbal, 129 S.Ct. at 1949).

### B. Claims for Breach of Contract and Quantum Meruit

**\*2** The elements of a breach of contract claim under North Carolina law are: (1) the existence of a valid contract between the parties; (2) breach of that contract; and (3) damages resulting from the breach. *Lee Cycle Center, Inc. v. Wilson Cycle Center, Inc.,* 545 S.E.2d 745, 751 (N.C.App.2001). The Plaintiff has a valid claim for breach of contract because it has properly alleged facts, including a history of business transactions, and written records, between the parties that, taken as true, suggest the possible existence of a valid contract between the parties. Plaintiff also fulfills the pleading requirements of the second and third elements by claiming that the Defendant has refused to fully pay for goods properly delivered by the Plaintiff, therefore damaging Plaintiff to the extent of the unpaid balance. Based on these same facts, Plaintiff has properly alleged a claim for quantum meruit. Under North Carolina law, while a party may not recover under both a theory of breach of contract and quantum meruit, a party may plead quantum meruit in the alternative. *James River Equip., Inc. v. Mecklenburg Utilities, Inc.,* 634 S.E.2d 557, 560 (N.C.App.2006).

### C. Claims for Defamation and Libel Per Se

To state a claim for defamation the Plaintiff must allege that: (1) the defendant caused injury to the plaintiff, (2) by making false, defamatory statements, (3) the statements were of, or concerning, the plaintiff, and (4) the statements were published to a third person. *Boyce & Isley, PLLC v. Cooper,* 568 S.E.2d 893, 897 (N.C.App.2002). Here, the Plaintiff has alleged in its complaint that it was harmed by statements made by the Defendant to its customers containing misrepresentations regarding the Plaintiff's product and business, the issue is whether the statements, viewed in a light most favorable to the Plaintiff, rise to the level of being "defamatory." North Carolina law recognizes two types of

defamation torts, libel and slander. There are three categories of libel:

> (1) Publications which are obviously defamatory and which are termed libels per se; (2) publications which are susceptible of two reasonable interpretations, one of which is defamatory and the other is not; and (3) publications which are not obviously defamatory, but which become so when considered in connection with innuendo, colloquium and explanatory circumstances. This type of libel is termed libel per quod. *Ellis v. Northern Star Co.,* 326 N.C. 219, 223, 388 S.E.2d 127,130 (1990).

A publication is libel per se if, among other things, it "tends to impeach one in his trade or profession." *Id.* at 224. " '[F]alse words imputing to a merchant or business man conduct derogatory to his character and standing as a business man tending to prejudice him in his business are actionable, and words so uttered may be actionable per se.' The false words (1) must touch the plaintiff in his special trade or occupation, and (2) must contain an imputation necessarily hurtful in its effect on his business." *Clark v. Brown,* 393 S.E.2d 134 (N.C.App.1990) (quoting *Badame v. Lampke* 89 S.E.2d 466,468 (1955). Plaintiff bases its claims for libel per se on two letters sent by the Defendant to two of its customers, in which it falsely suggests that Plaintiff's product is in short supply and the manufacturer is discontinuing it in the U.S. Market. (Exhibits D & E to Second Amended Complaint). In a business context, a statement that does not "assert any illegal or wrongful activity" by the plaintiff, generally does not rise to the level of defamation recognized under North Carolina law. *Nucor Corp. v. Prudential Equity Group, LLC,* 659 S.E.2d 483 (N.C.App.2008). Here, the Defendant has made false statements regarding the availability of the Plaintiff's product, but has not impeached the Plaintiff's business reputation for legality or integrity. Therefore, even viewed in the light most favorable to the Plaintiff, these statements do not rise to the level of libel per se.

**\*3** In the alternative, Plaintiff asserts a claim for defamation, in the forms of libel per quod and slander per quod, based on the letters, website content, and oral statements Plaintiff believes have been made by the Defendant to its customers. Under the per quod theory, "the publication must have been intended by the defendant to be defamatory and had to be understood as such by those to whom it was published ... [f]or these reasons, both the innuendo and special damages must be proven." *Holleman v. Aiken,* 668 S.E.2d 579, 588 (N.C.App.2008) (quoting *Raymond U v. Duke University,* 371 S.E.2d 701, 708 (N.C.App.1988). In other words, "if

the injurious nature of the spoken statement appears, not on its face as a matter of general acceptance, but only in consequence of extrinsic, explanatory facts showing its injurious effect ... the injurious character of the words must be plead and proved, and in order to recover there must be allegation and proof of some special damage." *Badame* at 467.

The Plaintiff alleges in its complaint that Defendant's statements are injurious when considered in conjunction with other defamatory statements about the Plaintiff and its products made by competitors and a former manufacturer. Specifically, the Plaintiff cites an allegedly defamatory letter from the former manufacturer of its Prodigy brand products, which asserts that the Plaintiff "sells fake test strips to its customers." (Complaint, ¶ 67). Plaintiff also claims that it has special damages because the Defendant's statements caused its customers to no longer order and purchase Plaintiff's testing meters or strips, therefore damaging Plaintiff to the extent of its former average monthly sales to the Defendant in the amount of $98,743.32. These factual claims sufficiently fulfill Plaintiff's obligation under the special pleading requirements for defamation per quod because, taken as true, Plaintiff has alleged extrinsic circumstances that could suggest a plausible reason for a defamatory understanding by those customers that received the Defendant's statements, and specific damages that resulted from that harm.

## D. Claims for Unfair and Deceptive Trade Practices under Chapter 75 of the North Carolina

General Statues and for Unfair Competition under North Carolina Common Law "To recover under the UTPA, a plaintiff must prove (1) that the defendant engaged in conduct that was in or affecting commerce, (2) that the conduct was unfair or 'had the capacity or tendency to deceive', and (3) 'that the plaintiff suffered actual injury as a proximate result of defendant's deceptive statement or misrepresentation.' " *Gilbane Bldg. Co. v. Federal Reserve Bank of Richmond, Charlotte Branch,* 80 F.3d 895, 902 (4th Cir.1996)(quoting *Pearce v. American Defender Life Ins. Co.,* 316 N.C. 461, 343 S.E.2d 174 (1986). "Acts are deceptive when they possess the tendency or capacity to mislead, or create the likelihood of deception." *Id.* at 903 (quoting *Chastain v. Wall,* N.C.App.

350, 337 S.E.2d 150,154 (1985), disc. rev. denied, 316 N.C. 375, 342 S.E.2d 891(1986). Here, the Plaintiff successfully pleads a cause of action under the UTPA by claiming that the Defendant knowingly made misrepresentations to its customers regarding Plaintiff's product and business, which caused the Plaintiff to lose sales and goodwill. While the Defendant asserts that only business competitors can sustain a claim under the UTPA, under North Carolina law, "one business is permitted to assert an UTPA claim against another business only when the businesses are competitors (or potential competitors) *or are engaged in commercial dealings with each other.*" *Food Lion, Inc. v. Capital Cities/ABC, Inc.,* 194 F.3d 505, 521 (4th Cir.1999) (emphasis added). In the instant case, the Plaintiff alleges that the parties were engaged in buying and selling diabetic supplies, and therefore involved in commercial dealings with each other.

**\*4** Plaintiff's claim for unfair competition is based on the same misrepresentations. The North Carolina Supreme Court has pointed out that "it is often very difficult to draw a distinction between fair and unfair competition." *Carolina Aniline & Extract Co. v. Ray,* 20 S.E.2d 59, 61 (1942). However, "the test is simple ... Has the plaintiff's legitimate business been damaged through acts of the defendants which a court in equity would consider unfair?" *Id.* at 61. Here, the Plaintiff has alleged that the Defendant made knowing misrepresentations that Plaintiff's product was in short supply because the manufacturer was discontinuing it in the U.S. market. This allegation, that Defendant deliberately misled customers as to the availability of the Plaintiff's product, is plausible enough to sustain a claim for unfair competition, and is sufficient to meet Plaintiff's burden to avoid dismissal.

## III. CONCLUSION

IT IS THEREFORE ORDERED that Defendant's motion is GRANTED as to Plaintiff's claim for libel per se, and this claim is hereby DISMISSED with prejudice. As to all other claims, this motion is DENIED.

## All Citations

Not Reported in F.Supp.2d, 2010 WL 143094

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 3023429
Only the Westlaw citation is currently available.
United States District Court, E.D. North Carolina,
Western Division.

EXCLAIM MARKETING, LLC, Plaintiff,

v.

DIRECTV, INC. and Directv
Operations, LLC, Defendants.

No. 5:11–CV–00684–FL.
|
July 24, 2012.

**Attorneys and Law Firms**

Joseph H. Nanney, Jr., Meynardie & Nanney, PLLC, Raleigh, NC, for Plaintiff.

Adam J. Bedel, Michael E. Williams, Quinn Emanuel Urquhart & Sullivan, LLP, Los Angeles, CA, Garrick Alcarez Sevilla, Brian C. Vick, Williams Mullen, Raleigh, NC, for Defendants.

**ORDER**

LOUISE W. FLANAGAN, District Judge.

**\*1** This matter is before the court on defendants' motion to dismiss (DE # 9). Plaintiff filed a response (DE # 18), and defendants filed a reply (DE # 20). Accordingly, the matter is ripe for decision. For the following reasons, the motion to dismiss is granted in part and denied in part.

**STATEMENT OF THE CASE**

On October 28, 2011, plaintiff, Exclaim Marketing, LLC ("Exclaim"), filed this action in Wake County Superior Court against defendants, DIRECTV, Inc. and DIRECTV Operations, LLC (collectively, "DIRECTV"), alleging tortious interference with contract, tortious interference with business relationships and prospective advantage, defamation, and unfair and deceptive trade practices. On December 1, 2011, the matter was removed to this court, and on December 14, 2011, defendants filed the instant motion to dismiss for failure to state a claim pursuant to Rule 12(b)

(6) of the Federal Rules of Civil Procedure. On January 24, 2012, the court entered an order memorializing the parties' agreement with respect to certain discovery, and all other discovery and action in this matter was stayed pending the court's decision on the instant motion.

**STATEMENT OF THE FACTS**

These are the relevant facts as alleged by Exclaim in its complaint. Exclaim is a North Carolina limited liability company formed in 2005. It provides "inbound marketing services" in a variety of industries, including the satellite television industry, Exclaim does not itself provide satellite service or installation, but contracts with satellite service dealers to provide them with customer leads. These dealers have contracts to provide satellite television service with either DIRECTV or Dish Network (or both), which are the only two consumer satellite television service providers in the United States. Exclaim maintains an "inbound call center" and owns over 10,000 phone numbers, some of which are published in generic advertisements for satellite television service. Consumers calling an Exclaim phone number to order satellite television service are routed to one of Exclaim's client satellite television dealers. Exclaim is paid by each dealer based on the number of calls the dealer receives from Exclaim's call center.

Exclaim worked with both DIRECTV and Dish Network dealers. In 2005, Exclaim contacted DIRECTV's corporate office directly and provided a DIRECTV manager with marketing materials. While DIRECTV did not respond to the solicitation, a DIRECTV area service manager did provide Exclaim with dealer leads. Exclaim generated millions of dollars in sales for DIRECTV through its dealers.

Beginning in 2007, for reasons unknown to Exclaim, DIRECTV began to interfere with Exclaim's dealer relationships. For example, in 2008, DIRECTV instructed one of its area service managers to inform his dealers to stop working with Exclaim. DIRECTV initially refused to discuss the matter with Exclaim or the dealer, but ultimately provided Exclaim with a list of 29 telephone numbers that were listed as DIRECTV but actually belonged to Exclaim, which listings DIRECTV found objectionable. Exclaim's investigation of this issue revealed that, despite its instruction to the telephone companies when it purchased the numbers to disassociate them from DIRECTV, the references to DIRECTV were not removed. Exclaim again contacted the

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.
1

telephone companies and instructed them to remove any reference to DIRECTV. For some of these numbers, Exclaim had to request disassociation with DIRECTV three or four times before the reference was removed by the phone company. Exclaim also implemented what it refers to as a "DIRECTV Dismiss" system, whereby if a consumer called one of the 29 telephone numbers at issue, a recorded message stated that the number called was not DIRECTV and that DIRECTV service could not be obtained through that number.

**\*2** Despite Exclaim's efforts to address DIRECTV'S concerns, DIRECTV continued to instruct its dealers to stop doing business with Exclaim. Between 2008 and 2011, DIRECTV representatives took actions such as calling Exclaim numbers pretending to be potential customers, which disrupted Exclaim's business; representing to dealers that Exclaim was engaged in wrongful conduct and was "blacklisted;" and threatening to terminate contracts with dealers who worked with Exclaim. At least one dealer, Big Dog Satellite, a "dual dealer" selling both DIRECTV and Dish Network, did, in fact, discontinue its business with Exclaim at the request of DIRECTV even though this dealer only used Exclaim to solicit Dish Network customers. Other dealers reduced purchases from Exclaim. As a result, Exclaim was required to offer substantial discounts in an effort to retain customers. Ultimately, Exclaim ceased providing its services related to DIRECTV and continued marketing only as to Dish Network,

## DISCUSSION

### A. Standard of Review

The purpose of a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted is to eliminate claims that are factually or legally insufficient. Fed. R. Civ, P. 12(b)(6); *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949–50 (2009); *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal,, 129 S.Ct. at 1949* (quoting *Twombly,* 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly,* 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "A court need not accept a complaint's legal conclusions,

elements of a cause of action, and bare assertions devoid of further factual enhancement." *Alfaro v. United States,* No. 5:09–CT–3073–D, 2011 WL 561320, at \*1 (E.D.N.C. Feb. 8, 2011) (citing *Iqbal* 129 S.Ct. at 1949–50; *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.,* 591 F.3d 250, 255 (4th Cir.2009)). All well-pleaded facts must be accepted as true and reasonable inferences drawn in favor of the plaintiff. *Nemet Chevrolet,* 591 F.3d at 253 (citations omitted).

### B. Analysis

DIRECTV argues that each of Exclaim's claims should be dismissed for failure to state a claim upon which relief can be granted. Accordingly, each claim will be addressed in turn.

#### 1. Tortious Interference Claims

Exclaim has alleged claims against DIRECTV for tortious interference with contract and tortious interference with prospective advantage, DIRECTV contends that, as to both types of tortious interference claims, the interference must be "without justification," and its actions were justified by its legitimate business interests of (1) controlling how and by whom its products and services are marketed; (2) protecting its trademarks; and (3) competing with Dish Network. Exclaim counters that DIRECTV'S interference was not justified and that, in any event, such a determination is not appropriate on a Rule 12(b)(6) motion.

**\*3** North Carolina law provides that there are five elements required to state a claim of tortious interference with contract: "(1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to the plaintiff." *Team 7, LLC v. Protective Solutions, Inc.,* 759 F.3d 2d 698, 705 (E.D.N.C.2010) (quoting *United Labs., Inc. v. Kuykendall,* 322 N.C. 643, 661, 370 S.E.2d 375, 387 (1988) (citing *Childress v. Abeles,* 240 N.C. 667, 84 S.E.2d 176 (1954))). A claim for tortious interference with prospective advantage requires proof of somewhat different elements than a tortious interference with contract claim. *Georgia Pacific Consumer Prods., LP v. Von Drehle Corp.,* 618 F.3d 441, 456 n.7 (4th Cir, 2010) (citing *S.N.R. Mgmt. Corp. v. Danube Partners 141, LLC,* 189 N.C. App, 601, 614–15, 659 S.E.2d 442, 452 (2008)). "In order for a plaintiff to be successful on a claim of tortious interference with prospective advantage, plaintiff 'must show that [d]efendants induced a third party

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2

to refrain from entering into a contract with [p]laintiff without justification, Additionally, [p]laintiff must show that the contract would have ensued but for [d]efendants' interference.' " *S.N.R. Mgmt. Corp.,* 189 N.C.App. at 615 (quoting Holroydjv. *Montgomery Cty.,* 167 N.C.App. 539, 546, 606 S.E.2d 353, 358 (2004) (internal citations and quotations omitted)). Thus, while the tortious interference claims are distinct, they both require that the interference be without justification.

Additionally, under North Carolina law, interference is considered justified when a "non-outsider" interferes with a contract to protect a legitimate business interest, *B.V.I. Indus., Inc. v. Microsoft Corp.,* No. 87–2007, 826 F.2d 1059, 1987 WL 38488, at *3 (4th Cir. Aug. 11, 1987). A "non-outsider" is "one who is not a party to a terminated contract, yet has a legitimate business interest of his own in the subject matter of the contract[.]" *Id.* "Non-outsiders are entitled to interfere in the contracts of others provided they do so to protect a legitimate business interest." *Id.* However, "[i]f the non-outsider's actions are not the result of a legitimate business interest, but rather the result of a malicious purpose or motive, then the interference witli the contract is actionable." *Id.* (citing *Smith v. Ford Motor Co.,* 289 N.C. 71, 87–88, 221 S.E.2d 282, 292 (1976)).

For purposes of this motion, the only element of the tortious interference claims that appears to be at issue is the requirement, common to both claims, that the interference be "without justification." Accordingly, the court will limit its discussion to that issue and will consider whether the allegations on the face of the complaint reveal (1) that DIRECTV is a "non-outsider;" (2) that DIRECTV's alleged interference was consistent with protecting its legitimate business interests; or (3) that DIRECTV was, in fact, motivated by actual malice or improper motive.

    a. The issue of justification is ripe for decision.
 **\*4** As an initial matter, Exclaim contends that the issue of justification is not appropriately decided on a 12(b)(6) motion, because the North Carolina Court of Appeals has found that issues of motive and intent cannot be decided by summary judgment. The court agrees that if a plaintiff's allegations of improper motive are sufficiently pled and supported by some evidence, then it would be inappropriate to decide the issue of justification at the summary judgment stage. However, such is not the posture of the present case.

Here, the court considers the issue on a motion to dismiss, not on a motion for summary judgment' On a motion to dismiss, the court must consider whether Exclaim has failed to sufficiently *plead* the required element—that defendant's actions were without justification—and dismissal is entirely appropriate if Exclaim has not satisfied the requisite pleading standard. *See Market Choice,* 2009 WL 2590651, at *7 ("A motion under Rule 12(b)(6) should be granted when the complaint reveals that the interference was justified or privileged.") (quoting *Peoples Sec.,* 322 N.C. at 220). Therefore, the court will proceed with its substantive analysis as to the element of justification,

    b. The complaint reveals that DIRECTV is a "non-outsider."
DIRECTV argues that it was a "non-outsider" to Exclaim's contracts with DIRECTV'S dealers, Exclaim contends that DIRECTV is not an "insider" because, "Defendants were never parties to any agreements between Exclaim and its clients, and any interest they may have in how their dealers conduct business does not translate into giving the Defendants 'insider status' such that they can legitimately claim any privilege." PL's Mem. in Opp'n at 8 (DE # 18). Exclaim misapprehends what it means to be a non-outsider under North Carolina law.

It is not required that the non-outsider be a party to the agreement; to the contrary, a party to a contract cannot be liable for tortious interference. *See Waters v. Collins & Aikman Prods. Co.,* 208 F.Supp.2d 593, 595 (W.D.N.C.2002) ("North Carolina decisions and federal case law interpreting North Carolina law have held consistently that a party to a contract cannot tortiously interfere with that contract.") (citing *Wagoner v. Elkin City Schools' Bd. of Ed.,* 113 N.C.App. 579, 587, 440 S.E.2d 119, 124 (1994); *Michaux v. Rexnord Corp.,* No. 1:01CV15, 2001 WL 1019852, at *1 (W.D.N.C. Apr. 9, 2001)). Further, DIRECTV'S claimed interest in how their dealers conduct business is precisely the type of interest that confers non-outsider status on a party. *See Ford Motor Co.,* 289 N.C. at 87 (concluding that the defendant was a non-outsider to a contract between the plaintiff and defendant's dealer, because defendant had a legitimate business interest in the success of its dealer). Accordingly, based on the allegations of the complaint, DIRECTV is a non-outsider to the contracts between Exclaim and its dealers.

Having concluded that the facts alleged support DIRECTV's assertion that it is a non-outsider, the court must next

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

consider whether DIRECTV's actions were consistent with its legitimate business interests.

    c. The complaint reveals that DIRECTV'S actions were consistent with its legitimate business interests.

**\*5** DIRECTV claims three legitimate business interests as justification for the alleged interference: (1) an interest in controlling how and by whom its products and services are marketed; (2) protection of its trademarks; and (3) its competition with Dish Network. The complaint, on its face, supports each of these claimed interests.

First, with respect to DIRECTV's alleged interest in the marketing of its services, Exclaim alleges that it offers its services to dealers who have agreements with DIRECTV, Compl. ¶ 25 (DE # 1–1), and that DIRECTV, through one of its managers, directed DIRECTV dealers not to work with Exclaim, *id.* ¶ 34. Exclaim also alleges that DIRECTV directed its dealers to stop running ads after it learned that the ads originated from or were copies of ads used by Exclaim. *Id.* ¶¶ 91–94. These allegations are consistent with a company attempting to control how and by whom its services are marketed and support DIRECTV's alleged interest in the marketing of its services.

Next, with respect to DIRECTV'S trademarks, Exclaim alleges that DIRECTV informed Exclaim that it found objectionable certain telephone numbers routed to its call center because they were listed as DIRECTV numbers and that, despite Exclaim's efforts to remedy this issue in 2008, Exclaim was still using some numbers listed as DIRECTV in 2011. *Id.* ¶¶ 38–42, 62. Exclaim further alleges that DIRECTV directed some of its managers and its marketing firm to call Exclaim's call center and then contacted Exclaim regarding telephone numbers it contended were improper. *Id.* ¶¶ 53, 60–61. These allegations are consistent with a company attempting to protect its trademarks and eliminate potential customer confusion and, likewise, support DIRECTV's alleged interest in protecting its trademarks.

Finally, with respect to DIRECTV's competition with Dish Network, Exclaim alleges that DIRECTV and Dish Network are the only consumer satellite television service providers in the United States and that Exclaim also provided services to Dish Network and its dealers, *Id* . ¶¶ 18, 29, 80. While DIRECTV may utilize some dealers who also provide Dish Network service, it may still have a legitimate interest in limiting its dealer's use of a marketing group that it has no agreement with or control over and that directs calls to its sole competitor, particularly where Exclaim has admitted that its employees "will not follow protocols 100% of the time," *id.* ¶ 71. See *Market Choice, Inc. v. New England Coffee Co.,* No, 5:08–CV–90, 2009 WL 2590651, at \*7 (W.D.N.C. Aug. 18, 2009) ("[C]ompetition in business constitutes justifiable interference in another's business relations and is not actionable so long as it is carried on in fiutlierance of one's own interests and by means that are lawful") (quoting *Peoples Sec. Life Ins. Co. v. Hooks,* 322 N.C. 21.6, 221, 367 S.E.2d 647, 650 (1988)). Therefore, the allegations are consistent with and support DIRECTV's alleged interest in competing with Dish Network.

**\*6** Accordingly, based on the allegations of the complaint, DIRECTV's actions were consistent with its legitimate business interests. However, the fact that DIRECTV can point to legitimate business interests that are evident on the face of the complaint in justification for its actions does not necessarily end the inquiry, because Exclaim has argued that the court must still consider whether DIRECTV was, in fact, motivated by its legitimate business interests or, rather, by actual malice or improper motive.

    d. Exclaim failed to sufficiently plead that DIRECTV acted with actual malice or improper motive.

DIRECTV contends that to survive a motion to dismiss, "the complaint must admit no motive for interference other than malice," *Filman Racing, Inc. v, Stewart,* 141 N.C, App. 668, 674, 541 S.E.2d 733, 738 (2001), and that because the complaint reveals that DIRECTV had a legitimate business purpose, it cannot be liable for tortious interference. Exclaim contends that the existence of a legitimate business purpose would not preclude a finding that DIRECTV'S actions were without justification if, in fact, DIRECTV was motivated by actual malice. See *Barker v. Kimberly–Clark Corp .,* 136 N.C.App. 455, 462, 524 S.E.2d 821, 826 (2000) ("The qualified privilege of a non-outsider is lost if exercised for motives other than reasonable, good faith attempts to protect the non-outsider's interests in the contract interfered with."). The court concludes that the facts alleged in the complaint would not support a finding that DIRECTV's alleged interference was motivated by actual malice as opposed to its legitimate business interests.

As defendant correctly observed, both North Carolina state courts and federal courts applying North Carolina law have stated that "[i]n order to demonstrate the element of acting without justification, a plaintiff's complaint must show 'no motive for interference other than malice.' " *See, e.g., Fen–*

WESTLAW  © 2024 Thomson Reuters. No claim to original U.S. Government Works.  4

*Phen Series 2005–01 v. Farrin,* No. 1:09CV479, 2010 WL 1740521, at *4 (M.D.N.C. Apr. 28, 2010) (quoting *Filmar Racing,* 141 N.C, App. at 674), *adopted by* No. 1:09–CV– 479–JAB (M.D.N.C. July 19, 2010), *aff'd,* 436 Fed. App'x 150, 2011 WL 2515973 (4th Cir. June 24, 2011). However, the North Carolina Supreme Court has explained that the non-outsider will not have immunity when its actions have "no relation whatever to the source of the non-outsider status," because "[i]n such a case, the defendant is in the same position as an outsider." *Ford Motor Co.,* 289 N.C. at 87–88. In other words, a non-outsider is not "[i]pso facto immune to suit for damages for bringing about the termination of [a] contract in all cases." *Id.* at 88. To the extent tension arguably exists between these statements of law, the court need not resolve it, because Exclaim has simply failed to sufficiently plead facts in support of its contention that DIRECTV acted with actual malice.

Exclaim points to several allegations that it contends support its claim that DIRECTV was motivated by actual malice and not by legitimate business interests. For example, in the complaint, Exclaim alleges that DIRECTV acted contrary to its own business interests because Exclaim made millions of dollars for DIRECTV, Compl. ¶ 88, and that DIRECTV acted with actual malice, *id.* ¶¶ 54, 98, 105. Such allegations are speculative and conclusory and, thus, insufficient. "Factual allegations must be enough to raise a right to relief above the speculative level[.]" *Twombly,* 550 U.S. at 555 (citations omitted). Here, Exclaim admits in its complaint that it "has never been able to understand" the reasons for DIRECTV'S actions. Compl. ¶ 33. Furthermore, the factual allegations made in the complaint with respect to DIRECTV'S actions are consistent with those of a company protecting its interests, as discussed above, and provide only speculation that DIRECTV acted with actual malice or improper motive. *See Fen–Phen,* 2010 WL 1740521, at *4 ("To state a claim for tortious interference with contract, Plaintiff must plead factual content that allows the court to draw the reasonable inference that Defendant acted with malice, rather than just alleging that Defendant's actions were undertaken with malice."). As to the latter allegation, simply stating that DIRECTV acted with actual malice is likewise insufficient, as made clear in *Twombly,* 550 U .S. at 555 ("[A] formulaic recitation of the elements of a cause of action will not do[.]").

*\*7* Exclaim also suggests in its response to the instant motion to dismiss that "Defendants could have protected their legitimate business interests by instructing dealers who work with them to decline to work with Exclaim." Pl.'s Mem.

in Opp'n at 18. And yet, that is precisely what DIRECTV did, and that Exclaim does not understand or agree with DIRECTV'S position does not convert a legitimate business action to tortious conduct. Further, Exclaim's complaint lacks the type of factual allegations that North Carolina federal and state courts have found sufficient to defeat a motion to dismiss, *See, e.g., Emory Util. Inc. v. Time Warner Cable, Inc.,* No. 7:09–CV–169–BO, 2010 WL 2402888, at *3 (E.D.N.C. June 11, 2010) (concluding that allegation that defendant personally benefitted from taking contract work from plaintiff and awarding it to a third party that later gave him a job was sufficient to plead that defendant's motives were improper and not for a legitimate business purpose); *Ford Motor Co.,* 289 N.C, at 84 (concluding that dismissal for failure to state a claim was error where plaintiff alleged that defendant's "sole motive" for its interference with plaintiff's contract with defendant's dealer was defendant's resentment of plaintiff's affiliation with an organization of which it disapproved). *Cf. B.V.I. Indus., Inc.,* 1987 WL 38488, at *3 (concluding that the lower court erred in granting summary judgment to defendant on a tortious interference claim where the plaintiff's allegation that defendant's actions were in retaliation against plaintiff for going over his head during license negotiations were sufficient for a jury to find that defendant's alleged legitimate business interest was pretext).

Accordingly, because the factual allegations made by Exclaim are consistent with DIRECTV acting to protect its legitimate business interests and provide no basis for a finding that DIRECTV acted with actual malice or improper motive, Exclaim has failed to sufficiently plead that DIRECTV acted without justification and, thus, has failed to state a claim for tortious interference with contract or tortious interference with prospective advantage.

    2. Defamation Claim
Exclaim has also alleged a claim for defamation against DIRECTV. Exclaim contends that DIRECTV'S actions amount to defamation *per se* or, alternatively, defamation *per quod.* DIRECTV contends that the allegations of the complaint are insufficient to establish that DIRECTV made defamatory statements as to Exclaim.

"In order to recover for defamation in North Carolina, a plaintiff must show that the defendant (1) made false, defamatory statements of or concerning the plaintiff, which were (2) published to a third person, (3) causing injury to the plaintiff's reputation." *Lanier Const. Co., Inc. v. City of Clinton, N.C.,* 812 F.Supp.2d 696, 700 (E.D.N.C.2011)

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

(citing *Boyce v. Isley, PLLC v. Cooper,* 710 S.E.2d 309, 317 (N.C.Ct.App.2011)). Defamation can be in the form of libel, any false written publication to a third party, or slander, a false oral communication published to a third party. *Cummings v. Lumbee Tribe of North Carolina,* 590 F, Supp.2d 769, 774 (E.D.N.C.2008) (citing *Barker v. Kimberly–Clark Corp.,* 136 N.C.App. 455, 459, 524 S.E.2d 821 (2000)). "To establish a claim for defamation *per se,* a plaintiff must prove: '(1) defendant spoke or published base or defamatory words which tended to prejudice him in his reputation, office, trade, business or means of livelihood or hold him up to disgrace, ridicule or contempt; (2) the statement was false; and (3) the statement was published or communicated to and understood by a third person.' " *Id.* (quoting *Friel v. Angell Care, Inc.,* 113 N.C.App. 505, 509, 440 S.E.2d 111, 113–14 (1994)). "For defamation *per se,* malice and damages are presumed as a matter of law." *Id.* (citing *Donovan v. Fiumara,* 114 N.C.App. 524, 528, 442 S.E.2d 572, 575 (1994)). "When the defamatory character of the words does not appear on their face, but only in connection with extrinsic, explanatory facts, they are only actionable as ... [defamation] *per quod.*" *Id.* (quoting *Eli Research, Inc. v. United Commc'n Group, LLC,* 312 F.Supp.2d 748, 761 (M.D.N.C.2004) (citing *Badame v. Lampke,* 242 N.C. 755, 756–57, 89 S.E.2d 466 (1955))). "When stating a claim for defamation *per quod,* a plaintiff must plead and prove special damages and malice, in addition to the aforementioned elements of a claim for defamation *per se.*" *Id.* (citing *Eli Research,* 312 F.Supp.2d at 757).

**\*8** In its complaint, Exclaim generally alleged the following facts in support of its defamation claim:

109. Among other things, Defendants have told and/or written to third parties:

a. That Exclaim has engaged in illegal conduct;

b. That ads posted by Exclaim were illegal;

c. That ads posted by Exclaim were unspecified "violations"; [sic] and

d. That as a result of improper actions by Exclaim, Defendants put Exclaim on a "blacklist."

Compl. ¶ 109. Specifically, Exclaim alleged that DIRECTV "[r]epeatedly told the Dealers that Exclaim was engaged in wrongful conduct, which assertions were entirely untrue[.]" *Id.* ¶ 53(c).

First, DIRECTV argues that the complaint's allegations lack sufficient detail to meet the plausibility standard required to survive a motion to dismiss. Specifically, it contends that there is no factual detail or context, such as the acts or ads that were alleged to be illegal or the identities of the speaker or recipient. However, unlike a fraud claim, there is no heightened pleading standard for a defamation claim. *See Market Choice,* 2009 WL 2590651, at \*5 ("[N]either the Federal Rules of Civil Procedure nor the Fourth Circuit impose a special or heightened pleading standard for defamation.") (citing *Wuchenich v. Shenandoah Mem'l Hosp.,* 215 F.3d 1324, 2000 WL 665633, at \*14 (4th Cir.2000); *Elina Adoption Servs. Inc. v. Carolina Adoption Servs., Inc.,* 2008 WL 40005738, at \*13 (M.D.N.C.2008)). Here, Exclaim's allegations that DIRECTV falsely told its dealers that Exclaim was engaged in illegal or improper conduct, though minimal, are sufficient to support a defamation claim. Furthermore, while DIRECTV claims that the complaint does not make clear the subject matter of the allegedly defamatory statements, it goes on to discuss how any allegedly defamatory statements regarding Exclaim's use of DIRECTV'S trademarks would, in fact, be true statements. Accordingly, it appears that the complaint is, in fact, sufficient to put DIRECTV on notice as to the subject matter of certain allegedly defamatory statements.

Next, DIRECTV argues that accusations of "illegal conduct" are not sufficient to support a defamation *per se* claim and contends that North Carolina courts have held that accusations of dishonesty or untruthfulness are not actionable *per se, Stutts v. Duke Power Co.,* 47 N.C.App. 76, 82, 266 S.E.2d 861, 865 (1980) (citing *Satterfield v. McLellan Stores,* 215 N.C. 582, 2 S.E.2d 709 (1939); *Ringgold v. Land,* 212 N.C. 369, 193 S.E. 267 (1937)). However, in the present case, the allegation is one of *illegal* conduct, not dishonesty or untruthfulness, and North Carolina courts have recognized that certain allegations of criminal conduct may be actionable *per se. See Ringgold,* 193 S.E. at 268 ("The principle seems to be well established, in relation to the action of slander, that the words spoken should contain an express imputation of some crime liable to punishment, some capital offense, or other infamous crime or misdemeanor,") (quoting *Eure v. Odom,* 9 N.C. 52 (1822)). Furthermore, North Carolina courts have held that "an allegation that impeaches the plaintiff in his trade, business, or profession" may be actionable *per se. Kinesis Advertising, Inc. v. Hill,* 187 N.C. App. 1, 18, 652 S.E.2d 284, 296 (2007). Here, the allegations that DIRECTV stated that Exclaim was running illegal ads or that its ads constituted "violations" is one that "impeaches the plaintiff in his trade, business, or profession" and is sufficient to state a claim for defamation *per se. Id.*

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

**\*9** Finally, DIRECTV argues that the complaint demonstrates that the allegedly defamatory statements were true, because the facts of the complaint demonstrate that Exclaim infringed DIRECTV'S trademark. While the complaint does allege that DIRECTV raised with Exclaim concerns related to its trademarks and that Exclaim attempted to address those concerns, the allegations do not admit trademark infringement on the part of Exclaim. Accordingly, there is no defense of truth evident on the face of the complaint that would justify dismissal of the defamation claim.

Having determined that the allegations are sufficient to state a claim for defamation *per se,* the issue of whether Exclaim has stated a claim for defamation *per quod* need not be reached, and the motion to dismiss with respect to Exclaim's defamation claim is denied.

3. Unfair and Deceptive Trade Practices Act Claim
Lastly, Exclaim has alleged a claim for unfair and deceptive trade practices ("UDTP") pursuant to North Carolina General Statute § 75–1.1. In response, DIRECTV contends that Exclaim has alleged no facts to support such a claim,

"To state a claim for unfair or deceptive trade practices (UDTP) under N.C, Gen.Stat. § 751.1, a plaintiff must allege three elements: '(1) an unfair or deceptive act or practice, (2) in or affecting commerce, which (3) proximately caused actual injury to the claimant.' " *Market Choice,* 2009 WL 2590651, at \*9 (quoting *Nucor Corp, v. Prudential Equity Group, LLC,* 189 N.C.App. 731, 738, 659 S.E.2d 483, 488 (2008)). North Carolina courts have recognized

that "[d]efamation *per se* impeaching a party in its business activities may constitute an unfair or deceptive act in or affecting commerce under § 75–1.1." *Id.* at \* 11 (citing *Ellis v. Northern Star Co.,* 326 N.C. 219, 225, 388 S.E.2d 127, 131 (1990); *Ausley v. Bishop,* 133 N.C.App. 210, 216, 515 S.E.2d 72, 77 (1999)).

Exclaim has sufficiently stated a claim for defamation *per se* related to its business activities, *see supra* Section II.2, and has also alleged that DIRECTV's acts injured Exclaim through loss of business, Compl. ¶¶ 81, 110–12, 121. *See Market Choice,* 2009 WL 2590651, at \*11 (allowing UDTP claim to proceed where plaintiff had stated claim for defamation *per se* related to its business reputation and alleged actual injury resulting therefrom,) Accordingly, Exclaim has sufficiently stated a UDTP claim, and its motion to dismiss as to that claim is denied.

**CONCLUSION**

Defendants' motion to dismiss (DE # 9) is GRANTED IN PART as to the tortious interference with contract and tortious interference with prospective advantage claims and DENIED IN PART as to the defamation and unfair and deceptive trade practices claims.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 3023429

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 289859

Only the Westlaw citation is currently available.

United States District Court, W.D. North Carolina, Charlotte Division.

HAYWARD INDUSTRIES, INC., Plaintiff,

v.

BLUE WORKS CORPORATION,

et al., Defendants.

3:20-cv-710-MOC-DSC

|

Signed January 25, 2024

**Attorneys and Law Firms**

Alexander L. Ried, Pro Hac Vice, Anne E. Shannon, Pro Hac Vice, Erik Paul Belt, Pro Hac Vice, McCarter & English, LLP, Boston, MA, James H. Donoian, Pro Hac Vice, McCarter & English LLP, New York, NY, Patrick G. Spaugh, Russ Ferguson, Womble Bond Dickinson (US) LLP, Charlotte, NC, for Plaintiff.

Brooks Foster Jaffa, Cranford, Buckley, Schultze, Tomchin, Allen & Buie, P.A., Charlotte, NC, Christina Davidson Trimmer, Shumaker, Loop & Kendrick, LLP, Charlotte, NC, Carla B. Oakley, Pro Hac Vice, Jenna K. Stokes, Pro Hac Vice, Morgan Lewis & Bockius, LLP, San Francisco, CA, Jacob Zweig, Pro Hac Vice, Jennifer Seraphine, Pro Hac Vice, Keeley I. Vega, Pro Hac Vice, Turner Boyd LLP, San Mateo, CA, Michelle C. Dunn, Pro Hac Vice, Platinum Intellectual Property, San Jose, CA, Scott D. Sherwin, Pro Hac Vice, Morgan, Lewis & Bockius LLP, Chicago, IL, Seth M. Gerber, Pro Hac Vice, Morgan, Lewis & Bockius LLP, Los Angeles, CA, Shaobin Zhu, Morgan, Lewis & Bockius LLP, Palo Alto, CA, for Defendants.

**ORDER**

Max O. Cogburn Jr., United States District Judge

**\*1** **THIS MATTER** is before the Court on Plaintiff Hayward Industries, Inc.'s Motion for Summary Judgment on Claims of Trademark Infringement, False Advertising, Passing Off, and Unfair Competition, (Doc. No. 119), Plaintiff's Motion for Summary Judgment on Defendant's Trademark Cancellation Counterclaim, (Doc. No. 142),

Defendant Blue Works Corporation's Motion for Summary Judgment of No False Advertising on Statements Regarding Compatibility and No Lost Profits, (Doc. No. 180), and Defendant's Motion for Summary Judgment of Plaintiff's Claims with Respect to the Turbo Cell, T-Cell, T-Cell-9, and T-Cell-15 Marks, (Doc. No. 189). The Court held a hearing on the motions on August 21, 2023.[1] This matter is ripe for disposition.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

This case involves a dispute between competitors in the pool industry. Plaintiff Hayward, which has a manufacturing facility in Charlotte, makes and sells pool chlorination systems, among other pool products. At issue here are chlorine generators, also known as "salt cell systems," that convert dissolved salt into chlorine to sanitize pools. Chlorine generator systems replace the need for liquid or tablet chlorine and are thus convenient for pool owners.

Chlorine generator systems include a control panel and a "salt cell." The control panel regulates the amount of chlorine generated by the salt cell. The cell itself, which has a limited use life, can be replaced with a new salt cell when the prior cell is exhausted. Salt cells are roughly analogous to printer toner cartridges. Just as toner cartridges must be replaced periodically, so must salt cells. And just as toner cartridges are compatible only with printers produced by certain manufacturers, salt cells are only compatible with certain control panels.

Plaintiff's salt cells are compatible only with Plaintiff's chlorination systems, in some cases particular versions of Plaintiff's systems (e.g., Aquarite) and pool sizes. Consumers generally understand this usage. (See, e.g., Doc. No. 126 at 4, ¶ 15; Seraphine Decl., Ex. 4 (Paroline Depo. at 144:9–146:9, 145:20–146:9), Ex. 5 (NingboCF_000003), Ex. 6 (NingboCF_0000096)). Hayward's salt cells are sold under various trademarks, including TURBO CELL® and T-CELL-15®, among others.

Named Defendants sell replacement salt cells compatible with Plaintiff's chlorination systems and advertise them as such.[2] Defendants use Plaintiff's various T-Cell trademarks in their advertisements to indicate that Defendants' salt cells are for use in specific models of Plaintiff's various chlorination systems. Defendants' Amazon presence offers a constructive example:

WESTLAW  © 2024 Thomson Reuters. No claim to original U.S. Government Works.



**\*2** Plaintiff maintains that Defendants, by using Plaintiff's various T-Cell trademarks in their advertisements, confusingly and deceptively suggest that Defendants' salt cells are associated with or endorsed by Plaintiff. Plaintiff further contends that Defendants' salt cells are falsely advertised as "compatible with" Plaintiff's controllers. Plaintiff alleges that Defendants have thus used Plaintiff's trademarks without permission and have deceptively passed off Defendants' salt cells as endorsed, authorized, or even manufactured by Plaintiff for use in Plaintiff's systems.

Plaintiff further contends that Defendants made the following misrepresentations about Defendants' salt cells in communications directed to Plaintiff's current and potential customers:

- "Direct Replacement" for Plaintiff's salt cells?

- "Compatible with" Plaintiff's controllers

- "Same as," "Comparable to," or "Equivalent to" Plaintiff's salt cells

- "Same cell supplier as the original"

- "Made in USA same as 'Hayward' "

- "NSF Certified"

- "Provide OEM services for the USA leading pool chlorinator manufacturers"

Plaintiff brings the following claims against Defendants: trademark infringement, false advertising, counterfeiting,

passing off, false designation of origin, unfair competition, and importation in violation of the Lanham Act, 15 U.S.C. § 1051 et seq.; North Carolina statutory and common law claims of unjust enrichment, tortious interference with prospective advantage, trademark infringement and unfair competition, and Unfair and Deceptive Trade Practices under N.C. Gen. Stat. § 75-1.1 et seq.; and infringement of Plaintiff's copyright-protected works in violation of the Copyright Act. (Doc. No. 57).

Defendants counterclaim, seeking an order from the Court finding that the trademarks are invalid as generic or as having acquired secondary meaning. Plaintiff seeks summary judgment against Defendants' counterclaim. Plaintiff also seeks summary judgment on its claims for false advertising (Count I), trademark infringement for TURBO CELL® (Count VI) T-CELL-3® (Count VII), trademark infringement for T-CELL-9® (Count VIII), trademark infringement for T-CELL-15® (Count IX), passing-off (Count XIV), false designation of origin (Counts XII and XIII), unfair competition (XVI), and North Carolina Unfair Deceptive Practices Act (Count XIX).

Defendants filed their own Motion for Summary Judgment of Plaintiff's Claims with Respect to the Turbo Cell, T-Cell, T-Cell-9, and T-Cell-15 Marks. Defendants also filed a separate summary judgment motion, asking that the Court find no false advertising based on Defendants' statements in their ads regarding "compatibility." Defendants also seek an order from the Court finding that Plaintiff's damages calculation based on lost profits is flawed and should therefore be excluded.

## II. STANDARD OF REVIEW

The Court grants a party's summary judgment motion "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted). Only disputes between the parties over material facts (determined by reference to the substantive law) that might affect the outcome of the case properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute about a material fact

is "genuine" only if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." Id.

 **\*3** Once the movant meets their initial burden, the burden shifts to the nonmoving party. Webb v. K.R. Drenth Trucking, Inc., 780 F. Supp. 2d 409 (W.D.N.C. 2011). The nonmoving party "may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing there is a genuine issue for trial." Anderson, 477 U.S. at 248. Considering a motion for summary judgment, a court views the evidence in the light most favorable to the non-moving party, that is, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255. At summary judgment, it is inappropriate for a court to weigh evidence or make credibility determinations. Id.

When considering cross-motions for summary judgment, a court evaluates each motion separately on its own merits using the standard set forth above. See Rossignol v. Voorhaar, 316 F.3d 516, 522 (4th Cir. 2003); accord Local 2-1971 of Pace Int'l Union v. Cooper, 364 F. Supp. 2d 546, 554 (W.D.N.C. 2005).

## III. DISCUSSION

### A. PLAINTIFF'S SUMMARY JUDGMENT MOTION ON DEFENDANT'S COUNTERCLAIMS

The Court first addresses Plaintiff's Motion for Summary Judgment on Defendants' counterclaims seeking declaratory judgment of invalidity for and cancellation of Plaintiff's registered trademarks "T-Cell-3," "T-Cell-9," "T-Cell-15" (the "T-Cell Marks").[3] Plaintiff uses these marks as model numbers for replacement salt cells used in its chlorine generator systems. "T-Cell" is a shortened version of "Turbo Cell," and the numbers "-3," "-9," and "-15" used in Plaintiff's T-Cell Marks correspond to the pool size in which each salt cell is used.

With respect to Defendants' invalidity counterclaims, Plaintiff argues that its T-Cell Marks are not generic. The Court will deny Plaintiff's summary judgment motion as it pertains to invalidity. First, whether an asserted mark is generic is a question of fact. See Booking.com B.V. v. United States Pat. & Trademark Off., 915 F.3d 171, 179 (4th Cir. 2019) (holding that "the question of whether a proposed mark is generic is a question of fact that is subject to deferential review"). Here, disputed facts as to the genericness of Plaintiff's marks include whether the T-Cell Marks are

used to identify Plaintiff as the source of the salt cell (as required for trademark protection) or instead are used to convey size and suitability (in which case they are generic). These questions of material fact preclude summary judgment on this issue for either party.

Second, even if Plaintiff could show that the T-Cell Marks are not generic, that is not the end of the inquiry. Marks can be (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful, and "descriptive" marks require a showing of secondary meaning to be protectible. See Sea-Roy Corp. v. Parts R Parts, Inc., No. 1:94cv59, 1997 WL 1046282, at \*\*24–26 (W.D.N.C. 1997) (citing Sara Lee Corp. v. Kayser-Roth Corp., 81 F.3d 455, 464 (4th Cir. 1996)). Secondary meaning exists when a descriptive mark has become sufficiently distinctive to establish "a mental association, if any, in consumers' minds between the mark and a single source of the product." Id. at \*27. Summary judgment is also not appropriate here because whether the T-Cell marks have a secondary meaning remains a disputed question of material fact.

 **\*4** Third, where the trademark at issue is used as a model number for a product, there must be a factual determination of whether the mark is truly used as a trademark or rather merely as a model designation. Use of a mark as a model designation renders the mark invalid. See Eastman Kodak Co. v. Bell & Howell Document Mgmt. Prods. Co., 994 F.2d 1569, 1576 (Fed. Cir. 1993). While Plaintiff argues that it uses the T-Cell Marks as trademarks, Defendants have produced some evidence that Plaintiff and others use the T-Cell Marks as model numbers. This factual dispute precludes summary judgment.

To prevail on its motion Plaintiff must show that there are no facts that could support a jury finding that: (1) the T-Cell Marks are generic; (2) the T-Cell Marks are descriptive but have not acquired secondary meaning; and (3) the T-Cell Marks are invalid due to functionality. Genuine issues of fact exist on each of these questions, and Plaintiff's motion is therefore denied.

### B. PLAINTIFF'S SUMMARY JUDGMENT MOTION AS TO PLAINTIFF'S LANHAM ACT FALSE ADVERTISING CLAIM

Plaintiff additionally seeks summary judgment on its false advertising claims under the Lanham Act. To carry its burden of proof on this count, Plaintiff must establish five elements: (1) Defendants made a false or misleading description of

WESTLAW  © 2024 Thomson Reuters. No claim to original U.S. Government Works.

fact or representation of fact in a commercial advertisement about his own or another's product; (2) the misrepresentation was material, i.e., likely to influence the purchasing decision; (3) the misrepresentation actually deceived or had the tendency to deceive a substantial segment of its audience; (4) Defendant placed the false or misleading statement in interstate commerce; and (5) Plaintiff has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a decrease in goodwill associated with its products. PBM Prods., LLC v. Mead Johnson & Co., 639 F.3d 111, 120 (4th Cir. 2011); see also 15 U.S.C. § 1125(a)(1)(B). Plaintiff contends that Defendants have misrepresented that Defendants' salt cells are: (1) a "direct replacement" for Hayward's salt cells; (2) "compatible with" Hayward's controllers; (3) the "same as," "comparable to," or "equivalent to" Hayward salt cells; (4) produced by the "same cell supplier as the original"; (5) "made in USA same as 'Hayward' "; (6) "NSF Certified"; and (7) that Defendants "[p]rovide OEM services for the USA leading pool chlorinator manufacturers." (Motion at 1–2).

Summary judgment will be denied as to the false advertising claims, as there are genuine issues of disputed fact precluding summary judgment. First, there are issue of fact as to whether the challenged statements were actually false.[4] There are also issues of fact as to materiality, deception, and injury. For these reasons, the Court will deny Plaintiff's motion for summary judgment.

## C. PLAINTIFF'S SUMMARY JUDGMENT MOTION ON PLAINTIFF'S LANHAM ACT TRADEMARK INFRINGEMENT CLAIMS

Plaintiff also seeks summary judgment on its claims for Lanham Act trademark infringement of the Turbo Cell, T-Cell-3, T-Cell-9, and T-Cell-15 marks (Counts VI – IX), unfair competition and false designation of origin (Counts XII and XIII), and unfair competition and false designation of origin passing-off (Count XIV).[5] For the reasons set forth below, Plaintiff's motion is denied.

**\*5** To establish trademark infringement under the Lanham Act, Plaintiff must prove that: (1) it owns a valid mark; (2) Defendant used the mark "in commerce" and without Plaintiff's authorization; (3) Defendant used the mark (or an imitation of it) "in connection with the sale, offering for sale, distribution, or advertising" of goods or services; and (4) Defendant's use of the mark is likely to confuse consumers. 15 U.S.C. § 1114(a); see Louis Vuitton Malletier S.A. v. Haute

Diggity Dog, LLC, 507 F.3d 252, 259 (4th Cir. 2007); People for the Ethical Treatment of Animals v. Doughney, 263 F.3d 359, 364 (4th Cir. 2001).

Nine factors are relevant to the "likelihood of confusion" inquiry: (1) the strength or distinctiveness of Plaintiff's mark as actually used in the marketplace; (2) the similarity of the two marks to consumers; (3) the similarity of the goods or services that the marks identify; (4) the similarity of the facilities used by the markholders; (5) the similarity of advertising used by the markholders; (6) Defendant's intent; (7) actual confusion; (8) the quality of Defendant's product; and (9) the sophistication of the consuming public. Rosetta Stone v. Google Inc., 676 F. 3d 144, 153 (4th Cir. 2012) (quoting George & Co., LLC v. Imagination Entm't Ltd., 575 F.3d 383, 393 (4th Cir. 2009)). "These 'factors are not always weighted equally, and not all factors are relevant in every case.' " Id. at 154 (quoting Louis Vuitton Malletier S.A., 507 F.3d at 259–60).

The Court finds that genuine issues of disputed fact preclude summary judgment here. Whether there is a likelihood of confusion by customers is an especially fraught, fact-dependent inquiry. First, Plaintiff broadly charges Defendants with infringing its Turbo Cell and T-Cell marks in a wide variety of manners, including different usages, at different times, by different parties, via different channels. Plaintiff also points to changing advertising over a seven-year period without indicating of when the offending advertising appeared. Plaintiff makes no effort to identify any particular usage as the basis for its motion. The Court "must examine the allegedly infringing use in the context in which it is seen by the ordinary consumer." Anheuser-Busch, Inc. v. L L Wings, Inc., 962 F.2d 316, 319 (4th Cir. 1992); see also Grayson O Co. v. Agadir Int'l LLC, 856 F.3d 307, 316 (4th Cir. 2017) (affirming this Court's grant of summary judgment of no infringement). Plaintiff nevertheless requests a broad grant of summary judgment of infringement for all uses in any context. The Court will decline Plaintiff's request.

Moreover, Defendants offer evidence from which a reasonable jury could find that its use of Plaintiff's trademarks was nominative fair use. Under the nominative fair use doctrine, one may lawfully reference the trademarks of another in connection with the sale of aftermarket parts. See Hypertherm, Inc. v. Precision Prods., Inc., 832 F.2d 697, 700 (1st Cir. 1987) ("[A] vendor ... which has labored (lawfully) to replicate another's parts, may ordinarily use the originator's trademark descriptively, that is, to identify the product it has

copied."); *see also* Porter v. Farmers Supply Serv., Inc., 617 F. Supp. 1175, 1187 (D. Del. 1985), aff'd, 790 F.2d 882 (Fed. Cir. 1986). This is because "an imitator is entitled to truthfully inform the public that it believes that it has produced a product equivalent to the original and that the public may benefit through lower prices by buying the imitation." Calvin Klein Cosmetics Corp. v. Lenox Labs, Inc., 815 F.2d 500, 503 (8th Cir. 1987).

 **\*6** In the Fourth Circuit, where nominative use is implicated, district courts may tailor the likelihood of confusion factors, which are "not intended to be exhaustive or mandatory," to those that are useful and relevant in context. Rosetta Stone, 676 F.3d at 153–55 (applying the defense of nominative fair use to trademark dilution claim); see R/C Theatres Mgmt. Corp. v. Metro Movies, LLC, 44 F. Supp. 3d 626, 634 (D. Md. 2014) (acknowledging defense of nominative fair use). Accordingly, the doctrine of nominative fair use employs different or additional factors to fairly assess the likelihood of confusion in such cases. For example, a defendant may demonstrate its use was a non-infringing under the following factors. (1) Is the use of plaintiff's mark necessary to describe (a) plaintiff's product or service and (b) defendant's product or service? (2) Is only so much of the plaintiff's mark used as is necessary to describe plaintiff's products or services? (3) Does the defendant's conduct or language reflect the true and accurate relationship between plaintiff and defendant's products or services? Century 21 Real Estate Corp. v. Lendingtree, Inc., 425 F.3d 211, 228 (3d. Cir. 2005); see also Toyota Motor Sales, U.S.A., Inc. v. Tabari, 610 F.3d 1171, 1175–76 (9th Cir. 2010) (similar factors).

Applying these factors, Defendants argue that their use of Plaintiff's marks is nominative fair use, solely to inform the public that Defendants have produced a lower-priced equivalent to Plaintiff's replacement salt cells. Defendants further contend their use was limited to that reasonably necessary to identify Plaintiff and its systems. Defendants also note that they use "Turbo Cell" and "T-Cell" marks in regular font and size, which weighs in favor of fair use. See Frontrange Sols. USA v. Newroad Software, Inc., 505 F. Supp. 2d 821, 835 (Dist. Colo. 2007) (use in "generic type" weighed in favor of fair use and against finding of likelihood of confusion). Finally, Defendants argue that the use of Plaintiff's marks does not suggest sponsorship or endorsement by Plaintiff. These are issues of fact for a jury to decide. Consequently, the Court will deny Plaintiffs' summary judgment motion with respect to its Lanham Act trademark infringement claims.

**D. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON STATEMENTS REGARDING COMPATIBILITY AND NO LOST PROFIT DAMAGES**

Defendants move for summary judgment on two issues: (1) false advertising based on Defendants' statements that its aftermarket replacement salt cell products are "compatible" with Plaintiff's pool chlorination systems; and (2) lost profits. The Court will deny Defendants' motion.

First, as "compatibility," the Court agrees with Defendant that merely stating that a product is compatible with another, even where the first product is inferior, is not alone a false statement. As the First Circuit aptly noted:

> One has a right to ape—if he can—the unpatented product of another. In the absence of false representations or palming off, the sale of unpatented replacement parts by one other than the manufacturer of the original equipment is neither unlawful nor actionable. Even if the parts are substandard, the rule holds—so long as their origin is not obscured. Notwithstanding some slight danger of confusion, it would (as we have said before) "be difficult to take seriously" an assertion that every such sale comprises unfair competition. Producing an unpatented machine does not give the producer a legal monopoly on its component parts. If a potentially lucrative aftermarket develops, imitators will flock to obtain and offer make-do surrogates, often claiming equivalent performance and some added premium (e.g., faster delivery, cheaper pricing). In the entrepreneurial world as elsewhere, copycats have always been commonplace.

Hyperptherm, Inc. v. Precision Prod., Inc., 832 F.2d 697, 700 (1st Cir. 1987).

Nonetheless, the Court will decline to grant Defendants summary judgment on "compatibility." Plaintiff credibly contends that the use of the term "compatibility," in the context of other statements, was meant specifically to confuse Hayward customers. Whether Defendants' compatibility language was intended to or did confuse Plaintiff's customers is, fundamentally, a question of disputed fact for the jury that the Court cannot resolve on summary judgment.

 **\*7** As to Defendant's lost profits arguments, Plaintiff has produced evidence from which a jury could determine that the salt cell market was in effect a two-supplier market. Consequently, Plaintiff's expert may give opinion evidence

5

to the jury on lost profits. Defendants' expert may likewise submit rebuttal evidence on lost profits damages. Thus, lost profits present another disputed question of material fact that must be resolved by the jury. The Court will deny Defendant's summary judgment motion as to lost profits damages.

### E. PLAINTIFF'S MOTION FOR JUDGMENT ON PLAINTIFF'S STATE LAW CLAIMS

Plaintiff's state law claims are based on the same facts as its Lanham Act claims. For the same reason the Court will deny summary judgment as to Plaintiff's Lanham Act claims, Plaintiff is not entitled to summary judgment on its state law claims. See Georgia Pac. Consumer Prods., LP v. Von Drehle Corp., 618 F.3d 441, 449 (4th Cir. 2010) (Lanham Act and related North Carolina state law claims "rise or fall" together); La Michoacana Nat., LLC v. Maestre, No. 317cv727, 2021 WL 4073292, at *10 (W.D.N.C. Sept. 7, 2021) (same).

### IV. CONCLUSION

The Court finds that both parties' motions for summary judgment must be denied.

**IT IS THEREFORE ORDERED THAT:**

Plaintiff Hayward Industries, Inc.'s Motion for Summary Judgment on Claims of Trademark Infringement, False Advertising, Passing Off, and Unfair Competition, (Doc. No. 119), Plaintiff's Motion for Summary Judgment on Defendant's Trademark Cancellation Counterclaim, (Doc. No. 142), Defendant Blue Works Corporation's Motion for Summary Judgment of No False Advertising on Statements Regarding Compatibility and No Lost Profits, (Doc. No. 180), and Defendant's Motion for Summary Judgment of Plaintiff's Claims with Respect to the Turbo Cell, T-Cell, T-Cell-9, and T-Cell-15 Marks, (Doc. No. 189), are **DENIED**.

**This matter shall proceed to trial.**

**All Citations**

Slip Copy, 2024 WL 289859

---

### Footnotes

1   Moreover, on January 18, 2024, Plaintiff submitted supplemental materials to support its summary judgment motion.

2   The named Defendants are BlueWorks Corporation, BlueWorks Innovation Corporation, Ningbo C.F. Electronic Tech Co., Ltd., and Ningbo Yishang Import and Export Co., Ltd. Plaintiff maintains that these companies are all connected and have acted in concert with one another for purposes of this lawsuit. The Court refers to these companies collectively as "BlueWorks."

3   Defendants' cancellation and invalidity claims are set forth in Count I Blueworks Corporation and Blueworks Innovation Corporation's counterclaims (Doc. No. 60), Counts XVI-XVII of Ningbo C.F. Electronic Tech Co., Ltd.'s counterclaims (Doc. No. 59), and Counts XII-XIII of Ningbo Yishang Import and Export Co., Ltd.'s counterclaims (Doc. No. 58). Defendants have withdrawn their challenge to the validity of and claim for cancellation of the "TURBO CELL" mark but maintain the challenge as to Plaintiff's "T-CELL-3," "T-CELL-9," and "T-CELL-15" marks.

4   As one example, Defendants maintain that the statement that the salt cells were made in the United States is not actually false.

5   Plaintiff notes that its motion is directed to only four of the nine trademarks Plaintiff asserts. (See Motion at 3 (identifying Counts VI-IX); Doc. No. 57 (Amended Complaint), Counts II-X.) Plaintiff does not seek summary judgment on its claims for other asserted trademarks: "Hayward," "Aqua Rite," "Gold Line," "Swimpure," and "Pro Logic," (Counts II-V, X), or its claims for trademark counterfeiting (Count XI).

---

Lineage Logistics, LLC v. Primus Builders, Inc., Not Reported in S.E. Rptr. (2024)

2024 NCBC 9

2024 WL 759948

Superior Court of North Carolina,
County of Iredell .
Business Court.

LINEAGE LOGISTICS, LLC, Plaintiff,

v.

PRIMUS BUILDERS, INC. and

Republic Refrigeration, Inc., Defendants.

Republic Refrigeration,
Inc., Third-Party Plaintiff,

v.

P3 Advantage, Inc., Third-Party Defendant.

21 CVS 2372
|
February 23, 2024

1. **THIS MATTER** is before the Court on Plaintiff Lineage Logistics, LLC's ("Lineage") Motion to Strike Affirmative Defenses (the "Motion to Strike") under Rule 12(f) of the North Carolina Rules of Civil Procedure (the "Rule(s)"), filed 27 November 2023,[1] and Third-Party Defendant P3 Advantage, Inc.'s ("P3") Motion to Dismiss the Third-Party Complaint (the "Motion to Dismiss"; together with the Motion to Strike, the "Motions") under Rules 12(b)(2), (4), (5), and (6), filed 1 December 2023, in the above-captioned case.[2]

2. Having considered the Motions, the parties' briefs in support of and in opposition to the Motions, the arguments of counsel at the hearing on the Motions, and other appropriate matters of record, the Court, in the exercise of its discretion, hereby **GRANTS in part** and **DENIES in part** the Motion to Strike and **GRANTS** the Motion to Dismiss as set forth below.

**Attorneys and Law Firms**

McGuireWoods LLP, by Alec Covington, Dylan M. Bensinger, Anthony Tatum, Shelby Guilbert, and Zachary L. McCamey, for Plaintiff Lineage Logistics, LLC.

Hedrick Gardner Kincheloe & Garofalo, LLP, by David L. Levy and Kristy M. D'Ambrosio, and Robinson Elliot & Smith, by William C. Robinson and Dorothy M. Gooding, for Defendant Republic Refrigeration, Inc.

Gallivan, White, & Boyd, P.A., by Christopher M. Kelly and Shivani Shah, and Taylor English Duma, LLP, by Ryan M. Arnold, Stephen L. Wright, and Gregory G. Schultz, for Defendant Primus Builders, Inc. and Third-Party Defendant P3 Advantage, Inc.

**ORDER AND OPINION ON PLAINTIFF'S MOTION TO STRIKE AFFIRMATIVE DEFENSES AND THIRD-PARTY DEFENDANT'S MOTION TO DISMISS**

Bledsoe, Chief Judge.

I.

FACTUAL BACKGROUND

**\*1** 3. The Court does not make findings of fact on the Motions. Rather, the Court recites the allegations asserted and documents referenced in the pleadings that are relevant to the Court's determination of the Motions.

4. Lineage operates a cold-storage facility in Statesville, North Carolina that stores temperature-controlled food products for customers (the "Facility").[3] Lineage assumed ownership of the Facility after it merged with Millard Refrigerated Services, LLC ("Millard").[4]

5. Defendant Primus Builders, Inc. ("Primus") is a general contractor specializing in the construction of large, refrigerated buildings.[5] Primus contracted with Millard (the "Primus Contract") to design and construct six blast cells at the Facility (the "Project").[6] Primus entered a subcontract with Defendant Republic Refrigeration, Inc. ("Republic") to perform services on the Project (the "Republic Subcontract").[7]

6. In the Primus Contract, Primus promised to name Lineage and Millard as additional insureds under several insurance policies and to indemnify Lineage against claims and damages that arose out of Primus's performance on the Project.[8] Similarly, under the Republic Subcontract, Republic promised to name Lineage as an additional insured under several insurance policies and to indemnify Lineage against any claims or damages that arose out of Republic's performance on the Project.[9]

Case 5:23-cv-00059-KDB-DCK Document 109-1 Filed 09/16/24 Page 57 of 81

Lineage Logistics, LLC v. Primus Builders, Inc., Not Reported in S.E. Rptr. (2024)

2024 NCBC 9

7. Primus hired its affiliate P3 "to furnish labor for the demolition and removal of IMP walls in the old blast cells including old blast cell 9 of the Project."[10] On 10 January 2020, two P3 employees—Anthony Lamattina ("Lamattina") and Carson Brandon Drawdy ("Drawdy")—were using a scissor lift to work on one of the blast cells at the Facility.[11] Lineage alleges that after Lamattina and Drawdy completed their initial task, a Republic employee requested that they remain on the lift and remove ice from an evaporator on one of the blast cells.[12] While removing the ice, Lamattina inadvertently punctured a coil containing liquid anhydrous ammonia, releasing nearly 1,000 pounds of ammonia into the Facility (the "Incident").[13] Lamattina was exposed to the ammonia and died at the scene. Drawdy was also exposed, but he was able to jump to the floor and escape the building. He was later hospitalized with significant injuries from the exposure.[14]

**\*2** 8. In addition to the human cost, the release of ammonia caused Lineage to incur massive cleanup and investigation costs, disruption to its business operations, and significant loss of products that were destroyed or rendered unusable because of the ammonia exposure.[15] Lineage and Primus allege that they have been named as defendants in numerous lawsuits related to the Incident, including a wrongful death action by Lamattina's estate and suits from customers seeking to recover for damage to property stored at the Facility (each an "Underlying Action").[16] Lineage and Primus also allege that they face claims from property owners who have not yet brought lawsuits.[17]

II.

PROCEDURAL BACKGROUND

9. This action began as an insurance coverage dispute. On 26 August 2021, Lineage filed its original complaint, asserting a single claim against National Union Fire Insurance Company of Pittsburgh, PA ("National Union"), Travelers Property Casualty Company of America ("Travelers"), and Hartford Fire Insurance Company ("Hartford") for a declaratory judgment that Lineage was an additional insured under these insurers' relevant policies and entitled to coverage up to the combined limits of liability under those policies.[18]

10. The Court permitted Primus to intervene in this action on 29 November 2021, and Primus filed its original Complaint the following day.[19] After Hartford filed an answer to Primus's Complaint on 15 December 2021,[20] Primus filed an amended complaint ("Primus's Amended Complaint") later that same day adding claims against Hartford.[21]

11. Lineage filed an amended complaint and crossclaim on 5 January 2022, adding claims against Hartford, National Union, Primus, and Republic.[22] Lineage and Primus reached a settlement with National Union on 1 September 2022[23] and with Hartford in December 2022.[24] Lineage and Primus ultimately dismissed their claims against National Union on 6 October 2022,[25] and against Hartford on 1 February 2023.[26]

**\*3** 12. After dismissing their claims against these two insurers and with leave of court, Lineage and Primus filed new complaints on 24 and 28 February 2023, respectively.[27] While these new complaints continued to seek relief against Travelers as the remaining insurer defendant, Lineage also brought claims for:

a. a declaratory judgment against Primus that Primus must defend and/or indemnify Lineage for losses sustained as a result of the Incident under the Primus Contract;[28]

b. breach of the Primus Contract against Primus for failure to indemnify Lineage for its losses as required by the Primus Contract;[29]

c. a declaratory judgment that Republic must indemnify Lineage under the Republic Subcontract;[30]

d. tortious interference with contract against Republic;[31] and

e. breach of the Republic Subcontract against Republic for failure to indemnify Lineage as required by the Republic Subcontract.[32]

13. Travelers and Republic thereafter moved to dismiss these new Complaints,[33] and in an Order dated 10 August 2023, the Court dismissed all claims against Travelers without prejudice but permitted Lineage's claims against Republic for declaratory judgment concerning Lineage's rights to indemnity under the Republic Subcontract and for breach of

Lineage Logistics, LLC v. Primus Builders, Inc., Not Reported in S.E. Rptr. (2024)

2024 NCBC 9

the indemnity obligations under that contract to proceed to discovery.[34] Lineage's claims against Primus for declaratory judgment concerning Lineage's rights to indemnity under the Primus Contract and for breach of the indemnity obligations under that contract remain in the case as well.

14. On 2 October 2023, the Court entered a Consent Order realigning the parties.[35] That same day, Primus dismissed its declaratory judgment claims against Republic without prejudice.[36]

15. On 25 October 2023, Primus filed an amended answer to Lineage's Second Amended Complaint and included a crossclaim against Republic for express indemnification ("Primus's Answer").[37]

16. On 1 November 2023, Republic also filed an amended answer to Lineage's Second Amended Complaint ("Republic's Answer") and, at the same time, asserted a third-party complaint against P3 (the "Third-Party Complaint") alleging that P3 was responsible for the Incident and liable to Republic should Republic be ordered to pay Lineage on its claims.[38] Republic asserted claims against P3 for (i) negligence (Count I), (ii) common law indemnification (Count II), and (iii) contribution (Count III).[39]

**\*4** 17. Lineage filed its Motion to Strike on 27 November 2023, seeking to strike certain of Republic's and Primus's affirmative defenses in their Answers to Lineage's Second Amended Complaint.[40] P3 filed the Motion to Dismiss the Third-Party Complaint on 1 December 2023, seeking the dismissal of Republic's third-party claims against it.[41]

18. After full briefing, the Court convened a hearing on the Motions on 18 January 2024, at which all parties were represented by counsel (the "Hearing"). The Motions are now ripe for resolution.

III.

ANALYSIS

A. Lineage's Motion to Strike

19. Under Rule 12(f), a trial court "may order stricken from any pleading any insufficient defense or any redundant, irrelevant, immaterial, impertinent, or scandalous matter."

N.C.R. Civ. P. 12(f). "Rule 12(f) motions are viewed with disfavor and are infrequently granted." *Daily v. Mann Media, Inc.*, 95 N.C. App. 746, 748–49, 384 S.E.2d 54 (1989) (cleaned up). A decision to grant or deny a Rule 12(f) motion to strike is within the trial court's sound discretion. *Reese v. City of Charlotte*, 196 N.C. App. 557, 567, 676 S.E.2d 493 (2009).

20. Significantly for present purposes, "[a] motion under Rule 12(f) is a device to test the legal sufficiency of an affirmative defense," *Faulconer v. Wysong & Miles Co.*, 155 N.C. App. 598, 601, 574 S.E.2d 688 (2002), and "[t]he requirements for pleading a defense are no more stringent than the requirements for pleading a claim for relief." *Vernon v. Crist*, 291 N.C. 646, 653, 231 S.E.2d 591 (1977). As a result, a Rule 12(f) motion to strike affirmative defenses is considered under the same standard as a motion to dismiss claims under Rule 12(b)(6). *See, e.g., Mozingo v. N.C. Nat'l Bank*, 31 N.C. App. 157, 163, 229 S.E.2d 57 (1976) (noting that Rule 12(f) is an "analogue to" Rule 12(b)(6) and that "the same tests apply" to both rules); *see also* N.C.R. Civ. P. 8(a)–(c) (setting forth pleading requirements for both claims for relief and defenses).

21. This Court has recognized that "defenses may be stricken from pleadings, if they are insufficient as a matter of law." *Nat'l Fin. Partners Corp. v. Ray*, 2014 NCBC LEXIS 50, at *18 (N.C. Super. Ct. Oct. 13, 2014) (quoting *Palmer v. Oakland Farms, Inc.*, 2010 U.S. Dist. LEXIS 63265, at *4 (W.D. Va. June 24, 2010)).

22. As this Court has explained:

[T]o survive a motion to strike, a defendant must offer more than a "bare-bones conclusory allegation which simply names a legal theory but does not indicate how the theory is connected to the case at hand." *Villa v. Ally Fin., Inc.*, 2014 U.S. Dist. LEXIS 25624, at *6 (M.D.N.C. Feb. 28, 2014) (citation omitted); *see also Johnson v. Clark*, 2013 U.S. Dist. LEXIS 95492, at *4–6 (E.D.N.C. July 9, 2013) (striking "conclusory defenses" that failed to allege sufficient facts to provide the plaintiff with sufficient notice of the affirmative defenses in question); *Koehler v. United States*, 2012 U.S. Dist. LEXIS 163816, at *3–4 (E.D.N.C. Nov. 15, 2012) (providing that "conclusory defenses," presented without any factual support, should be stricken"); *Odyssey Imaging, LLC v. Cardiology Assocs. of Johnston, LLC,* 752 F. Supp. 2d 721, 726 (W.D. Va. 2010) (explaining that "dismissal under Rule 12(f) is appropriate where the defendant has not articulated its defenses so

Lineage Logistics, LLC v. Primus Builders, Inc., Not Reported in S.E. Rptr. (2024)

2024 NCBC 9

that they are contextually comprehensible"). "When a court strikes a defense, the general practice is to grant the defendant leave to amend." *Banks v. Realty Mgmt. Serv.*, 2010 U.S. Dist. LEXIS 7501, at *3 (E.D. Va. Jan. 29, 2010). **\*5** *Nat'l Fin. Partners Corp.*, 2014 NCBC LEXIS 50, at *18; *see also Staton v. N. State Acceptance, LLC*, No. 1:13-CV-277, 2013 WL 3910153 at *——, 2013 U.S. Dist. LEXIS 105599 at *7 (M.D.N.C. July 29, 2013) ("At a minimum, therefore, a statement of an affirmative defense must give notice to an opponent of its basis and go beyond conclusions.").

23. Thus, as Judge Robinson of this Court has summarized: "a defense that is conclusory, contextually incomprehensible, not well-grounded in fact, speculative, or otherwise devoid of any factual support may be stricken pursuant to Rule 12(f), since such a defense will ordinarily fail to give a party sufficient notice of the nature of the defense as required by Rule 8." *Merrell v. Smith*, 2020 NCBC LEXIS 126, at *7 (N.C. Super. Ct. Oct. 22, 2022); *see, e.g., Carpenter v. Carpenter*, 189 N.C. App. 755, 761, 659 S.E.2d 762 (2008) (reversing striking of answer containing defenses that could have "a possible bearing on the litigation"); *Daily*, 95 N.C. App. at 749, 384 S.E.2d 54 (affirming the striking of a defense that had "no possible bearing upon the litigation").

24. Lineage's Motion to Strike seeks to strike certain affirmative defenses from Republic's and Primus's Amended Answers to Lineage's Second Amended Complaint. The Court will consider each challenge in turn.

1. Republic's Affirmative Defenses

25. In response to Lineage's Motion to Strike, Republic has agreed to withdraw the following affirmative defenses: (i) adoption of any and all contractual defenses, limitations, exclusions, and language (Third Defense); (ii) justification (Fourth Defense); (iii) adoption of defenses (Fifth and Sixth Defenses); (iv) a purported motion to strike (Seventh Defense); (v) collateral estoppel and res judicata (Eighth Defense); (vi) waiver (Ninth Defense); (vii) laches (Tenth Defense); and (viii) accord, satisfaction, and compromising settlement (Eleventh Defense).[42] Accordingly, the Court will strike these defenses.[43]

26. Republic seeks to maintain, however, three affirmative defenses which Lineage seeks to strike through its motion: (i) the defense titled "First Motion to Dismiss," a single-

sentence "motion" asserted under Rule 12(b)(6) at the beginning of Republic's Answer;[44] (ii) statute of limitations (Twelfth Defense);[45] and (iii) N.C.G.S. § 22B-1 (Fourteenth Defense).[46]

a. "First Motion to Dismiss"

**\*6** 27. Republic's inclusion of its purported "First Motion to Dismiss" at the beginning of its amended answer reflects common practice in the North Carolina state courts. Also typical of North Carolina state court practice, Republic's purported motion is not accompanied by a supporting brief. Under Business Court Rule 7.2 (the "BCR(s)"), however, a motion to dismiss "must be set out in a separate document"— i.e., it may not be included in a party's answer—and "[a] motion unaccompanied by a required brief may, in the discretion of the Court, be summarily denied." BCR 7.2.

28. Rather than summarily deny the First Motion to Dismiss, however, the Court, in the exercise of its discretion and after discussion and agreement with the parties at the Hearing, elects not strike the First Motion to Dismiss but instead will consider the purported motion inoperative and take no action on it unless and until Republic files a motion in compliance with BCR 7.2. Lineage will retain all its available defenses to any such motion. Accordingly, Lineage's Motion to Strike the First Motion to Dismiss will be denied on this limited basis.

b. Statute of Limitations (Twelfth Defense)

29. Republic's statute of limitations defense asserts that Lineage's claim against Republic for breach of the Republic Subcontract, which was filed on 24 February 2023, was filed more than three years after the 10 January 2020 Incident, which was the earliest date on which the claim could have accrued, and was thus after the applicable three-year statute of limitations period had expired.[47] *See, e.g., Charlotte Motor Speedway, Inc. v. Tindall Corp.*, 195 N.C. App. 296, 301, 672 S.E.2d 691 (2009) ("The statute of limitations period for an indemnity contract is three years."); *see also, e.g., Christenbury Eye Ctr., P.A. v. Medflow, Inc.*, 370 N.C. 1, 6, 802 S.E.2d 888 (2017) ("A cause of action is complete and the statute of limitations begins to run upon the inception of the loss from the contract, generally the date the promise is broken."); *Schenkel & Schultz, Inc. v. Hermon F. Fox & Assocs., P.C.*, 180 N.C. App. 257, 267, 636 S.E.2d 835 (2006)

Lineage Logistics, LLC v. Primus Builders, Inc., Not Reported in S.E. Rptr. (2024)

2024 NCBC 9

("North Carolina follows the general rule that a cause of action on an obligation to indemnify normally accrues when the indemnitee suffers actual loss.").

30. Lineage argues in opposition that its claim was timely because, under Rule 15(c), its claim for breach of the indemnity clause in the Republic Subcontract relates back to Lineage's First Amended Complaint, which was filed on 5 January 2022, less than two years after the Incident and thus well within the three-year statute of limitations for breach of contract. The Court agrees with Lineage.

31. Under North Carolina law, "[a] claim asserted in an amended pleading is deemed to have been interposed at the time the claim in the original pleading was interposed, unless the original pleading does not give notice of the transactions, occurrences, or series of transactions or occurrences, to be proved pursuant to the amended pleading." N.C.R. Civ. P. 15(c). If an original complaint "gave notice under Rule 8(a) (1) of a claim based on [the same transaction or occurrence], then the amended complaint under Rule 15(c) is absorbed into the original[.]" *Pyco Supply Co. v. Am. Centennial Ins. Co.*, 321 N.C. 435, 443, 364 S.E.2d 380 (1988). Lineage's indemnity claim against Republic relates back to the First Amended Complaint because Lineage's breach of contract claim in the Second Amended Complaint and its declaratory judgment claim in the First Amended Complaint are both based on Republic's alleged breach of the same indemnity provision in the Republic Subcontract. Republic was therefore on "notice of the transactions, occurrences, or series of transactions or occurrences" on which Lineage's current breach of contract claim is based upon the filing of the First Amended Complaint. The Court will therefore grant Lineage's Motion to Strike Republic's statute of limitations affirmative defense.

c. N.C.G.S. § 22B-1 (Fourteenth Defense)

**\*7** 32. The Court has previously rejected Republic's argument that N.C.G.S. § 22B-1 renders the Republic Subcontract's indemnity provision void,[48] and Republic has represented that this affirmative defense is asserted solely to preserve the issue for appeal.[49] Since the Court has already determined that Republic's affirmative defense fails as a matter of law, the Court will grant Lineage's Motion to Strike Republic's affirmative defense based on section 22B-1.

2. Primus's Affirmative Defenses

33. In response to Lineage's Motion to Strike, Primus has agreed to withdraw its affirmative defenses based on lack of subject matter jurisdiction (Fifth Defense) and the statute of limitations and/or repose (Seventh Defense).[50] Accordingly, the Court will strike these defenses. In addition, the parties agreed at the Hearing that Primus's unclean hands defense (Eighth Defense) should be stricken as to quantifiable past losses but remain as a defense to uncertain future losses. The Court will therefore memorialize the parties' agreement in this Order and Opinion.

34. Lineage's Motion to Strike has thus been narrowed to Primus's affirmative defenses for waiver (Third Defense) and equitable estoppel (Fourth Defense).[51] These defenses are related, and through them, Primus alleges that Lineage has waived or is otherwise equitably estopped from seeking indemnity from Primus because of Lineage's own negligence.[52] Although Lineage argues that Primus has failed to allege facts showing each of the required elements for waiver[53] or equitable estoppel[54], necessitating that each defense be stricken, the Court finds, upon a review of all of the allegations of Primus's amended answer, including those incorporated into these two defenses, that Primus has satisfied its pleading burden under Rule 8 to put Lineage on notice of the facts supporting these affirmative defenses. The Court further concludes that each asserted defense could have "a possible bearing on the litigation." *Carpenter*, 189 N.C. App. at 761, 659 S.E.2d 762; *see also Daily*, 95 N.C. App. at 749, 384 S.E.2d 54. As a result, the Court will deny the Motion to Strike Primus's affirmative defenses of waiver and equitable estoppel.

B. P3's Motion to Dismiss

**\*8** 35. P3 seeks to dismiss all claims in Republic's Third-Party Complaint for insufficiency of process under Rules 12(b)(4) and 12(b)(5) and resulting lack of personal jurisdiction under Rule 12(b)(2) as well as for failure to state a claim upon which relief can be granted under Rule 12(b) (6). P3 also moves to dismiss Republic's negligence claim on statute of limitations grounds (N.C.G.S. § 1-52) under Rule 12(b)(6).

Case 5:23-cv-00059-KDB-DCK   Document 109-1   Filed 09/16/24   Page 61 of 81

Lineage Logistics, LLC v. Primus Builders, Inc., Not Reported in S.E. Rptr. (2024)

2024 NCBC 9

1. Insufficiency of Process/Lack of Personal Jurisdiction

36. P3 contends that Republic failed to "submit a summons for issuance by the Court" and "failed to properly serve the Third-Party Complaint,"[55] requiring the dismissal of the third-party action against P3 for insufficient process under Rules 12(b) (4) and 12(b)(5) and for lack of personal jurisdiction under Rule 12(b)(2).[56]

37. It is undisputed that Republic filed its Third-Party Complaint against P3 on 1 November 2023 but did not cause a summons to be issued until 5 December 2023 and effect service upon P3 until 10 January 2024.[57] P3 argues that the Third-Party Complaint should be dismissed because the delay in issuing the summons caused Republic's action against P3 to abate under Rule 4(a), which provides that "[u]pon the filing of the complaint, summons shall be issued forthwith, and in any event within five days." N.C.R. Civ. P. 4(a). P3 further argues that dismissal for lack of personal jurisdiction must follow, citing *Thomas & Howard Co. v. Trimark Catastrophe Servs., Inc.*, 151 N.C. App. 88, 91, 564 S.E.2d 569 (2002) ("Absent valid service of process, a court does not acquire personal jurisdiction over the defendant and the action must be dismissed." (citation omitted)).[58]

38. The Court of Appeals, however, has held that while an "action abate[s] upon failure to issue proper summons within five days of filing the complaint, [ ] the action revive[s] upon the issuance and service of summons on defendant." *Roshelli v. Sperry*, 57 N.C. App. 305, 308, 291 S.E.2d 355 (1982). In *Roshelli*, as here, a complaint abated and was subject to dismissal under Rule 4(a) after a summons was not issued within five days after the complaint's filing. And again like here, a second summons was issued and served more than five days after the complaint was filed. The Court of Appeals held on these facts that "the effect of the second summons ... was to revive and commence a new action on the date of issue." *Id.* The Court, therefore, affirmed the trial court's denial of the defendant's motion to dismiss for insufficiency of process and lack of personal jurisdiction.

39. *Roshelli* is controlling. Although Republic's third-party action against P3 abated and was subject to dismissal under Rule 4(a) after Republic failed to cause a summons to be issued within five days after the Third-Party Complaint was filed, *Roshelli* provides that the issuance and service of a second summons thereafter revived the action. Accordingly,

P3's Motion to Dismiss under Rules 12(b)(2), 12(b)(4), and 12(b)(5) is without merit and shall be denied. *See also, e.g., Morton v. Blue Ridge Ins. Co.*, 250 N.C. 722, 724–25, 110 S.E.2d 330 (1959) (concluding that issuance of a second summons instituted a new action at the time of issuance of the second summons).

2. Statute of Limitations

**\*9** 40. P3 next moves under Rule 12(b)(6) to dismiss Republic's negligence claim, contending that that claim is barred by the applicable three-year statute of limitations under N.C.G.S. § 1-52.[59] "A statute of limitations defense may properly be asserted in a Rule 12(b)(6) motion to dismiss if it appears on the face of the complaint that such a statute bars the claim." *Horton v. Carolina Medicorp, Inc.*, 344 N.C. 133, 136, 472 S.E.2d 778 (1996). "Once a defendant raises a statute of limitations defense, the burden of showing that the action was instituted within the prescribed period is on the plaintiff. A plaintiff sustains this burden by showing that the relevant statute of limitations has not expired." *Id.*

41. When ruling on a motion to dismiss under Rule 12(b) (6), the Court must consider "whether the allegations of the [challenged pleading], if treated as true, are sufficient to state a claim upon which relief can be granted under some legal theory." *Corwin v. Brit. Am. Tobacco, PLC*, 371 N.C. 605, 615, 821 S.E.2d 729 (2018) (quoting *CommScope Credit Union v. Butler & Burke, LLP*, 369 N.C. 48, 51, 790 S.E.2d 657 (2016)).

42. Dismissal pursuant to Rule 12(b)(6) is proper when "(1) the [challenged pleading] on its face reveals that no law supports [its] claim[s]; (2) the [pleading] on its face reveals the absence of facts sufficient to make a good claim; or (3) the [pleading] discloses some fact that necessarily defeats the [non-moving party's] claim." *Corwin*, 371 N.C. at 615, 821 S.E.2d 729 (quoting *Wood v. Guilford County*, 355 N.C. 161, 166, 558 S.E.2d 490 (2002)).

43. On a Rule 12(b)(6) motion, the challenged pleading is construed liberally, viewing the allegations as true and in the light most favorable to the non-moving party, and the claim is not dismissed unless it appears beyond doubt that the non-moving party could prove no set of facts in support of his claim which would entitle him to relief. *U.S. Bank Nat'l Ass'n ex rel. C-BASS Mortg. Loan Asset-Backed Certificates, Series 2006-RP2 v. Pinkney*, 369 N.C. 723, 726, 800 S.E.2d 412

(2017). While "the well-pleaded material allegations of the [challenged pleading] are taken as true[,] conclusions of law or unwarranted deductions of fact are not admitted." *Azure Dolphin, LLC v. Barton*, 371 N.C. 579, 599, 821 S.E.2d 711 (2018) (quoting *Arnesen v. Rivers Edge Golf Club & Plantation, Inc.*, 368 N.C. 440, 448, 781 S.E.2d 1 (2015)).

44. Under North Carolina law, a claim for negligence "accrues when the wrong giving rise to the right to bring suit is committed." *Harrold v. Dowd*, 149 N.C. App. 777, 781, 561 S.E.2d 914 (2002). Republic's negligence claim is based on P3's alleged conduct in causing the injuries suffered in the Incident.[60] P3 argues that because the Incident occurred on 10 January 2020 and the Third-Party Complaint was filed over three years later on 1 November 2023, Republic's negligence claim should be dismissed.

45. Republic contends that its negligence claim is timely because the claim relates back to Lineage's claims for negligence, gross negligence, and indemnity in a lawsuit Lineage filed against P3 in January 2023 in Iredell County Superior County (Civil Action No. 23-CVS-62) (the "Iredell Action").[61] Based on those allegations, Republic contends that P3 has long been on notice of the events or occurrences giving rise to Republic's negligence claim and that relation back is therefore proper under Rule 15(c).

46. At the Hearing, the parties sparred over the application of *Crossman v. Moore*, 341 N.C. 185, 459 S.E.2d 715 (1995), and *Baldwin v. Wilkie*, 179 N.C. App. 567, 635 S.E.2d 431 (2006), to the facts of this case. In *Crossman*, the Supreme Court held that Rule 15(c) "does not apply to the naming of a new party-defendant to the action. It is not authority for the relation back of a claim against a new party." *Id.*, 341 N.C. 185, 459 S.E.2d at 187. In *Baldwin*, the Court of Appeals looked to New York law for guidance to conclude that, for the purpose of determining venue, Rule 15(c) permitted relation back when the claim of a newly joined plaintiff was "virtually identical" to the original plaintiff's claim and the newly joined plaintiff, through its injury, was "similarly situated" to the original plaintiff. *Baldwin*, 179 N.C. App. at 571, 635 S.E.2d 431 (quoting *Key Int'l Mfg., Inc. v. Morse/Diesel, Inc.*, 142 A.D.2d 448, 536 N.Y.S.2d 792, 798 (1988)).

 **\*10** 47. P3 was originally a plaintiff in this action asserting claims against Republic. P3 dismissed those claims on 2 October 2023[62] and was no longer a party-plaintiff in the litigation.[63] Less than a month later, Republic brought

P3 back into the case as a third-party defendant. While, as Republic contends, the third-party claims that Republic asserts against P3 are based on allegations very similar to those Lineage advanced against P3 in the Iredell Action, Rule 15(c) contemplates relation back to the "original pleading" in the same action, not to a pleading in a separate action. *See id.* (applying relation back to the original complaint in the same action); *see also, e.g.*, *Watkins v. Stephenson*, 57 F.4th 576, 580 (6th Cir. 2023) ("[the analogous Federal] Rule 15's text contemplates that the relevant filings will arise in the same case.").[64] Further, *Crossman* makes plain that Republic cannot get the benefit of Rule 15(c)'s relation back provision since P3 is a newly added defendant. Accordingly, since Republic's negligence claim was filed more than three years after it accrued, that claim is barred by the applicable statute of limitations. P3's Motion shall therefore be granted dismissing this claim.

### 3. Failure to State a Claim Upon Which Relief May Be Granted

48. P3 separately argues that because Lineage's claims are grounded in contract, not tort, Republic's third-party claims for negligence, indemnity, and contribution must be dismissed.[65] The Court agrees.

49. First, the Court has already determined that Republic's negligence claim against P3 shall be dismissed on statute of limitations grounds. Even if the claim had survived that challenge, however, the Court agrees with P3[66] that Republic's failure to allege any underlying tortious injury or damages provides a separate ground for dismissal. *See, e.g.*, *Parker v. Town of Erwin*, 243 N.C. App. 84, 110, 776 S.E.2d 710 (2015) (requiring that a negligence claim allege both that "the breach was the actual and proximate cause of the plaintiff's injury" and that "damages resulted from the injury" (quoting *Bostic Packaging, Inc. v. City of Monroe*, 149 N.C. App. 825, 830, 562 S.E.2d 75 (2002))).

50. Moreover, while it is true that Republic will only be liable for breach of the indemnity provision in the Republic Subcontract if it is found to be negligent in connection with the Incident, Lineage's claims against Republic are in contract, not tort. And while Republic may defend against Lineage's contract claim by seeking to establish that it was not negligent (thereby avoiding liability on the contract claim), Republic's defense is a contract defense, not a basis to

**Lineage Logistics, LLC v. Primus Builders, Inc., Not Reported in S.E. Rptr. (2024)**

2024 NCBC 9

assert an independent negligence claim against P3. And since Republic's contribution claim is only available if Republic prevails on its negligence claim, that claim, too, must therefore be dismissed. *See, e.g.*, *State Farm Mut. Auto. Ins. Co. v. Holland*, 324 N.C. 466, 470, 380 S.E.2d 100 (1989) ("[T]he right to contribution does not exist unless two or more parties are joint tortfeasors."). For each of these separate and independent reasons, Republic's negligence and contribution claims shall be dismissed.

 **\*11**  51. Republic's indemnification claim fares no better. Republic frames the claim as "common law indemnification" and asserts that it is entitled to indemnity because "the damages alleged by Lineage were caused in whole or in part by the conduct of P3 Advantage, without any corresponding culpable conduct on the part of Republic."[67] P3 contends that this claim should be dismissed because Lineage's claims against Republic do not sound in tort, and in the absence of a tort claim, Republic cannot seek indemnification from P3.[68] The Court agrees with P3.

52. "In North Carolina, a party's rights to indemnity can rest on three bases: (1) an express contract; (2) a contract implied-in-fact; or (3) equitable concepts arising from the tort theory of indemnity, often referred to as a contract implied-in-law." *Kaleel Builders, Inc. v. Ashby*, 161 N.C. App. 34, 38, 587 S.E.2d 470 (2003). Republic does not allege an express contract or a contract implied-in-fact giving rise to a right to indemnity, so Republic's "common law" right to indemnity, if it exists at all, is based on a right to indemnity implied-in-law.

53. "For indemnification implied-in-law, more an equitable remedy than an action in and of itself, North Carolina law requires there be an underlying injury sounding in tort. The party seeking indemnity must have imputed or derivative liability for the tortious conduct from which indemnity is sought." *Id.* at 41, 587 S.E.2d 470. Since there is no tort claim against Republic for which it seeks indemnity from P3, Republic's claim does not fit the "active-passive tort-feasor framework" required to state a claim for a right to indemnity implied-in-law. *See id.* at 47, 587 S.E.2d 470 (holding that "the parties do not fit the active-passive tort-feasor framework required to support an equitable right to indemnity implied-in-law" where the plaintiff's claim sought indemnification from a claim for breach of contract and not one sounding in tort). Since Republic failed to allege any of the three bases that permit it a right to indemnity, the Court will grant Republic's Motion dismissing Republic's claim for indemnification.[69]

IV.

CONCLUSION

54. **WHEREFORE:**

a. The Court, in the exercise of its discretion, hereby **GRANTS in part** and **DENIES in part** the Motion to Strike as follows:

 i. Lineage's Motion to Strike is **DENIED** as to Republic's "First Motion to Dismiss," but the Court will consider the purported motion inoperative and take no action on it unless and until Republic files a motion in compliance with BCR 7.2. Lineage will retain all its available defenses to any such motion.

 ii. Lineage's Motion to Strike is **GRANTED** as to Republic's third, fourth, fifth, sixth, seventh, eighth, ninth, tenth, eleventh, twelfth, thirteenth, and fourteenth affirmative defenses, and those defenses shall be stricken **without prejudice.**[70]

 iii. Lineage's Motion to Strike is **DENIED** as to Primus's third and fourth affirmative defenses.

 iv. Lineage's Motion to Strike is **GRANTED** as to Primus's fifth and seventh affirmative defenses, and those defenses shall be stricken **without prejudice.**

 **\*12**  v. Lineage's Motion to Strike is **GRANTED** as to Primus's eighth affirmative defense (unclean hands) to the extent that defense is asserted as a defense to Lineage's claims for past losses, and that defense shall be stricken to that extent **without prejudice**, but to the extent the defense is asserted as a defense to Lineage's claims for future losses, Lineage's Motion to Strike is **DENIED**.

b. The Court hereby **GRANTS** the Motion to Dismiss, and the Third-Party Complaint shall be **DISMISSED with prejudice**.

**SO ORDERED**, this the 23rd day of February, 2024.

**All Citations**

Not Reported in S.E. Rptr., 2024 WL 759948, 2024 NCBC 9

Lineage Logistics, LLC v. Primus Builders, Inc., Not Reported in S.E. Rptr. (2024)

2024 NCBC 9

## Footnotes

1   (Pl. Lineage Logistics, LLC's Mot. Strike Affirmative Defenses [hereinafter "Mot. Strike"], ECF No. 177.)

2   (Third-Party Def. P3 Advantage, Inc.'s Mot. Dismiss Third-Party Compl. [hereinafter "Mot. Dismiss"], ECF No. 182.)

3   (Pl. Lineage Logistics, LLC's Second Am. Compl. and Cross-Cl. ¶ 1 [hereinafter "Lineage Second Am. Compl."], ECF No. 121.)

4   (Lineage Second Am. Compl. ¶ 2; Pl. Primus Builders, Inc. and P3 Advantage, LLC's Second Am. Compl. ¶¶ 10–11 [hereinafter "Primus Second Am. Compl."], ECF No. 122.)

5   (Primus Second Am. Compl. ¶ 1.)

6   (Lineage Second Am. Compl. ¶ 5.)

7   (Lineage Second Am. Compl. ¶¶ 7, 25; Primus Am. Compl. ¶¶ 12–13.)

8   (Lineage Second Am. Compl. ¶¶ 27–29; Lineage Second Am. Compl. Ex. A Guaranteed Maximum Sum Contract 44, ECF No. 121.1.)

9   (Lineage Second Am. Compl. ¶¶ 7, 30–31; Lineage Second Am. Compl. Ex. B Design/Build Subcontract 18, ECF No. 121.2.)

10  (Republic Refrigeration, Inc.'s Mot. Dismiss, Am. Answer Pl.'s Second Am. Compl. and Third-Party Compl. [hereinafter "Republic's Answer" or "Third-Party Compl."] ¶ 15, ECF No. 172.) Republic's Answer and Third-Party Complaint are located in different sections within ECF No. 172, with Republic's Third-Party Complaint beginning on page fifteen of the document. The Court's references to "Republic's Answer" or "Third-Party Compl." will refer to the applicable section in ECF No. 172.

11  (Lineage Second Am. Compl. ¶ 57; Primus Second Am. Compl. ¶¶ 22–26.) Primus's Second Amended Complaint does not identify Drawdy by name.

12  (Lineage Second Am. Compl. ¶ 58.) Primus's Second Amended Complaint does not allege that a Republic employee requested Lamattina to remain on the scissor lift or remove ice. (Primus Second Am. Compl. ¶¶ 22–26.)

13  (Lineage Second Am. Compl. ¶ 59; Primus Second Am. Compl. ¶ 22.)

14  (Lineage Second Am. Compl. ¶ 60; Primus Second Am. Compl. ¶ 26.)

15  (Lineage Second Am. Compl. ¶¶ 62–63.)

16  Each amended complaint identifies three pending lawsuits: *Stone ex rel. Estate of Lamattina v. Lineage Logistics, LLC*, Case No. 20-CVS-3109 (N.C. Super. Ct. 2020); *DFA Dairy Brands, LLC v. Primus Builders, Inc.*, Case No. 5:21-cv-00025-KDB-DSC (W.D.N.C. 2021); and *Equatorial Seafood, LLC v. Lineage Logistics, LLC*, Case No. 21-CVS-1960 (N.C. Super. Ct. 2021). (Lineage Am. Compl. ¶ 64; Primus Am. Compl. ¶ 27.) Primus's Second Amended Complaint also names a separate action brought by Lineage against Primus, *Lineage Logistics, LLC v. Primus Builders, Inc.*, Case No. 23-CVS-62 (N.C. Super. Ct. 2023). (Primus Am. Compl. ¶ 27.)

17  (Lineage Second Am. Compl. ¶ 29; Primus Second Am. Compl. ¶ 33.)

18  (Lineage Compl. ¶¶ 47–53, ECF No. 3.)

19  (Order Primus Builders, Inc.'s Mot. Intervene as Pl., ECF No. 31; Pl. Primus Builders, Inc.'s Compl. [hereinafter "Primus's Original Compl."], ECF No. 36.)

WESTLAW  © 2024 Thomson Reuters. No claim to original U.S. Government Works.   9

**Lineage Logistics, LLC v. Primus Builders, Inc., Not Reported in S.E. Rptr. (2024)**

2024 NCBC 9

20    (Def. Hartford Fire Insurance Company's Answer Pl. Primus Builders, Inc.'s Compl., ECF No. 41.) Hartford filed its answer to Primus's Original Complaint, but it was not until Primus's Amended Complaint that Primus actually named Hartford as a defendant.

21    (Pl. Primus Builders, Inc.'s Am. Compl., ECF No. 42.) Before Lineage filed its Amended Complaint, National Union and Travelers filed motions to dismiss or stay Primus's Original Complaint, (ECF Nos. 48, 50), which this Court declared moot by an order dated 19 January 2022, (ECF No. 60).

22    (*See generally* Pl. Lineage Logistics LLC's First Am. Compl. and Cross Claim, ECF No. 55.)

23    (Lineage Second Am. Compl. ¶ 72.)

24    (Lineage Second Am. Compl. ¶ 84.)

25    (Lineage Second Am. Compl. ¶ 72; Voluntary Dismissal With Prejudice All Claims Made Against Def. National Union Fire Insurance Company Pittsburgh, PA, ECF No. 104; Stipulation Dismissal, ECF No. 105.)

26    (Lineage Second Am. Compl. ¶ 87; Voluntary Dismissal With Prejudice All Claims Made Against Def. Hartford Fire Insurance Company, ECF No. 111; Notice Voluntary Dismissal, ECF No. 112.)

27    (Lineage Second Am. Compl.; Primus Second Am. Compl.)

28    (Lineage Second Am. Compl. ¶¶ 133–38.)

29    (Lineage Second Am. Compl. ¶¶ 139–46.)

30    (Lineage Second Am. Compl. ¶¶ 147–52.)

31    (Lineage Second Am. Compl. ¶¶ 122–32.)

32    (Lineage Second Am. Compl. ¶¶ 153–60.)

33    (Def. Travelers Property Casualty Company America's Mot. Dismiss the Second Am. Compl. Lineage Logistics, LLC, ECF No. 132; Def. Republic Refrigeration, Inc.'s Mot. Dismiss Pl. Lineage Logistics, LLC's Second Am. Compl. Pursuant Rule 12(b)(6), ECF No. 134.)

34    (Order and Op. Travelers Property Casualty Company America's Mots. Dismiss Pls.' Am. Compls., Republic Refrigeration, Inc.'s Mot. Dismiss Lineage Logistics, LLC's Am. Compl., and Republic Refrigeration, Inc.'s Mot. Stay, ECF No. 155; *Lineage Logistics, LLC v. Nat'l Union Fire Ins. Co.*, 2023 NCBC LEXIS 97 (N.C. Super. Ct. Aug. 10, 2023).) In this order and opinion, the Court also denied Republic's Motion to Stay, (ECF No. 135).

35    (Consent Order Realignment the Parties, ECF No. 166.)

36    (Notice Voluntary Dismissal Without Prejudice, ECF No. 165.)

37    (Def. Primus Builders, Inc.'s Am. Answer Lineage Logistics, LLC's Second Am. Compl. and Cross-Cl. and Primus Builders, Inc.'s Cross-Cl. Against Republic [hereinafter "Primus's Answer"], ECF No. 171.)

38    (Third-Party Compl.)

39    (Third-Party Compl. ¶¶ 26–36.)

40    (Mot. Strike.)

41    (Mot. Dismiss.)

**Lineage Logistics, LLC v. Primus Builders, Inc., Not Reported in S.E. Rptr. (2024)**

2024 NCBC 9

42   (*See* Mem. Opp'n Pl.'s Mot. Dismiss [sic] Strike Affirmative Defenses 5 [hereinafter "Republic's Br. Opp'n Mot. Strike"], ECF No. 190.)

43   The Motion to Strike also seeks to strike Republic's thirteenth affirmative defense, which states that "[Lineage's] claims are barred in whole or in part to the extent they have been raised in a prior pending action." (Republic's Answer 14; Pl. Lineage Logistics, LLC's Mem. Supp. Mot. Strike Affirmative Defenses 12, 14 [hereinafter "Lineage's Br. Supp."], ECF No. 178.) Republic did not address Lineage's Motion to Strike this defense in its briefing or at the Hearing, and the Court agrees with Lineage that "Republic does not identify any previous litigation that might have preclusive effect on this action[.]" (Lineage's Br. Supp. 12.) Accordingly, the Court will strike this affirmative defense as well. *See also, e.g., Elhulu v. Alshalabi*, 2021 NCBC LEXIS 44, *21 (N.C. Super. Ct. Apr. 29, 2021) (granting motion as uncontested when response brief did not respond to moving party's argument); *Glover Constr. Co. v. Sequoia Servs., LLC*, 2020 NCBC LEXIS 76, at *23 (N.C. Super. Ct. June 18, 2020) (same).

44   (Republic's Answer 1.)

45   (Republic's Answer 14.)

46   (Republic's Answer 14.)

47   (Republic's Br. Opp'n Mot. Strike 6.)

48   *Lineage Logistics, LLC v. Nat'l Union Fire Ins. Co.*, 2023 NCBC LEXIS 97, at *40–41 (N.C. Super. Ct. Aug. 10, 2023); (*see also* Lineage's Br. Supp 13–14; Republic's Br. Opp'n Mot. Strike 6).

49   (Republic's Br. Opp'n Mot. Strike 6.)

50   (Primus Builders, Inc.'s Mem. Opp'n Pl.'s Mot. Strike Affirmative Defenses 10–11 [hereinafter "Primus's Br. Opp'n"], ECF No. 189.)

51   (Mot. Strike; Primus's Answer 24–25.)

52   (Primus's Br. Opp'n 12–13.)

53   (Lineage's Br. Supp. 3–4.) *See, e.g., Fetner v. Rocky Mount Marble & Granite Works,* 251 N.C. 296, 302, 111 S.E.2d 324 (1959) ("The essential elements of waiver are (1) the existence, at the time of the alleged waiver, of a right, advantage or benefit; (2) the knowledge, actual or constructive, of the existence thereof; and (3) an intention to relinquish such right, advantage or benefit.").

54   (Lineage's Br. Supp. 4–5.) *See, e.g., Gore v. Myrtle/Mueller,* 362 N.C. 27, 33–34, 653 S.E.2d 400 (2007):

   [T]he essential elements of an equitable estoppel as related to the party estopped are: (1) Conduct which amounts to a false representation or concealment of material facts, or at least, which is reasonably calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party afterwards attempts to assert; (2) intention or expectation that such conduct shall be acted upon by the other party, or conduct which at least is calculated to induce a reasonably prudent person to believe such conduct was intended or expected to be relied and acted upon; [and] (3) knowledge, actual or constructive, of the real facts.

   *Id.* (cleaned up).

55   (Mem. Supp. P3 Advantage, Inc.'s Mot. Dismiss The Third-Party Compl. 10 [hereinafter "P3's Br. Supp."], ECF No. 183.)

56   (P3's Br. Supp. 9–11.)

57   The relevant summons documents are appended to the end of Republic's brief opposing the Motion to Dismiss. (Mem. Opp'n P3 Advantage, Inc.'s Mot. Dismiss Third-Party Compl. 9–16 [hereinafter "Republic's Br. Opp'n Mot. Dismiss"], ECF No. 191.)

Case 5:23-cv-00059-KDB-DCK   Document 109-1   Filed 09/16/24   Page 67 of 81

**Lineage Logistics, LLC v. Primus Builders, Inc., Not Reported in S.E. Rptr. (2024)**

2024 NCBC 9

**58**    (P3's Br. Supp. 10.)

**59**    (P3's Br. Supp. 11–12.)

**60**    (Third-Party Compl. ¶¶ 17–34.)

**61**    (Republic's Br. Opp'n Mot. Dismiss 5.)

**62**    (Notice Voluntary Dismissal Without Prejudice.)

**63**    (*See* Consent Order Realignment the Parties.)

**64**    Numerous federal circuit decisions are to similar effect. *See, e.g., Velez-Diaz v. United States*, 507 F.3d 717, 719 (1st Cir. 2007) ("Rule 15(c), by its terms, applies to amended pleadings in the *same* action as an original, timely pleading: the pleading sought to be amended may not be a pleading filed in a different case." (emphasis in original)); *Carter v. Tex. Dep't Health*, 119 Fed. Appx. 577, 581 (5th Cir. 2004) (for purposes of Federal Rule 15(c), an " 'original pleading' may not be a pleading filed in a different case"); *United States ex rel. Malloy v. Telephonics Corp.*, 68 Fed. Appx. 270, 273 (3d Cir. 2003) ("We agree that Rule 15(c) does not permit a complaint filed in one civil action to relate back to a complaint filed in a separate civil action." (cleaned up)); *Bailey v. N. Ind. Pub. Serv. Co.*, 910 F.2d 406, 413 (7th Cir. 1990) (holding that a complaint filed in one civil action cannot relate back to a complaint filed in a separate civil action); *see also Turner v. Duke Univ.*, 325 N.C. 152, 164, 381 S.E.2d 706 (1989) ("Decisions under the federal rules are [ ] pertinent for guidance and enlightenment in developing the philosophy of the North Carolina rules.").

**65**    (P3's Br. Supp. 13–16.)

**66**    (P3's Br. Supp. 12–13.)

**67**    (P3's Br. Supp. 15.)

**68**    (P3's Br. Supp. 15.)

**69**    Republic also raises an additional timeliness argument—contending that its claims for indemnity and contribution are timely because they did not accrue until Lineage sued Republic in January 2022. But as discussed above, claims for implied-in-law indemnity and contribution necessarily depend upon an underlying tort, and, here, Lineage has not asserted a tort claim against Republic. Therefore, Republic's accrual argument, even if correct, does not salvage its claims. *See Schenkel & Schultz, Inc.*, 180 N.C. App. at 268, 636 S.E.2d 835.

**70**    "When a court strikes a defense, the general practice is to grant the defendant leave to amend." *Nat'l Fin. Partners Corp.*, 2014 NCBC LEXIS 50, at *19 (quoting *Banks*, 2010 U.S. Dist. LEXIS 7501, at *3).

---

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Declined to Follow by Obesity Research Institute, LLC v. Fiber Research International, LLC, S.D.Cal., February 21, 2018

2017 WL 628306

Only the Westlaw citation is currently available.

United States District Court, W.D. North Carolina, Charlotte Division.

Jacqueline S. MCFEE, Plaintiff,

v.

CPP INTERNATIONAL, Defendant.

3:16-cv-00165-RJC-DCK
|
Signed 02/15/2017

**Attorneys and Law Firms**

Albert Peter Allan, Allan IP Litigation, Charlotte, NC, for Plaintiff.

John C. Nipp, Additon, Higgins, Pendleton & Ashe, P.A., Kathleen K. Lucchesi, Charlotte, NC, for Defendant.

### ORDER

Robert J. Conrad, Jr., United States District Judge

 *1 **THIS MATTER** comes before the Court on Defendant's Motion to Dismiss, (Doc. No. 6), and the related memoranda and exhibits in support of and in opposition to the motion; the Magistrate Judge's Memorandum and Recommendation ("M&R"), (Doc. No. 14); Plaintiff's Objections to the M&R, (Doc. No. 17); and Defendant's Reply to Plaintiff's Objections, (Doc. No. 18).

### I. BACKGROUND

No party has objected to the Magistrate Judge's statement of the factual and procedural background of this case. Therefore, the Court adopts the facts as set forth in the M&R.

In the M&R, the Magistrate Judge recommended that Defendant's Motion to Dismiss should be granted. (Doc. No. 14 at 1). The Magistrate Judge considered the five claims brought by Plaintiff: (1) False Advertising in Violation of 15 U.S.C. § 1125(a); (2) Copyright Infringement in Violation of 17 U.S.C. § 501; (3) Unfair Competition; (4) Unfair and

Deceptive Trade Practices in Violation of North Carolina General Statutes § 75-1.1 et seq.; and (5) breach of contract. (Doc. No. 14 at 1–2). Specifically, the Magistrate Judge found that the two federal claims, counts one and two—and the basis for jurisdiction in this court—should be dismissed for failure to state a claim, primarily because Plaintiff does not have ownership of the intellectual property at issue, as required by the underlying statutes. (Id. at 4–11). By recommending dismissal of the two federal law claims, the Magistrate Judge accordingly recommended dismissal without prejudice to re-file in state court the three state law claims for unfair competition, unfair and deceptive trade practices, and breach of contract. (Id.).

Plaintiff timely filed objections to the M&R, contesting the Magistrate Judge's recommendation on two grounds: (1) that the terms of the employment agreement between Plaintiff and Defendant ("Employment Agreement"), (Doc. No. 8-1), are sufficient to convey ownership interest of the contested intellectual property rights; and (2) that the claim for breach of contract can be read consistent with factual contentions that Plaintiff already owns the intellectual property; or, in the alternative, both claims are permitted as alternative pleadings under Rule 8(d)(2) of the Federal Rules of Civil Procedure. (Doc. No. 17 at 3). Plaintiff agrees that the Court has no jurisdiction over the three state-law claims if the two federal claims fail. (Id. at 2).

Defendant timely filed its reply to Plaintiff's objections countering Plaintiff's two objections by asserting: (1) Defendant's promise to assign intellectual property rights at a future time did not transfer ownership to Plaintiff; and (2) Plaintiff's alternative pleading argument is irrelevant because neither the Magistrate Judge nor Defendant has argued that alternative pleadings are impermissible. (Doc. No. 18 at 4).

### II. STANDARD OF REVIEW

A district court may assign dispositive pretrial matters, including motions to dismiss, to a magistrate judge for "proposed findings of fact and recommendations." 28 U.S.C. § 636(b)(1)(A) & (B). The Federal Magistrate Act provides that a district court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." Id. § 636(b)(1)(C); Fed. R. Civ. P. 72(b)(3). However, "when objections to strictly legal issues are raised and no factual issues are challenged, de novo review of the record may be dispensed with." Orpiano v. Johnson, 687 F.2d 44, 47 (4th Cir. 1982). De novo review is also not required "when a party makes

general or conclusory objections that do not direct the court to a specific error in the magistrate judge's proposed findings and recommendations." Id. Similarly, when no objection is filed, "a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.' " Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310, 315 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72, advisory committee note).

## III. DISCUSSION

### A. Federal Claims

**\*2** As an initial matter, the Court agrees with Defendant that alternative pleading here is not at issue. Neither Defendant nor the Magistrate Judge assert that Plaintiff's claims cannot proceed because they are inconsistent or alternative. Although the Magistrate Judge described Plaintiff's allegations as "inconsistent" and "contradictory," the Court believes those inconsistencies relate to the factual allegations, not the legal allegations and specific causes of action. Accordingly, the Court overrules Plaintiff's second objection.

Plaintiff's first objection to the M&R gets to the heart of the matter—at least the heart of the federal law claims. The Court agrees with, and neither party contests, the Magistrate Judge's analysis that claims under both Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (Count One) and for copyright infringement under 17 U.S.C. § 501 (Count Two) require that the Plaintiff own the intellectual property rights in order for the claims to be plausible. See (Doc. No. 14 at 6–8, 10) ("There appears to be no dispute that both the false advertising and copyright claims require Plaintiff to assert a plausible claim of ownership over the disputed designs, and that a failure to do so is fatal to those claims."). Therefore, this matter boils down to a simple question: Did the language in the Employment Agreement that Defendant "shall assign" intellectual property rights upon satisfaction of certain conditions automatically convey ownership of those ownership rights to Plaintiff once the conditions were satisfied, or was Defendant required by contract to convey those rights once the conditions were satisfied but conveyance would not take place until Defendant took affirmative steps to convey the ownership rights? Plaintiff argues that the Employment Agreement automatically conveyed ownership while Defendant asserts that it had to affirmatively convey ownership through a separate form labeled "Assignment of Intellectual Property," which was Exhibit D to the Employment Agreement. (Doc. No. 8-1 at 19–21).

As the Magistrate Judge noted, the Complaint is self-contradictory regarding whether Plaintiff possessed ownership over the disputed intellectual property. For example, with one breath Plaintiff says she "was granted all right, title and interest to all of her designs" but with the next she says Defendant "failed to grant rights to those designs as agreed." (Doc. No. 1 at ¶¶ 2–3). The Court finds these contradictions telling but not dispositive.

More importantly, the Employment Agreement seems clear on the issue of assignment of intellectual property rights: if the express conditions were met, Defendant was required to assign the relevant intellectual property rights to Plaintiff, but assignment was not complete until Defendant took the necessary affirmative steps to assign the ownership rights to Plaintiff, namely by completing the separate agreement titled "Assignment of Intellectual Property" and attached as Exhibit D to the Employment Agreement. This conclusion is most in line with the fundamental principles of contract interpretation. "Interpreting a contract requires the court to examine the language of the contract itself for indications of the parties' intent at the moment of execution." State v. Philip Morris USA Inc., 618 S.E.2d 219, 225 (N.C. 2005) (citing Lane v. Scarborough, 200 S.E.2d 622, 624 (N.C. 1973)). "If the plain language of a contract is clear, the intention of the parties is inferred from the words of the contract." Walton v. City of Raleigh, 467 S.E.2d 410, 411 (N.C. 1996). "The words used are given their ordinary, accepted meaning unless it is apparent another meaning is intended, and each is given effect." Peirson v. Am. Hardware Mut. Ins. Co., 107 S.E.2d 137, 139 (N.C. 1959). "Intent is derived not from a particular contractual term but from the contract as a whole." Philip Morris, 618 S.E.2d at 225 (citing Jones v. Casstevens, 23 S.E.2d 303, 305 (N.C. 1942)).

**\*3** Looking at the plain words of the Employment Agreement and the Employment Agreement as a whole, the parties clearly intended for Defendant to affirmatively assign any eligible intellectual property rights. First, the language of the agreement is "shall assign." The plain meaning of shall places the act of assignment in the future, not a contemporaneous, automatic assignment as argued by Plaintiff. The parties could just have easily drafted the contract to say upon satisfaction of certain requirements intellectual property rights "are assigned" to Plaintiff. Moreover, taking the Employment Agreement as a whole, it includes an exhibit titled "Assignment of Intellectual Property" that appears to be a separate form

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

or contract, requiring signature by both parties, that would legally and formally assign relevant intellectual property rights to Plaintiff. (Doc. No. 8-1 at 19–21). This exhibit to the Employment Agreement reflects the intent of the parties that a separate affirmative action was needed for assignment. Any other interpretation renders the exhibit meaningless.

Thus, the terms of the contract are clear. Although Defendant may be in breach of the Employment Agreement by failing to assign intellectual property ownership to Plaintiff, Defendant nonetheless needed to affirmatively assign any such ownership. Absent that assignment, Plaintiff does not have ownership of the intellectual property rights and fails to state a claim for false advertising or copyright infringement.

    B. State Claims

In her Complaint, Plaintiff also alleges three claims based on North Carolina state law: unfair competition (Count Three), unfair and deceptive trade practices (Count Four), and breach of contract (Count Five). "A district court's decision whether to exercise [supplemental] jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary." Carlsbad Tech., Inc. v. HIF Bio, Inc., 556 U.S. 635, 639 (2009). 28 U.S.C. § 1367(c) provides that a court may decline supplemental jurisdiction over a claim if: "(1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction." Under the authority of 28 U.S.C. § 1367(c), "a district court has inherent power to dismiss the case or, in cases removed from State court, to remand, provided the condition set forth in § 1367(c) for declining to exercise supplemental jurisdiction have been met." Hinson v. Norwest Fin. S.C., Inc., 239 F.3d 611, 617 (4th Cir. 2001).

Here, the Court finds that the condition set forth in § 1367(c)(3) has been met. This Court has original jurisdiction over Plaintiff's false advertising and copyright infringement claims (Counts One and Two); but the Court has dismissed both of those claims. Therefore, the only claims remaining are state-law claims. Indeed, the Magistrate Judge properly noted that "[a]t its core, this is a breach of contract action." (Doc. No. 14 at 10). Furthermore, the parties agree that the state-law claims should be dismissed if the Court finds no jurisdiction over the two federal claims. Therefore, this Court declines to exercise supplemental jurisdiction of the remaining claims and dismisses the state law claims without prejudice to re-file in state court.

### IV. CONCLUSION
**IT IS, THEREFORE, ORDERED** that:

1. The Magistrate Judge's M&R, (Doc. No. 14), is **ADOPTED**;

2. Defendant's Motion to Dismiss, (Doc. No. 6), is **GRANTED**;

3. Counts One and Two of Plaintiff's Complaint—False Advertising in Violation of 15 U.S.C. § 1125(a) and Copyright Infringement in Violation of 17 U.S.C. § 501, respectively—are **DISMISSED with prejudice**;

4. Count Three through Five of Plaintiff's Complaint —Unfair Competition, Unfair and Deceptive Trade Practices in Violation of N.C. Gen. Stats. § 75-1.1 et seq., and Breach of Contract, respectively—are **DISMISSED without prejudice** to refile in state court; and

**\*4** 5. The Clerk of Court is directed to close the case.

### All Citations

Not Reported in Fed. Supp., 2017 WL 628306

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 6931787
Only the Westlaw citation is currently available.
United States District Court, W.D. North Carolina,
Statesville Division.

MOUNTAINEER MOTORS
OF LENOIR, LLC, Plaintiff,

v.

CARVANA, LLC; Carvana & Company;
Carvana and Company of NC LLC;
Carvana Logistics LLC; Ernest Garcia
III; Carvana Cars, LLC; Carvana Co.,
LLC; Does 1 Through 10; Carvana FAC
LLC; and Ernest Garcia II, Defendants.

CIVIL ACTION NO. 5:22-CV-00171-KDB-DCK
|
Signed October 18, 2023
|
Filed October 19, 2023

**Attorneys and Law Firms**

Nevin Wisnoski, Napoli Shkolnik, PLLC, Wilmington, NC, Rebeca Martinez Sicari, Pro Hac Vice, NS PR Law Services LLC, Santurce, PR, Salvatore C. Badala, Pro Hac Vice, Napoli Shkolnik PLLC, Melville, NY, for Plaintiff.

Gregory T. Saetrum, Pro Hac Vice, Squire Patton Boggs (U.S.) LLP, Phoenix, AZ, Margaret Louise Booz, Squire Patton Boggs (U.S.) LLP, Washington, DC, Patrick J. Brooks, Squire Patton Boggs (U.S.) LLP, Columbus, OH, for Defendants Carvana, LLC, Carvana Logistics LLC, Carvana Cars, LLC, Carvana Fac LLC.

Gregory T. Saetrum, Squire Patton Boggs (U.S.) LLP, Phoenix, AZ, Margaret Louise Booz, Squire Patton Boggs (U.S.) LLP, Washington, DC, for Defendants Ernest Garcia, II, Ernest Garcia, III, Carvana Co., LLC.

**ORDER**

Kenneth D. Bell, United States District Judge

**\*1 THIS MATTER** is before the Court on Defendant Carvana's Motion to Dismiss (Doc. No. 30) and Defendants

Ernest Garcia II and Ernest Garcia III's (together, the "Garcias") Motion to Dismiss (Doc. No. 31).[1] In this case, Mountaineer Motors argues that Carvana's alleged unfair and deceptive trade practices, false advertising, and violations of North Carolina's vehicle dealer "Licensing Law" impaired Plaintiff's ability to remain competitive, leading to a loss in business. In their Motions to Dismiss, all of the Defendants argue that Plaintiff has not plausibly alleged any unlawful conduct and further argue that all of the claims are barred on other grounds. The Court has carefully considered these motions, the associated briefs, and other filings of record. For the reasons discussed below, the Court will **GRANT** Defendants' Motions to Dismiss.

**I. LEGAL STANDARD**

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes the dismissal of a complaint if it fails to state a claim upon which relief can be granted. The purpose of Rule 12(b)(6) is to expose deficient allegations "at the point of minimum expenditure of time and money by the parties and the court." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 558 (2007).

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead facts sufficient to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 570). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556). A claim will not survive a motion to dismiss if it contains nothing more than "labels and conclusions, and a formulaic recitation of a cause of action's elements." Twombly, 550 U.S. at 555 (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)). That said, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." Id. (internal citation and quotation marks omitted).

When deciding a motion to dismiss, "a court considers the pleadings and any materials 'attached or incorporated into the complaint.'" Fitzgerald Fruit Farms LLC v. Aseptia, Inc., 527 F. Supp. 3d 790, 796 (E.D.N.C. 2019) (quoting E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 448 (4th

Cir. 2011)). The Court, for the purposes of a Rule 12(b)(6) motion, takes all factual allegations as true. *See Ashcroft*, 556 U.S. at 678. However, "[d]etermining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* (citation omitted).

## II. FACTS AND PROCEDURAL HISTORY

**\*2** Plaintiff Mountaineer Motors, which also does business as Car Guys Mountaineer Motors, is a car dealership in Lenoir, North Carolina. Doc. No. 25 at ¶ 40.[2] Carvana sells used automobiles. In 2017, it opened its first car "vending machine" in North Carolina. ¶ 103. It opened a second vending machine location the following year. *Id.* By the end of 2019, Carvana was among North Carolina's top selling car retailers. ¶ 107. As Carvana's market share grew, Mountaineer Motors saw its sales decrease. ¶ 117. Plaintiff alleges that although it sold 494 vehicles in 2017, it sold only 380 vehicles in 2018, before further losing sales in 2019. ¶ 103.

Carvana, for its part, faced regulatory hurdles despite its rapid growth. In 2021, the North Carolina Division of Motor Vehicles ("DMV") suspended the Raleigh location's dealers' license for violations of the North Carolina Motor Vehicle Dealers and Manufacturers Licensing Law ("Licensing Law"). ¶ 36. The DMV found that Carvana had failed to timely deliver title paperwork to the DMV, that Carvana had engaged in unfair or deceptive acts constituting an unfair method of competition because it issued out-of-state temporary tags/plates for vehicles sold to North Carolina residents, and that it had offered vehicles for sale without the required state inspection. ¶ 37. The Charlotte location was placed on probation for similar infractions. ¶ 36.

In 2022, Plaintiff filed its original Complaint, alleging that Carvana had engaged in unfair and deceptive trade practices in violation of the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA"), had engaged in false advertising in violation of the federal Lanham Act, and had violated provisions of the Licensing Law. (Doc. No. 1). Carvana filed a Motion to Dismiss in response to Plaintiff's Complaint, (Doc. No. 20), which was denied as moot after Mountaineer Motors filed its Amended Complaint (Doc. Nos. 23, 25). Defendants Carvana and the Garcias then filed the pending Motions to Dismiss the Amended Complaint for Failure to State a Claim pursuant to Rule 12(b)(6). (Doc. Nos. 30, 31).

## III. DISCUSSION

### A. The Garcias' Motion to Dismiss

In their Motion to Dismiss, the Garcias, who are residents of Texas and Arizona, argue that: (1) the Court lacks personal jurisdiction over them, and (2) the Complaint fails to state a claim against them. (*See* Doc. No. 31-1, at 4, 10). In response, Mountaineer Motors contends that although it does not allege that either Garcia personally carried out any alleged wrongful conduct the Court should exercise personal jurisdiction over the Garcias and allow its claims to proceed. Specifically, it argues that the Court should "pierce the corporate veil" and hold the Garcias individually responsible for all of Carvana's conduct. (*See* Doc. No. 40, 5-9). For the reasons discussed below, the Court finds that there are insufficient allegations to ignore Carvana's corporate form and hold its officers liable without regard to their personal involvement. Further, the Court agrees with the Garcias that the Plaintiff's "shotgun Complaint" fails to state a claim against them. Therefore, the Court will grant the Garcias' motion.

### 1. Personal Jurisdiction

It is well established that there are two ways – general and specific jurisdiction – for a federal court to exercise personal jurisdiction over a defendant. *See, e.g., Universal Leather, LLC v. Koro AR, S.A.*, 773 F.3d 553, 559 (4th Cir. 2014). Neither applies here. "A court with general jurisdiction may hear *any* claim against that defendant, even if all the incidents underlying the claim occurred in a different State." *Bristol-Myers Squibb Co. v. Superior Ct. of Calif., San Francisco County*, 582 U.S. 255, 262 (2017) (emphasis in original) (citing *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). For individuals, such as the Garcias, "the paradigm forum for the exercise of general jurisdiction is the individual's domicile." *Goodyear*, 564 U.S. at 924. Garcia Senior and Garcia Junior have provided sworn affidavits that they are residents of Texas and Arizona, respectively, (*See* Doc. No. 31-1, at 22-23, 25-26), and Mountaineer Motors asserts no argument or evidence to the contrary. Accordingly, the Court finds that Plaintiff has not plausibly alleged that this Court has general personal jurisdiction over the Garcias.

**\*3** As for specific personal jurisdiction, Plaintiff's lack of particular factual allegations against the Garcias in the Complaint leads to the same result. The Court can only exercise specific personal jurisdiction over a nonresident

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

defendant if doing so comports with the North Carolina long-arm statute and the Fourteenth Amendment Due Process Clause. *See, e.g., Mitrano v. Hawes*, 377 F.3d 402, 406 (4th Cir. 2004). In North Carolina, where the long-arm statute extends personal jurisdiction to the limits of the Fourteenth Amendment's Due Process Clause, "the statutory inquiry merges with the constitutional inquiry." *Christian Sci. Bd. of Dirs. v. Nolan*, 259 F.3d 209, 215 (4th Cir. 2001). Specific jurisdiction depends on "an affiliation between the forum and the underlying controversy." *Goodyear*, 564 U.S. at 918 (citations omitted). In short, Plaintiff must plausibly allege that (1) the Garcias have had "continuous and systematic" contacts with North Carolina, (2) Mountaineer Motors' claim arises out of those contacts, and (3) exercising personal jurisdiction would be fair. *See Int'l Shoe Co. v. Washington*, 326 U.S. 310, 317 (1945). In their respective affidavits, the Garcias testify they were not personally involved with Carvana's alleged unlawful advertisements and further state they have not engaged in any substantial activity in the state of North Carolina. (*See* Doc. No. 31-1, at 22-23, 25-26). Again, Mountaineer Motors asserts no argument or evidence to the contrary in its Complaint or response to the Garcias' Motion to Dismiss. Therefore, the Court finds that the facts as alleged do not plausibly establish that this Court has specific jurisdiction over the Garcias.

Lastly, Mountaineer Motors argues that personal jurisdiction exists because Carvana, a group of related corporate entities, are collectively merely an "instrumentality" of the individual Garcias. Courts rarely "pierce the corporate veil" in either North Carolina or Delaware, and with good reason because to do otherwise would eviscerate the long acknowledged economic benefits of limited individual liability for corporate shareholders, officers and directors.[3] *See Green v. Freeman*, 749 S.E.2d 262, 270 (N.C. 2013) ("Disregarding the corporate form is not to be done lightly."); *see also Manichaean Cap., LLC v. Exela Techs., Inc.*, 251 A.3d 694, 706 (Del. 2021) ("Delaware public policy disfavors disregarding the separate legal existence of business entities.") (cleaned up); *Cleveland-Cliffs Burns Harbor LLC v. Boomerang Tube, LLC*, No. 2022-0378-LWW, 2023 WL 5688392, at *14 (Del. Ch. Sept. 5, 2023) (citing *All. Data Sys. Corp.*, 963 A.2d 746, 769 (Del. Ch. 2009)) ("Delaware law respects corporate formalities, absent a basis for veil-piercing, recognizing that the wealth-generating potential of corporate and other limited liability entities would be stymied if it did otherwise."). Thus, to survive a motion to dismiss, Plaintiff must plausibly allege that Carvana is operated as "a mere instrumentality or *alter ego* of the sole or dominant shareholder and a shield for [their]

activities in violation of declared public policy or statute of the State." *Green v. Freeman*, 749 S.E.2d 262, 270 (N.C. 2013) (emphasis in original) (citing *Henderson v. Sec. Mortg. & Fin. Co.*, 160 S.E.2d 39, 44 (N.C. 1968)).

**\*4** The three essential elements of piercing the veil are: (1) "complete domination, not only of finances, but of policy and business practice" respecting the conduct alleged such that the business entity had "no separate mind, will, or existence of its own"; (2) the control "must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of a plaintiff's legal rights"; and (3) the individual's "control and breach of duty must proximately cause the injury or unjust loss complained of." *See Bear Hollow, L.L.C. v. Moberk, L.L.C.*, No. 5:05-CV-210, 2006 WL 1642126, at *17 (W.D.N.C. June 5, 2006) (citations omitted). Other allegations that may support a veil piercing claim include inadequate capitalization, and non-compliance with corporate formalities. *Timber Integrated Invs., LLC v. Welch*, 737 S.E.2d 809, 817 (N.C. Ct. App. 2013) (citations omitted).

The degree of control must be absolute, "to the point that [Carvana] no longer has legal or independent significance of its own." *Banks v. Theodore Banks and Southern Comfort, LLC*, No. 2022-0428-PWG, 2022 WL 17261512, at *5 (Del. Ch. Nov. 29, 2022) (citation omitted). Here, the Court finds that Mountaineer Motors has not plausibly alleged that such exclusive control exists. Plaintiff's core allegation is that Garcia Senior and Garcia Junior control the vast majority of Carvana's voting power and that Garcia Junior is the CEO, Chairman, and President of Carvana. (*See* Doc. No. 40, at 11). Yet, "[m]ere control and even total ownership of one corporation by another is not sufficient to warrant the disregard of a separate corporate entity." *Banks*, 2022 WL 17261512, at *5 (citation omitted). Similarly, Mountaineer Motors argument that the Garcias "stacked the board" with allies fails to sufficiently plead the requisite absolute control for similar reasons. (*See* Doc. No. 11).[4]

Moreover, Plaintiff must plausibly allege that the Garcias' control was used to commit fraud, violate statutory or other legal duties, or to act dishonestly in contravention of Plaintiff's rights. *See Bear Hollow*, 2006 WL 1642126, at *17. Even if Plaintiff has alleged facts showing that Carvana plausibly violated statutory and regulatory duties in the state of North Carolina, (*see* Doc. No. 25, at 12-13), it has not alleged that the Garcias directed such action or were otherwise

personally involved in the challenged conduct. Instead, Mountaineer Motors merely recites conclusory statements that the Garcias dominate the company. *Id.* at 15.

Finally, Mountaineer Motors does not plausibly allege that the Garcias' "control and breach of duty ... proximately cause[d] the injury or unjust loss complained of." *Tailored Chemical Prods., Inc. v. DAFCO Inc.*, No. 5:21-cv-00069-KDB-DSC, 2021 WL 7448761, at *4 (W.D.N.C. Dec. 8, 2021). For example, Plaintiff argues that the Garcias intended to pump up the price of Carvana stock unlawfully but does not claim that it is or was a Carvana shareholder. (*See* Doc. No. 31-1, at 17). Likewise, Plaintiff complains that Carvana and the Garcias have engaged in prior land sale transactions, but does not explain how such transactions, if impermissible, affected Plaintiff. *Id.* at 16. In short, Mountaineer Motors makes no allegations that the Garcias are personally responsible for any injury it may have suffered.

**\*5** Because Plaintiff has not plausibly alleged that the Garcias exercised complete control over Carvana or that such control hurt Plaintiff's interests, it may not maintain personal jurisdiction based on its veil piercing claims, which, together with the analysis of general and specific jurisdiction above, requires the Court to conclude that this Court lacks personal jurisdiction over the Garcias.

**2. Failure to State a Claim**

The Garcias next, but similarly, ask the Court to dismiss Plaintiff's claims because Plaintiff has failed to distinguish their personal alleged wrongful conduct from the allegations against Carvana. The Garcias argue that Plaintiff has filed a "shotgun pleading" that "fails to articulate claims with sufficient clarity to allow the defendant to frame a responsive pleading" or which makes it "virtually impossible to know which allegations of fact are intended to support which claims for relief." *Knouse v. Primecare Medical of West Virginia*, 333 F. Supp. 3d 584, 592 (S.D.W. Va. 2018) (citing *SunTrust Mortgage, Inc. v. First Residential Mortg. Servs. Corp.*, No. 3:12-CV-162, 2012 WL 7062086, at *7 (E.D. Va. Sept. 11, 2012)). A complaint that fails to distinguish which claims are asserted against which defendants is a "quintessential" shotgun pleading. *Turton v. Va. Dep't of Educ.*, No. 3:14-CV-446, 2014 WL 12539403, at *2 (E.D. Va. Sept. 23, 2014); *see also Knouse*, 333 F. Supp. 3d at 592 (granting a motion to dismiss where the complaint made numerous allegations against defendants in the "plural sense" without

distinguishing the defendants' conduct within the scope of the asserted claims).

Here, the Complaint asserts that the Garcias so dominate and control Carvana that any actions attributable to Carvana are also attributable to the Garcias. However, for the reasons discussed above, the Court finds that Mountaineer Motors has not sufficiently pled facts to pierce the corporate veil. Therefore, in the absence of independent allegations against the Garcias, the Court finds that Plaintiff has failed to meet its burden to plausibly state claims against the Garcias as individuals.

**3. Conclusion**

Because Mountaineer Motors has not pled sufficient facts to plausibly establish that this Court has jurisdiction over the Garcias, that Carvana is the mere alter ego of the Garcias or that the Garcias have themselves engaged in tortious conduct, the Court will grant the Garcias' Motion to Dismiss.

**B. Carvana**

In its Motion to Dismiss, Carvana argues that Plaintiff's UDTPA and common law unfair competition claims must fail because Mountaineer Motors lacks standing, has failed to state a claim, and the claims are preempted because the subject matter is already subject to pervasive and intricate regulation. (*See* Doc. No. 30-1). Carvana further argues that the Lanham Act claim must fail because it is inadequately pled and is barred by the doctrine of laches. Lastly, it argues that the Licensing Law claim should be dismissed because Mountaineer Motors has failed to exhaust its administrative remedies. Mountaineer Motors replies to each argument in turn, generally arguing that it has sufficiently complied with the UDTPA's statutory requirements, that the contested advertisements are literally false and are not barred by the doctrine of laches, and that the Licensing Law claim is plausibly alleged and seeks relief wholly outside the authority and jurisdiction of the DMV Commissioner.

**1. UDTPA and Common Law Unfair Competition Claims**

**\*6** Carvana contends that Mountaineer Motor's UDTPA and common law unfair competition claims should be dismissed due to a lack of standing, failure to state a claim, and because the subject matter is already governed by a pervasive and

intricate regulatory scheme. For the reasons discussed below, the Court finds that Mountaineer Motors has plausibly alleged standing regarding violations of the Licensing Law (but not standing to assert its consumer-related allegations) and that it has pled facts that plausibly state a claim for relief under the UDTPA. However, the Court also finds that Plaintiff's UDTPA and common law unfair competition claims cannot be pursued in this context because vehicle dealers are already subject to pervasive and intricate regulation under the Licensing Laws. Therefore, to permit a UDTPA claim here risks undermining the statutory and regulatory balancing of interests inherent in the extensive existing regulation of vehicle dealers. Accordingly, Plaintiff's UDTPA claim will be dismissed.

a. Standing

Carvana asserts that Mountaineer Motors lacks standing because (1) it has failed to plead an antitrust injury, (2) any injury that may have occurred would harm consumers rather than Plaintiff, and (3) allowing recovery in this case risks double-recovery because consumers could bring the same claim. Mountaineer Motors argues that it has standing under both the UDTPA and the Licensing Law.[5]

The UDTPA grants standing to

> any person shall be injured or the business of any person, firm or corporation shall be broken up, destroyed or injured by reason of any act or thing done by any other person, firm or corporation in violation of the provisions of this Chapter, such person, firm or corporation so injured shall have a right of action on account of such injury done....

N.C. Gen. Stat. § 75-16. Although the statute may be modeled on the Sherman Act, there is no statutory requirement that a plaintiff allege an antitrust injury. *Id.* Moreover, the UDTPA "is an act often noted for the breadth of its language," *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 951 F. Supp. 1224, 1230 (M.D.N.C. 1996) (citing *Winston Realty Co., Inc. v. G.H.G., Inc.*, 70 N.C. App. 374, 381 (1984), *aff'd*, 314 N.C. 90 (1985)), and is intended to create "civil legal means to maintain ethical standards of dealings between persons engaged in business, and between persons engaged in business and the consuming public within this State, to the end that good faith and fair dealings between buyers and sellers at all levels of commerce be had in this State." *Nobel v. Foxmoor Group, LLC*, 868 S.E.2d 30, 34 (N.C. 2022) (quoting *Bhatti v. Buckland*, 400 S.E.2d 440, 443 (N.C. 1991)) (cleaned up). Thus, no

allegation of antitrust injury is required to have standing under the UDTPA. The Licensing Law is no different: it grants standing to "any motor vehicle dealer who is or may be injured by a violation of a provision of this Article ..." N.C. Gen. Stat. § 20-308.1(a). Therefore, because the statutes do not require an antitrust injury, Mountaineer Motors is not required to allege one.[6]

**\*7** Taking the allegations in the Complaint as true, Mountaineer Motors has plausibly alleged it suffered a cognizable injury. Plaintiff stated that it has "suffered and continue[s] to suffer damages, including loss of profits and loss of market share" because it is unable to compete with Carvana's "compliance-cost cutting." (Doc. 25, ¶ 87). The Complaint further asserts that Carvana's alleged conduct "unlawfully, unfair, and uniquely expands the inventory of Carvana." *Id.* at ¶ 96. This, Mountaineer Motors pled, led directly to lost sales. *See id.* at ¶ 103 (noting a 23% decrease in sales between 2017-18 and a further 27% decrease in sales between 2018-19). Accordingly, while Mountaineer Motors' UDTPA claim will not be allowed to proceed for other reasons, Mountaineer Motors has plausibly alleged that Carvana's conduct proximately caused Plaintiff's injury and so it has standing to assert its UDTPA claim.

b. Failure to State a Claim

Carvana next argues that Mountaineer Motors has failed to state a plausible UDTPA or common-law unfair competition claim because it cannot show that Plaintiff itself relied on alleged misrepresentations to consumers and because the alleged violations of the Licensing Law are mere "legal conclusions." (*See* Doc. No. 30-1, at 11, 13). Mountaineer Motors responds that it has plausibly alleged its UDTPA claim by alleging that Carvana uses misleading advertisements and committed a series of regulatory violations, that collectively constitute unfair and deceptive practices, leading to Plaintiff's injuries. (*See* Doc. No. 40, at 16).

To state a claim for unfair and deceptive trade practices under the UDTPA, a plaintiff must plausibly allege that the Defendant engaged in "(1) an unfair or deceptive act or practice or an unfair method of competition; (2) in or affecting commerce; (3) that proximately cause[d] actual injury to the plaintiff or to his business." *Harty v. Underhill*, 710 S.E.2d 327, 332 (N.C. Ct. App. 2011).

Where a UDTPA claim is based upon alleged misrepresentations or fraudulent statements, such as the claim that Carvana used misleading advertisements, the plaintiff must meet the heightened standard of Rule 9(b) and make its allegations with particularity. *See Cross v. Ciox Health, LLC*, 438 F. Supp. 3d 572, at 584-85 (E.D.N.C. 2020).[7] Further, North Carolina law requires that plaintiffs plead actual reliance on an alleged misrepresentation to show proximate cause. *See Bite Busters, LLC v. Burris*, 2021 NCBC 19, 2021 WL 1161316, at \*10 (N.C. Sup. Ct. Mar. 25, 2021) (citing *Bumpers v. Community Bank of Northern Virginia*, 747 S.E.2d 220, 225 (N.C. 2013); *see also D C Custom Freight, LLC v. Tammy A. Ross & Assocs., Inc.*, 848 S.E.2d 552, 562 (N.C. Ct. App. 2020)) ("It is clear from [Bumpers] that only the direct reliance of the plaintiff is sufficient to support a UDTP[A] claim based on misrepresentation. The holding in Bumpers precludes a UDTP[A] claim ... in which a third party's reliance caused damage to the plaintiff."). Here, Plaintiff has not identified a single customer who would have bought a car from them but-for the alleged unfair and deceptive advertisements. Moreover, it has not alleged that Mountaineer Motors itself relied on any of the advertisements. Instead Plaintiff offers conclusory allegations that Carvana's advertisements "misappropriate[ ] Plaintiff's commercial advantage as a Bona Fide Used Car Dealer in Caldwell County ..." (Doc. No. 25, ¶ 145). Thus, the Court finds that the UDTPA claim, to the extent it is based on misrepresentations made to consumers, has not been plausibly alleged.

**\*8** However, North Carolina law provides that violations of a regulatory statute, such as the Licensing Law, which governs businesses or their activities "may also be a violation of N.C. Gen. Stat. § 75-1.1." *Drouillard v. Keister Williams Newspaper Services, Inc.*, 423 S.E.2d 324, 326 (N.C. Ct. App. 1992). But, merely alleging a regulatory violation is not enough; a Plaintiff must also plausibly allege that the violation was the proximate cause of its injuries. *See id.* ("If the violation of the Trade Secrets Protection Act satisfies this three prong test, it would be a violation of N.C. Gen. Stat. § 75–1.1.").

Here, Mountaineer Motors alleged several violations of the Licensing Law, which taken "on the assumption that all the allegations in the complaint are true (even if doubtful in fact)," *Twombly*, 550 U.S. at 555-56 (citations omitted), could plausibly support Plaintiff's claim that Carvana has engaged in unfair and deceptive practices. Specifically, the Court notes that the DMV determined in an administrative decision that Carvana violated several sections of the Licensing Laws, including one violation which the DMV found constituted an unfair method of competition or unfair deceptive act or practice. (*See* Doc. No. 25, ¶ 37). Also, as discussed in the standing analysis, Mountaineer Motors has plausibly alleged that Carvana's conduct hurt its own sales. In sum, at least to the extent of these elements (i.e. subject to the required further analysis of the pervasiveness of the regulations), Plaintiff could possibly meet the relatively low Rule 12(b)(6) standard to pursue its UDTPA claim.

### c. Pervasive Regulation

As noted above, while UDTPA claims may be based on alleged regulatory violations that injure competitors, there is a limit to such claims to avoid having UDTPA claims supplant an extensive regulatory scheme (and the careful balancing of remedies reflected in the regulations). Carvana argues that Plaintiff's UDTPA claims must fail because the subject matter is already subject to pervasive and intricate regulation. (*See* Doc. No. 30-1, at 17). The Court agrees with Carvana (and notes that Mountaineer Motors failed to respond to this ultimately determinative argument).[8]

"North Carolina courts have refused to apply the UDTPA to ... matters already under 'pervasive and intricate regulation' by other statutory schemes that contain separate enforcement, supervisory, and remedial provisions.' " *Champion Pro Consulting Grp., Inc. v. Impact Sports Football, LLC*, 845 F.3d 104, 110 (4th Cir. 2016) (quoting *Hagy v. Advance Auto Parts, Inc.*, No. 3:15–CV–509–RJC–DCK, 2016 WL 5661530, at \*2 (W.D.N.C. Sept. 28, 2016)). Accordingly, the UDTPA and its provision for treble damages are "inappropriate 'where there already exists an extensive regulatory regime to address the violations' " *Id.* (quoting *Hagy*, 2016 WL 5661530, at \*2); *see also Skinner v. E.F. Hutton & Co. Inc.*, 333 S.E.2d 236, 241 (N.C. 1985). Where a law "provides for its own enforcement, supervision, and remediation," it is more likely that the relevant subject matter is regulated by a pervasive and intricate statutory scheme. *See Hagy*, 2016 WL 5661530, at \*3 (W.D.N.C. Sept. 28, 2016) ("As noted by Defendants, the [Medicare statute] provides for its own enforcement, supervision, and remediation. Medicare [ ] claims are clearly regulated by a pervasive and intricate statutory scheme—the [Medicare statute]—and that scheme provides a remedy for violations and a means to obtain that remedy. On this basis, the UDTPA does not apply to Plaintiff's claims and should be dismissed.").

**\*9** The Licensing Law in dispute gives the DMV the authority to "deny, suspend, place on probation, or revoke a license issued under this Article" for certain enumerated grounds, including failure to have an established salesroom, willfully defrauding any retail or wholesale buyer or using unfair methods of competition that causes actual damages to the buyer, or "[k]nowingly advertising by any means, any assertion, representation or statement of fact which is untrue ..." N.C. Gen. Stat. § 20-294(3), (4), (6), (7). The DMV Commissioner is expressly authorized to "prevent unfair methods of competition and unfair or deceptive acts or practices and other violations of the [Licensing Law]." § 20-301. The law further establishes notice and hearing requirements, *see* § 20-296, and even allows the Commissioner to levy civil penalties, *see* § 20-287(b). Moreover, the fact that the DMV *did* issue administrative findings regarding much of the subject matter in this case is further evidence that there is pervasive and intricate regulation in this area. Perhaps even more significantly, the Licensing Law provides a civil cause of action, which is further evidence that it would be inappropriate to bring a claim here under the UDTPA. *See* § 20-308.1. Thus, the Court finds that allowing the UDTPA claim to go forward would "risk improperly creating 'overlapping supervision, enforcement, and liability' " with respect to vehicle dealers. If every regulatory violation in the ultracompetitive vehicle dealer industry became a potential UDTPA violation (together with the remedy of trebled damages and possible attorneys' fees) upon the allegation of a competing dealer that it had lost sales, then the various rulings of Courts and juries would effectively replace the regulatory balance reflected in the Licensing Law. *See Champion Pro Consulting Group, Inc.,* 845 F.3d at 111 (quoting *Hagy,* 2016 WL 5661530, at \*2). Therefore, Plaintiff's UDTPA claim will be dismissed.

## 2. False Advertising Claims under the Lanham Act

Carvana argues that Plaintiff's claims under the Lanham Act fail because Mountaineer Motors has not plausibly alleged that Carvana's advertisements meet the elements of the Lanham Act and that the claim is barred under the doctrine of laches. In response, Mountaineer Motors argues that it has plausibly alleged a violation of the Lanham Act and that its claim is timely because the analogous state statute has a four-year, rather than three-year, statute of limitations.

To state a claim for false advertising under the Lanham Act, a plaintiff must plausibly argue that "(1) the defendant made a false or misleading description of fact or representation of fact in a commercial advertisement about his own or another's product that (2) is material and (3) actually deceives or has the tendency to deceive a substantial segment of its audience (4) after being placed in interstate commerce, (5) causing the plaintiff injury." *First Data Merch. Servs. Corp. v. SecurityMetrics, Inc.,* 672 F. App'x 229, 234 (4th Cir. 2016) (citation omitted).

First, and foremost, the advertisements at issue are not false or misleading. The contested Carvana advertisements claim that Carvana has "used cars *for sale*" in places such as Hickory, North Carolina. (Doc. No. 25, ¶165) (emphasis supplied). This is true. Indeed, Plaintiff bases its lawsuit on the allegation that Carvana made car sales to customers in Hickory and elsewhere that hurt its business. Moreover, § 20-292(b) of the Licensing Law allows motor vehicle dealers to "deliver[ ] a motor vehicle purchased or leased by a customer to the customer's home or place of business ..." The law similarly allows the customer "to execute forms and other documents relating to vehicle purchase, lease, titling, registration, financing, insurance, ... at the customer's home or place of business by any employee or authorized agent of the dealer." *Id.* Therefore, to say that a car, be it based in Charlotte or Raleigh (or anywhere else in the state, for that matter), is "for sale" in Hickory is both true and lawful, not false or misleading. Moreover, Plaintiff admits that Carvana does not advertise where the offered vehicle is physically located. (Doc. No. 25, ¶ 60). Failure to establish any one element of a false advertising claim is "fatal;" therefore, Plaintiff's Lanham Act claim cannot proceed. *See Verisign, Inc. v. XYZ.COM, LLC,* 848 F.3d 292, 299 (4th Cir. 2017) (quoting *Design Res., Inc. v. Leather Indus. of Am.,* 789 F.3d 495, 501 (4th Cir. 2015)).

Even though the truth of the challenged advertisement is dispositive, the Court will address the remaining elements for the sake of completeness. The second and third elements, whether the statement is material and actually deceives its audience, fail for similar reasons. If an "advertisement is literally false, a violation may be established without evidence of consumer deception." *Scotts Co. v. United Industries Corp.,* 315 F.3d 264, 273 (4th Cir. 2002). However, as discussed above, this advertisement is not literally false. Because Mountaineer Motors makes no allegation that Carvana is not delivering the vehicles as advertised or that customers were told that the advertised car is physically

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

located nearby (which they were not), Plaintiff fails to plead any sort of material consumer deception regarding these advertisements. Thus, it has failed to plausibly plead the second and third elements of the claim.

**\*10** Next, the Court also finds that Mountaineer Motors has not plausibly alleged that Carvana was the proximate cause of the Lanham Act injury. "Diversion of sales to a direct competitor may be the paradigmatic direct injury from false advertising." *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 138 (2014). A plaintiff can also be injured by "a lessening of goodwill associated with its product." *Verisign*, 848 F.3d at 229 (quoting *Design Res., Inc.*, 789 F.3d at 501). However, the Court must dismiss a Lanham Act claim where the complaint "does not identify a single consumer who withheld or cancelled business with it or pointed to a particular quantum of diverted sales or loss of goodwill and reputation resulting directly from reliance on any false or misleading representations by Defendants ..." *Wall & Assocs. Inc. v. Better Bus. Bureau of Cent. Virginia., Inc.*, 685 F. App'x 277, 279 (4th Cir. 2017). Correlation is insufficient to show causation. *Id.* at 300-01 ("That analysis suffers from what we have identified as a "fatal flaw" in calculating Lanham Act damages: It assumes rather than demonstrates that every .xyz registration during the relevant time period was the result of XYZ's allegedly false statements ..."); *see also PBM Products, LLC v. Mead Johnson & Co.*, 639 F.3d 111, 122 (4th Cir. 2011) ("The fatal flaw in Mead Johnson's economic information was that its expert assumed that every sale PBM made was attributable to the "compare to" statement on the product. As a result, Mead Johnson failed to show that it suffered damages that were caused by the statement.").

Here, Mountaineer Motors failed to allege with any specificity that a consumer who would have otherwise bought a car from Plaintiff instead bought a car from Carvana because of the advertisements. It merely asserted that its sales dropped at the same time as Carvana's presence in the North Carolina market grew. (*See* Doc. No. 25, ¶ 103). Under either the Rule 8 or Rule 9(b) pleading standards, correlation is insufficient to prove causation related to the subsequent injury.[9] Therefore, Mountaineer Motors has not plausibly alleged that Carvana violated § 1125(a) of the Lanham Act.

Moreover, the claim is barred by the doctrine of laches. The Lanham Act does not have a statute of limitations and so courts use the doctrine of laches to determine if false advertising claims are timely. *See What–A–Burger of Virginia*

*v. Whataburger of Corpus Christi, Texas*, 357 F.3d 441, 449 (4th Cir. 2004). "When a false advertising plaintiff files suit outside of the statute of limitations, both elements of laches—unreasonable delay and prejudice—are strongly presumed." *Id.* (citing *EEOC v. The Great Atlantic & Pacific Tea Co.*, 735 F.2d 69, 80 (3d Cir. 1984)). Importantly, "the presumption of laches is triggered if any part of the claimed wrongful conduct occurred beyond the limitations period." *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 837 (9th Cir. 2002), *cited with approval by PBM Products, LLC*, 639 F.3d at 122. Specifically, the limitations period for the Lanham Act is borrowed from an analogous state statute. *See PBM Products, LLC*, 639 F.3d at 121 (citations omitted).

Although no court has directly addressed which North Carolina state statute is the appropriate analogue, the analogous statute for the wrongful conduct alleged here is North Carolina's fraud statute. *See PBM Products, LLC*, 639 F.3d at 121 (using the Virginia fraud statute, Va. Cod. § 8.01-243(A), as the analogous state statute for a false advertising claim under the Lanham Act); *see also Unlimited Screw Products, Inc. v. Malm*, 781 F. Supp. 1121, 1125 (E.D. Va. 1991) ("A number of courts have concluded that claims under section 43(a) of the Lanham Act are most analogous to fraud claims.").[10] The North Carolina fraud statute has a three-year limitations period. *See* N.C. Gen. Stat. § 1-52(9).

**\*11** Plaintiff first noticed an annual drop in sales in 2018. (*See* Doc. No. 25, ¶ 103). However, Mountaineer Motors waited until 2022, four years later, to commence this suit, (Doc. No. 1), triggering the presumption of laches. *See Jarrow Formulas, Inc.*, 304 F.3d at 837. Mountaineer Motors provides no reason why it waited several years to file this suit, even when it alleges that it noticed another decrease in sales in 2019. In fact, Plaintiff makes no argument as to why it waited four years to file this suit. (*See* Doc. No. 40, at 31-32). Accordingly, the Court finds that Plaintiff's Lanham Act claim is also barred by the doctrine of laches.

### 3. Licensing Law Claim

Plaintiff's last claim is that Carvana violated the Licensing Law. Carvana argues that claim fails because Mountaineer Motors lacks statutory authorization to bring the suit. A Plaintiff is authorized under the Licensing Law to "bring an action for damages and equitable relief, including injunctive relief, in any court of competent jurisdiction with regard to any matter not within the jurisdiction of the Commissioner [of

the DMV] or that seeks relief wholly outside the authority or jurisdiction of the Commissioner to award." N.C. Gen. Stat. § 20-308.1. The Court finds that the subject matter of this case is within the jurisdiction of the Commissioner; therefore, Plaintiff is not authorized to bring a Licensing Law claim.

Plaintiff argues that it can bring a Licensing Law claim because it seeks trebled damages. While the Commissioner does lack "the authority to award damages, let alone treble damages," those damages must be "the only relief that Plaintiff[ ] [is] seeking." *Southern States Imports, Inc. v. Subaru of Am., Inc.*, 2007 WL 9718537 (E.D.N.C. 2007). In other words, Plaintiff can garner its statutory authorization only by seeking forms of relief that fall "*wholly outside*" the Commissioner's authority or jurisdiction. N.C. Gen. Stat § 20-308.1 (emphasis supplied). Here, Plaintiff seeks restitution, declaratory relief, injunctive relief, and an award of reasonable attorneys' fees and costs. (Doc. No. 25, ¶ 193). At a minimum, injunctive relief is clearly within the Commissioner's authority to grant, *see* N.C. Gen. Stat. § 20-294(3), (4), (6), (7), and so the relief Plaintiff seeks is not wholly outside the Commissioner's authority or jurisdiction.

Therefore, Plaintiff's claim under the Licensing Law fails because the relief sought does not fall wholly outside the Commissioner's authority or jurisdiction.

## IV. ORDER

**NOW THEREFORE IT IS ORDERED THAT:**

1. The Garcia's Motion to Dismiss (Doc. No. 31) is **GRANTED**; and

2. Carvana's Motion to Dismiss (Doc. No. 30) is **GRANTED**; and

3. The Clerk is directed to close this matter in accordance with this Order.

**SO ORDERED ADJUDGED AND DECREED.**

**All Citations**

Slip Copy, 2023 WL 6931787

## Footnotes

1    For the purposes of this order, "Carvana" includes Defendants Carvana Group, LLC, Carvana, LLC, Carvana Cars, LLC, Carvana FAC, LLC, Carvana Logistics, LLC, and Carvana Co., LLC. The Garcias, when discussed individually, will be referred to as Garcia Senior and Garcia Junior.

2    Unless otherwise noted, all paragraph markers refer to the Amended Complaint (the "Complaint") (Doc. No. 25).

3    The Garcias argue that federal courts in North Carolina generally apply the law of the state of incorporation when analyzing a claim to pierce the corporate veil. (*See* Doc. No. 31-1, at 13) (citing *Dewitt v. Hutchins*, 309 F. Supp. 2d 743, 751 (M.D.N.C. 2004)); *Richmond v. Indalex Inc.*, 308 F. Supp. 2d 648, 658 (M.D.N.C. 2004). Here, that would mean applying Delaware law. For its part, Plaintiff notes that the overall standard for piercing the corporate veil is consistent in North Carolina and Delaware, but otherwise refers only to North Carolina law. (Doc. No. 40, at 9-12).

     The North Carolina Supreme Court has not definitively answered the question of which law applies to a claim for piercing the corporate veil. *See Loray Master Tenant, LLC v. Foss N.C. Mill Credit 2014 Fund I, LLC,* No. 19 CVS 1024, 2021 WL 661910, at *9 (N.C. Super. Feb. 18, 2021). Although some state courts have applied North Carolina law in piercing corporate veil, rather than the law of the state of incorporation, this Court need not wade into this issue because Plaintiff has not satisfied the elements to pierce the corporate veil under either North Carolina or Delaware law. *See Bruce-Terminix Co. v. The Terminix Int'l Co. P'ship,* No. 1:20-CV-962, 2023 WL 2306936, at *8 (M.D.N.C. Mar. 1, 2023) (explaining that the court "need not decide the choice of law issue here because [Plaintiff] has not satisfied the elements to pierce the corporate veil under either North Carolina law or Delaware law."). Therefore, the Court will draw on shared principals in both sets of case law.

4    Plaintiff states that a Delaware court found that at least one member of the Carvana Board of Directors is not independent from Garcia Senior. (Doc. No. 25, at 3) (citing *In re Carvana Co. Stockholders Litigation*, No. 2020-0415-KSJM, 2022 WL 2352457 (June 30, 2022)). However, that case did not involve claims to pierce the corporate veil, but instead involved allegations that the Garcias breached their fiduciary duties to Carvana by setting up a direct offering of common stock that was allegedly below market value. *See Id.* at *1. Moreover, in the same decision, the Chancellery Court noted that both

Case 5:23-cv-00059-KDB-DCK    Document 109-1    Filed 09/16/24    Page 80 of 81

parties agreed that half of the board members were independent and disinterested in the relevant transaction. *See Id.* at *8 ("And Plaintiffs do not challenge the independence or disinterestedness of directors Maroone, Parikh, or Quayle.").

5      Because a common law claim for unfair competition and a UDTPA claim are "not appreciably different," the Court considers them in the same analysis. *Blue Rhino Global Sourcing, Inc. v. Well Traveled Imports, Inc.*, 888 F. Supp. 2d 718, 721 n.1 (M.D.N.C. 2012) (quoting *BellSouth Corp. v. White Directory Publishers, Inc.*, 42 F. Supp. 2d 598, 615 (M.D.N.C. 1999)).

6      Carvana also argues that allowing Plaintiff to bring its UDTPA claim risks double-recovery because both Mountaineer Motors and future consumer plaintiffs could sue for the same wrong. (*See* Doc. 30-1, at 9). Carvana's argument is based on a series of cases which hold that plaintiffs lack antitrust standing when they are only indirectly impacted by the alleged conduct and damages were speculative. *Id.* However, because Mountaineer Motors, as explained above, is not alleging an antitrust injury, these cases are unpersuasive. Furthermore, this would not be a case of double recovery. Mountaineer Motors is contesting conduct that consumers might themselves contest, but to the extent it does so to redress *its own* injuries, it is not a double recovery.

7      Plaintiff argues that the advertisement allegations are used "primarily of the purpose of establishing how Carvana's unfair and deceptive actions are against public policy declared in the relevant state and federal laws governing used motor vehicle dealers and sales in North Carolina." (Doc. No. 40, at 23). Plaintiff contends, therefore, that it need not meet the heightened Rule 9(b) standard. The Court disagrees. In its Complaint, Plaintiff clearly and repeatedly alleges that Carvana "falsely advertised ... to the consuming public" and that it "misleads customers, and, in so doing, misappropriates Plaintiff's commercial advantage ..." (*See* Doc. No. 25 ¶ 138; *see also* ¶ 145). It seems disingenuous for Plaintiff to argue that its UDTPA claim is not based on misrepresentation when it specifically alleged in its Complaint that Defendants' advertisements violate the UDTPA.

8      Carvana contends that Plaintiff has conceded this issue by failing to respond to the argument in its brief. (*See* Doc. No. 48, at 3). However, because the Court's strong preference is to address issues on the merits when it can reasonably do so, the argument will be discussed in full even in the absence of contrary argument.

9      The parties disagree over whether the heightened pleading standards in Rule 9(b) apply to a false advertising claim under the Lanham Act. The Fourth Circuit does not appear to have addressed this issue, but because the Court finds that Defendant has not met even the lower Rule 8 standard, the Court need not reach this issue. *See Nutrition & Fitness, Inc. v. Mark Nutritionals, Inc.*, 202 F. Supp. 2d 431, 434-35 (M.D.N.C. 2002).

10     Mountaineer Motors protests that the UDTPA, which has a four-year statute of limitations, is the correct analogue. (*See* Doc. No. 40, at 32). However, not only does the case Plaintiff cites involve trademark infringement and false designation of origin rather than false advertising, but the cited court decision itself noted that had the parties not both assumed a four-year limitation applied, it would have applied the three-year limitation under the North Carolina fraud statute because that was what "the court would find the statute most analogous to the Plaintiff's [claims] to be." *WorkingFilms, Inc. v. Working Narratives, Inc.*, No. 7:20-CV-00139-M, 2021 WL 1196189, at *4 n.2 (E.D.N.C. 2021).

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.